Jonathan Jantzen, Attorney General, SBN 016220
Samuel Daughety, Assistant Attorney General, SBN 023170
Office of Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ  85634
(520) 383-3410
jonathan.jantzen@tonation-nsn.gov
samuel.daughety@tonation-nsn.gov

Seth P. Waxman (*Pro hac vice*)
Danielle Spinelli (*Pro hac vice*)
Annie L. Owens (*Pro hac vice*)
Shivaprasad Nagaraj (*Pro hac vice*)
Sonya L. Lebsack (*Pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
seth.waxman@wilmerhale.com
danielle.spinelli@wilmerhale.com
annie.owens@wilmerhale.com
shiva.nagaraj@wilmerhale.com
sonya.lebsack@wilmerhale.com

*Counsel for Defendant Tohono O'odham Nation*

COUNSEL CONTINUED ON FOLLOWING PAGE

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| THE STATE OF ARIZONA, THE GILA RIVER INDIAN COMMUNITY, and THE SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY,<br><br>                              Plaintiffs,<br><br>        v.<br><br>THE TOHONO O'ODHAM NATION,<br><br>                              Defendant. | Case No. 2:11-cv-296-DGC<br><br>**THE TOHONO O'ODHAM NATION'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW**<br><br>**ORAL ARGUMENT REQUESTED** |

1

2

Michael J. Rusing, SBN 006617
Todd H. Hardy, SBN 023675
RUSING LOPEZ & LIZARDI, PLLC
6363 N. Swan Road, Suite 151
Tucson, AZ  85718
(520) 792-4800
mrusing@rllaz.com
thardy@rllaz.com

*Counsel for Defendant Tohono O'odham Nation*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND .................................................................................................................. 1

I.     THE STATUTORY SCHEME ................................................................................. 1

II.    THE NATION'S 1993 GAMING COMPACT WITH ARIZONA ............................. 3

III.   PROPOSITION 202 AND THE NATION'S 2002 GAMING COMPACT WITH
       ARIZONA ................................................................................................................ 4

IV.    THE SETTLEMENT PROPERTY AND THE PROCEDURAL HISTORY OF THIS
       CASE ...................................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

I.     IGRA AUTHORIZES GAMING ON THE SETTLEMENT PROPERTY (COUNT 1) ............... 10

       A.     The LRA Is A "Settlement Of A Land Claim" Under IGRA .......................... 11

       B.     The LRA Is A "Settlement Of A Land Claim" Under DOI's
              Regulations ............................................................................................. 12

              1.     The Nation had "land claims" against the United States ...................... 12

                     a.     The Nation had claims "concerning the impairment of
                            title or other real property interest or loss of
                            possession" .............................................................................. 13

                     b.     The Nation's claims meet the remaining requirements ............. 16

              2.     The LRA was a "settlement" of the Nation's land claims .................... 18

II.    THE COMPACT DOES NOT IMPLICITLY BAR GAMING ON THE SETTLEMENT
       PROPERTY (COUNTS 1 AND 2) ........................................................................... 19

       A.     The Compact Should Be Construed According To Federal Law .................... 19

       B.     No Implied Term In The Compact Bars Gaming On The Settlement
              Property (Count 1) ................................................................................... 22

              1.     The Compact is unambiguous, and its written terms cannot be
                     varied by extrinsic evidence under federal or Arizona law .................. 23

2.   The Compact contains no implied additional terms ............................. 27

C.   Plaintiffs' Implied-Covenant Claim (Count 2) Fails As A Matter Of
Law .......................................................................................................... 30

III.   THE NATION IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
PROMISSORY-ESTOPPEL CLAIM (COUNT 3) ..................................................... 32

A.   Plaintiffs' Promissory-Estoppel Claim Is Barred By The Nation's
Sovereign Immunity .............................................................................. 32

B.   Plaintiffs' Promissory-Estoppel Claim Fails As A Matter Of Law ................. 34

CONCLUSION ................................................................................................................ 35

CERTIFICATE OF SERVICE

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

Page(s)

*A.K. Management v. San Manuel Band*, 789 F.2d 785 (9th Cir. 1986) ................................. 33

*Aguilar v. International Longshoremen's Union*, 966 F.2d 443 (9th Cir. 1992) .................. 34

*Alabama v. North Carolina*, 130 S. Ct. 2295 (2010) ................................................ 30

*All-Tech Telecom v. Amway Corp.*, 174 F.3d 862 (7th Cir. 1999) .......................................... 35

*Anderson v. Preferred Stock Food Markets*, 854 P.2d 1194 (Ariz. Ct. App. 1993) ......... 27, 28

*Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003) ............. 20

*Best Western International v. Furber*, 2008 WL 4182827 (D. Ariz. Sept. 5, 2008) ............. 28

*Cabazon Band v. Wilson*, 124 F.3d 1050 (9th Cir. 1997) ............................... 21, 23, 25, 26, 33

*Cachil Dehe Band v. California*, 618 F.3d 1066 (9th Cir. 2010) ........................................ 20

*Cardon v. Cotton Lane Holdings*, 841 P.2d 198 (Ariz. 1992) ................................................ 21

*Center for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012) ........................... 12

*Chanay v. Chittenden*, 563 P.2d 287 (Ariz. 1977) ........................................................ 34, 35

*Chewning v. Palmer*, 650 P.2d 438 (Ariz. 1982) ................................................... 34

*Chuidian v. Philippine National Bank*, 976 F.2d 561 (9th Cir. 1992) ................................ 21

*Citizens Against Casino Gambling v. Hogen*, 2008 WL 2746566 (W.D.N.Y. July 8, 2008) ........ 17

*City of Roseville v. Norton*, 348 F.3d 1020 (D.C. Cir. 2003) ............................................ 12

*Craig-Buff Ltd. Partnership v. United States*, 69 Fed. Cl. 382 (2006) ................................ 34

*Crow Tribe v. Racicot*, 87 F.3d 1039 (9th Cir. 1996) ............................................ 34

*Cuyler v. Adams*, 449 U.S. 433 (1981) ............................................................... 20

*Day v. American Seafoods*, 557 F.3d 1056 (9th Cir. 2009) ............................................. 29

*Del-Rio Drilling Programs v. United States*, 146 F.3d 1358 (Fed. Cir. 1998) ...................... 15

*Double AA Builders v. Grand State Construction*, 114 P.3d 835 (Ariz. Ct. App. 2005) .......... 33

*Ervco, Inc. v. Texaco Refining & Marketing*, 422 F. Supp. 2d 1084 (D. Ariz. 2006) ............ 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Flores v. American Seafoods*, 335 F.3d 904 (9th Cir. 2003) .................................................. 30

*Florida v. Seminole Tribe*, 181 F.3d 1237 (11th Cir. 1999) ...................................... 33

*Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir. 1996) ..................... 20

*Gila River Indian Community v. United States*, 776 F. Supp. 2d 977 (D. Ariz. 2011), *aff'd*, 697 F.3d 886 (9th Cir. 2012) ................................................................. 9

*Grand Traverse Band v. Office of United States Attorney Western District Michigan*, 369 F.3d 960 (6th Cir. 2004) ................................................... 12

*Hercules, Inc. v. United States*, 516 U.S. 417 (1996) .............................................. 34

*Higginbottom v. State*, 51 P.3d 972 (Ariz. Ct. App. 2002)........................................ 35

*Institute of London Underwriters v. Sea-Land Service*, 881 F.2d 761 (9th Cir. 1989)............. 24

*Jablon v. United States*, 657 F.2d 1064 (9th Cir. 1981) ................................... 33, 34

*Kennewick Irrigation District v. United States*, 880 F.2d 1018 (9th Cir. 1989) ................... 20

*Kiowa Tribe v. Manufacturing Technologies*, 523 U.S. 751 (1998) ..................... 33

*Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999)...... 23, 24

*Lane v. Peña*, 518 U.S. 187 (1996) .................................................................. 32

*Long v. City of Glendale*, 93 P.3d 519 (Ariz. Ct. App. 2004) ........................... 25, 26

*Mann v. GTCR Golder Rauner*, 425 F. Supp. 2d 1015 (D. Ariz. 2006)............................... 35

*Market Street Associates v. Frey*, 941 F.2d 588 (7th Cir. 1991) ............................... 32

*Mayo Foundation for Medical Education & Research v. United States*, 131 S. Ct. 704 (2011) ...................................................................................... 12

*McAbee Construction v. United States*, 97 F.3d 1431 (Fed. Cir. 1996) ............................ 28

*McKnight v. Torres*, 563 F.3d 890 (9th Cir. 2009).................................................. 30

*Menominee Tribe v. United States*, 391 U.S. 404 (1968) ........................................... 14

*Muhammad v. Comanche Nation Casino*, 742 F. Supp. 2d 1268 (W.D. Okla. 2010)...... 20, 21

*Narramore v. United States*, 30 Fed. Cl. 383 (1994)................................................ 15

*Narramore v. United States*, 960 F.2d 1048 (Fed. Cir. 1992) ................................. 15

*Nehmer v. Department of Veterans Affairs*, 494 F.3d 846 (9th Cir. 2007) .................... 23, 24

iv

*New Jersey v. Delaware*, 552 U.S. 597 (2008) ........................................................ 29

*Nollan v. California Coastal Commission*, 483 U.S. 825 (1987) ........................... 14

*Ogden v. CDI Corp.*, 2010 WL 2662274 (D. Ariz. July 1, 2010) ........................... 31

*Pinnacle Peak Developers v. TRW Investment*, 631 P.2d 540 (Ariz. Ct. App. 1980) ........... 29

*R.J. Widen Co. v. United States*, 357 F.2d 988 (Ct. Cl. 1966) ............................... 15

*Rawlings v. Apodaca*, 726 P.2d 565 (Ariz. 1986) ................................................. 30

*Rincon Band v. Schwarzenegger*, 602 F.3d 1019 (9th Cir. 2010) .................... 19, 32

*RUI One v. City of Berkeley*, 371 F.3d 1137 (9th Cir. 2004) ............................... 28

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) ......................................... 32

*Seminole Tribe v. Florida*, 517 U.S. 44 (1996) .............................................. 19, 20

*South Dakota v. Bourland*, 508 U.S. 679 (1993) ................................................. 15

*Southwest Savings & Loan Ass'n v. SunAmp Systems*, 838 P.2d 1314 (Ariz. Ct. App. 1992) ....... 31

*Sylvania Electric Products v. United States*, 458 F.2d 994 (Ct. Cl. 1972) ......... 28

*Taylor v. State Farm Mutual Automobile Insurance*, 854 P.2d 1134 (Ariz. 1993) ......... 26, 27

*Thompson v. SunTrust Mortgage*, 2011 WL 3320774 (D. Ariz. Aug. 2, 2011) ........... 31

*United States v. Basin Electric Power Cooperative*, 248 F.3d 781 (8th Cir. 2001) ......... 30, 31

*United States v. Cress*, 243 U.S. 316 (1917) ...................................................... 15

*United States v. Dion*, 476 U.S. 734 (1986) ....................................................... 14

*United States v. Imperial Irrigation District*, 799 F. Supp. 1052 (S.D. Cal. 1992) ......... 14, 16

*United States v. James*, 980 F.2d 1314 (9th Cir. 1992) ....................................... 32

*United States v. Lindsay*, 346 U.S. 568 (1954) .................................................. 17

*United States v. Lynah*, 188 U.S. 445 (1903) ..................................................... 15

*United States v. Milner*, 583 F.3d 1174 (9th Cir. 2009) ..................................... 16

*United States v. Triple A Machine Shop*, 857 F.2d 579 (9th Cir. 1988) ............... 27

*United States v. Winnebago Tribe*, 542 F.2d 1002 (8th Cir. 1976) ..................... 14

*United States ex rel. Citizen Band Potawatomi Indian Tribe v. Enterprise
        Management Consultants*, 883 F.2d 886 (10th Cir. 1989) .......................................... 33

*Velarde v. PACE Membership Warehouse*, 105 F.3d 1313 (9th Cir. 1997).................... 26, 27

*Wagenseller v. Scottsdale Memorial Hospital*, 710 P.2d 1025 (Ariz. 1985)................... 30, 31

*Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons*, 38 P.3d 12
        (Ariz. 2002).............................................................................................................. 31

*West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22 (1951) ......................................................... 20

*Wyandotte Nation v. National Indian Gaming Commission*, 437 F. Supp. 2d 1193
        (D. Kan. 2006) ......................................................................................................... 13

## DOCKETED CASES

*Gila River Indian Community v. United States*, No. 10-cv-1993 (D. Ariz.)............................ 10

## CONSTITUTIONAL PROVISIONS, STATUTES, REGULATIONS, AND
## LEGISLATIVE MATERIALS

U.S. Const.
        art. I, §8, cl. 3 ............................................................................................................ 16
        art. I, §10, cl. 3 ........................................................................................................... 20
        amend. V .................................................................................................................... 16

25 U.S.C.
        §177............................................................................................................................. 14
        §1774........................................................................................................................... 17
        §§2701-2721 ................................................................................................................. 2
        §2702 ......................................................................................................................... 2, 19
        §2702(1) ...................................................................................................................... 11
        §2703(4)(A) ........................................................................................................ 2, 3, 4, 24
        §2703(4)(B) ....................................................................................................... 2, 3, 24
        §2710(d)(1) .................................................................................................................... 2
        §2710(d)(1)(C) ........................................................................................................... 19
        §2710(d)(3) .................................................................................................................... 2
        §2710(d)(3)(A) ........................................................................................................... 19
        §2710(d)(3)(B) ...................................................................................................... 20, 22
        §2710(d)(3)(C) ........................................................................................................... 19
        §2710(d)(7)(A)(ii) ............................................................................................... 9, 32, 34
        §2719............................................................................................................... *passim*
        §2719(a) ................................................................................................................... 3, 11
        §2719(b) ................................................................................................................... 3, 11
        §2719(b)(1)(B) ........................................................................................................... 12
        §2719(b)(1)(B)(i) ..................................................................................................... 3, 11

28 U.S.C.
    §1346(a)(2) .............................................................................. 33
    §1491(a)(1) .............................................................................. 33

Flood Control Act of 1950, Pub. L. No. 81-516, 64 Stat. 170......................................... 13, 14

Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503, 100
    Stat. 1798 (1986)................................................................................*passim*

25 C.F.R.
    §292.2.................................................................................. 13, 14, 16, 17
    §292.5(a) .............................................................................. 18

68 Fed. Reg. 5,912 (Feb. 5, 2003) ......................................................................... 8

73 Fed. Reg. 29,354 (May 20, 2008) ............................................................... 13, 17

75 Fed. Reg. 52,550 (Aug. 26, 2010)...................................................................... 9

132 Cong. Rec. H8106 (daily ed. Sept. 23, 1986) ........................................... 13, 16

H.R. Rep. No. 99-851 (1986)......................................................................*passim*

Ariz. Rev. Stat. Ann. §5-601.02.......................................................................... 8

S.B. 1001, 41st Leg., 3d Spec. Sess. (Ariz. 1993) ................................................. 4

## OTHER AUTHORITIES

75 *Am. Jur. 2d Trespass*  (2007)
    §1........................................................................................ 16
    §43...................................................................................... 16

Burton, Steven J., *Breach of Contract and the Common Law Duty to Perform in
    Good Faith*, 94 Harv. L. Rev. 369 (1980) ................................................... 31

Burton, Steven J., & Eric G. Anderson, *Contractual Good Faith* (1995) ............................ 31

3 *Corbin on Contracts* (1960)
    §578.................................................................................... 28
    §582.................................................................................... 28
    §583.................................................................................... 28

17A C.J.S. *Contracts* §437 (2011)................................................................... 31

2 *Farnsworth on Contracts* §7.17 (3d ed. 2004) ................................................ 31

4 *Powell on Real Property* (Michael Allan Wolf ed.)
    §34.02[1](1) (2007)..................................................................... 14
    §34.04 (2008)............................................................................ 17

*Restatement (Second) of Conflicts of Law* §188 (1971) ..................................................... 21, 22

*Restatement (Second) of Contracts* (1981)
    §90.................................................................................................................. 33, 34
    §205......................................................................................................... 30, 31, 32
    §212........................................................................................................................ 23
    §213........................................................................................................................ 27
    §216................................................................................................................ 23, 28

*Restatement (Second) of Torts* §158 (1965)................................................................ 16

4 *Williston on Contracts* §8:7 (4th ed. 2008)............................................................. 33

23 *Williston on Contracts* §63:22 (4th ed. 2002)...................................................... 31

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 56.1, defendant Tohono O'odham Nation moves for summary judgment on all counts (counts 1-4 and 7) remaining in Plaintiffs' First Amended Complaint (Dkt. 26).

## PRELIMINARY STATEMENT

What remains of this case—after dismissal of plaintiffs' fraudulent-inducement and material-misrepresentation claims—presents, at bottom, two questions.  The first is one of statutory interpretation:  whether the Nation's Maricopa County property was acquired as part of "a settlement of a land claim" and is thus gaming eligible under the Indian Gaming Regulatory Act (IGRA).  The second is one of contract interpretation:  whether, even if IGRA would otherwise permit it, the Nation's gaming compact with the State of Arizona bars the Nation from gaming on that property.  Each question is straightforward, and each can and should be resolved in the Nation's favor, based on the plain language of the statute and its implementing regulations and the plain language of the Compact, respectively.  Plaintiffs have had well over a year of wide-ranging discovery to develop a record that could support their reading of the Compact, and have failed to do so.  While plaintiffs will undoubtedly comb the record for supposed disputes in their continuing attempt to impugn the Nation's conduct during negotiations, any such disputes are immaterial to the questions of statutory and contract interpretation presented here.  Notwithstanding the development of an extensive factual record, there is simply no genuine dispute of *material* fact, and the Nation is entitled to summary judgment.

## BACKGROUND

### I.    THE STATUTORY SCHEME

In the 1970s and 1980s, flooding caused by the federal Painted Rock Dam destroyed the Nation's 10,000-acre Gila Bend Indian Reservation in Maricopa County, leaving the reservation's people without any land that could support economic development.  Statement of Material Undisputed Facts (SMF) ¶4.  In response, Congress enacted the Gila Bend Indian Reservation Lands Replacement Act (Lands Replacement Act or LRA), Pub. L. No. 99-503,

100 Stat. 1798 (1986) (Nagaraj Decl. in Supp. of the Nation's Mot. for Summ. J. Ex. 1),[1] "to provide for the settlement of [the Nation's] claims arising from the operation" of the dam. H.R. Rep. No. 99-851, at 1 (1986) (Ex. 2); *see* SMF ¶5.  The LRA's purposes were to "replace[] … Reservation land with land suitable for sustained economic use which is not principally farming … , to promote the economic self-sufficiency of the O'odham Indian people at Gila Bend, and to preclude lengthy and costly litigation."  H.R. Rep. No. 99-851, at 3-4; SMF ¶5.  It thus provided that, in exchange for surrendering title to the flooded lands and releasing "any and all claims of water rights or injuries to land or water rights" against the United States, the Nation would receive $30 million to acquire replacement lands.  LRA §§4(a), 6(c), 9(a); *see* 10/13/87 U.S./TON Agreement (Ex. 3); SMF ¶¶6, 8.  If those lands meet certain conditions, including being located in unincorporated portions of Maricopa, Pima, or Pinal Counties, the LRA requires the Secretary to take them into trust for the Nation.  LRA §6(d); SMF ¶7.  The LRA provides that, once taken into trust, such lands will be "a Federal Indian Reservation for all purposes."  *Id.*

In 1988, Congress enacted IGRA, 25 U.S.C. §§2701-2721, to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and to "establish[] independent Federal regulatory authority [and] Federal standards for gaming on Indian lands."  *Id.* §2702.  IGRA authorizes Class III gaming on "Indian lands," including "all lands within the limits of any Indian reservation" and "any lands title to which is … held in trust by the United States for the benefit of any Indian tribe," *id.* §2703(4)(A), (B), if, among other things, gaming is "conducted in conformance with a Tribal-State compact."  *Id.* §2710(d)(1); *see* SMF ¶13.  IGRA requires states to "negotiate" such a compact "in good faith" upon a tribe's request; a compact must be approved by the Secretary of the Interior before it can become effective.  25 U.S.C. §2710(d)(3).  Although IGRA generally prohibits gaming on lands acquired in trust after October 17, 1988, that are not contiguous to the tribe's existing reservation as of that date, it makes an exception for, among other things,

---

[1] All citations to exhibits in this brief refer to exhibits to the Nagaraj Declaration.

after-acquired lands "taken into trust as part of a settlement of a land claim."  *Id.* §2719(a),

(b); *see* SMF ¶13.

## II.   THE NATION'S 1993 GAMING COMPACT WITH ARIZONA

The Nation first entered into a gaming compact with the State in 1993.  The 1993

compact "authorized" the Nation to conduct Class III gaming, TON and Arizona 1993

Gaming Compact (1993 Compact) §3(a) (Ex. 4), in four facilities "on the Indian Lands" of

the Nation, *id.* §3(f).  "Indian Lands" was a defined term meaning "land as defined in

[IGRA,] 25 U.S.C. §2703(4)(A) and (B), subject to the provisions of 25 U.S.C. §2719."  *Id.*

§2(s).  As noted above, IGRA defines "Indian lands" to include "any lands title to which is

… held in trust by the United States for the benefit of any Indian tribe."  25 U.S.C.

§2703(4)(B).  And §2719 of IGRA provides that although Class III gaming is generally

barred on land taken into trust after IGRA's effective date, that bar does not apply to land

acquired as part of "a settlement of a land claim."  *Id.* §2719(b)(1)(B)(i).  The 1993 compact

thus expressly authorized the Nation to game on land taken into trust after IGRA's effective

date as part of a settlement of a land claim.  *See also* 1993 Compact §3(f) ("Gaming on lands

acquired after the enactment of [IGRA] on October 17, 1988, shall be authorized only in

accordance with 25 U.S.C. §2719.").  It imposed only one limitation:  that a tribe's facilities

be at least 1.5 miles apart.  *Id.*  Otherwise, the 1993 compact authorized the Nation to game

wherever IGRA permitted gaming.

The Lands Replacement Act—a public federal law—was passed in 1986.  The State

was thus on notice during the 1993 compact negotiations that, as part of the Nation's

settlement of its claims arising from the destruction of the Gila Bend Indian Reservation, the

Nation could acquire replacement reservation lands in unincorporated Maricopa County.

Indeed, at compact negotiation meetings with the State in July 1992 and May 1993, the

Nation's counsel expressly advised State negotiators that the Nation had the right to purchase

"up to 9,880 acres of additional trust land" under the LRA and that "[n]ot all of the land has

been purchased yet, so there is a possibility of additional trust land to be acquired."  7/15/92

Tohono/Arizona Reps. Mtg. Tr. 3 (Ex. 5); *see* Dahlstrom Dep. 49, 209-210, 257-260 (Ex. 29).

The State was also, of course, on notice that IGRA—a federal statute expressly incorporated into the compact—permitted gaming on after-acquired lands in certain circumstances.  Indeed, the State's representatives informed tribal representatives that "[t]hey were concerned that there not be a mechanism by which an Indian tribe could open a casino outside of their contiguous reservation lands."  Dahlstrom Dep. 86.  And the State actually proposed that the compact include a bar on gaming on such lands.  *See* Tohono Comparison 11 (Ex. 6) (noting that State's proposal would "result in the Nation forfeiting the rights provided to tribes in IGRA to request that in certain circumstances after-acquired trust land be available for class III gaming activities").  That proposal was not accepted, and the State ultimately agreed to a compact that had no such restrictions, and instead incorporated IGRA's provisions governing gaming on after-acquired lands.[2]

During the term of the 1993 compact, the Nation operated three facilities out of the four it was authorized to operate:  one on Nogales Highway near Tucson, one near Sahuarita south of Tucson, and one in a rural area near Why.  Quigley I Dep. 152-153 (Ex. 38).

## III.    PROPOSITION 202 AND THE NATION'S 2002 GAMING COMPACT WITH ARIZONA

The initial terms of the 1993 compacts were set to expire in 2003.  Accordingly, in 1999, the State and the tribes began to discuss the terms of new compacts.  Rather than negotiating separately with each tribe to arrive at a standard form compact, as it had done in

_____

[2] At a legislative hearing during the 1993 compact negotiations, State Senator Matthew Salmon—the chairman of the legislature's Joint Select Committee on Indian Gaming—stated that he was "real concerned" about "the possibility that a tribal government may purchase land outside of the reservation virtually anywhere in the state and place casinos on, or place slot machines on those parcels of land."  5/26/93 Hr'g Tr. 32 (Ex. 7).  He added that "we have to clarify in those compacts to make sure that that's not in the equation for Arizona."  *Id.* 32-33.  In response, Arizona Solicitor General Rebecca Berch explained that "the definition of authorized gaming locations in the drafts of compacts that are now circulating limits the locations to Indian lands of the tribe, and again, that's subject to a very technical definition in IGRA."  *Id.* 36.  She advised that Senator Salmon's concerns could "be handled simply by contract negotiations limited to lands that were designated Indian lands as of a particular date, such as 1993."  *Id.*  The legislature subsequently proposed a bill, S.B. 1001, 41st Leg., 3d Spec. Sess. (Ariz. 1993) (Ex. 8), that would have limited Indian gaming to "lands that were part of a reservation as referred to in 25 [U.S.C. §]2703(4)(A) on October 17, 1988," excluding any after-acquired lands from gaming eligibility.  But that bill was not enacted, and the State entered into a compact that included no such limitations.

1  1993, the State sought to negotiate collectively with the tribes.  LaSarte Dep. 13-14 (Ex. 32).
2  The negotiations occurred principally between the State and the member tribes of the
3  Arizona Indian Gaming Association (AIGA), which included most of Arizona's gaming
4  tribes.  *See id.* 15-17; Makil Dep. 26 (Ex. 35).  AIGA's membership shifted over time, but at
5  all relevant times it included the Nation and plaintiffs Gila River Indian Community (GRIC)
6  and Salt River Pima-Maricopa Indian Community (SRPMIC).  *See* AIGA 7/20/01 Meeting
7  Agenda (Ex. 9).  AIGA and its leadership had no authority to bind individual tribes and
8  played a purely organizational role.  LaSarte Dep. 26.

9       The parties negotiated the new compact terms through counsel and at "arm's length."
10  Ochoa Dep. 56-58 (Ex. 37); Clapham Dep. 29 (Ex. 28).  The tribes wanted to ensure, in
11  particular, that all compact provisions were approved by the leaders of each tribe, and that
12  statements by individual negotiators could not "bind the tribe."  LaSarte Dep. 23; Landry
13  Dep. 12 (Ex. 31); Makil Dep. 32, 34; Dahlstrom Dep. 213-214.  This approach was intended
14  to prevent "some kind of casual conversation or … side remark [from being] considered an
15  agreement before the tribe had a chance to review and approve it."  Landry Dep. 14-15; *see*
16  *also* W.M. Smith Dep. 66-67, 80 (Ex. 42).  The tribes also sought to strike a balance between
17  forging a unified position in their negotiations with the State and preserving their individual
18  sovereignty.  To that end, and in response to a concern that certain tribal negotiators were
19  leaking information to the State, Miguel Dep. 24-25 (Ex. 36); Ritchie Dep. 33-34 (Ex. 40),
20  the tribes entered into an agreement in principle early in the negotiations providing that tribal
21  leaders would make a "good-faith effort" to cooperate during the negotiations, but
22  acknowledging that their "first priority is to protect the interests, sovereignty, and right to
23  self-determination of their individual Indian Nations."  Agreement in Principle (Ex. 10).
24  Thus, in some circumstances, when tribes could not reach agreement among themselves on
25  an issue, they would seek "one-on-one discussions" with the State concerning that issue.
26  Hart Dep. 81 (Ex. 30).

27       The tribal negotiators participated in hundreds of meetings from 1999 to 2002 to
28  negotiate the new compact terms—both among themselves and in discussions with the

State—and they sought an agreement that would be "comprehensive."  LaSarte Dep. 19;
W.M. Smith Dep. 64; Landry Dep. 18-19; Lunn Dep. 13 (Ex. 34).  The tribes were all
represented by sophisticated counsel, on whom they depended to draft compact provisions
for all the terms on which they came to agreement.  Landry Dep. 21; Lunn Dep. 35.  The
parties spent "countless hours" negotiating each detail of the agreement.  Dahlstrom Dep.
233; Lewis Dep. 36 (Ex. 33); Ochoa Dep. 54; W.M. Smith Dep. 70.  Indeed, the written
provisions of the standard compact that was eventually adopted cover all aspects of tribal
gaming in Arizona, down to minor details such as where ATMs could be located within a
facility and how many players could sit at blackjack and poker tables.  TON and Arizona
2002 Gaming Compact (Compact) §3(e)(1), (k)(1) (Ex. 11).

　　　One key point in the negotiations was the number of gaming machines each tribe
would be allowed to operate.  The State was willing to increase the maximum number of
machines that tribes could install in their facilities in return for a decrease in the total number
of gaming facilities.  Hart Dep. 78-79.  As the parties negotiated over the number of
machines they would be permitted to operate, their positions were set forth in numerous
versions of a "Gaming Device Allocation Table" that were exchanged among the parties.  *Id.*
60-61, 81.  Ultimately, the parties agreed on the version of the table contained in the
Compact.  Compact §3(c)(5).

　　　The parties also negotiated over the number of gaming facilities each tribe would be
permitted to operate.  The State initially asked each tribe to surrender one of the facilities
that it had a right to operate under the 1993 compact.  Quigley I Dep. 69.  Although nine
tribes ultimately agreed to reduce their authorized number of gaming facilities, six tribes,
including the Nation, did not.  The Nation did not want to give up its right to operate four
facilities because, as it explained to the State and the other tribes, it had just opened its
facility near Why, which was far from any metropolitan area and attracted little revenue but
provided much-needed jobs for members on a rural part of its reservation.  Reducing the
Nation's facility allocation to three ultimately would have forced the Nation to close that
facility.  *Id.* 69, 83, 85-86; Quigley II Dep. 75-77 (Ex. 39); Clapham Dep. 36; *see also* Notes

on 5/22/01 Compact Negotiations 5 (Ex. 12).  In the end, the State and the other tribes agreed that the Nation could retain the right to operate four facilities, but later "raised a concern that if there was not a provision in the compact that required the Nation to keep the [Why] facility in such a [rural] location that the Nation might put it in a metropolitan area." Quigley I Dep. 83-85; *see also id.* 69-70; Dahlstrom Dep. 296; Clapham Dep. 36-37.  The State and the other tribes therefore proposed, and the Nation agreed, that if the Nation operates four facilities, "at least one of the four" must be "at least fifty (50) miles from the existing Gaming Facilities of the Tribe in the Tucson metropolitan area."  Compact §3(c)(3); *see* Quigley II Dep. 96-97 (noting that "the proposal for that language came initially from [the State]").  The Nation does not yet have four facilities, but is still operating the Why facility, which would satisfy the requirements of Compact §3(c)(3) if the Nation operates four facilities in the future.

Notably, at various points during the negotiations, parties proposed restricting gaming on after-acquired lands, even though IGRA allows such gaming in certain circumstances. But those proposals were rejected.  Specifically, Steve Hart, a negotiator for the State, asked all tribes to relinquish their right to game on after-acquired lands.  *See* Hart Dep. 146-147 ("We did have a discussion about after-acquired lands.  And there was a time then that I put that question forward:  Should we be drafting this compact with an eye towards barring gaming on after-acquired lands?"); Makil Dep. 86-88; Landry Dep. 39, 77.  The tribes did not agree to this request.  Hart Dep. 147.  Indeed, a representative for the Navajo Nation specifically objected to the proposal because the Navajo had the right to acquire additional trust lands under its land settlement and was considering acquiring lands near Flagstaff for gaming purposes.  Landry Dep. 39, 77-78.  The Navajo indicated that they instead wanted the new compact to incorporate the 1993 compact's language on after-acquired lands, *id.* 42, which is what ultimately occurred.  Participants in the negotiations also recall that Eric Dahlstrom, GRIC's counsel, made a similar proposal to limit gaming on after-acquired lands. Makil Dep. 100; Ochoa Dep. 88; Clapham Dep. 57; Ritchie Dep. 15.  But it, too, was quickly

dismissed.  Clapham Dep. 58; Ochoa Dep. 88-89; Ritchie Dep. 15.  In fact, "everybody in the room was against it."  Ritchie Dep. 15.[3]

      After three years of intense negotiations, then, the parties agreed on a framework for a new standard compact that left intact the 1993 provisions governing the location of gaming facilities, which themselves incorporated IGRA's provisions.  *See* Compact Framework (Ex. 13) (mentioning only the limit on the location of the Nation's fourth facility).  But a new state law was required to give the Governor the authority to enter into the new compacts, and a bill that would have done so failed to pass the Arizona legislature.  Bielecki Dep. 33-34 (Ex. 27).  As a result, a coalition of tribes decided to propose a ballot initiative—Proposition 202—that would require the Governor to enter into a standard form compact with any tribe that requested one and that would set out the precise wording of such compacts.  Proposition 202 (Ex. 14); *see* Ariz. Rev. Stat. Ann. §5-601.02 (codifying Proposition 202).  In drafting Proposition 202, the tribes drew on the terms they had previously negotiated with the State, Hart Dep. 179, and no substantive changes were made to the terms governing the location of gaming facilities.  Arizona voters passed Proposition 202, and on December 4, 2002, the State and the Nation executed the Compact, *see* Compact; SMF ¶9.  On January 24, 2003, the Secretary of the Interior approved the Compact, *see* DOI Compact Approval Letter (Ex. 15), which became effective on February 5, 2003, *see* 68 Fed. Reg. 5,912; SMF ¶10.

      Proposition 202 mandated, and the Compact incorporates, very specific terms governing the permissible locations for gaming facilities.  Those terms are virtually identical to the terms of the 1993 compact.  Like the 1993 compact, the 2002 Compact "authorize[s]" Class III gaming on the "Indian Lands" of the tribe, Compact §3(a), (j), and incorporates IGRA's definition of "Indian lands," subject to the restrictions on gaming on after-acquired lands in §2719 of IGRA, *id.* §2(s); *see* SMF ¶¶11, 12.  The 2002 Compact retained the requirement that facilities be located at least 1.5 miles apart, adding the proviso "unless the configuration of the Indian Lands of the Tribe makes this requirement impracticable."

---

[3] In 2007, GRIC pressed other tribes to agree to a compact amendment that would "preclude gaming on after-acquired lands," Lunn Dep. 72, but that has not occurred.

Compact §3(j).  It also retained the provision stating that "Gaming Activity on lands acquired after the enactment of [IGRA] on October 17, 1988 shall be authorized only in accordance with 25 U.S.C. §2719."  *Id*.  In short, the 2002 Compact authorizes gaming wherever IGRA permits it, subject to the 1.5-mile limitation and the limitation on the location of one of the Nation's four facilities (if the Nation operates four facilities).

The Compact further provides that it "contains the entire agreement of the parties with respect to the matters covered by this Compact and no other statement, agreement, or promise made by any party, officer, or agent of any party shall be valid or binding."  Compact §25; SMF ¶16.

## IV.   THE SETTLEMENT PROPERTY AND THE PROCEDURAL HISTORY OF THIS CASE

In May 2003, the Nation, acting through its wholly owned corporation, Rainier Resources, Inc., purchased the Settlement Property, an unincorporated parcel at 91st and Northern Avenues adjacent to Glendale.  The Secretary of the Interior determined that he was required to take a portion of the Settlement Property (Parcel 2) into trust under the LRA. 75 Fed. Reg. 52,550 (Aug. 26, 2010); SMF ¶17.  Plaintiffs and others challenged the Secretary's decision, but this Court upheld it, and the Ninth Circuit affirmed.  *GRIC v. U.S.*, 776 F. Supp. 2d 977 (D. Ariz. 2011), *aff'd*, 697 F.3d 886 (9th Cir. 2012); SMF ¶17.

Plaintiffs filed this action in February 2011 pursuant to §2710 of IGRA, which confers jurisdiction over, and abrogates tribes' sovereign immunity against, certain suits "to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact."  25 U.S.C. §2710(d)(7)(A)(ii).  Plaintiffs argued that gaming on the Settlement Property would violate the Compact because the LRA was not a settlement of a land claim under IGRA (count 1); that it would violate an implied term in the Compact barring the Nation from gaming in the Phoenix area (also count 1); that it would violate the implied covenant of good faith and fair dealing (count 2); and that promissory estoppel barred such gaming (count 3).  Plaintiffs also raised claims of fraud in the inducement (count 5) and material misrepresentation (count 6) based on the Nation's alleged failure to disclose

its intention to develop a gaming facility in the Phoenix area during the compact negotiations.[4]

The Nation moved to dismiss the complaint, and this Court granted the motion in part and denied it in part.  6/15/11 MTD Order (Dkt. 43).  The Court determined that the settlement-of-a-land-claim issue was within the primary jurisdiction of DOI and the National Indian Gaming Commission (NIGC), the agencies charged with administering IGRA.  *Id.* 12.[5]  The Court dismissed plaintiffs' claims of fraud in the inducement and material misrepresentation because they did not allege a violation of the Compact and were thus barred by sovereign immunity.  *Id.* 18-19.  It allowed plaintiffs' remaining claims to go forward.

## ARGUMENT

Because there is no genuine dispute as to any fact truly material to plaintiffs' claims—as distinct from plaintiffs' many immaterial allegations—the Nation is entitled to judgment as a matter of law on all the counts remaining in plaintiffs' complaint.

## I.   IGRA AUTHORIZES GAMING ON THE SETTLEMENT PROPERTY (COUNT 1)

Plaintiffs allege in count 1 of their complaint that the Compact's express terms preclude the Nation from gaming on the Settlement Property because it authorizes gaming on

---

[4] Count 4 sought an injunction based on the purported breaches of contract or promises described in counts 1-3, and count 7 alleged anticipatory repudiation based on the purported breaches in counts 1-2.  Because those claims cannot succeed independently of counts 1-3, they are not separately addressed in this motion.

[5] In 2009, the Nation asked DOI to issue an Indian lands opinion (ILO) as to whether the Settlement Property, once in trust, would be eligible for gaming under IGRA's "settlement of a land claim" exception.  The Nation later suspended that request after becoming concerned that DOI's review of its gaming policies was impeding action on the Nation's fee-to-trust application.  After counsel for the United States informed this Court that DOI "would make [an ILO] if asked by the Nation," 2/17/2011 Hr'g Tr. 42-43, *GRIC v. U.S.*, No. 10-cv-1993 (Dkt. 128), the Nation renewed its request to DOI, Exs. 16 and 17, and after consultation with DOI, also submitted a site-specific gaming ordinance to the NIGC.  On August 24, 2011, the NIGC rejected the Nation's site-specific gaming ordinance on the ground that it did not have jurisdiction over land that was not yet in trust.  Ex. 18.  DOI continues to represent that the Nation's request for an ILO is under consideration, but has not indicated when it expects to issue a response.  Ex. 19.  The Nation thus prepared this motion in accordance with this Court's order that if DOI had not "issue[d] a decision 21 days or more before the parties' summary judgment briefing is due, the parties shall address [the issue] in their briefs."  9/7/11 Order (Dkt. 54).

after-acquired lands "only in accordance with 25 U.S.C. §2719."  Compact §3(j)(1).  Plaintiffs contend that the Settlement Property cannot be taken into trust as part of "a settlement of a land claim," 25 U.S.C. §2719(b)(1)(B)(i), and thus falls outside §2719.  Am. Compl. ¶¶88-96.  Plaintiffs are wrong.  The Settlement Property falls within IGRA's "settlement of a land claim" exception under the statute's plain terms and DOI's regulations construing that phrase.  It is thus eligible for gaming under IGRA and the Compact.

**A.** **The LRA Is A "Settlement Of A Land Claim" Under IGRA**

A principal purpose of the Lands Replacement Act was to settle the Nation's claims against the United States by providing it with new, economically viable reservation lands to compensate the Nation for its loss of virtually the entire Gila Bend Indian Reservation.  As the House Report explained, the nearly continual flooding of the reservation gave the Nation "a variety of potential legal claims against the United States"—including the unauthorized and unlawful taking of tribal trust lands—and "resolving [those claims] in the courts would be both lengthy and costly to all parties."  H.R. Rep. No. 99-851, at 7.  The Act thus "provide[d] for the United States to settle the prospective claims of the [Nation] by," among other things, authorizing the Secretary "to hold in trust up to 9,880 acres of replacement lands."  *Id*. 8.  In return, the Nation was required to cede "all right, title, and interest" to 9,880 acres of the destroyed reservation land and waived "any and all claims of … injuries to land or water rights."  LRA §§4(a), 9(a).  Land acquired under the Act thus qualifies as a "settlement of a land claim" under the ordinary meaning of those words.

Reading §2719(b)(1)(B)(i) any other way would contravene its purpose.  When Congress enacted IGRA, it contemplated, consistent with the statute's broad remedial aim, *see* 25 U.S.C. §2702(1), that certain trust lands acquired after the law's effective date would be dealt with as though they were part of a tribe's pre-IGRA reservation lands, *see id.* §2719(a), (b).  The purpose of that treatment was to place tribes that were disadvantaged by the 1988 cut-off date—such as tribes that had lost land that otherwise would have been eligible for gaming and had yet to obtain replacement land—on an "equal footing."  6/18/2010 Mem. from Sec'y to Asst. Sec'y for Indian Affairs 2 (Ex. 20).  Here, the Nation

1  lost gaming-eligible land due to the United States' actions, and the Settlement Property is

2  designed to replace that land.  *Cf.* LRA §2(3), (4) ("the O'odham people of the Gila Bend

3  Indian Reservation" lack "an appropriate land base"; thus Congress sought to "facilitate

4  replacement of reservation lands with lands suitable for sustained economic use *which is not*

5  *principally farming*") (emphasis added)).  Indeed, the Lands Replacement Act expressly

6  provides that land acquired under it would be "a Federal Indian Reservation for all

7  purposes." *Id.* §6(d) (emphasis added).  Consistent with that provision, and in response to an

8  inquiry from the Nation's San Lucy District, the Field Solicitor for the Phoenix Field Office

9  of DOI determined that "any land" acquired under the LRA would satisfy IGRA's

10  settlement-of-a-land-claim exception.  *See* 2/10/92 Mem. (Ex. 21).[6]

11       **B.    The LRA Is A "Settlement Of A Land Claim" Under DOI's Regulations**

12       More recently, DOI has issued regulations construing the settlement-of-a-land-claim

13  exception, promulgated through notice-and-comment rulemaking and entitled to deference,

14  that leave no doubt that (1) the Nation had "land claims" against the United States and (2)

15  the LRA settled those claims.[7]

16       **1.    The Nation had "land claims" against the United States**

17       The Department defines the term "land claim" to include:

18       [A]ny claim by a tribe concerning the impairment of title or other real
19       property interest or loss of possession that:  (1) [a]rises under the United
         States Constitution, Federal common law, Federal statute or treaty; (2) [i]s

20

21       [6] If there were any doubt that the settlement-of-a-land-claim exception covers the
22  Settlement Property, both the purpose of IGRA and the Indian canon of construction require
    that the question be resolved in favor of the Nation.  As the Sixth Circuit has held,
23  "[a]lthough §2719 creates a presumptive bar against casino-style gaming on Indian lands
    acquired after the enactment of the IGRA, that bar should be construed narrowly (and the
24  exceptions to the bar broadly) in order to be consistent with the purpose of the IGRA, which
    is to encourage gaming." *Grand Traverse Band v. Office of U.S. Att'y W.D. Mich.*, 369 F.3d
25  960, 971 (6th Cir. 2004); *see also City of Roseville v. Norton*, 348 F.3d 1020, 1030-1032
    (D.C. Cir. 2003) (the exceptions in §2719(b)(1)(B) "all embody policies counseling for a
26  broad reading" and the Indian canon "would resolve any doubt" in their interpretation).

27       [7] The Department's regulations are, at a minimum, a reasonable construction of IGRA
    and thus entitled to *Chevron* deference.  *See Mayo Found. for Med. Educ. & Research v.*
28  *U.S.*, 131 S. Ct. 704, 711-712 (2011); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 899,
    902 (9th Cir. 2012).

in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental); and (3) [e]ither accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.

25 C.F.R. §292.2.  The claims settled by the Lands Replacement Act easily meet this test.[8]

### a.   The Nation had claims "concerning the impairment of title or other real property interest or loss of possession"

In 1950, Congress authorized the construction of the Painted Rock Dam on the Gila River to protect non-Indian farmland and the City of Yuma from flooding.  Flood Control Act of 1950, Pub. L. No. 81-516, §204, 64 Stat. 170, 176 (Ex. 22); H.R. Rep. No. 99-851, at 4; *see* SMF ¶1.  The Act did not authorize the U.S. Army Corps of Engineers—which was in charge of the project—to condemn the Nation's land during the construction or operation of the dam.  *See* H.R. Rep. No. 99-851, at 4.  The Corps nonetheless built the dam ten miles downstream from the Nation's Gila Bend Indian Reservation and sought to purchase a flowage easement or acquire the Nation's land outright.  *Id.* 4-5; SMF ¶2.  The Nation rejected those offers—"largely because of express representations" by government officials "that flooding would occur so infrequently as not to impair [the Nation's] ability to farm the land."  H.R. Rep. No. 99-851, at 5; SMF ¶2.

In 1960, relying on the Flood Control Act, the Corps initiated eminent domain proceedings and obtained a court-ordered flowage easement giving the Corps the "perpetual right to *occasionally* overflow, flood, and submerge" about 7,700 acres of the Gila Bend Indian Reservation "and all structures on the land, as well as to prohibit the use of the land for human habitation."  H.R. Rep. No. 99-851, at 5 (emphasis added); *see also* Decl. of Taking, *U.S. v. 7,743.82 Acres of Land* (D. Ariz. Nov. 23, 1960) (Ex. 23); SMF ¶3.[9]

---

[8] During the notice-and-comment process, DOI explicitly rejected as "too narrow" the recommendation that the definition be limited to "'the determination of title to lands,'" explaining that "not all claims brought under the definition are for the determination of title to lands."  73 Fed. Reg. 29,354, 29,356 (May 20, 2008); *see also Wyandotte Nation v. NIGC*, 437 F. Supp. 2d 1193, 1208 (D. Kan. 2006) (a "'land claim' means that the operative facts giving rise to a right arise from a dispute over land").

[9] The Corps allegedly paid compensation of $130,000 to the Bureau of Indian Affairs (BIA) for the benefit of the Nation (a rate of $16.83 per acre), but that amount cannot be found in the BIA's accounts, *see* 132 Cong. Rec. H8106 (daily ed. Sept. 23, 1986).

1   Despite the Corps' assurances, the reservation sustained almost continual flooding

2   throughout the late 1970s and early 1980s, "each time resulting in a large standing body of

3   water."  H.R. Rep. No. 99-851, at 5; SMF ¶4.  The floods also destroyed a 750-acre tribal

4   farm and left the land blanketed with saltcedar thickets so dense that a subsequent federal

5   study found that almost the entire reservation—nearly 10,000 acres—had been rendered

6   unsuitable for agriculture or livestock grazing.  H.R. Rep. No. 99-851, at 5-6; SMF ¶4.  "The

7   tribe thus ha[d] a reservation which for all practical purposes [could not] be used to provide

8   any kind of sustaining economy."  H.R. Rep. No. 99-851, at 7; SMF ¶4.

9   These events gave rise to multiple claims by the Nation against the United States

10  "concerning the impairment of title or other real property interest or loss of possession."  25

11  C.F.R. §292.2.

12  *First*, the Nation had a claim that the flowage easement took its land without

13  congressional authorization.  An easement "is 'an interest in land' in the possession of

14  another," 4 *Powell on Real Property* §34.02[1](1) (2007), and thus impairs the owner's full

15  enjoyment of title and possession.  When obtained by the government on private property, an

16  easement gives rise to a taking.  *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831-832

17  (1987).  There must be "a clear expression of congressional purpose" to authorize a

18  condemnation of tribal land.  *U.S. v. Winnebago Tribe*, 542 F.2d 1002, 1005 (8th Cir. 1976);

19  *U.S. v. Imperial Irr. Dist.*, 799 F. Supp. 1052, 1061 (S.D. Cal. 1992) (requiring "both that

20  Congress … recognized that the affected land was Indian land, and … clearly intended to

21  abolish Indian rights in the affected land" (citing *U.S. v. Dion*, 476 U.S. 734, 739-740

22  (1986))); *cf. Menominee Tribe v. U.S.*, 391 U.S. 404, 413 (1968) ("'intent[] to abrogate or

23  modify [Indian property rights] is not to be lightly imputed to the Congress'"); 25 U.S.C.

24  §177.  Here, however, neither the Flood Control Act, 64 Stat. at 176, nor any of the other

25  statutes on which the Corps relied, expressly authorized the Corps to take the Nation's land

26  by way of a flowage easement.  Far from it.  As Congress acknowledged, there was "[no]

27  mention of the [Gila Bend] reservation or the dam's potential effects on the reservation and

28  its inhabitants," including in the legislative process leading up to the Flood Control Act.

1  H.R. Rep. No. 99-851, at 4.[10]  The Nation thus had "claims for the taking of tribal trust lands

2  by condemnation without express authority from Congress."  *Id.* 7.

3       *Second*, even if the easement had been authorized, the Nation would still have had a

4  claim under the Takings Clause for the impairment of its title and property interests because

5  the Corps plainly exceeded the scope of the purported easement, which permitted only

6  "occasional[]" flooding—not the almost continual flooding (and resulting destruction) that

7  actually occurred.  H.R. Rep. No. 99-851, at 5, 6.[11]  In litigation concerning other property

8  on the Gila River for which the Corps obtained an identical flowage easement for the Painted

9  Rock Dam, the Federal Circuit and the Court of Federal Claims recognized that plaintiffs had

10  "stated a claim based upon the Government's taking of property beyond the scope" of that

11  easement, *Narramore v. U.S.*, 960 F.2d 1048, 1051, 1052 (Fed. Cir. 1992):  "The [Corps']

12  abandonment of [the schedule of flooding it presented to the court to obtain the easement]

13  does not fall within the scope of the existing easement; thus, a claim based on this

14  abandonment clearly qualifies as a 'new claim'" for an "additional taking."  *Narramore v.*

15  *U.S.*, 30 Fed. Cl. 383, 391 (1994).  Accordingly, as the House Report, again, expressly

16  recognized, the Nation had a claim "for payment of unjust compensation" for the loss of its

17  title interest.  H.R. Rep. No. 99-581, at 7.[12]

18

---

19      [10] By contrast, Congress has passed several acts specifically "authoriz[ing] limited

20  takings of Indian lands for hydroelectric and flood control dams" and identifying the specific lands to be taken.  *S.D. v. Bourland*, 508 U.S. 679, 683 (1993).

21      [11] *See R.J. Widen Co. v. U.S.*, 357 F.2d 988, 992-993 (Ct. Cl. 1966) (taking of land authorized by Flood Control Act of 1936 "gave rise to an obligation [by the United States]

22  … to pay just compensation therefor"); *Del-Rio Drilling Programs v. U.S.*, 146 F.3d 1358, 1363 (Fed. Cir. 1998) ("If the government appropriates property without paying just

23  compensation, a plaintiff may sue … on a takings claim regardless of whether the government's conduct leading to the taking was wrongful.").

24      [12] As the Supreme Court has explained, "the property-owner [may] resort[] to the

25  courts … to recover compensation for what actually has been taken, upon the principle that the Government by the very act of taking impliedly has promised to make compensation."

26  *U.S. v. Cress*, 243 U.S. 316, 329 (1917); *see also U.S. v. Lynah*, 188 U.S. 445, 470 (1903) ("Wh[ere] the government does not directly proceed to appropriate the title, yet [through

27  flooding] it takes away the [land's] use and value[,] … the proceeding must be regarded as an actual appropriation of the land, including the possession, the right of possession and the

28  fee [for which just compensation must be paid]").

*Third*, the Nation had a claim for trespass under federal common law.  *U.S. v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009) ("Federal common law governs an action for trespass on Indian lands.").  "One is subject to liability to another for trespass … if he intentionally … enters land in the possession of the other, or causes a thing or a third person to do so[.]" *Restatement (Second) of Torts* §158 (1965).  "Any physical entry upon the surface of the land is a trespass, including flooding land with water."  *Imperial Irr. Dist.*, 799 F. Supp. at 1059; *see also* 75 *Am. Jur. 2d Trespass* §43 (2007); *id*. §1 (defining trespass as an "injury to possession").  Here, there is no dispute that the Corps caused water to enter the Nation's land.  Because the Corps' purported easement authorizing the entry was invalid—and because the flooding exceeded the easement's terms—this action constituted a trespass.

*Finally*, the Nation had a claim against the United States for breach of its fiduciary duty to preserve the Gila Bend Indian Reservation in trust for the Nation.  *See* H.R. Rep. No. 99-851, at 7 (suggesting that the Nation had a "breach of trust" claim); 1/18/2009 Letter from David Bernhardt, Solicitor of the Interior (Bernhardt Letter) (explaining that a "breach of fiduciary duty" claim can be "a land claim" under the Department's regulations) (Ex. 24).  The United States, through the Corps, unlawfully inundated the very lands that the United States, as trustee for the Nation, was obligated to protect.  Moreover, it did so on profoundly inequitable terms.[13]

### b.    *The Nation's claims meet the remaining requirements*

The Nation's claims also meet each of the three remaining requirements in 25 C.F.R. §292.2.  *First*, the Nation's claims arose under federal law.  The Nation's claims for unauthorized taking of its land and for just compensation arose under the Constitution, *see* U.S. Const. art. I, §8, cl. 3; *id*. amend. V; the trespass and breach of trust claims arose under federal common law.

---

[13] *See* 132 Cong. Rec. H8106 (Rep. McCain) ("[T]he Corps … and the [BIA] negotiated the amount [of compensation] for the[] flowage easement[] and did not allow the tribe to appeal. … [Further] the amount [paid] was approximately one-half to one-third of that paid non-Indians."); *compare* Bernhardt Letter 2 (noting a "'breach of trust responsibility'" that springs from "'lease terms [that] were unfair and inequitable at the time [they] were ratified by the Congress'").

*Second*, the Nation's claims were "in conflict with the right, or title or other real property interest claimed by" the Corps.  25 C.F.R. §292.2.  The Corps imposed the flowage easement "against the will of the owner of the servient estate [the Nation] … through the process of land condemnation."  4 *Powell on Real Property* §34.04 (2008).  By obtaining that easement and by asserting that the easement authorized the flooding that actually occurred, the Corps claimed a "right" or "interest" in the Nation's land.  The Nation's claims to full beneficial title and possessory interest in the reservation unquestionably "conflicted" with the Corps' claim that it had a right to flood that very same land.

*Third*, each of the Nation's claims accrued before IGRA's enactment on October 17, 1988.  "In common parlance a right accrues when it comes into existence[.]"  *U.S. v. Lindsay*, 346 U.S. 568, 569 (1954).  The Nation's claims accrued no later than 1984, the last year of the floods.  H.R. Rep. No. 99-851, at 5.

In sum, the Nation indisputedly had "land claims" against the United States.  And the United States judged those claims sufficiently meritorious to justify a $30 million settlement.[14]  However, as DOI has explained, it is irrelevant whether the claims would have prevailed in court:  A land claim "does not [even] have to be filed in court in order to fall under the definition."  73 Fed. Reg. 29,354, 29,356 (May 20, 2008); *see id*. at 29,359.  The question is whether the parties sought to avoid the risks of litigation by entering into a legally binding agreement resolving the claims.[15]  Here, Congress explained that its intent was "to provide for the settlement of certain claims" of the Nation "arising from the operation of Painted Rock Dam," and "to preclude lengthy and costly litigation" on those claims, "includ[ing] claims for the taking of tribal trust lands by condemnation without express

---

[14] *See* 10/24/86 DOI News Release, "Arizona Indian Tribe Gets $30 Million Settlement" (Ex. 25) (characterizing the LRA as "one of the Reagan Administration's largest land settlements with an Indian tribe").

[15] Indeed, the Solicitor of the Interior recently found that the Seneca Nation Settlement Act, 25 U.S.C. §1774, was a "settlement of a land claim" because it "settle[d] potential legal claims," Bernhardt Letter 1—claims that a court had previously held were "[un]enforceable," *Citizens Against Casino Gambling v. Hogen*, 2008 WL 2746566, at *58 (W.D.N.Y. July 8, 2008).

1    authority from Congress; for payment of unjust compensation for the flowage easement; for

2    damages to their land and water resources …; and for breach of trust."  H.R. Rep. No. 99-

3    851, at 1, 4, 7.

4              **2.       The LRA was a "settlement" of the Nation's land claims**

5              Under DOI's regulations, a "settlement" of a land claim "[1] resolves or extinguishes

6    with finality the tribe's land claim in whole or in part, [2] thereby resulting in the alienation

7    or loss of possession of some or all of the lands claimed by the tribe, [3] in legislation

8    enacted by Congress."  25 C.F.R. §292.5(a).  The LRA meets each of these requirements.

9              *First*, the Act "resolves or extinguishes" the Nation's land claims "with finality."  In a

10   section called "Waiver and Release of Claims," the Act provides that "[t]he Secretary shall

11   be required to carry out the obligations of this Act only if within one year after the enactment

12   of this Act the [Nation] executes a waiver and release in a manner satisfactory to the

13   Secretary of any and all claims of … injuries to land or water rights …with respect to the

14   lands of the Gila Bend Indian Reservation from time immemorial to the date of the execution

15   by the [Nation] of such a waiver."  LRA §9(a); *see* H.R. Rep. No. 99-851, at 12 ("tribe

16   [must] execute[] a waiver and release of *all* claims to rights with respect to lands in the Gila

17   Bend Reservation" (emphasis added)).  The Nation executed this waiver after the Act passed,

18   relinquishing all its claims stemming from the flooding of the Gila Bend Indian Reservation.

19   *See* 10/13/87 U.S./TON Agreement; SMF ¶8.  *Second*, the Act "result[ed] in the alienation or

20   loss of possession of some or all of the lands claimed by" the Nation because it required the

21   Nation to "assign[] to the United States all right, title, and interest of the [Nation] in nine

22   thousand eight hundred and eighty acres of land within the Gila Bend Indian Reservation."

23   LRA §4(a).  *Finally*, the LRA is, of course, "legislation enacted by Congress."  In short, once

24   the Settlement Property is taken into trust, it will be eligible for gaming under IGRA's

25   "settlement of a land claim" exception.

26

27

28

18

## II.   THE COMPACT DOES NOT IMPLICITLY BAR GAMING ON THE SETTLEMENT PROPERTY (COUNTS 1 AND 2)

Plaintiffs next wrongly contend that, even if IGRA permits gaming on the Settlement Property, the Compact nonetheless implicitly prohibits it, either through an implied term (count 1) or through the implied covenant of good faith and fair dealing (count 2).  These arguments ultimately boil down to the claim that the Compact—whose basic framework was intensively negotiated by sophisticated, sovereign parties over the course of several years; whose precise wording was mandated by statute; and whose provisions became effective only after approval by federal officials—does not mean what it says.  That claim is not only wholly implausible, it fails as a matter of law.  The Compact expressly authorizes the Nation to game on its Indian lands, with no hint of the limitation plaintiffs seek.  And there is no rule of contract interpretation, federal or state, under which plaintiffs' recourse to extrinsic evidence regarding the Nation's purported "bad faith" conduct justifies a reading of the Compact that would prohibit the very conduct the Compact expressly permits.

### A.   The Compact Should Be Construed According To Federal Law

As the Court observed in its ruling on the motion to dismiss, MTD Order 13, interpreting the Compact requires first addressing the threshold question of what law should govern that inquiry.  Although, as shown below, the Nation is entitled to summary judgment no matter what law is applied, federal law governs the construction of the Compact.

All Indian gaming compacts are creatures of federal law that would not exist but for IGRA.  IGRA's express purpose is to create a comprehensive federal statutory and regulatory scheme governing the "operation and regulation of gaming by Indian tribes." *Seminole Tribe v. Fla.*, 517 U.S. 44, 48 (1996); *see also* 25 U.S.C. §2702; *Rincon Band v. Schwarzenegger*, 602 F.3d 1019, 1027-1029 (9th Cir. 2010).  To that end, IGRA provides that Class III gaming is lawful only where it is "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State … that is in effect."  25 U.S.C. §2710(d)(1)(C).  The statute establishes a detailed process for compact negotiations, *id.* §2710(d)(3)(A), prescribes the compact's permissible scope, *id.* §2710(d)(3)(C), and provides that the compact is effective "only when … approv[ed] by the Secretary [of the

Interior]," *id.* §2710(d)(3)(B).  These provisions allow states and tribes—which are separate sovereigns—to enter agreements that would otherwise be impermissible without congressional consent.  *Seminole Tribe*, 517 U.S. at 58; *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 716 (9th Cir. 2003); *cf.* U.S. Const. art. I, §10, cl. 3.  "Tribal-state compacts are at the core of the scheme Congress developed to balance the interests of the federal government, the states, and the tribes.  They are a creation of federal law."  *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 546 (8th Cir. 1996).

In the analogous context of interstate compacts, which are also entered into by equal sovereigns and approved by the federal government, the Supreme Court has made clear that there is a strong federal interest in the way such accords are interpreted and that their "construction … presents a federal question."  *Cuyler v. Adams*, 449 U.S. 433, 438 (1981); *W. Va. ex rel. Dyer v. Sims*, 341 U.S. 22, 27 (1951) (A compact "is more than a supple device for dealing with interests confined within a region. … [I]t is also a means of safeguarding the national interest.").  Tribal-State compacts that are authorized by Congress and approved by the Secretary of the Interior should be treated no differently.  Indeed, the Ninth Circuit has stated that "[g]eneral principles of federal contract law govern [Tribal-State] Compacts … entered pursuant to IGRA," at least absent some indication that the parties had a different intent.  *Cachil Dehe Band v. Cal.*, 618 F.3d 1066, 1073 (9th Cir. 2010) (citing cases); *see also Muhammad v. Comanche Nation Casino*, 742 F. Supp. 2d 1268, 1276 n.7 (W.D. Okla. 2010) ("A tribal-state gaming compact is similar to a 'congressionally sanctioned interstate compact the interpretation of which presents a question of federal law.'").[16]

Although as this Court previously noted, MTD Order 13-14, parties to a Tribal-State compact can presumably agree that non-federal law will apply to the construction of their agreement, there is no such agreement here.  The "Governing Law" provision of the

---

[16] *Cachil* drew an analogy between "a contract entered pursuant to federal law when the United States is a party," *Kennewick Irr. Dist. v. U.S.*, 880 F.2d 1018, 1032 (9th Cir. 1989), and a Tribal-State compact entered pursuant to federal law when the approval of the Secretary of the Interior is required.  *Cachil*, 618 F.3d at 1073.  "[F]ederal law governs" the interpretation of both because similar federal interests are involved in both.  *Id.*

Compact provides that the Compact "shall be governed by and construed in accordance with the *applicable* laws of the United States, and the Nation and the State."  Compact §24 (emphasis added).  Certain portions of the Compact refer to or incorporate Arizona law.  *See, e.g., id.* §3(h) (addressing additional changes in state law); §12 (incorporating specific Arizona statutes).  Likewise, certain portions of the Compact refer to or incorporate tribal law.  *See, e.g., id.* §6 (providing for tribal regulation of gaming activities through the Nation's Gaming Office).  But those provisions are not at issue here, and nothing in the Compact or in the record suggests that any party intended Arizona or tribal law to be the "applicable" law governing interpretation of the Compact as a whole.  Indeed, it would make little sense to construe an agreement between two sovereigns under the auspices of federal law according to the law of one or the other compacting party absent clear evidence that this was the parties' intention.  Here, there is no such evidence, and given that the Compact itself is a creation of federal law, the "applicable" law governing its construction is the law of the United States.

The application of traditional conflict-of-laws principles yields the same result.  The *Restatement (Second) of Conflicts of Law* §188 (1971) provides that where there has not been an effective choice of law by the parties to a contract, the law of the jurisdiction with "the most significant relationship to the transaction and the parties" should apply.  *See Chuidian v. Phil. Nat'l Bank*, 976 F.2d 561, 564-565 (9th Cir. 1992).[17]  Here, the federal government—whose regulatory scheme is at issue—has the paramount connection to the Compact and to the parties.  *First*, this is an agreement between two sovereigns, each with its own law, but each subject to federal law.  *Cabazon Band v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997) (emphasizing the "federal interest at stake" in the enforcement of Tribal-State Compacts); *Muhammad*, 742 F. Supp. 2d at 1276 ("The federal government has a direct interest in … ensur[ing] that an approved gaming contract is enforced according to its terms.").  *Second*, even considering traditional conflict-of-laws factors—such as the "place

---

[17] Arizona courts also apply the *Restatement* to determine the applicable law in a contract action.  *Cardon v. Cotton Lane Holdings*, 841 P.2d 198, 202 (Ariz. 1992).

1   of contracting," "place of performance," and "location of the subject matter of the contract,"

2   *Restatement of Conflicts* §188(2), it is clear that the federal interest prevails.  As the

3   *Restatement* explains, *id.* cmt. e, the "place of contracting" is where the "last act" that gave

4   the contract "binding effect" occurred.  Here, that was the approval of the Secretary of the

5   Interior, as determined by federal law, 25 U.S.C. §2710(d)(3)(B).  Moreover, the gaming at

6   issue—a distinctly federal "subject matter"—will occur not on Arizona land, but rather on

7   "Indian lands" demarcated by federal law.  And even if the Nation and the State have an

8   interest in having the Compact's terms construed under their own sovereign law, those

9   interests are equivalent, and both are subordinate to governing federal law.[18]

10      **B.      No Implied Term In The Compact Bars Gaming On The Settlement
               Property (Count 1)**

11

12          The Compact "authorize[s]" the Nation to conduct Class III gaming on its "Indian

13   Lands," as that term is defined by IGRA, "subject to the provisions of 25 U.S.C. §2719,"

14   which in turn authorizes gaming on after-acquired lands acquired as part of a settlement of a

15   land claim.  Compact §§2(s), 3(a), 3(j); *see* SMF ¶¶12, 13.  Plaintiffs nonetheless claim that

16   the Compact contains an implied term prohibiting the Nation from gaming on such lands in

17   the Phoenix area.[19]  To be sure, in certain circumstances, a party may rely on extrinsic

18

19      [18] The federal government has a particularly acute interest in application of the federal
    parol evidence rule, *see infra* pp. 23-25, which bars consideration of such evidence absent a

20   contractual ambiguity.  IGRA's requirement that the Secretary of the Interior must approve
    the Compact would be undercut if the Secretary is not afforded the opportunity to review and
    consider all of the terms of the Compact.  *See* 25 U.S.C. §2710(d)(3)(B); *cf.* DOI Compact

21   Approval Letter 3 ("[T]he Secretary's approval authority [would be] meaningless … [if]
    substantive and controversial provisions [could] escape Secretarial review.").

22
       [19] Plaintiffs have never identified the precise term they seek to imply into the

23   Compact.  At various times, plaintiffs have suggested that the Nation agreed not to build any
    new gaming facilities in Phoenix, Am. Compl. ¶92; not to game on after-acquired lands, *id.*

24   ¶80; not to game outside its "existing reservation lands" or "historic tribal lands," Pls.' Am.
    Resp. to Nation's First Set of Non-Uniform Interrogs. 9 (Aug. 10, 2012) (Ex. 26); or not to

25   game outside its aboriginal lands as defined by the Indian Claims Commission.  The fact is
    that the Nation never agreed to limit its ability to game on its Indian lands beyond the

26   limitations expressly set out in the Compact—as deposition testimony from plaintiffs' own
    witnesses confirms.  *See, e.g.*, Walker Dep. 43 (Ex. 43) ("Q. … [Y]ou can't point to any

27   member of the Nation or any of their lobbyists or lawyers who have ever specifically stated
    that there would be no new casinos in the Phoenix area.  Correct?  A. Correct."); Severns

28   Dep. 53-54 (Ex. 41) ("I have no recollection of a conversation in which [the Nation]

evidence either to aid interpretation of an ambiguous contract term, *Restatement (Second) of Contracts* §212 (1981) ("*Restatement*"), or to argue that the parties orally agreed to terms beyond those in the written contract, *see id.* §216.  But under *no* circumstances, under either federal or Arizona law, may a party rely on extrinsic evidence to vary or contradict the written terms of a contract under the guise of construing them.  Nor can parties use extrinsic evidence to shoehorn a supposed representation or side agreement into a contract where the purported agreement contradicts the written contract's terms, especially where—as here—the parties have included an integration clause specifically to prevent such maneuvers.  This is precisely what plaintiffs seek to do, and their claims thus fail as a matter of law.

> ### 1.  The Compact is unambiguous, and its written terms cannot be varied by extrinsic evidence under federal or Arizona law

a.      Where, as here, a contract provision is clear and unambiguous, federal law categorically prohibits the admission of extrinsic evidence as an interpretive aid.  *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) ("[T]he plain language of the contract should be considered first … and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself." (citations omitted)); *Cabazon Band*, 124 F.3d at 1057-1058 ("reject[ing] the State's efforts to introduce extrinsic evidence" to impose a restriction that "the plain language of the [Tribal-State] Compacts does not contain").  Resort to extrinsic evidence is appropriate only if the provision is ambiguous on its face.  *Nehmer v. DVA*, 494 F.3d 846, 861 (9th Cir. 2007).  A contractual provision is ambiguous only "if reasonable people could find its terms

mentioned they would or would not build [a casino in Phoenix].");  Lewis Dep. 44 (does not recall the Nation ever stating it would not game in Phoenix area); Makil Dep. 95 ("Q. [Y]ou don't recall any specific representative of the Nation affirmatively stating that the Tohono O'odham would not build casinos in the Phoenix area.  Correct?  A. No one ever said anything to me.");  Landry Dep. 43 ("Q.  During the negotiations, no one from the Tohono O'odham ever specifically stated that the tribe would never game in the Phoenix area, did they?  A. That's correct.");  LaSarte Dep. 62-63 ("Q. And at no time did the State ever ask the Tohono O'odham to agree never to game in the Phoenix metropolitan area. Correct? … [A.] I do not recall any discussions for or against the possibility of Tohono O'odham gaming in the Phoenix metropolitan market[.]").  The Court need not address that question, however, because plaintiffs' attempt to use extrinsic evidence to vary or contradict the written terms of the Compact fails as a matter of law.

1    susceptible to more than one interpretation." *Klamath*, 204 F.3d at 1210.  Such a question

2    may be answered on summary judgment because "the determination of whether contract

3    language is ambiguous is a question of law."  *Id.*

4           Here, the Compact contains a specific section governing the "Location of Gaming

5    Facilit[ies]," which plainly "authorize[s]" gaming on any land that meets IGRA's

6    requirements, provided that the facilities are located one and a half miles apart:

> **Location.**  All Gaming Facilities shall be located on the Indian Lands of the
> Tribe.  All Gaming Facilities of the Tribe shall be located not less than one
> and one-half ($1^1/_2$) miles apart unless the configuration of the Indian Lands
> of the Tribe makes this requirement impracticable….  Gaming Activity on
> lands acquired after the enactment of the Act on October 17, 1988 shall be
> authorized only in accordance with 25 U.S.C. §2719.

11   Compact §3(j)(1); *see* SMF ¶11.  The Compact further defines "Indian Lands" as "lands as

12   defined in 25 U.S.C. §2703(4)(A) and (B), subject to the provisions of 25 U.S.C. §2719,"

13   which allows gaming on after-acquired lands acquired as part of a settlement of a land claim.

14   Compact §2(s); *see* SMF ¶¶12, 13.  This language, on its face, is unambiguous, as plaintiffs

15   have conceded.  *See* MTD Hr'g Tr. 34 (Dkt. 44).  Indeed, "[w]here a statute is incorporated

16   by reference its provisions [become] terms of the contract."  *Inst. of London Underwriters v.*

17   *Sea-Land Serv.*, 881 F.2d 761, 765 (9th Cir. 1989).  Accordingly, the Nation may game

18   anywhere authorized under that statute—including on after-acquired lands as provided by 25

19   U.S.C. §2719.  *See Nehmer*, 494 F.3d at 862-863; SMF ¶¶14, 15.

20          Plaintiffs have argued that a bar on gaming on the Settlement Property "is not

21   inconsistent with the written agreement" because it is merely a "further restriction" on the

22   Nation's right to game on after-acquired lands.  MTD Tr. 33.  That argument is meritless.

23   As an initial matter, Section 3(a) expressly and unambiguously "authorize[s]" the Nation to

24   conduct Class III gaming under the Compact.  The Compact further provides that "[a]ll

25   Gaming Facilities shall be located on the Indian Lands of the Tribe," Compact §3(j)(1), and

26   defines "Indian Lands" to have the same broad meaning as in IGRA, "subject to the

27   provisions of 25 U.S.C. §2719," *id.* §2(s).  That is, far from restricting the Nation's right to

28   game on after-acquired lands, the Compact plainly authorizes gaming everywhere that IGRA

24

authorizes it, including on after-acquired lands that meet §2719's requirements.  Indeed, plaintiffs have already conceded that these terms, as written, would allow the Nation to game on the Settlement Property, assuming it satisfies IGRA.  *See* MTD Tr. 34.  Plaintiffs nonetheless apparently rely on the word "only" in the last sentence of Section 3(j)(1)— which provides that "Gaming Activity on lands acquired after the enactment of [IGRA] on October 17, 1988 shall be authorized only in accordance with 25 U.S.C. §2719"—to suggest that this provision restricts, rather than authorizes, gaming on after-acquired lands.  But that reading, implausible on its face, cannot be sustained given the clear authorization to game on Indian lands elsewhere in the Compact.  *See* Compact §§3(j)(1), 2(s).  That additional sentence, which does nothing more than reiterate the fact that the Nation is authorized to game on after-acquired lands to the extent provided by IGRA, does not transform that authorization into a limitation.

Plaintiffs have suggested that, notwithstanding these clear terms, extrinsic evidence will establish that a "Gaming Device Allocation Table" included elsewhere in the Compact somehow precludes the Nation from gaming in Phoenix.  *See* Compact §3(c)(5); MTD Tr. 34.  But that table does nothing more than establish the number of gaming devices (and gaming facilities) allocated to each tribe; it says nothing whatsoever about where facilities may be located.  Plaintiffs' attempt to use extrinsic evidence to stretch the meaning of that unambiguous provision therefore fails.  As in *Cabazon Band*, the Court should reject such "strained interpretations" and "hold the State to its word." 124 F.3d at 1058.

b.      The result under Arizona law is identical.  Arizona allows consideration of extrinsic evidence in some circumstances to determine whether a contractual provision is ambiguous, but "even under Arizona's more permissive approach …, a proponent of parol evidence cannot completely escape the confines of the actual writing."  *Long v. City of Glendale*, 93 P.3d 519, 529 (Ariz. Ct. App. 2004).  In particular, the court still must determine whether the "written language is … 'reasonably susceptible' to the meaning asserted" as a matter of law.  *Id.* at 528.  And "one cannot claim that one is 'interpreting' a written clause with extrinsic evidence if the resulting 'interpretation' unavoidably changes

1   the meaning of the writing." *Id.* at 529.  Accordingly, Arizona law bars the use of "extrinsic

2   evidence to vary or contradict … the agreement." *Taylor v. State Farm Mut. Auto. Ins.*, 854

3   P.2d 1134, 1138 (Ariz. 1993); *see also Velarde v. PACE Membership Warehouse*, 105 F.3d

4   1313,1317-1318 (9th Cir. 1997) (applying *Taylor*).

5          Once again, plaintiffs' claim fails as a matter of law because they propose to do

6   precisely that.  Like federal law, Arizona law provides that when a contract incorporates a

7   statutory provision, "the interpretation and construction of the … provision … is controlled

8   by" the statute.  *Ervco, Inc. v. Texaco Ref. & Mktg.*, 422 F. Supp. 2d 1084, 1088 (D. Ariz.

9   2006).  The Compact's plain language thus allows the Nation to game on its "Indian Lands"

10  to the same extent authorized by IGRA, including on after-acquired lands that qualify under

11  25 U.S.C. §2719.  *See* Compact §§2(s), 3(j)(1).  Arizona law, like federal law, does not allow

12  plaintiffs to use extrinsic evidence to imply into the Compact a term that would prohibit what

13  the written terms of the Compact otherwise permit.  *See Taylor*, 854 P.2d at 1142 (agreement

14  unlikely to be found reasonably susceptible to an interpretation that "'X' does not in fact

15  mean 'X'"); *Long*, 93 P.3d at 529 (plaintiff could not use extrinsic evidence to show that

16  land he deeded to airport could be used only for a new runway where the deed contained no

17  such restriction).

18         The "Gaming Device Allocation Table" in Section 3(c)(5) of the Compact in no way

19  supports plaintiffs' reading.  The table lists, for each tribe, the current gaming device

20  allocation, the number of additional devices allocated to that tribe, the tribe's previous

21  gaming facility allocation, and its revised gaming facility allocation.  It says nothing

22  whatsoever about the location of facilities, which is addressed in a wholly separate provision.

23  Plaintiffs apparently contend that the ordering of the tribes in the table, which groups

24  together four tribes with facilities in the Phoenix area, followed by two tribes with facilities

25  in the Tucson area, indicates that the Compact prohibits the Tucson tribes from ever opening

26  a facility near Phoenix.  But it quite obviously does nothing of the sort.  The Compact simply

27  is not "reasonably susceptible" to plaintiffs' interpretation. *Cf. Long*, 93 P.3d at 529 ("Even

28  assuming the parties intended [the land] to be used [only] for a second runway, there must be

something *in the [writing]* … amenable to [such] an interpretation." (emphasis added));
*accord Velarde*, 105 F.3d at 1317 (rejecting extrinsic evidence offered to show that a letter
offering severance pay to employees of a closing warehouse was "operative only if the
warehouse in fact closed," because letter's language was "[not] susceptible to competing
interpretations"). Accordingly, even under Arizona law, plaintiffs cannot offer extrinsic
evidence to show that the Compact's terms should be interpreted to prohibit the Nation from
gaming in Phoenix.

### 2.    The Compact contains no implied additional terms

Both federal and Arizona law likewise preclude the use of extrinsic evidence to prove
that the Nation agreed to an additional, implied term not otherwise present in the written
Compact that bars the Nation from gaming in Phoenix.

As an initial matter, there is no dispute that the Compact is at least partially
integrated. Under both federal and Arizona law, the parol evidence rule provides that even a
partially integrated written agreement "discharges prior agreements to the extent that it is
inconsistent with them." *Restatement* §213(1); *see U.S. v. Triple A Mach. Shop*, 857 F.2d
579, 585 (9th Cir. 1988) (under federal parol evidence rule, "[e]vidence of a collateral
agreement" is inadmissible if it "contradict[s] a clear and unambiguous provision of a written
agreement"); *Taylor*, 854 P.2d at 1138-1139 (same under Arizona law). As discussed above,
any implied term barring the Nation from gaming in Phoenix flatly contradicts the
Compact's written terms. Accordingly, even if the Nation had represented to the State
during negotiations that that it would not game in Phoenix—which it did not—that
"agreement" is discharged by the parol evidence rule as a matter of law. *See supra* pp. 23-27.

In addition, even if an implied term prohibiting gaming in Phoenix did not contradict
the Compact's written terms—and it does—plaintiffs' attempt to introduce extrinsic
evidence would still fail because the Compact is *completely* integrated. Under both federal
and Arizona law, extrinsic evidence of any additional terms, consistent *or* inconsistent, is
inadmissible if the contract is fully integrated. *See Triple A*, 857 F.2d at 585; *Anderson v.*
*Preferred Stock Food Mkts.*, 854 P.2d 1194, 1197 (Ariz. Ct. App. 1993) ("If the court

27

1   concludes that a contract … [is] fully integrated …, it may enforce the contract as written."

2   (citing 3 *Corbin on Contracts* §§582-583 (1960)); *see also Restatement* §216.

3       A written agreement is completely integrated unless "the writing [1] omits a

4   consistent additional agreed term which … [2] in the circumstances might naturally be

5   omitted from the writing."[20]   *Restatement* §216(2).  Both elements must be proven.  *Id.*

6   Here, in addition to being inconsistent with the written Compact terms, *see supra* pp. 23-27,

7   the additional term that plaintiffs seek to impose is not the sort of term that naturally would

8   have been omitted from the writing.  *First*, the Compact contains a comprehensive integration

9   clause *disclaiming* that any terms were omitted:  The Compact provides that it "contains the

10  entire agreement of the parties with respect to the matters covered by this Compact and no

11  other statement, agreement, or promise made by any party, officer, or agent of any party

12  shall be valid or binding."  Compact §25; SMF ¶16.  It is well settled that the inclusion of

13  such a statement is "likely to conclude the issue whether the agreement is completely

14  integrated."  *Restatement* §216 cmt. e; *see McAbee Constr. v. U.S.*, 97 F.3d 1431, 1434 (Fed.

15  Cir. 1996) (under federal law, party "carries an extremely heavy burden in overcoming" an

16  integration clause); *Best W. Int'l v. Furber*, 2008 WL 4182827, at *4 (D. Ariz. Sept. 5, 2008)

17  (Campbell, J.) (applying Arizona law and concluding that "'[b]ecause the … agreement

18  contains an integration clause, the [agreement] represents the parties' entire agreement, and

19  there can be no implied terms'" (quoting *RUI One v. City of Berkeley*, 371 F.3d 1137, 1148

20  (9th Cir. 2004)).[21]  Further, the Compact contains specific language reflecting the parties'

21  intent that the Compact's written provisions exclusively govern the locations of gaming.  *See*

22  Compact §3(p) (prohibiting "Class III Gaming not specifically authorized in this Section").

23

24  [20] Whether a writing is completely integrated is a question of law.  *See Sylvania Elec.
    Prods. v. U.S.*, 458 F.2d 994, 1007 n.9 (Ct. Cl. 1972); *Anderson*, 854 P.2d at 1197 ("The
    question of integration and interpretation of a contract is initially one for the court.").

25

26  [21] *See also Corbin* §578 ("If a written document … declares in express terms that it
    contains the entire agreement of the parties, and that there are no antecedent or extrinsic

27  representations, warranties, or collateral provisions …, *this declaration is conclusive* ….
    [The writing] is just like a general release of all antecedent claims." (emphasis added));
    *Anderson*, 854 P.2d at 1198 ("Corbin's rule of integration applies to negotiated contracts"

28  under Arizona law).

*Second*, the location of gaming facilities is by no means a trivial or subsidiary issue, and the specificity of the Compact terms governing facility locations demonstrates that a bar on gaming in Phoenix is not a term that the parties naturally would have omitted.  The Compact expressly provides that (1) "[a]ll Gaming Facilities shall be located on the Indian Lands of the Tribe" as defined by IGRA, *see* Compact §§3(j)(1), 2(s); (2) all such facilities "shall be located not less than one and one-half ($1\frac{1}{2}$) miles apart" unless impracticable, *id.* §3(j); (3) gaming on after-acquired lands "shall be authorized only in accordance with 25 U.S.C. §2719," *id.*; and (4) if the Nation operates four facilities, "at least one of the four" must be "at least fifty (50) miles from the existing Gaming Facilities of the Tribe in the Tucson metropolitan area," *id.* §3(c)(3).  Given that the parties included these written terms precisely delineating where the Nation could game, the contention that the parties naturally would have omitted a term barring the Nation from gaming in Phoenix is simply not credible.  *See Day v. Am. Seafoods*, 557 F.3d 1056, 1058 (9th Cir. 2009) (specificity of written terms in contract defeated attempt to introduce extrinsic evidence to add new term).

*Finally*, the unique circumstances of negotiating a Tribal-State compact make it still more unlikely that a term barring gaming in Phoenix would naturally be omitted from the Compact.  Here, both parties were sovereigns; were sophisticated, repeat players in the compacting process; and were represented by experienced counsel during years of painstaking negotiations.  *See Pinnacle Peak Developers v. TRW Inv.*, 631 P.2d 540, 547-548 (Ariz. Ct. App. 1980) (oral agreement inadmissible where "formal contract" resulted from negotiations among experienced parties represented by counsel); *cf. N.J. v. Del.*, 552 U.S. 597, 615-616 (2008) ("Interstate compacts, like treaties, are presumed to be 'the subject of careful consideration before they are entered into, and are drawn by persons competent to express their meaning and to choose apt words in which to embody the purposes of the high contracting parties.'").  Moreover, the parties were aware that any agreement they reached would not be effective until approved by the Secretary of the Interior—a federal sovereign

29

1    not privy to the negotiations.  Under these circumstances, the notion that the parties

2    "naturally omitted" an additional substantive term is meritless.[22]

3         **C.    Plaintiffs' Implied-Covenant Claim (Count 2) Fails As A Matter Of Law**

4         Plaintiffs cannot resurrect their failed implied-term argument by recasting it as a

5    breach of the covenant of good faith and fair dealing.[23]  The covenant is not "'an everflowing

6    cornucopia of wished-for legal duties.'"  *U.S. v. Basin Elec. Power Coop.*, 248 F.3d 781, 796

7    (8th Cir. 2001) (applying federal common law).  It requires only that a party exercise good faith

8    in performing and enforcing the bargain that was struck.  *Restatement* §205.[24]  Here, plaintiffs

9    cannot establish that the Nation owes them a contractual obligation not to game in Phoenix—

10   *see supra* pp. 22-30—and because the Compact specifies with precision where gaming

11   facilities can be located, plaintiffs cannot show that the Nation's plans frustrate their right "to

12   receive the benefits of the agreement that they have entered into," *Wagenseller v. Scottsdale*

13   *Mem'l Hosp.*, 710 P.2d 1025, 1040 (Ariz. 1985).  Plaintiffs' claim fails as a matter of law.

14        The implied covenant assures only that a party will act reasonably in performing the

15   express terms of the contract.  *See McKnight v. Torres*, 563 F.3d 890, 893 (9th Cir. 2009);

16   *Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986) ("'[T]he relevant inquiry always will

17   focus on the contract itself, to determine what the parties did agree to.'").  Where, as here,

18   the parties have defined their expectations and limited the exercise of discretion through

19   precise contract terms—by "authoriz[ing]" the Nation to game on any "[Indian] lands

20   _____

21        [22] The fact that the Compact's terms were prescribed by an initiative ratified by the
     voters of Arizona is a further reason why this Court should not recognize an implied term in

22   this context.  Even if the parties had agreed on an unwritten term, that term obviously was
     not included in the text of the initiative that the voters approved.

23        [23] In *Alabama v. North Carolina*, 130 S. Ct. 2295, 2313 (2010), the Supreme Court
     held that there can be no implied covenant claim with respect to an "agreement among

24   sovereign[s] …, to which the political branches [of the United States] consented."  At the
     motion-to-dismiss stage, the Nation argued that the rationale of *Alabama* also applied to a

25   Tribal-State compact.  This Court disagreed, determining that "*Alabama*'s rationale is rooted
     in the special nature of interstate compacts."  MTD Order 15.  The Nation will not reargue

26   this point, but respectfully preserves it for appeal.

27        [24] Both Arizona and federal common law follow the *Restatement*.  *See Rawlings v.*
     *Apodaca*, 726 P.2d 565, 569 (Ariz. 1986); *Flores v. Am. Seafoods*, 335 F.3d 904, 913 (9th

28   Cir. 2003).

acquired after the enactment of [IGRA] … in accordance with 25 U.S.C. §2719," Compact §3(j)(1)—the only "*justified* expectation[]" that can result, *Restatement* §205 cmt. a (emphasis added), is that those terms will be performed.  *See* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 373 (1980) ("reasonable contemplation of the parties" means those "opportunities that were preserved upon entering the contract, interpreted objectively").  That is precisely why it is hornbook law that "there can be no breach of the implied promise or covenant of good faith and fair dealing where … the defendant acts in accordance with the express terms of the contract." 23 *Williston on Contracts* §63:22 (4th ed. 2002).[25]  Put simply, the Nation cannot breach the implied covenant simply by exercising its rights under the Compact.  *See Basin Elec.*, 248 F.3d at 796-798; *Thompson v. SunTrust Mortg.*, 2011 WL 3320774, at *3 (D. Ariz. Aug. 2, 2011) (Campbell, J.).[26]

Nor can alleged extrinsic evidence that the Nation somehow acted improperly or in bad faith during the compact negotiations, such as by purportedly withholding its intention to

---

[25] *See also* 17A C.J.S. *Contracts* §437 (2011) (implied covenant "cannot contradict, modify, negate, or override the express terms of a contract, … create rights or duties beyond those agreed to by the parties, … supply terms to the contract the parties were free to negotiate, but did not, … or interpose new obligations about which the contract is silent, even if the inclusion of the obligation is thought to be logical and wise"); 2 *Farnsworth on Contracts* §7.17 (3d ed. 2004) (It is "often repeated by courts" that "there is no duty of good faith if it would conflict with an express provision of the contract."); Burton & Anderson, *Contractual Good Faith* §3.2.1 (1995) (same).

[26] Even if the Nation's motive in exercising its express rights under the Compact were relevant, plaintiffs are not alleging that the Nation cannot build a facility in Glendale because it is "exercis[ing] a retained contractual power in bad faith."  *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons*, 38 P.3d 12, 30 (Ariz. 2002); *see, e.g.*, *Wagenseller*, 710 P.2d at 1040-1041 (while at-will employee could be terminated for any or no reason, employer cannot terminate for "bad cause").  Plaintiffs' claim is not that the Nation is pursuing the Glendale facility for a bad reason, but rather that the Nation cannot have a facility in Phoenix for *any* reason.  *See* Am. Compl. ¶¶101-103.  That allegation fails to state a breach of the implied covenant because it seeks to rewrite the contract to give plaintiffs "benefits for which [they] did not bargain."  *Basin Elec.*, 248 F.3d at 798; *see also Sw. Sav. & Loan Ass'n v. SunAmp Sys.*, 838 P.2d 1314, 1320-1322 (Ariz. Ct. App. 1992) (remanding for JNOV where lender acted solely out of a financial interest, not "out of spite, ill will, or any other non-business purpose," and thus did not thwart the borrower's justified expectations); *Ogden v. CDI Corp.*, 2010 WL 2662274, at *6 (D. Ariz. July 1, 2010) (Campbell, J.) (granting summary judgment).

31

build a casino in Phoenix, violate the implied covenant.  The covenant is not an independent cause of action for "bad faith."  Indeed, the covenant "does not deal with good faith in the formation of a contract" at all.  *Restatement* §205 cmt. c.  Contract *formation* raises "question[s] of tort law," *Market St. Assocs. v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991) (Posner, J.), that this Court has already dismissed from this suit.  *See* MTD Order 19 (dismissing claims for fraudulent inducement and material misrepresentation because they "do[] not constitute a claim for breach of the Compact").  Plaintiffs cannot resurrect those dismissed claims now under the guise of the implied covenant of good faith and fair dealing.

### III.  THE NATION IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' PROMISSORY-ESTOPPEL CLAIM (COUNT 3)

Finally, plaintiffs cannot seek to enforce outside of the Compact what they cannot enforce within its four corners.  The Nation is entitled to summary judgment on plaintiffs' promissory-estoppel claim (Count 3) both because the claim is barred by sovereign immunity and because it fails as a matter of law.

#### A.   Plaintiffs' Promissory-Estoppel Claim Is Barred By The Nation's Sovereign Immunity

The Nation's sovereign immunity bars plaintiffs' promissory-estoppel claim.  "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978).  Thus, "the 'Indian Nations are exempt from suit'" absent an "'unequivocally expressed'" congressional intent.  *Id.*; *U.S. v. James*, 980 F.2d 1314, 1319 (9th Cir. 1992).  Any such abrogation must be read narrowly, both because a waiver of sovereign immunity "will be strictly construed, in terms of its scope, in favor of the sovereign," *Lane v. Peña*, 518 U.S. 187, 192 (1996), and because ambiguities in federal laws implicating Indian rights must be resolved in the Indians' favor, *Rincon Band*, 602 F.3d at 1028 n.9.

Here, the only relevant statute that could be read as abrogating the Nation's sovereign immunity from suit is IGRA, 25 U.S.C. §2710(d)(7)(A)(ii), which provides that "[t]he United States district courts shall have jurisdiction over any cause of action initiated by a

State or Indian tribe to enjoin a class III gaming activity … conducted in violation of any Tribal-State compact … that is in effect."  That "limited" abrogation, *Kiowa Tribe v. Mfg. Techs.*, 523 U.S. 751, 758 (1998), does not, however, "evince[] a broad congressional intent to abrogate tribal immunity from any state suit that seeks declaratory or injunctive relief." *Fla. v. Seminole Tribe*, 181 F.3d 1237, 1242 (11th Cir. 1999).  It confers jurisdiction and abrogates sovereign immunity only with respect to a cause of action for a "violation *of a[] Tribal-state compact*."  *See id.* (emphasis added); *Cabazon Band*, 124 F.3d at 1059-1060 (no jurisdiction to enjoin activities "beyond the express provisions of the Compacts"); MTD Order 19 ("Congress abrogated tribal sovereign immunity only for claims alleging violations of gaming compacts.").

Promissory estoppel, by definition, is not such a claim.  Promissory estoppel is a legal fiction that substitutes for contractual consideration where one party relies on another's promise *without* having entered into an enforceable contract.  *See Restatement* §90; 4 *Williston on Contracts* §8:7 (4th ed. 2008).  A claim for promissory estoppel "cannot be characterized … as an 'express or implied-in-fact' contract.'"  *Jablon v. U.S.*, 657 F.2d 1064, 1070 (9th Cir. 1981); *see also Double AA Builders v. Grand State Constr.*, 114 P.3d 835, 843 (Ariz. Ct. App. 2005) ("A promissory estoppel claim is not the same as a contract claim").  Plaintiffs' claim for promissory estoppel does not seek to enforce a term of the Compact, but to enforce an alleged separate, noncontractual promise.  It thus does not involve "gaming activity … in violation of a[] Tribal-State compact" and is barred by sovereign immunity.[27]

Indeed, even a much broader waiver of sovereign immunity would not permit a claim for promissory estoppel to proceed.  The Tucker Act waives the United States' sovereign immunity for a broad class of contract claims, *see* 28 U.S.C. §1346(a)(2); *id.* §1491(a)(1),

---

[27] Courts routinely refuse to allow equitable contract principles to expand the abrogation of a tribe's sovereign immunity.  *See, e.g.*, *A.K. Mgmt. v. San Manuel Band*, 789 F.2d 785, 789 (9th Cir. 1986) (no "duty [of good faith and fair dealing] on the Band to seek BIA approval of the Agreement" because "the waiver of sovereign immunity is clearly part of the Agreement, and is not operable except as part of that Agreement"); *U.S. ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt. Consultants*, 883 F.2d 886, 890 (10th Cir. 1989) ("egregious conduct by the Tribe" does not change this result).

33

1   but has long been held not to waive the United States' sovereign immunity for a claim for

2   promissory estoppel. *Jablon*, 657 F.3d at 1068-1069 ("We have not discovered … any

3   precedent in this circuit for an independent cause of action against the government founded

4   upon promissory estoppel."); *see Craig-Buff Ltd. P'ship v. U.S.*, 69 Fed. Cl. 382, 389 (2006);

5   *Hercules, Inc. v. U.S.*, 516 U.S. 417, 423 (1996).  IGRA's abrogation of sovereign immunity

6   is far narrower, involving only gaming "in violation of" a singular type of contract—"a

7   Tribal-State compact." 25 U.S.C. §2710(d)(7)(A)(ii).  "'This court [thus] has no jurisdiction

8   over [plaintiffs'] claim[] for promissory estoppel, as it requires the finding of a [separate]

9   contract implied-in-law against the [Nation], for which there has been no waiver of sovereign

10   immunity.'" *Craig-Buff*, 69 Fed. Cl. at 389 (citing *Hercules*, 516 U.S. at 423).[28]

11         **B.**    **Plaintiffs' Promissory-Estoppel Claim Fails As A Matter Of Law**

12         In any event, plaintiffs' claim for promissory estoppel fails as a matter of law.

13   Promissory estoppel is an equitable cause of action under which someone who reasonably

14   relies on another's promise can later enforce that promise, even absent a binding contract.

15   *Restatement* §90(1) (promissory estoppel involves "[a] promise which the promisor should

16   reasonably expect to induce action or forbearance on the part of the promisee or a third

17   person and which does induce such action or forbearance").[29]

18         But such a promise cannot be enforced where an actual contract between the parties

19   *does* exist.  Even if a plaintiff "may [be] able to prove an implied agreement … under some

20   equitable theory," summary judgment is warranted where the parties entered an "express

21   agreement." *Chanay v. Chittenden*, 563 P.2d 287, 290 (Ariz. 1977) (citing §90).  "There can

---

22         [28] *Crow Tribe v. Racicot*, 87 F.3d 1039, 1044-1045 (9th Cir. 1996) is not to the

23   contrary. *See* MTD Order 18.  *Crow Tribe* did not involve a claim for promissory estoppel.
     Rather, the court merely determined that the "ambiguous language" of the Tribal-State

24   compact at issue did not "authorize mechanical slot machine use when the State and the
     Crow earlier [during compact negotiations] disputed an explicit authorization." *Crow Tribe*,

25   87 F.3d at 1045.  That is, *Crow Tribe* involved interpretation of the terms of a contract, not a
     noncontractual promise, and thus is inapposite to plaintiffs' promissory-estoppel claim.

26
         [29] While plaintiffs have never identified the law under which they bring their

27   promissory-estoppel claim, both Arizona and federal common law generally follow the
     *Restatement*. *See Aguilar v. Int'l Longshoremen's Union*, 966 F.2d 443, 445 & n.2 (9th Cir.

28   1992); *Chewning v. Palmer*, 650 P.2d 438, 440 (Ariz. 1982).

be no implied contract where there is an express contract between the parties in reference to the same subject matter."  *Id.* (citing cases); *see also Mann v. GTCR Golder Rauner*, 425 F. Supp. 2d 1015, 1036 (D. Ariz. 2006) (granting summary judgment to defendants where subject matter of promise was addressed in a contract between the parties); *cf. All-Tech Telecom v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999) ("When there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill.").

This result is entirely consistent with basic principles of contract law and with the elements of promissory estoppel.  Where an alleged promise is followed by an actual contract, reliance on the alleged promise is unreasonable.  "Plaintiffs cannot establish that they justifiably relied on the alleged promises due to the express contract[] … referencing the same subject matters and the integration clause[] contained therein."  *Mann*, 425 F. Supp. 2d at 1036; *see also Higginbottom v. State*, 51 P.3d 972, 977 (Ariz. Ct. App. 2002) ("'Reliance is  … not justified when knowledge to the contrary exists.'").  Here, even if the Nation had made any of the "promises" that plaintiffs allege—and it did not—the Nation and the State subsequently entered into an enforceable, binding Tribal-State Compact that "authorize[s]" the Nation to game on any "lands acquired after the enactment of [IGRA] … in accordance with 25 U.S.C. §2719," Compact §3(j)(1).  In addition, the Compact's integration clause instructs that the Compact contains the parties' "entire agreement" and "no other statement, agreement, or promise … shall be valid or binding."  *Id.* §25.  Put simply, "[t]o allow [promissory estoppel] to be invoked" under these circumstances "circumvent[s] … carefully designed rules of contract law."  *All-Tech Telecom*, 174 F.3d at 869.

## CONCLUSION

The Nation's motion for summary judgment should be granted.

Dated:  November 19, 2012                    Respectfully submitted,


                                             /s/ Danielle Spinelli
                                             Jonathan Jantzen,
                                                Attorney General, SBN 016220
                                             Samuel Daughety,
                                                Assistant Attorney General, SBN 023170
                                             Office of Attorney General
                                             TOHONO O'ODHAM NATION
                                             P.O. Box 830
                                             Sells, AZ  85634
                                             Telephone: (520) 383-3410
                                             jonathan.jantzen@tonation-nsn.gov
                                             samuel.daughety@tonation-nsn.gov

                                             Seth P. Waxman (*Pro hac vice*)
                                             Danielle Spinelli (*Pro hac vice*)
                                             Annie L. Owens (*Pro hac vice*)
                                             Shivaprasad Nagaraj (*Pro hac vice*)
                                             Sonya L. Lebsack (*Pro hac vice*)
                                             WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
                                             1875 Pennsylvania Avenue, N.W.
                                             Washington, D.C.  20006
                                             Telephone:  (202) 663-6000
                                             seth.waxman@wilmerhale.com
                                             danielle.spinelli@wilmerhale.com
                                             annie.owens@wilmerhale.com
                                             shiva.nagaraj@wilmerhale.com
                                             sonya.lebsack@wilmerhale.com

                                             Michael J. Rusing, SBN 006617
                                             Todd H. Hardy, SBN 023675
                                             RUSING LOPEZ & LIZARDI, PLLC
                                             6363 N. Swan Road, Suite 151
                                             Tucson, AZ  85718
                                             (520) 792-4800
                                             mrusing@rllaz.com
                                             thardy@rllaz.com
                                             *Counsel for Defendant Tohono O'odham Nation*

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on this 19th day of November, 2012, I electronically transmitted

3    the foregoing document to the Clerk's Office using the CM/ECF System, which will send a

4    notice of filing to all counsel of record.

5

6                                                  /s/ Danielle Spinelli

7                                                  DANIELLE SPINELLI

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28