Mary R. O'Grady (#011434)
John L. Blanchard (#018995)
Shane M. Ham (#027753)
Grace E. Rebling (#028661)
OSBORN MALEDON, P.A.
2929 North Central Avenue
Suite 2100
Phoenix, Arizona  85012
(602) 640-9352
mogrady@omlaw.com
jblanchard@omlaw.com
sham@omlaw.com
grebling@omlaw.com

*Attorneys for Plaintiff Salt River Pima-
  Maricopa Indian Community*

Thomas C. Horne (#002951)
Attorney General
Michael Tryon (#003109)
Evan Hiller (#028214)
Assistant Attorneys General
1275 West Washington Street
Phoenix, Arizona  85007-2926
(602) 542-5025
Tom.horne@azag.gov
Michael.tryon@azag.gov
Evan.hiller@azag.gov

*Attorneys for Plaintiff the State of
  Arizona*

Linus Everling, General Counsel
 (#019760)
GILA RIVER INDIAN COMMUNITY
525 W. Gu u Ki
P.O. Box 97
Sacaton, Arizona  85247
(520) 562-9763
Linus.Everling@gric.nsn.us

James P. Tuite (Pro Hac Vice)
Merrill C. Godfrey (Pro Hac Vice)
Jason T. Hauter (#022188)
AKIN GUMP STRAUSS HAUER &
  FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, DC  20036-1564
(202) 887-4000
jtuite@akingump.com
mgodfrey@akingump.com
jhauter@akingump.com

Brian J. Schulman (#015286)
GREENBERG TRAURIG LLP
2375 E. Camelback Road, Suite 700
Phoenix, AZ  85016
602-445-8000
schulmanb@gtlaw.com

*Attorneys for Plaintiff Gila River Indian
  Community*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **The State of Arizona**; **The Gila River Indian Community**, a federally recognized Indian tribe; and **The Salt River Pima-Maricopa Indian Community**, a federally recognized Indian tribe,<br><br>Plaintiffs,<br><br>v.<br><br>**The Tohono O'odham Nation**, a federally recognized Indian tribe,<br><br>Defendant. | No. CV11-0296-PHX-DGC<br><br><br>**PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>***ORAL ARGUMENT REQUESTED***<br><br>(Assigned to David G. Campbell) |

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................... 4

FACTUAL BACKGROUND ......................................................................... 8

SUMMARY OF THE ARGUMENT ........................................................... 14

ARGUMENT ................................................................................................ 15

I.  THE NATION'S PLAN TO LOCATE A CASINO IN THE
    PHOENIX MARKET VIOLATES THE COMPACT ...................... 15

   A.  The Compact Authorizes Gaming Facilities and
       Machines Within Specific Markets, and the Nation Did
       Not Obtain Any Authorizations in the Phoenix Market ........... 15

   B.  Arizona Law Governs the Admission of Extrinsic
       Evidence for Contract Interpretation ....................................... 18

       1.  The Parties Chose a Traditional Conflicts
           Analysis Among Three Specified Sources of
           Law on an Issue-By-Issue Basis Under the
           Restatement ..................................................................... 19

       2.  Under the Restatement, Arizona Law Applies to
           Interpretation ................................................................. 21

       3.  State Law Applies in Any Event Because There
           Is No Significant Conflict Between Arizona Law
           and a Genuine, Identifiable Federal Policy or
           Interest ............................................................................ 24

   C.  Extrinsic Evidence Is Admissible and Conclusive in
       Favor of Plaintiffs' Interpretation, Under Either
       Arizona or Federal Law .............................................................. 26

       1.  Under Arizona Law, Extrinsic Evidence Is
           Admissible and Conclusively Establishes that
           Plaintiffs' Interpretation of the Compact Is
           Correct .............................................................................. 26

           a.  Extrinsic Evidence Is Admissible and
               Conclusive ............................................................. 26

           b.  The Plaintiffs' Interpretation Does Not
               Contradict Any Terms of the Compact ............... 28

       2.  Under Federal Law, the Extrinsic Evidence Is
           Admissible to Resolve Ambiguity Created by
           Sections 3(c)(3) and 3(c)(5) ............................................ 29

D.   Extrinsic Evidence Proves an Additional Consistent Term Limiting the Nation's Casinos to the Tucson Market and Rural Areas ................................................................. 32

II.   LOCATING A CASINO IN THE PHOENIX MARKET VIOLATES THE COVENANT OF GOOD FAITH AND FAIR DEALING ................................................................. 35

III.   ALTERNATIVELY, THE NATION'S PROMISES MAY BE ENFORCED UNDER PROMISSORY ESTOPPEL ......................... 37

A.   Plaintiffs Detrimentally Relied on the Nation's Promise That There Would Be No Additional Gaming Facilities in the Phoenix Metropolitan Area ......................... 37

B.   Sovereign Immunity Does Not Bar The Promissory Estoppel Claim ......................... 38

IV.   THE NATION'S GLENDALE PARCEL DOES NOT QUALIFY AS PART OF A "SETTLEMENT OF A LAND CLAIM" UNDER IGRA ......................... 39

A.   The Gila Bend Act Did Not Settle a "Land Claim" ................... 40

1.   A Land Claim Under IGRA Is a Claim Regarding the Title or Possession of Land, and Neither the Gila Bend Act nor Its Accompanying Settlement Agreement Settle Such Claims .................... 40

2.   The Legislative History of the Gila Bend Act Supports the View That the Act Did Not Settle a "Land Claim" ......................... 42

B.   The Nation Intentionally Abandoned Any Right It Might Have Had to Assert That the Gila Bend Act Is a Settlement of a Land Claim ......................... 45

1.   Judicial Estoppel Bars the Nation from Asserting That the Gila Bend Act Qualifies as the Settlement of a Land Claim ......................... 46

2.   The Nation Waived the Right to Invoke the Settlement of a Land Claim Exception ......................... 48

V.   PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF ............. 51

CONCLUSION ......................... 52

CERTIFICATE OF SERVICE ......................... 54

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*AGA S'holders, LLC v. CSK Auto, Inc.*, 589 F. Supp. 2d 1175 (D. Ariz. 2008)...................... 26

*Alabama v. North Carolina*, 130 S. Ct. 2295 (2010) ................................................ 25

*AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572 (7th Cir. 1995) ......................... 31

*Am. Cont'l Life Ins. Co. v. Ranier Constr. Co., Inc.*, 607 P.2d 372 (1980) ........................... 48

*Apple Inc. v. Psystar Corp.*, 658 F.3d 1150 (9th Cir. 2011) ...................................... 51

*Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663 (9th Cir. 1997) ............................ 20

*Baldwin v. Univ. of Pittsburgh Med. Ctr. UPMC*, 636 F.3d 69 (3d Cir. 2011)....................... 31

*Bike Fashion Corp. v. Kramer*, 46 P.3d 431 (Ariz. App. 2002)................................... 36

*Burkons v. Ticor Title Ins. Co.*, 813 P.2d 710 (Ariz. 1991)............................... 26, 28

*Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050 (9th Cir. 1997) ..................... 39

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 618 F.3d 1066 (9th Cir. 2010)................................................ 25, 26

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847 (9th Cir. 2009) ............................. 51

*Castaneda v. Dura-Vent Corp.*, 648 F.2d 612 (9th Cir. 1981) .................................. 30

*Chanay v. Chittenden*, 563 P.2d 287 (Ariz. 1977)............................................ 38

*Chewning v. Palmer*, 650 P.2d 438 (Ariz. 1982)............................................ 37

*Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162 (9th Cir. 2006)................ 48

*Cohen v. United States*, 650 F.3d 717 (D.C. Cir. 2011) ...................................... 44

*Confederated Tribes of Siletz Indians v. Oregon*, 143 F.3d 481 (9th Cir. 1998)................... 23

*Conroy v. Aniskoff*, 507 U.S. 511 (1993)................................................... 43

*Cont'l Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099 (9th Cir. 1994)............................ 51

*Contempo Constr. Co. v. Mountain States Tel. & Tel. Co.*, 736 P.2d 13 (Ariz. App. 1987)................................................ 37

*Crow Tribe of Indians v. Racicot*, 87 F.3d 1039 (9th Cir. 1996)............................... 30, 31, 39

*eBay Inc v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)................................... 51

*Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677 (2006)........................... 24

*Energy Oils, Inc. v. Mont. Power Co.*, 626 F.2d 731 (9th Cir. 1980)....................................22

*Flood Control Dist. of Maricopa Cnty. v. Paloma Inv. Ltd. P'ship*, 279 P.3d 1191
    (App. 2012) ....................................................................................................46

*Gila River Indian Cmty. v. United States*, No. CV-10-1993-PHX,
    2011 WL 1656486 (D. Ariz. May 3, 2011) ......................................51

*Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778 (9th Cir. 2001)..............................46

*Hass v. Darigold Dairy Prods., Inc.*, 751 F.2d 1096 (9th Cir. 1985)...................................37

*Hill v. Jones*, 725 P.2d 1115 (Ariz. App. 1986)....................................................................38

*I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ................................................................45

*John C. Lincoln Hosp. & Health Corp. v. Maricopa Cnty.*, 96 P.3d 530
    (Ariz. App. 2004)...........................................................................................38

*Johnson v. Cavan*, 733 P.2d 649 (Ariz. App. 1986) .............................................................18

*Kerin v. U.S. Postal Serv.*, 116 F.3d 988 (2d Cir. 1997)......................................................31

*L-3 Commc'n Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066
    (D. Colo. 2012) ..............................................................................................44

*Miller v. Hehlen*, 104 P.3d 193 (Ariz. App. 2005) ........................................................21, 26

*Muhammad v. Comanche Nation Casino*, 742 F. Supp. 2d 1268
    (W.D. Okla. 2010) .........................................................................................25

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ............................................................46, 47

*O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994) ........................................................24, 25

*Rawlings v. Apodaca*, 726 P.2d 565 (Ariz. 1986)................................................................35

*Smith v. Melson, Inc.*, 659 P.2d 1264 (Ariz. 1983) .............................................................26

*Starrag v. Maersk, Inc.*, 486 F.3d 607 (9th Cir. 2007) ........................................................21

*State ex rel. Dyer v. Sims*, 341 U.S. 22 (1951) ....................................................................25

*Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134 (Ariz. 1993)........................26, 28

*Transport Indem. Co. v. Liberty Mut. Ins. Co.*, 620 F.2d 1368 (9th Cir. 1980) ..................24

*Traumann v. Southland Corp.*, 842 F. Supp. 386 (N.D. Cal. 1993) .....................................37

*United States v. Basin Elec. Power Coop.*, 248 F.3d 781 (8th Cir. 2001)............................37

*United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979) .................................................24

*United States v. Mezzonatto*, 513 U.S. 196 (1995) ..............................................................48

*United States v. Talley Defense Sys., Inc.*, 393 F. Supp. 2d 964 (D. Ariz. 2005)................... 33

*W. Chance #2, Inc. v. KFC Corp.*, 957 F.2d 1538 (9th Cir. 1992) ......................................... 32

*Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12 (Ariz. 2002)........................................................ 35, 36

*Wilson v. Marchington*, 127 F.3d 805 (9th Cir. 1997)...................................................... 26

*Wyandotte Nation v. Nat'l Indian Gaming Comm'n*, 437 F. Supp. 2d 1193 (D. Kan. 2006) ......................................................................... 42

**Statutes**

18 U.S.C. § 1859................................................................................................. 40

25 C.F.R. § 292.2 ......................................................................................... 41, 42

25 U.S.C. § 2 ...................................................................................................... 23

25 U.S.C. § 941 .................................................................................................. 41

25 U.S.C. § 941a ................................................................................................ 41

25 U.S.C. § 941d ................................................................................................ 41

25 U.S.C. § 1300k .............................................................................................. 40

25 U.S.C. § 1758 ................................................................................................ 40

25 U.S.C. § 1771 ................................................................................................ 41

25 U.S.C. § 1777 ................................................................................................ 41

25 U.S.C. § 1777c .............................................................................................. 41

25 U.S.C. § 2710............................................................................................. passim

25 U.S.C. § 2719 ................................................................................................ 42

28 U.S.C. § 1346 ................................................................................................ 38

43 U.S.C. § 757.................................................................................................. 40

A.R.S. § 5-601 ................................................................................................... 25

Gila Bend Act § 2 ......................................................................................... 43, 44

S. Ariz. Water Rights Settlement Act of 1982, P.L. 97-293, 96 Stat. 1261.................... 44

Tohono O'odham Code, Title 4, ch. 1, § 1-102 ................................................... 19

**Rules**

Tohono O'odham Rules of Court 1 ...................................................................... 19

**Other Authorities**

Farnsworth, *Contracts* § 7.9 (3d ed. 1999) ................................................................ 18

Farnsworth, *Contracts* § 7.12 (3d ed. 1999) .............................................................. 31

Pub. L. 98–602, 98 Stat 3149 § 105 ............................................................................. 42

Rest. 2d Confl. § 6 (1971) ............................................................................................. 20

Rest. 2d Confl. § 186 (1971) ................................................................................... 20, 21

Rest. 2d Confl. § 188 (1971) ............................................................................. 20, 21, 22

Rest. 2d Contr. § 90 (1981) .......................................................................................... 38

Rest. 2d Contr. § 201 (1981) ................................................................................... 18, 27

Rest. 2d Contr. § 210 (1981) ........................................................................................ 33

Rest. 2d Contr. § 212 (1981) ........................................................................................ 18

Rest. 2d Contr. § 215 (1981) ........................................................................................ 28

Rest. 2d Contr. § 216 (1981) ................................................................................... 32, 34

Webster's Third New Int'l Dictionary 57 (1976) ......................................................... 16

1
2
3
4
5

Plaintiffs the State of Arizona, the Gila River Indian Community ("Gila River"), and the Salt River Pima-Maricopa Indian Community ("Salt River") file this Cross Motion for Summary Judgment and brief in opposition to the Tohono O'odham Nation's ("Nation") Motion for Summary Judgment and Memorandum of Law ("N. Mot.") (Doc. 193) with respect to all pending claims in the Complaint.

6
7
8
9
10
11
12

The Court should deny the Nation's Motion and grant Plaintiffs' Cross-Motion because, by locating a casino on the Glendale parcel, the Nation violates both the current gaming compact ("2002 Compact" or "Compact") and its duty of good faith and fair dealing.  Alternatively, the Nation is barred by promissory estoppel.  In addition, the Nation's plan violates the Compact because the Gila Bend Act does not constitute the "settlement of a land claim" under the Indian Gaming Regulatory Act ("IGRA") and the Nation is estopped from asserting the contrary.

13

**FACTUAL BACKGROUND**

14

***The Tribes Agreed to Work Cooperatively and in Good Faith in Their Negotiations***

15
16
17
18
19
20
21
22
23

The Nation's Compact is the product of negotiations among Arizona Indian tribes, and between those tribes and the State (through the office of Governor Jane Hull).  Plaintiffs' Statement of Undisputed Material Facts ("SOF") ¶¶ 28-30.  With many of the tribes' existing compacts set to expire in 2003, the parties engaged in more than two years of intensive negotiations, from late 1999 to early 2002.  SOF ¶¶ 29, 31.  That, in turn, led to an agreed-upon term sheet or framework in February 2002, a subsequent unsuccessful lobbying effort to adopt the framework by statute, the Proposition 202 ballot initiative (which passed in November 2002), and ultimately to the execution of compacts between the State and the tribes.  N. Mot. at 18.[1]

24
25

Early in the negotiations, the Nation, Gila River, Salt River, and more than a dozen other Arizona tribes agreed to work together to forge a unified front to

26
27
28

---

[1] All references to the Nation's Motion will use the page numbers appended by the ECF system in blue at the top of each page.

4648905v3

negotiate with the State.  SOF ¶¶ 29-33.  In the words of the Nation's Chairman, Ed Manuel, Jr., that approach gave the tribes "[s]trength in numbers."  SOF ¶ 36.

The tribes worked together under the auspices of the Arizona Indian Gaming Association ("AIGA") to conduct inter-tribal negotiations and to negotiate as a unit with the State.  SOF ¶ 30, 32; N. Mot. at 15.  AIGA acted by consensus of its member tribes' elected leaders, including the Nation's Chairman.  SOF ¶¶ 48-50.  To memorialize their good-faith commitments to each other, the tribal leaders entered into an "Agreement in Principle."  SOF ¶ 35.  Among other things, this bound the tribes to be honest, open, and candid with each other about their positions, intentions, and actions during the negotiations, and to notify other tribal leaders if in any circumstance that was not possible.  SOF ¶¶ 36-45.

### A Key Goal of the State Was to Restrict the Number of Casinos in Metropolitan Markets

From the outset of the negotiations, Governor Hull stated that a key goal of the State was to reduce the overall number of gaming facilities authorized under the existing compacts and to eliminate all rights to build additional facilities in the two metropolitan markets.  SOF ¶¶ 68-74.  Under their existing compacts, each of the Phoenix-market and Tucson-market tribes had the right to build one additional facility, and the State sought to eliminate those rights.  SOF ¶ 77.  In exchange for a reduction in the number of authorized facilities, the State was willing to agree that the gaming tribes could increase the number of machines in each of their facilities, through a system allowing the transfer of unused machine rights from non-gaming tribes.  SOF ¶¶ 77-80.

### The Phoenix and Tucson Market Tribes Divided into Separate Negotiating Groups

For each of the two metropolitan markets, the AIGA tribes formed subgroups to resolve among themselves the inherently competitive issues of how many machines and facilities each would seek within each of those markets and then to present a common position on those issues to the State.  SOF ¶¶ 81-82.  The Phoenix market

4648905v3

group consisted of Salt River, Gila River, the Fort McDowell Yavapai Indian Community, and the Ak-Chin Indian Community.  SOF ¶ 84.  The Tucson market group consisted of the Nation and the Pascua Yaqui Tribe.  SOF ¶ 83.  Except for some discussions about whether Ak-Chin should be treated as a Phoenix tribe or as a rural tribe, the compositions of these two groups never changed.  SOF ¶ 85. Throughout the long negotiating process, the Nation never identified itself as a member of the Phoenix market group, negotiated for facilities or machines in the Phoenix market, or asserted a right to locate facilities or machines in that market. SOF ¶¶ 89-92.

These market-area negotiations were facilitated and memorialized by an iteration of charts listing the numbers of facilities and machines to be authorized for each tribe.  SOF ¶¶ 93-94.  The metropolitan-market tribes used these "Scope of Gaming" charts when negotiating among themselves and ultimately when negotiating with the State.  SOF ¶ 94.  The final version of the Scope of Gaming chart agreed upon by the tribes and the State was placed in Section 3(c)(5) of the Compact.  SOF ¶ 93.

The Scope of Gaming charts grouped gaming tribes according to whether they were in the Phoenix market group, the Tucson market group, or one of two rural groupings.  SOF ¶ 94, 96.  An early version dated April 27, 2000, identified the four tribes "in the Phoenix metropolitan market area," the two tribes "in the Tucson metropolitan market area," and the rural tribes "located outside of either" of those market areas.  SOF ¶ 94 (SOF Exs 48, 74).  Iterations of the chart between September 2000 and January 2002 state that the numbers of facilities and machines in the Phoenix market group are "still subject to negotiation between Maricopa County Tribes" or "still subject to [negotiation over] Maricopa County market parity."  They also have similar, parallel notations regarding ongoing "market parity" negotiations between the two Tucson-market tribes. *See* SOF ¶¶ 95-98.

4648905v3

When the parties finalized the Scope of Gaming chart in early 2002, they removed the references to these negotiations over Phoenix market parity and Tucson market parity.  SOF ¶¶ 100-102.  But one feature never changed – namely, the grouping of the tribes according to geographic market area.  SOF ¶¶ 105-106.  In the Compact, the 15 gaming tribes are listed in the same order they appear in the August and September 2000 Scope of Gaming charts; only the blank spaces separating the different market groups were eliminated as a clerical revision.  *Id.*; Compact § 3(c)(5).

In response to the State's effort to prevent additional casinos in the urban markets, all the Phoenix-market tribes ultimately agreed to reduce by one their gaming facility authorization under their existing compacts.  SOF ¶ 87.  In the Tucson market, the Pascua Yaqui Tribe agreed to a similar reduction. SOF ¶ 88.  These agreed-upon reductions in gaming facility allocations appear in the final Scope of Gaming chart in Section 3(c)(5) of the Compact, which lists each tribe's "Previous Gaming Facility Allocation" (column 3) and "Revised Gaming Facility Allocation" (column 4).  Because each of these tribes was already using all but one of its existing facility rights, none of them would be allowed to build an additional casino.  SOF ¶ 93.

### The Nation Refused to Give Up a Facility

Among the metropolitan-market tribes, the Nation was the only tribe that refused to give up one of its allocated facility rights under the prior compacts.  SOF ¶¶ 110-13.  By 2001, it had three facilities:  two facilities in the Tucson metropolitan area and one smaller facility in a rural area near Why.  *Id.*  During the negotiations, it insisted on retaining the right under its existing compact to have four facilities.  Negotiators for the State and for the AIGA tribes pressed the Nation on why it needed an additional facility and asked the Nation where it intended to locate it.  SOF ¶¶ 111-127.  The Nation explained that it wanted to retain the small Why facility and that to do so it needed three other facilities to use its full machine allocation.  SOF ¶ 113.  It said that it hoped to add another Tucson casino if Pascua Yaqui would agree.  If not, it

4648905v3

would construct a second rural casino on its main reservation or in Gila Bend or Florence (two outlying areas where it had non-contiguous lands).  SOF ¶¶ 115-118.  The Nation explained that it was not merely an urban Tucson tribe, but also a rural tribe, given its vast rural reservation lands.  Having the capacity to build small rural casinos would enable it to provide jobs.  SOF ¶¶ 109, 122.  Sympathetic to the Nation's stated justification, AIGA tribal leaders were persuaded to permit it to retain its four-facility allocation.  SOF ¶ 126.  The State, too, eventually relented, falling one Tucson facility short of its goal of having no additional urban casinos.  SOF ¶ 127.

While agreeing to let the Nation preserve its authorization for four casinos, negotiators sought to ensure that it would be required to restrict at least one of its four casinos to a smaller casino in a rural location, like the Why facility.  SOF ¶¶ 120, 124, 127.  The parties thus inserted language into Section 3(c)(3) modifying the Nation's facility allocation in the Section 3(c)(5) Scope of Gaming chart.  SOF ¶ 128-133.  The inserted language states that, if the Nation "operates four (4) Gaming Facilities, then at least one of the four (4) Gaming Facilities" authorized in the chart "shall . . . be at least fifty (50) miles from the [Nation's] existing Gaming Facilities . . . in the Tucson metropolitan area as of the Effective Date" and that facility shall have a reduced number of devices and game tables.  SOF ¶¶ 130-31; Compact § 3(c)(3).

### *The Nation Assured the Public that the Compact Would Prevent Additional Casinos in the Phoenix Market*

Litigation over the Governor's authority to sign compacts without legislative authorization caused the negotiation process to take longer than expected.  Therefore, the Governor and the tribes drafted a so-called "framework" reflecting their agreement for use in drafting legislation seeking such authorization.  SOF ¶¶ 136-38.  When the effort to obtain authorizing legislation failed, the AIGA tribes drafted and promoted Proposition 202, which asked the public to authorize the Governor to sign compacts with the terms on which tribes and the Governor had agreed (with minor differences not relevant here).  SOF ¶ 159.

4648905v3

The Nation participated in and financially supported AIGA's lobbying and public relations efforts to promote Proposition 202.  SOF ¶¶ 160-61.  In the course of those efforts, the Nation made, authorized, endorsed, or acquiesced in dozens of public statements that the Compact's restrictions on the number of casinos in urban markets were an important benefit of the Compact.  SOF ¶¶ 142-154; 156-158; 169; 184-193.  These public statements promised in unequivocal terms that the Compact would prevent the addition of any more casinos in the Phoenix market and would permit no more than one additional casino in the Tucson market (*i.e.*, the Nation's heavily negotiated unbuilt casino).  *Id.*  The Nation's activities in this regard included the financing of printed materials and having its leadership and staff, including its current Chairman, Ned Norris, Jr. (then a casino manager for the Nation), make public appearances and participate in other public relations work in support of Proposition 202's approval.  SOF ¶¶ 161, 164, 166-184.

### The Nation Kept Its Plan to Locate a Casino in the Phoenix Market a Secret

In November 2002, the voters passed Proposition 202 by a slim margin.  SOF ¶ 195.  When the Nation signed its Compact in December 2002, it expressed no disagreement with the public message it had endorsed and helped disseminate— namely, that a key benefit of the bargain embodied in the Compact was that there would be no additional casinos in Phoenix.  SOF ¶¶ 140-184; 194; 196.

To preserve and foster these expectations of the State and, most consequentially, among the Phoenix-area tribes that each gave up a facility during the negotiations, the Nation actively concealed its secret plan to operate a casino in the Phoenix market area.  SOF ¶¶ 197-230.  Notwithstanding its public position that there would be no additional casinos permitted in the Phoenix market, the Nation had been actively searching, since May 2001 at the latest, for a casino site in west Phoenix.  It undertook this search in cooperation with the San Lucy District, a political subdivision of the Nation, and Vi-ikam Doag Industries ("VDI"), a tribally chartered corporation.  SOF ¶ 202-205.

4648905v3

1   Throughout this effort, the Nation actively concealed its plans from the other

2   parties in the compact negotiations.  Handwritten minutes of a VDI board of directors

3   meeting, which at least two members of the Nation's Legislative Council attended,

4   contain a map of the west Phoenix area labeled "Land in West Phx to put a casino

5   on."  SOF ¶ 204.  According to the minutes, the attendees were "unsure what will

6   happen" with the gaming compact, but had no doubt about what they needed to do to

7   keep the secret plan intact: "**Put [the land] in a shell company – need to keep it**

8   **quite expecially when negociations of compact [with] State.**" SOF ¶ 204 (errors in

9   original).  Ultimately the Nation did just that:  it purchased the Glendale property

10  through a shell company called Rainier Resources, and kept the plan quiet until

11  January 2009.  SOF ¶¶ 232-234.  The Nation fully expected a backlash from the State

12  and the Phoenix-market tribes once it revealed its secret plan.  SOF ¶¶ 228-230.

13  *During the Compact Negotiations of the Early 1990s, the Nation Assured Other*

14  *Tribes and the State That Gaming Could Not Occur on After-Acquired Lands*
    *Without the Governor's Concurrence*

15

16  The Nation's 2002 promises of no additional Phoenix casinos were consistent

17  with the position it expressed ten years earlier.  In 1992-1993, the Nation represented

18  to this Court and to key leaders for the State, in response to concerns about the

19  potential for a casino in downtown Phoenix, that the "settlement of a land claim"

20  exception in § 2719 of IGRA could never apply in Arizona because gaming on

21  noncontiguous, after-acquired land could take place only with the governor's

22  concurrence under the "two-part determination" of § 2719(b)(1)(A).  SOF ¶¶ 5-12;

23  15-24.  In these circumstances, and for the reasons explained below, the Nation

24  should not be surprised or aggrieved to be held to its own Compact interpretations.

25  The Nation's Compact does not allow it to locate a casino in the Phoenix market.

26  **SUMMARY OF THE ARGUMENT**

27  The Nation's proposed Glendale casino violates the Compact because the

28  Nation is authorized to locate casinos only in the Tucson market or in rural areas.

14

This interpretation is discernible on the face of the Compact and is confirmed by extrinsic evidence that is admissible for purposes of interpretation under either Arizona law or federal common law.  Alternatively, the parties' agreement to limit the Nation to markets outside the Phoenix area may be proved as an additional consistent term, because the circumstances unmistakably show such an intent.  *See* Part I, *infra*.

The Nation's Glendale casino also violates the implied covenant of good faith and fair dealing because it would deprive the other parties of a reasonably expected benefit of the bargain, that there be no additional casinos in the Phoenix market.  *See* Part II, *infra*.  It may also be enforced by promissory estoppel, due to the Plaintiffs' detrimental reliance on the Nation's promises in this regard.  *See* Part III, *infra*.

Moreover, the Gila Bend Act does not constitute the "settlement of a land claim" under IGRA, and the Nation is judicially estopped from making a contrary argument and has waived any such argument.  *See* Part IV, *infra.*  The requirements for injunctive relief are met here, *see* Part V, and therefore the Court should grant summary judgment to the Plaintiffs and deny it to the Nation on Counts I, II, III, IV, and VII, and enjoin the Nation from locating any casinos in the Phoenix market.

## ARGUMENT

### I. THE NATION'S PLAN TO LOCATE A CASINO IN THE PHOENIX MARKET VIOLATES THE COMPACT

#### A. The Compact Authorizes Gaming Facilities and Machines Within Specific Markets, and the Nation Did Not Obtain Any Authorizations in the Phoenix Market

This is not a case where the parties' intent regarding the meaning of their contract is unclear.  Tribal leaders, including the Nation's leaders, undertook an extensive and expensive campaign to publicize their bargain and to explain its benefits to the public under the auspices of Arizonans for Fair Gaming and Indian Self-Reliance.  SOF ¶¶ 140-158; 161, 163, 168-180; 184-194.  The campaign heavily emphasized that the compacts unconditionally would bar anything like the Nation's proposed Glendale casino during the life of the compacts:  "there will be no additional

4648905v3

facilities authorized in Phoenix, and only one additional facility permitted in Tucson." *Id.* This represented the achievement of a major goal articulated by the State and agreed to by the AIGA tribes over the course of the negotiations. SOF ¶¶ 68-69; 72-80. The parties' intent was that there be no uncertainty on this question; nobody intended to assume the risk of something like the Glendale casino being built. SOF ¶ 93. The only question here is whether the Nation should be allowed to evade the bargain it struck and sold to the public.

The language and structure of the Compact show that the Tucson market (the Nation's market) is the only metropolitan market where the Nation is authorized to operate casinos. SOF ¶¶ 124, 128-35. The Nation is authorized to operate four casinos. That right is granted in a "Gaming Device Allocation Table" that allocates rights among competing tribes that are grouped into geographic markets: rural areas, Phoenix metropolitan area, and Tucson metropolitan area. Compact § 3(c)(5). To "allocate" is "to deal out (something limited in supply) according to an allowance schedule established esp. by a public authority . . . ." Webster's Third New Int'l Dictionary 57 (1976). Thus, the chart is on its face the result of a zero-sum apportionment of rights among the listed tribes. The chart groups together the Phoenix-area tribes and provides that each loses one facility as compared to the then-existing compacts. Compact § 3(c)(5). It similarly groups together the Tucson-area tribes and provides that the Pascua Yaqui Tribe also loses one facility, but makes no reduction from the Nation's "Previous Gaming Facility Allocation" of four. *Id.* Thus, the Nation is the only tribe in a metropolitan market that did not suffer a reduction in the number of gaming facilities allocated. This is addressed further in Compact Section 3(c)(3), which explains that, if the Nation operates four casinos, at least one must be a rural facility with reduced capacity:

> [i]f the Tribe [in the Table] is the Tohono O'odham Nation, and if the Tribe operates four (4) Gaming Facilities, then at least one of the four (4) Gaming Facilities shall:  a) be at least fifty (50) miles from the

4648905v3

1
2
3

> existing Gaming Facilities of the Tribe in the Tucson
> metropolitan area as of the Effective Date; b) have no
> more than six hundred forty-five (645) Gaming Devices;
> and c) have no more than seventy-five (75) Card Tables.

4   As is evident from the 50-mile restriction and the lower machine and table limits,

5   Section 3(c)(3) was intended to limit at least one of the Nation's authorized Gaming

6   Facilities to a rural location.  Indeed, the Nation concedes that this provision requires

7   "a rural location" instead of a location in "a metropolitan area."  N. Mot. at 16, 17.

8   Section 3(c)(3) accomplishes this *solely by requiring that the facility be 50*

9   *miles from existing facilities in "the Tucson metropolitan area."*  Under the Compact

10  Tucson was the only metropolitan area from which a casino granted to the Nation

11  under Section 3(c)(5) had to be excluded to ensure the casino is a rural casino.  Thus,

12  this language shows that the Gaming Facility authorizations granted to the Nation in

13  the Section 3(c)(5) chart, to which Section 3(c)(3) is an added restriction, do not

14  pertain to any "metropolitan area" other than Tucson.  The Nation is now improperly

15  attempting to use one of its Tucson-area rights in the Phoenix market.  This is

16  contrary to the structure and language of Sections 3(c)(3) and 3(c)(5).

17  The revised facility numbers in Section 3(c)(5) for the four Phoenix tribes and

18  the two Tucson tribes corresponded to the numbers of facilities then already in

19  operation, with one exception.  When voters passed Proposition 202, the Nation was

20  operating only two "facilities in the Tucson metropolitan area" and one rural facility

21  near Why that satisfied the restriction in Section 3(c)(3).  SOF ¶ 108, 116.  Thus the

22  phrase "no additional facilities authorized in Phoenix, and only one additional facility

23  permitted in Tucson" meant that the Nation was permitted to place its unbuilt casino

24  in Tucson or in a rural area, but not in Phoenix.

25  As a matter of law, the Nation's open endorsement of this interpretation of the

26  Compact during negotiations and the Proposition 202 campaign is conclusive.

27  "Where the parties have attached the same meaning to a promise or agreement or a

28  term thereof, it is interpreted in accordance with that meaning."  Restatement

(Second) Contracts ("Rest. 2d Contr.") § 201(1) (1981).  The Nation cannot escape § 201(1) by claiming it never meant what it said, because "the relevant intention of a party is that manifested by him rather than any different undisclosed intention."  *Id*. § 212 cmt. a.  And even if the Nation had not itself publicly endorsed this interpretation of the Compact, it knew that the other parties interpreted it thus, and it is bound by that interpretation.  *See Id*. § 201 (2).  A "party that makes a contract knowing of a misunderstanding is sufficiently at fault to justify that party's being subjected to the other party's understanding."  Farnsworth, *Contracts* § 7.9 at 462 (3d ed. 1999); *see also Johnson v. Cavan*, 733 P.2d 649, 651-52 (Ariz. App. 1986) (quoting Rest. 2d Contr. § 214 cmt. b (1981)) ("In cases of misunderstanding, there must be inquiry into the meaning attached to the words by each party and into what each knew or had reason to know.")  By contrast, none of the other parties could reasonably have known that the Nation asserted a right to conduct gaming in Phoenix, because the Nation concealed this information.  SOF ¶¶ 92, 197-230.

The Nation seeks to evade the parties' intent by excluding extrinsic evidence and re-interpreting the parties' written expression of their bargain in a manner no other party anticipated or intended.  To address the admissibility of extrinsic evidence, the Court must analyze two distinct and independent purposes for which it may be admitted.  First, the evidence can be used to interpret the Compact.  The Nation seeks to prevent this by arguing that the Compact is not reasonably susceptible to the Plaintiffs' interpretation (Arizona law) and is unambiguous (federal common law).  Second, extrinsic evidence can be used to show an additional, consistent term implied in or collateral to the agreement.  The Nation seeks to defeat this by invoking the parol evidence rule and arguing that the agreement is integrated.  As shown below, these arguments fail, and the extrinsic evidence must be admitted.

### B.   Arizona Law Governs the Admission of Extrinsic Evidence for Contract Interpretation

The only issue on which the Nation identifies any relevant conflict of law is

4648905v3

the test for admitting extrinsic evidence for purposes of contract *interpretation* (the "reasonably susceptible" test vs. the test for ambiguity).  The Nation does not identify any relevant conflict on the question of integration (*i.e.*, the parol evidence rule) or the duty of good faith and fair dealing.[2]  As demonstrated below, under the parties' agreement, the governing law for contract interpretation is Arizona law.

### 1. The Parties Chose a Traditional Conflicts Analysis Among Three Specified Sources of Law on an Issue-By-Issue Basis Under the Restatement

As the Nation concedes (N. Mot. at 30-3), the choice of law here is governed by Section 24 of the Compact:  "This Compact shall be governed by and construed in accordance with the applicable laws of the United States, and the Nation and the State."  Because the parties addressed choice of law in the Compact, the issue is reduced to one of intent.  Although Section 24 limits the inquiry to three sources, the choice of law on the issue here—the admission of extrinsic evidence for contract interpretation—is essentially binary.  Two of the three sources of law, the Nation and the State, would apply Arizona law to this issue.[3]  Thus, the Nation finds itself in the position of arguing that the parties chose federal law to interpret their contract rather than their own law.

---

[2] In a footnote in its choice of law argument, the Nation argues for "application of the federal parol evidence rule, *see infra* pp. 23-25, which bars consideration of such evidence absent a contractual ambiguity."  N. Mot. at 32 n.18.  But the reference to "pp. 23-25" is to the Nation's argument about the plain meaning rule (the requirement that ambiguity exist before extrinsic evidence is admissible for purposes of interpretation), not its argument about the parol evidence rule (which governs evidence of additional consistent terms).

[3] See Tohono O'odham Rules of Court 1, at p. 1 ("Where applicable, the Arizona rules will be followed to the extent they do not directly conflict with a written Tohono O'odham law or rule and are applicable to the facts and circumstances of a case."); Tohono O'odham Code, Title 4, ch. 1, § 1-102 ("If a Tohono O'odham Court finds that there is no Tohono O'odham law or custom which addresses the claims asserted, the court may in its discretion look to the laws of the State of Arizona for guidance.").

4648905v3

By designating three sources of law, the parties intended to allow different sources of law to govern different issues under the Compact.  The Nation concedes at least this much.  N. Mot. at 31.  And by deliberately choosing *not* to specify which issues would be governed by which source of law, and by referring instead to the "applicable" laws of each, the parties plainly elected a traditional conflict-of-laws analysis among these three sources of law on an issue-by-issue basis.  Determining "applicable law" is the function of conflicts analysis, and the rule for that analysis is undisputedly the Restatement (Second) Conflict of Laws ("Rest. 2d Confl.").  *See, e.g.,* Rest. 2d Confl. § 186 (1971) (titled "Applicable Law" and noting that §§ 187-188 govern the determination for contracts).

The Restatement applies a general principle for determining "the *applicable rule of law*" by looking for the state with the "most significant relationship" to the issue at hand.  Rest. 2d Confl. § 6(2) & cmt. c; § 188 cmt. e (emphasis added); *Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 674 (9th Cir. 1997) (adopting and applying the Restatement's "most significant relationship" test).  The analysis is issue by issue; different issues under a contract may be governed by different sources of law (a point not lost on the drafters of Section 24).  *See* Rest. 2d Confl. § 188 cmt. d. (describing the Restatement's "selective approach to choice of the law governing particular issues" in an action on a single contract).

Indeed, the Nation itself eventually offers the Restatement to resolve this choice-of-law question.  N. Mot. at 31-32.  But before engaging in that analysis, the Nation first strives to avoid it, by proffering an alternative interpretation of the term "applicable laws" in Section 24.  The Nation interprets that term not as a reference to a traditional conflicts analysis, but as a superfluous reference to the law that would otherwise apply if the parties had been silent (which, it incorrectly concludes, is federal common law).  It argues that federal common law governs IGRA compacts "absent some indication that the parties had a different intent," and that, by choosing the "applicable" law, the parties were expressing an intent not to deviate from this

1   supposed default rule.  This interpretation would render Section 24 a perfect nullity—

2   as though it said, "This Compact shall be governed by and construed in accordance

3   with the laws that would otherwise apply in the absence of this section."  This

4   nullifying interpretation violates a cardinal rule of contract interpretation.  *See Starrag*

5   *v. Maersk, Inc*., 486 F.3d 607, 616 (9th Cir. 2007) (citation omitted); *Miller v. Hehlen*,

6   104 P.3d 193, 197 (Ariz. App. 2005).  Section 24 was included to ensure that

7   traditional conflicts analysis would be used to determine the "applicable law" from a

8   limited set of three specified sources.  That is the only reading that makes it

9   meaningful.

### 2.   Under the Restatement, Arizona Law Applies to Interpretation

12   The Nation correctly identifies Restatement § 188 as the starting point for

13   determining the applicable law for the issue here (contract interpretation).[4]  Section

14   188 lists five contacts to be taken into account in determining the state with the "most

15   significant relationship" to a particular issue.  *See* Rest. 2d Confl. § 188(2).  Arizona

16   and the Nation are treated as a single state in evaluating these contacts.  *See id*. § 186

17   cmt. c (where two states have the same law on an issue, contacts under § 188 are

18   analyzed as though they were grouped in a single state).  And two of the five contacts

19   are dispositive if they are in the same state: "[i]f the place of negotiating the contract

20   and the place of performance are in the same state, the local law of this state will

21   usually be applied," with exceptions not relevant here.  *Id*. § 188 (3).  Because the

22   Compact was negotiated solely in Arizona and is to be performed entirely within

23   Arizona and the Nation, Arizona/Nation law applies.  The place of negotiating is

---

26   [4] Section 188 applies "[i]n the absence of an effective choice of law by the
27   parties."  Rest. 2d Confl. § 188 (2).  Here, while the Compact choice of law clause is
effective as far as it goes, it does not specify which issues are governed by which of
28   the three specified sources of law, and § 188 provides the appropriate analysis for that
question.

4648905v3

1   particularly important to the issue here:  whether evidence of those negotiations can

2   be considered in interpreting the resulting writing.

3          The Nation ignores § 188(3) and focuses instead on the full list of five factors

4   in § 188(2).  But the applicability of Arizona law is just as clear under § 188(2).  The

5   five factors in § 188 should be evaluated "according to their relative importance with

6   respect to the particular issue." *Id*. §188 (2).  The Nation tacitly concedes two of the

7   five factors, the place of negotiation (Arizona) and the domicil/residence/nationality

8   of the parties (Arizona and the Nation; notably, the United States is not a party).  With

9   respect to two others, the Nation attempts to characterize the location of the subject

10  matter and the place of performance—gaming on the Nation's lands in Arizona—as

11  federal, rather than in Arizona or the Nation.  It argues that the gaming will occur "not

12  on Arizona land, but rather on 'Indian lands' demarcated by federal law."  N. Mot. at

13  32.  This misguided argument is surprising coming from an Indian tribe; it would put

14  the Nation's sovereign lands in Arizona on par with Washington D.C., a U.S. military

15  base, or a national park, merely because there are federal restrictions on where

16  gaming can occur within the Nation's lands in Arizona.  Under the Restatement, what

17  matters is where the land is physically located.  *See* Rest. 2d Confl. § 188, cmt. e; *see*

18  *also Energy Oils, Inc. v. Mont. Power Co*., 626 F.2d 731, 734 n. 6 (9th Cir. 1980).

19         The Nation selectively quotes from a Restatement comment to imply that the

20  "place of contracting" is outside Arizona because the "last act" giving "binding

21  effect" was the Secretary's approval of the Compact.  Rest. 2d Confl. § 188, cmt. e.

22  But the note states that it is "the last act necessary, *under the forum's rules of offer and*

23  *acceptance*, to give the contract binding effect."  *Id.* (emphasis added).  Offer and

24  acceptance between the parties occurred in Arizona when the Compact was executed.

25  *The Secretary could not change those terms* to which the parties had bound

26  themselves.  Secretarial approval is relevant only to the date the Compact takes effect,

27  not the offer and acceptance that bind the parties to particular terms.  *See* 25 U.S.C.

28  § 2710(d)(3)(B).  In any event, the effective date of the Compact depends on actions

4648905v3

taken pursuant to state law as well as actions governed by federal law.  *See* § 2 (vv)(1) (requiring execution) and 2(vv)(4) (requiring "[e]ach Indian tribe with a Gaming Facility in Maricopa, Pima or Pinal Counties" to have "entered into a new Compact as defined by A.R.S. § 5-601.02" unless the Governor waives this requirement).  In sum, the factors in § 188 all favor the application of Arizona law.

The Nation also makes various attempts to leapfrog the five contacts in § 188 by purporting to identify overriding federal interests that would give it the "most significant relationship" to contract interpretation, but these all fail.  It argues that the United States has the most significant relationship to contract interpretation because the parties are "sovereigns, each with its own law, but each subject to federal law." N. Mot. 31.  The Nation's argument does not follow; the sovereign nature of the parties gives them each a greater interest in the application of their own laws, and here there is no conflict between Arizona law and the Nation's law with respect to contract interpretation.  The Nation also argues that the United States has an interest in the enforcement of tribal-state compacts, *see* N. Mot. at 32, but enforcement *per se* is fully vindicated by federal jurisdiction under 25 U.S.C. § 2710(d)(7)(A).

The Nation argues that the Secretarial review provisions of IGRA would be frustrated by allowing state law to govern interpretation.  N. Mot. at 32 n.18.  But if that were true, parties to an IGRA compact would not be free to choose state law to govern interpretation, which they clearly are.  *See Confederated Tribes of Siletz Indians v. Oregon*, 143 F.3d 481, 485-86 (9th Cir. 1998).  In any event, IGRA requires only that the Secretary not disapprove a compact, and the only three permissible grounds for disapproval are strictly limited, precisely defining the boundaries of any federal interest:  (1) if a compact violates IGRA, (2) if it violates any other federal law, or (3) if it violates the United States' trust obligations to Indians.  *See* 25 U.S.C. § 2710(d)(8).  Nobody has suggested that those interests are implicated here under any interpretation.

4648905v3

1       In sum, Arizona and the Nation—the parties to the Compact and the locations

2  where the terms of the Compact were negotiated and agreed to and are being

3  performed—have the most significant relationship to the interpretation of their own

4  Compact.  *See Transport Indem. Co. v. Liberty Mut. Ins. Co.*, 620 F.2d 1368, 1375

5  (9th Cir. 1980) (recognizing a state's "strong interest" in applying its own law).

6           **3.**      **State Law Applies in Any Event Because There Is No**

7                    **Significant Conflict Between Arizona Law and a Genuine, Identifiable Federal Policy or Interest**

8       In any event, even under the Nation's interpretation of "applicable law" as a

9  superfluous reference to a background rule, the Nation is wrong that federal law

10  presumptively applies across the board to interpretation of IGRA compacts.  Even

11  where a contract is authorized or entered into pursuant to a federal statutory scheme,

12  state law provides rules of decision unless there is first a showing of "a significant

13  conflict between an identifiable federal policy or interest and the operation of state

14  law."  *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 691 (2006)

15  (citations and alterations omitted); *accord O'Melveny & Myers v. FDIC*, 512 U.S. 79,

16  87 (1994).  "Not only the permissibility but also the scope of judicial displacement of

17  state rules turns upon such a conflict."  *O'Melveny*, 512 U.S. at 87-88; *see also United*

18  *States v. Kimbell Foods, Inc.*, 440 U.S. 715, 729 (1979).  Moreover, the conflict must

19  be with "a genuinely identifiable (as opposed to judicially constructed) federal

20  policy."  *O'Melveny* at 89.

21       Cases finding such a conflict that would displace state law are "few and

22  restricted."  *Id.* at 87.  And this is not one of them.  As in *O'Melveny*, here "[t]here is

23  not even at stake that most generic (and lightly invoked) of alleged federal interests,

24  the interest in uniformity."  *Id.* at 88.  To the contrary, in IGRA Congress left state

25  contract law undisturbed.  IGRA is designed to foster and respect state-by-state

26  variations in the terms of compacts.  For example, IGRA specifically reserves to each

27  state the right to negotiate state-law remedies for breach of its gaming compacts.  *See*

28  25 U.S.C. § 2710(d)(3)(C)(v).  Further, "[t]he rules of decision at issue here do not

1    govern the primary conduct of the United States or any of its agents or contractors."

2    *O'Melveny*, 512 U.S. at 88.  The United States is not a party to the Compact, the

3    Compact does not impose obligations upon the federal government, beyond the

4    publication of the Federal Register notice already required by IGRA, and the Compact

5    does not implicate any direct federal interests.

6         As in its motion to dismiss, the Nation likens an IGRA compact to an

7    interstate compact by arguing that states and Indian tribes are both sovereigns.  The

8    Nation cites no relevant authority making this analogy, and the analogy does not

9    work.  Interstate compacts are governed by federal common law because they are

10   enacted as federal statutes, or because neither state's law can take precedence over the

11   other's.  *See, e.g., State ex rel. Dyer v. Sims*, 341 U.S. 22, 28 (1951); *Alabama v. North*

12   *Carolina*, 130 S. Ct. 2295, 2312-13 (2010); *see also* Order dated June 15, 2011 (Doc.

13   43) at 14-16 (rejecting the analogy in the context of Count II because gaming

14   compacts are not federal statutes).  By contrast, IGRA permits tribal regulation only to

15   the extent it is not "inconsistent with, or less stringent than, the State laws and

16   regulations made applicable by any Tribal-State compact" in effect.  25 U.S.C.

17   § 2710(d)(5); *see also* § 2710(b)(4)(A).  Nor was the Nation's Compact enacted as a

18   federal statute; rather, it is based on an Arizona statute enacted through Proposition

19   202.  *See* A.R.S. § 5-601 *et seq*.[5]

20        The Nation resorts again to *Cachil Dehe Band of Wintun Indians of Colusa*

21   *Indian Community v. California*, 618 F.3d 1066 (9th Cir. 2010).  *Cachil* applied

22   California law because it "'discern[ed]. . . no difference between California and

23   federal contract law,'" relegating to dicta its statement that "[g]eneral principles of

24   federal contract law govern the Compacts, which were entered pursuant to IGRA."

25   _____

26        [5] The Nation repeats language from a footnote in *Muhammad v. Comanche Nation Casino*, 742 F. Supp. 2d 1268 (W.D. Okla. 2010), *see* N. Mot. at 20-21, but as
27   this Court has observed, the footnote addressed only the existence of federal
     jurisdiction; nothing in the language or logic of that opinion extends any further.  *See*
28   Doc. 43 at 15-16.

4648905v3

1   *Id.* at 1073 (quotations and citations omitted).  As the Court previously noted, the

2   cases cited for this statement do not adequately support it.  *See* Doc. No. 43 at 14.

3   *Cachil* seems to have assumed that federal common law applied simply because

4   tribal-state compacts are entered into pursuant to a federal statute.  It did not identify

5   the requisite "significant conflict" in the case before it, much less for all tribal-state

6   compacts generally.  And there is other Ninth Circuit dicta to the contrary, describing

7   tribal-state compacts as a matter of "[s]tate law."  *Wilson v. Marchington*, 127 F.3d

8   805, 813 (9th Cir. 1997) ("State law, especially the compacts between a state and a

9   tribe, may be of substantial significance in a particular case.").  Indeed, there does not

10  appear to be any instance where a federal court has interpreted an IGRA compact

11  using rules of interpretation in conflict with the compacting state's law.

    **C.**    **Extrinsic Evidence Is Admissible and Conclusive in Favor of Plaintiffs' Interpretation, Under Either Arizona or Federal Law**

        **1.**    **Under Arizona Law, Extrinsic Evidence Is Admissible and Conclusively Establishes that Plaintiffs' Interpretation of the Compact Is Correct**

            **a.**    **Extrinsic Evidence Is Admissible and Conclusive**

17      In Arizona, "the judge first considers the offered evidence and, if he or she

18  finds that the contract language is 'reasonably susceptible' to the interpretation

19  asserted by its proponent, the evidence is admissible to determine the meaning

20  intended by the parties."  *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134,

21  1140 (Ariz. 1993); *accord AGA S'holders, LLC v. CSK Auto, Inc.*, 589 F. Supp. 2d

22  1175, 1181 (D. Ariz. 2008).  "When interpreting an agreement, the court may always

23  consider the surrounding circumstances" and "the context in which it was made,"

24  *Smith v. Melson, Inc.*, 659 P.2d 1264, 1267 (Ariz. 1983), guided by "common sense,"

25  *Burkons v. Ticor Title Ins. Co.*, 813 P.2d 710, 715-16 (Ariz. 1991); *see also Miller*,

26  104 P.3d at 197.

27      Here, the extrinsic evidence shows that the Compact is far more than merely

28  reasonably susceptible to an interpretation that limits the location of the Nation's

4648905v3

casinos to the Tucson metropolitan market and rural areas.  As a matter of law, this overwhelming evidence about the parties' knowledge and intent make Plaintiffs' reading not just plausible, but conclusive.  The Nation knew of and endorsed this interpretation while deliberately concealing its contrary plans.  *See* Rest. 2d Contr. § 201.

The negotiating history confirms the interpretation that the Nation publicly endorsed.  In response to the State's demand that the facility authorizations for the two metropolitan markets be frozen at their current levels, the Phoenix market and Tucson market tribes engaged in independent competitive negotiations to allocate the machine and device rights for each of those respective  markets, as reflected the prior drafts of Section 3(c)(5).  SOF ¶¶ 68-127.  The Nation never asserted a right to locate a facility or device in the Phoenix market, but instead asserted the right to locate machines in the Tucson market or in rural areas.  SOF ¶¶ 84-91. When the numbers in each market for each tribe were finally agreed upon, the footnotes on the scope of gaming chart came off, signaling agreement within those markets and resulting in what is now Section 3(c)(5).  SOF ¶¶ 100-105.

Moreover, the Nation held out successfully against a reduction in the number of casinos it could operate, based on representations that it was both an urban and a rural tribe due to its reservation lands near Tucson and its rural lands.  SOF ¶¶ 117, 122, 124.  It argued that this distinguished it from the Phoenix tribes and the other Tucson tribe, persuasively enough to avoid a reduction in the number of Gaming Facilities.  *Id.*  In so doing, it also made express representations that its unbuilt casino would be located either in the Tucson market or in a rural location, and never asserted any plan or right to locate it in the Phoenix market.  SOF ¶¶ 111, 112, 116-122, 124, 127.  This negotiating history further supports holding the Nation to the interpretation it publicly endorsed.

Where an interpretation is "unrealistic" or would result in a bargain "contrary to any reasonable business objective," it must be rejected "unless [the court] found

4648905v3

that one party had been incompetent to make the contract, had been led to do it through fraud, or both." *Burkons*, 813 P.2d at 715-16. *Burkons* (1) applied "common sense" to conclude that "no rational seller would agree to" the interpretation being proffered, (2) discerned indicia of fraud in the "internal documents" of the defendant showing it knew its interpretation was not something it would accept for itself, and (3) looked at the structure of the transaction as a whole. Likewise, the Court should reject the Nation's interpretation here. The Nation cannot reconcile the "unrealistic" and absurd bargain where all Phoenix-market tribes would agree in 2002 to give up the right to additional casinos in Section 3(c)(3) while simultaneously accepting a risk that a Tucson-market tribe such as the Nation could enter the Phoenix market and take advantage of the reduction. Rather, the Nation's internal documents show that it kept its west Phoenix casino plan secret precisely because it knew that the plan would upend other parties' expectations. SOF ¶¶ 197-230.

### b.    The Plaintiffs' Interpretation Does Not Contradict Any Terms of the Compact

The Nation argues that none of this matters because the Compact interpretation endorsed by all parties during the Proposition 202 campaign "contradict[s]" the language they chose. N. Mot. at 36. The Nation is wrong in two ways. First, in purporting to find a contradiction between the Plaintiffs' interpretation and the language of the Compact, the Nation conveniently ignores the extrinsic evidence. Whether there is contradiction between the proffered interpretation and the language of the agreement is itself a question of interpretation. It is "a question which often cannot be determined from the face of the writing; the writing must first be applied to its subject matter and placed in context. The question is then decided by the court as part of a question of interpretation." Rest. 2d Contr. § 215, cmt. b; *Taylor*, 854 P.2d at 1140-41.

The extrinsic evidence shows that interpreting the Compact to limit the metropolitan tribes in Section 3(c)(5) to their respective metropolitan markets is

entirely consistent with the writing.  That is particularly true in light of the recognition in 3(c)(3) that the only such market in which the Nation is authorized to locate a casino is Tucson.

Second, the Nation's premise that the Compact expressly and unconditionally authorizes gaming wherever IGRA allows it is erroneous.  The Nation argues that "[t]he Compact's plain language . . . allows the Nation to game on its 'Indian Lands' to the same extent authorized by IGRA, including on after-acquired lands that qualify under 25 U.S.C. § 2719.  *See* Compact §§2(s)), 3(j)(1)."  N. Mot. at 36.  However, Section 3(j)(1) is not an affirmative authorization, but rather a non-exclusive list of *mandatory limitations* on the location of all Gaming Facilities, including that (1) "All Gaming Facilities" must located on land that complies with IGRA's "Indian Lands" definition, (2) these facilities must be at least 1½ miles apart (unless that is "impracticable"), and (3) "Gaming Activities" on after-acquired lands "shall be authorized *only* in accordance with 25 U.S.C. § 2719."  The language of 3(j)(1) is solely restrictive; thus, it does not state that Gaming Activities shall be lawful on all lands that satisfy 25 U.S.C. § 2719, notwithstanding any other provision of the Compact.  To the contrary, Section 3(j)(1) on its face imposes location limits beyond those in IGRA—it prohibits locating a Gaming Facility on any lands, including Indian Lands, with a 1½ mile radius of an existing facility.  Nowhere does Section 3(j)(1) say it is an exclusive list of location limitations, because it is not.  Section 3(c)(3) limits the location of the Nation's smaller rural facility, and directly references the chart in Section 3(c)(5).  This is a further limitation beyond those in IGRA and beyond those in Section 3(j)(1).  Reading Sections 3(c)(3) and 3(c)(5) together as restricting urban tribes to their respective markets is therefore no more inconsistent with Section 3(j)(1) than 3(c)(3) is in isolation.  Such a limitation does not require excising or nullifying any language in Section 3(j)(1) or any other provision in the Compact.

**2.    Under Federal Law, the Extrinsic Evidence Is Admissible to Resolve Ambiguity Created by Sections 3(c)(3) and 3(c)(5)**

4648905v3

1    As discussed above, Sections 3(c)(3) and 3(c)(5) together demonstrate that the

2    Nation is not authorized to locate casinos in the Phoenix market.  At the very least

3    these provisions of the Compact are ambiguous because reasonable people could find

4    their terms "susceptible of more than one construction or interpretation."  *Castaneda*

5    *v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981) .

6    The Nation has effectively admitted that Section 3(c)(3) is at least ambiguous

7    regarding its right to operate a casino in the Phoenix metropolitan area.  According to

8    the Nation, that Section requires the Nation to operate at least one *rural* casino if the

9    Nation operates four casinos:

> [T]he State and the other tribes agreed that the Nation could retain
> the right to operate four facilities, but later "raised a concern that if
> there was not a provision in the compact that required the Nation
> to keep the [Why] facility in such a [rural] location that the nation
> might put it in a metropolitan area."  [Record citations excluded.]
> The State and the other tribes therefore proposed, and the Nation
> agreed, that if the Nation operates four facilities, "at least one of
> the four" must be "at least fifty (50) miles from the existing
> Gaming Facilities of the Tribe in the Tucson metropolitan area."

16   N. Mot. 17 (alterations in original except exclusion of record citations).  During

17   discovery the Nation was even more direct on this point:  "[T]he Nation's justification

18   to the other tribes for wanting to keep the fourth facility is that it would not be located

19   in a metropolitan area; it would be in a rural area."  SOF ¶ 124.  As discussed above,

20   this (correct) reading that Section 3(c)(3) requires a *rural* location presumes that the

21   Nation may not locate the Section 3(c)(3) casino in the Phoenix *metropolitan* area

22   even though it would be more than 50 miles from the Nation's Tucson casinos.

23   The presence of ambiguity here is controlled by *Crow Tribe of Indians v.*

24   *Racicot*, 87 F.3d 1039 (9th Cir. 1996).  In *Crow Tribe* the court had to decide whether

25   a definition of "lottery games" that by its literal terms would have included

26   mechanical slot machines was actually intended to do so.  *Id.* at 1044.  The definition

27   of "lottery games" was lengthy, and did not by its terms exclude mechanical slot

28   machines.  *Id.*  After reviewing the evidence proffered by the State regarding the

30

1    parties' negotiations bearing on the issue, the court stated that the definition was

2    "ambiguous" in light of the absence of any specific reference in the compact "to the

3    use of mechanical slot machines." *Id.* at 1045.  That the tribal interpretation of the

4    disputed language was widely accepted by courts in nearly every state did not stop the

5    Ninth Circuit from finding ambiguity. *Id.* at 1045-46.  It agreed with the state that

6    although "the Crow present a good argument that lotteries generally include slot

7    machines," the question was "whether the parties *intended* the term 'lottery games' in

8    the compact to authorize slot machines." *Id.*  In light of the negotiating history, it

9    concluded "that *this result was not intended*." *Id.* at 1046 (emphasis added).

10       Here, the groupings and allocation structure in Section 3(c)(5), and Section

11   3(c)(3)'s assumption that the only metropolitan market the Nation's reduced-capacity

12   rural casino needed to be excluded from was "the Tucson metropolitan area," create at

13   least an ambiguity that meets the low threshold in *Crow Tribe.*[6]

14       If the Court does not admit extrinsic evidence as a general matter, it

15   nonetheless should consider objective evidence of the surrounding circumstances

16   (such as public statements during the Proposition 202 campaign).  SOF ¶¶ 142-154,

17   156-158, 184-193. Even "under a plain meaning rule, evidence of surrounding

18   circumstances, as distinguished from evidence of prior negotiations, should be

19   admitted during the first stage" even before any determination of clarity or ambiguity.

20   Farnsworth, *Contracts* § 7.12 at 477-78 (3d ed. 1999); *see also Baldwin v. Univ. of*

21   *Pittsburgh Med. Ctr. UPMC*, 636 F.3d 69, 76-77 (3d Cir. 2011); *Kerin v. U.S. Postal*

22   *Serv.*, 116 F.3d 988, 992 n.2 (2d Cir. 1997); *AM Int'l, Inc. v. Graphic Mgmt. Assocs.,*

23   *Inc.*, 44 F.3d 572, 575-77 (7th Cir. 1995) (Posner, C.J.).

24

25

26       [6] The Nation argues that the Plaintiffs have "conceded" that the last sentence of
27   3(j)(1) is "unambiguous."  N. Mot. 34.  That badly mischaracterizes the cited portion
     of the transcript.  To the contrary, counsel for plaintiffs argued that Section 3(c)(5)
28   creates ambiguity that must be resolved with extrinsic evidence.  MTD Hr'g Tr. at 34
     (Dkt. 44).

1

### D. Extrinsic Evidence Proves an Additional Consistent Term Limiting the Nation's Casinos to the Tucson Market and Rural Areas

2

3   Alternatively, extrinsic evidence should be admitted to prove an additional

4   consistent term limiting the Nation to the markets for which it negotiated gaming

5   facility rights—the Tucson market and rural areas.  As the Nation concedes, under

6   either federal or Arizona law, Rest. 2d Contr. § 216(2)(b) requires that the Court

7   conclude that the Compact "is not completely integrated if the writing omits a

8   consistent additional agreed which is . . . such a term as in the circumstances might

9   naturally be omitted from the writing."  N. Mot. at 38.  The Nation argues, however,

10   that (1) "any implied term barring the Nation from gaming in Phoenix flatly

11   contradicts the Compact's written terms," and (2) any such implied term is not a term

12   that "in the circumstances might naturally be omitted from the writing."  N. Mot. at

13   37-38.  It is wrong on both counts.

14   In making the first point, the Nation merely refers back to its erroneous

15   analysis of the consistency test for interpretation— which incorrectly fails to consider

16   the extrinsic evidence.  The law is plain that one must analyze the consistency of the

17   implied term with the writing *in full view of* the evidence of that term:

18
19   The determination whether an alleged additional term is consistent or inconsistent with the integrated agreement requires interpretation of the writing ***in the light of all the circumstances***, including the evidence of the additional term.  For this purpose, the meaning of the writing includes not only the terms explicitly stated but also those fairly implied as part of the bargain of the parties in fact.

20
21
22

23   Rest. 2d Contr. § 216, cmt. B (emphasis added).  Under this standard, the extrinsic

24   evidence of the parties' negotiations and of their efforts to promote statutory

25   authorization of the compacts shows emphatically that limiting the Nation's

26   metropolitan casinos to the market for which it negotiated gaming rights is not

27   "inherently irreconcilable" with anything in the resulting writing.  *W. Chance #2, Inc.*

28   *v. KFC Corp.*, 957 F.2d 1538, 1543 (9th Cir. 1992).

4648905v3

On the second point, the Nation recognizes that the extrinsic evidence of all "the circumstances" must be considered in determining whether the omitted term "might naturally be omitted from the writing."  N. Mot. at 38.  But the Nation fails to address all the "circumstances" in which the Compact was negotiated and signed. Those circumstances confirm that the parties thought that a term preventing the Nation from gaming in any urban market other than Tucson would have been superfluous.

The question of integration "is to be decided on the basis of all relevant evidence of the prior and contemporaneous conduct and language of the parties." Rest. 2d Contr. § 210, illust. 1. "That a writing was or was not adopted as a completely integrated agreement may be proved by any relevant evidence." *Id.*, cmt b.  The Court should consider "all relevant evidence, including 'agreements and negotiations prior to or contemporaneous with the adoption of a writing.'" *United States v. Talley Defense Sys., Inc.*, 393 F. Supp. 2d 964, 970 (D. Ariz. 2005) (quoting Rest. 2d Contr. § 214).

Here, that extrinsic evidence plainly demonstrates that the Compact does not authorize the Nation to locate a casino in the Phoenix market.  Nobody knew or could have known that the Nation asserted or had the means to assert any claim to a gaming property in the Phoenix market. SOF ¶¶ 5-6; 8-9, 14, 20, 23, 106-107.  The Nation bargained for machine and facility rights solely as part of the Tucson negotiating market group.  SOF ¶¶ 83, 88-89.  When asked by the State and other tribes where it might locate its casinos, it mentioned only the Tucson metropolitan area and rural areas of its existing reservation, rather than decline to answer or candidly mention its west Phoenix plans.  SOF ¶¶ 111-112, 116-122, 124, 127.  Tribes were cooperating in the negotiations and expressly had agreed to be candid about such matters as a predicate to negotiating the compact.  SOF ¶¶ 35-45. Dozens of public statements were made during the Proposition 202 campaign about no additional casinos in Phoenix and one in Tucson.  SOF ¶¶ 142-154, 156-158, 169, 184-193.  When the

Nation argues about "sophisticated, repeat players," "experienced counsel," and "years of painstaking negotiations," (N. Mot. at 39) it ignores the numerous detailed circumstances that most directly bear on why more express language would naturally be omitted.

Neither Section 25 of the Compact nor the other language cited by the Nation transforms this natural omission into something unnatural. The "specificity" that the Nation finds in the Compact, N. Mot. at 39, particularly in Section 3(c)(3), is all the product of the negotiations just described, where some of the basic premises were so fundamental that they did not bear elaboration. Read in the context of those events, Section 3(c)(3) itself unmistakably reflects the fact that the only urban market where the Nation bargained for and obtained any machine or facility rights was Tucson.

Moreover, Section 25 is unlike the clauses in the cases the Nation cites because it is limited "to matters covered by this Compact" and thus by its terms does not disclaim the possibility of consistent collateral terms effectuating the parties' clear intentions on a matter not covered. As discussed above, the parties believed that market restrictions preventing a new entrant into the Phoenix market were included in the Compact. But if the Court interprets the Compact otherwise, that does not mean that it should fail to give effect to the parties' intentions on the "uncovered" matter of market-based restrictions. The evidence of those intentions is so clear that it can independently establish a separate contract term barring the Nation from using its gaming facility allocations to enter a market in which it had never participated or sought the right to do so.

In any event, Section 25 "does not control the question whether the writing was assented to as an integrated agreement, the scope of the writing if completely integrated, or the interpretation of the written terms." Rest. 2d Contr. § 216, cmt. e. Rather, it is only one of the circumstances to be considered. Here, Section 25 is completely overshadowed by the many other circumstances conclusively demonstrating the parties' agreement to prevent an increase in the number of casinos

34

4648905v3

1    in the Phoenix market.  It is the overwhelming evidence of that agreement that
2    controls, not Section 25.

3    **II.     LOCATING A CASINO IN THE PHOENIX MARKET VIOLATES THE**
4    **         COVENANT OF GOOD FAITH AND FAIR DEALING**

5            The "essence" of the duty of good faith and fair dealing, which is implied in
6    every contract, "is that neither party will act to impair the right of the other to receive
7    the benefits which flow from their agreement or contractual relationship."  *Rawlings*
8    *v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986); *accord Wells Fargo Bank v. Ariz.*
9    *Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d
10   12, 28 (Ariz. 2002).[7]  Here, locating a new casino in the Phoenix market would
11   deprive the Plaintiffs of important benefits that they reasonably expected to flow from
12   the Compact.  As the record shows, the State expected that, by agreeing to increase
13   the number of gaming devices per facility, it would achieve the benefit of capping the
14   number of Phoenix-market casinos; and the Plaintiff tribes expected that, by agreeing
15   to give up their rights to build additional facilities, they would achieve the benefit of
16   limiting the number of competing casinos to seven.  SOF ¶¶ 74, 77-80.  Moreover,
17   those expectations were unquestionably justified in light of the Nation's failure to
18   participate in the Phoenix-market negotiations, its endorsement and financial support
19   of the public message that the Compact would freeze the number of Phoenix-market
20   casinos, and its deceptive conduct described elsewhere in this brief.  SOF ¶¶ 83-86,
21   89-90, 140-196.
22           The Nation argues that it cannot be held accountable under the implied
23   covenant "because the Compact specifies with precision where gaming facilities can
24   be located" and it is "simply . . . exercising its rights" in accordance with that
25   specification.  N. Mot. at 40.  But the Compact contains no such precise specification
26
27           [7]  The parties agree that, with respect to the implied covenant, there is no
28   difference between Arizona law and federal common law, both of which follow the
     Restatement (Second) of Contracts § 205.  *See* N. Mot. at 40, n. 24.

4648905v3

affirmatively authorizing the Nation to build a casino in the Phoenix market. According to the Nation's interpretation, the Compact's express terms do not precisely specify the location of its proposed casino but instead give it broad discretion in that regard.  Indeed, under the Nation's view, it need not conform to the separate market structure of the Compact.  "[B]y exercising [such] express discretion in a way that is inconsistent with" the Plaintiffs' "reasonable expectations," the Nation breaches the implied covenant under well-established precedent.  *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 435 (Ariz. App. 2002) (citing *Wells Fargo*, 38 P.3d at 28).

Moreover, even if the Court determines that the Nation's proposed casino is not expressly excluded by the Compact's terms, that does not end the matter.  A party can violate the implied covenant "by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the [other] party's reasonably expected benefits of the bargain."  *Id.*  As the Arizona Supreme Court ruled in *Wells Fargo*, the "duty of good faith extends beyond the written words of [a] contract."  38 P.3d at 29.  In that case, a construction lender argued that, because it had breached no express contractual provision, the implied covenant was inapplicable to its failure to disclose a borrower's financial condition to the permanent lender.  The court rejected that argument, noting that it relied "too heavily on the literal text."  *Id.* The court explained that, "[b]ecause a party may be injured when the other party to a contract manipulated bargaining power to its own advantage, a party may nevertheless breach its duty of good faith without actually breaching an express covenant in the contract."  *Id.*  Similarly, the Nation should be foreclosed from taking advantage of its manipulation of the negotiation process to evade the implied covenant simply because its conduct breaches no express provision of the Compact.

The Nation offers the non sequitur that, because bad-faith conduct during the formation of a contract cannot itself violate the implied covenant, its conduct during the negotiation of the Compact should not be considered.  N. Mot. at 41-42.  Evidence of such conduct is highly relevant to the nature and reasonableness of the expectations

1    that were created, and courts may properly consider it in this context.  *See Traumann*

2    *v. Southland Corp.*, 842 F. Supp. 386, 391-92 (N.D. Cal. 1993) (parol evidence rule

3    did not bar consideration of extrinsic evidence showing Plaintiffs' expectations).

4         Seemingly oblivious to the irony, the Nation argues that the implied covenant

5    claim fails "because it seeks to rewrite the contract to give plaintiffs 'benefits for

6    which [they] did not bargain.'"  N. Mot. at 41 n. 26 (*quoting United States v. Basin*

7    *Elec. Power Coop.*, 248 F.3d 781, 798 (8th Cir. 2001)).  The Nation apparently

8    believes that it is entitled to enter the Phoenix market without ever having bargained

9    for that right and to deprive Plaintiffs of benefits for which they bargained vigorously.

10   Such a gross distortion of the parties' reasonable expectations would constitute a

11   monumental breach of the implied covenant.

12   **III.   ALTERNATIVELY, THE NATION'S PROMISES MAY BE**
     **ENFORCED UNDER PROMISSORY ESTOPPEL**

13

14        **A.   Plaintiffs Detrimentally Relied on the Nation's Promise That There**
          **Would Be No Additional Gaming Facilities in the Phoenix**
15        **Metropolitan Area**

16        The doctrine of promissory estoppel prohibits the Nation from repudiating

17   promises made and detrimentally relied upon by Plaintiffs.  *See Hass v. Darigold*

18   *Dairy Prods., Inc.*, 751 F.2d 1096, 1100 (9th Cir. 1985) (applying Rest. 2d Contr. § 90

19   (1981) (promissory estoppel requires "[a] promise which the promisor should

20   reasonably expect to induce action or forbearance on the part of the promisee or a

21   third person and which does induce such action or forbearance"); *Contempo Constr.*

22   *Co. v. Mountain States Tel. & Tel. Co.*, 736 P.2d 13, 16 (Ariz. App. 1987) (promise

23   may be enforced when another party has reasonably and detrimentally relied on the

24   promise made).[8]

25        Here, it is undisputed that the AIGA tribes, including the Nation, promised that

26   there would be no additional Phoenix casinos.  *E.g.,* SOF ¶¶ 142-154, 156-158, 169;

27

28        [8] Both Arizona and federal common law have adopted § 90.  *See Chewning v.*
     *Palmer*, 650 P.2d 438, 440 (Ariz. 1982) (adopting Rest. 2d Contr. § 90).

4648905v3

184-193.  It is undisputed that the Nation *knew* this to be the expectation of the other parties when they signed the Compact.  The Plaintiffs' reliance was reasonable and undeniably foreseen by the Nation, which chose to actively keep secret its plans for a Phoenix casino.   SOF ¶¶ 198-199, 201, 204-206, 214, 216-218, 223, 230, 233.

The Nation argues that the promissory estoppel claim fails because "such a promise cannot be enforced where an actual contract between the parties *does* exist." N. Mot. at 44.  But this is true only where there is a direct conflict between an express contract and the oral promise.  *See Chanay v. Chittenden*, 563 P.2d 287, 290 (Ariz. 1977) (promissory estoppel may be established when there is "no express agreement *to the contrary*.") (emphasis added).  The Nation's promise not to build an additional casino in the Phoenix market does not contradict any express term of the compact.

The Nation also suggests that Plaintiffs' reliance on the promise was unreasonable.  Without addressing the facts, the Nation argues only that the existence of an integration clause renders any reliance on a promise unreasonable.  N. Mot. at 45.  An integration clause alone, however, does not necessarily defeat a promissory estoppel claim.  *Cf. Hill v. Jones*, 725 P.2d 1115, 1117 (Ariz. App. 1986).  The facts establish promises made and justifiable, detrimental reliance on those promises. Therefore, summary judgment should be entered for Plaintiffs.  At a minimum, the reasonableness of Plaintiffs' reliance is an issue for trial.  *See John C. Lincoln Hosp. & Health Corp. v. Maricopa Cnty.*, 96 P.3d 530, 535 (Ariz. App. 2004) ("[q]uestions of estoppel, including reasonable reliance, are fact-intensive inquiries"); Rest. 2d Contr. § 90, cmt b.

**B.** **Sovereign Immunity Does Not Bar The Promissory Estoppel Claim**

The Nation argues that sovereign immunity shields it from the promissory estoppel claim.  N. Mot. at 42-44.  Unlike the Tucker Act, to which the Nation analogizes, IGRA abrogates sovereign immunity as to "*any* cause of action … to enjoin" a class III gaming activity conducted in violation of any Tribal-State compact. 25 U.S.C. § 2710(d)(7)(A)(ii) (emphasis added); *compare* 28 U.S.C. § 1346(a)(2)

4648905v3

1    (requiring claims to be "*founded upon* any express or implied contract").  Sovereign

2    immunity is not a license to negotiate gaming compacts in bad faith.  "Congress, in

3    passing IGRA, did not create a mechanism whereby states can make empty promises

4    to Indian tribes during good-faith negotiations of Tribal-State compacts, knowing that

5    they may repudiate them with immunity whenever it serves their purpose."  *Cabazon*

6    *Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997).  For the

7    same reasons, IGRA does not permit tribes to engage in such conduct.

8         The Nation wishes to limit this court's jurisdiction under § 2710(d)(7)(A)(ii) to

9    actions for breach of an "express or implied-in-fact contract," N. Mot. at 43, but the

10   statutory language is not so limited.  The Nation promised to locate its gaming

11   facilities in the Tucson market or in outlying rural areas, and enforcing that promise

12   through equitable means is well within IGRA's abrogation of sovereign immunity.

13   *See* 25 U.S.C. § 2710(d)(7)(A)(ii) (abrogating sovereign immunity for "any" cause of

14   action initiated to enjoin class III gaming in violation of a compact); *Cabazon Band*,

15   124 F.3d at 1056 (IGRA envisions "the enforcement of a compact and *any* contractual

16   obligations assumed pursuant to a compact" (emphasis added)); *cf. Crow Tribe*, 87

17   F.3d at 1044-45 (enforcing a promise made during compact negotiations to refrain

18   from the use of slot machines).  For these reasons, this Court has jurisdiction over the

19   promissory estoppel claim, and it should grant Plaintiffs' motion for summary

20   judgment on Count III and deny the Nation's motion, or set the matter for trial to

21   determine the reasonableness of Plaintiffs' reliance.

**IV.    THE NATION'S GLENDALE PARCEL DOES NOT QUALIFY AS
         PART OF A "SETTLEMENT OF A LAND CLAIM" UNDER IGRA**

24        The Nation's proposed casino would also violate Section 3(j)(1) of the

25   Compact, which requires compliance with § 2719 of IGRA.  The Glendale parcel is

26   not part of a "settlement of a land claim."  Doc. 195-11 at 33.  The Gila Bend Act did

27   not settle any "land claim" as that term of art has been used in statute, regulation, and

28   judicial precedent.  Additionally, the Nation made or joined in numerous statements to

this Court, the State, and the public that the Nation could never take advantage of the "settlement of a land claim" exception.  Allowing the Nation to renege on the statements it made would cause a grave injustice to the Plaintiffs and the citizens of Arizona.

### A.    The Gila Bend Act Did Not Settle a "Land Claim"

Consistent with its usage in other legislation for over a century, a "land claim" as used in IGRA is a claim to land—a claim to title or possession.  The Gila Bend Act did not settle any such claim.

### 1.    A Land Claim Under IGRA Is a Claim Regarding the Title or Possession of Land, and Neither the Gila Bend Act nor Its Accompanying Settlement Agreement Settle Such Claims

The settlement of a land claim exception, upon which the Nation relies to justify its effort to open a Glendale casino, applies to *title* or *possession* disputes between the United States and a tribe.  This interpretation is consistent with IGRA's language and purpose and with the usage of the term "land claim" in other federal statutes.[9]

Congress has repeatedly used the term "land claim" to describe a tribe's possessory claim or claim of title to treaty lands or aboriginal lands that seeks a remedy to circumstances (peculiar to Indian tribes) of forced migration or other illegal dispossession of aboriginal homelands or treaty reservations.  *See* 25 U.S.C. § 1300k(6) (describing a "successful land claim with the Indian Claims Commission"); 25 U.S.C. § 1758(b) (referring to "the Settlement of the Mashantucket Pequot Indian Land Claim").  For instance, Congress described one tribe's "land claim" as "litigation to regain possession of its treaty lands," and as "the Tribe's claim

---

[9] For example, since 1876 the Department of the Interior has been required to keep "[a]n accurate account . . . of the cost of surveying and platting every private *land claim*" and to recover the cost thereof before issuing a land patent for "any such private claim."  43 U.S.C. § 757 (emphasis added).  And for over a hundred years it has been a federal crime to forcefully prevent or hinder "the surveying of the public lands, or of any private *land claim* which has been or may be confirmed by the United States."  18 U.S.C. § 1859 (emphasis added).

that it was dispossessed of its lands in violation of Federal law" when it "ceded its [federal] treaty reservation to the State." 25 U.S.C. § 941(a)(4)(B), (D), (E) (settlement with the Catawba Indian Tribe of South Carolina). Congress's major stated purpose in enacting the statute (and settlement) was "to remove the cloud on titles . . . resulting from the Tribe's land claim." *Id.* § 941(b)(4).[10] Likewise, Congress settled a lawsuit involving land claims in Massachusetts so as "to remove all clouds on titles resulting from such Indian land claim." 25 U.S.C. § 1771.

Congress has distinguished "land claims" from other property disputes. In settling claims of the Pueblo of Santo Domingo, which involved both "land claims" and "trespass claims," Congress explicitly distinguished between the two types of claims. 25 U.S.C. § 1777(a). The settlement resolved "all claims to land, whether based on aboriginal or recognized title, ***and*** all claims for ***damages*** or other judicial relief or for administrative remedies pertaining in any way to the Pueblo's land, such as boundary, trespass, and mismanagement claims." 25 U.S.C. § 1777c(a)(1)(B)(i) (emphasis added).

The Department of Interior's regulations do not define a "land claim" any differently. The regulations establish that a land claim is "any claim by a tribe concerning the impairment of title or other real property interest or loss of possession." 25 C.F.R. § 292.2. The regulations do not mention injuries to land, such as flooding, because the settlement of a land claim exception was not intended to encompass a grab-bag of torts. Under the regulation, as the Nation notes, an action need not specifically be brought for "the determination of title to lands" to qualify as a

---

[10] Not surprisingly, in acts authorizing payments to settle "land claims," Congress has required tribes to relinquish *all* claims, including not only land claims but also claims for trespass and damage to land. These comprehensive descriptions of relinquished claims further support the distinction between a "land claim" and other kinds of claims derived from the ownership of land. *See*, *e.g.,* 25 U.S.C. §§ 941a(2); 941d(c); 941d (d).

1    "land claim."  N. Mot. at 23 n.8 (citing 73 Fed. Reg. 29354, 29356 (May 20, 2008)).[11]

2    Plaintiffs do not dispute that an action can qualify as a § 2719 "land claim" even

3    though the ultimate resolution of the case involves only money damages.  An action

4    need not quiet title to be a dispute about title.  But a § 2719 "land claim" must

5    substantively be about or focus on *title* to or *possession* of land and not mere *injuries*

6    to land.  *See* discussion *supra*.  The Gila Bend Act simply does not constitute a

7    "settlement of a land claim" as Congress has traditionally used that term in the context

8    of Indian lands.

9           The Gila Bend Act did not settle any "land claim."  No such claim is

10   mentioned either in the text of the Act or in the accompanying Settlement

11   Agreement.  Rather, both the Act and the Settlement Agreement state that the Act

12   settled "any and all claims of water rights or injuries to land or water rights (including

13   rights to both surface and ground water)."  Doc. 195-1 at 4 § 9(a); Doc. 195-3 at 5

14   § 6.1.  This language settling claims for "injuries to land" does not implicate the

15   "impairment of title or other real property interest or loss of possession" necessary to

16   constitute a "land claim" under IGRA 25 U.S.C. § 2719(b)(1)(B)(i); 25 C.F.R.

17   § 292.2.

18                   **2.     The Legislative History of the Gila Bend Act Supports the**
                             **View That the Act Did Not Settle a "Land Claim"**
19

20          The Nation asserts that the committee report accompanying the Gila Bend Act

21   demonstrates congressional intent to settle challenges to title.  Doc. 193 at 23-24.  In

22   doing so, the Nation provides a textbook example of citing legislative history by

23   _____

24          [11] The Nation also cites *Wyandotte Nation v. National Indian Gaming
     Commission*, 437 F. Supp. 2d 1193, 1208 (D. Kan. 2006), but that case is inapposite.
25   The "land claim" at issue there was a settlement by the Indian Claims Commission
     ("ICC"), and the subsequent enabling legislation *mandated* that $100,000 be spent on
26   land acquisition—two facts which were "key" to the court's analysis.  *Id.* at 1210-12;
     Pub. L. 98–602, 98 Stat 3149 § 105(b)(1).  The Gila Bend Act did not arise out of an
27   ICC proceeding, and the Act permits, but does not mandate, the appropriated funds to
     be used to acquire additional trust lands.
28

4648905v3

"entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring).  The legislative history actually makes clear that the House Committee on Interior and Insular Affairs specifically and intentionally *avoided* settling land title claims.

The committee report accompanying the Gila Bend Act includes an amendment in the nature of a substitute, replacing the original bill introduced by Reps. Udall and McCain.  Doc. 195-2 at 2.  The report makes clear why Congress performed an extensive rewrite, particularly of the findings in section 2, which confirm that Congress was focused on assisting the Nation with its economic problem instead of its potential "claims," if any, against the United States:

> These findings [in the committee substitute bill] **replace those in the original bill which stressed the need to settle prospective O'odham legal claims against the United States** as well as to provide alternative lands for the tribe.  As such, **they did not adequately reflect the principal purpose of the legislation**—to provide suitable alternative lands and economic opportunity for the tribe.  **These findings apparently and regrettably prompted the Administration to focus its attention almost entirely on the legitimacy of these potential claims and the extent of the United States' liability if they were brought**, rather than on the broader responsibility of the United States, as trustee, to take action to resolve the tribe's immediate problem of an utterly uneconomic land base.

Doc. 195-2 at 10 (emphasis added).

The committee report confirms that the purpose of the Gila Bend Act was not to settle claims, but instead to permit the Nation to replace land which had become unsuitable for farming with land the Nation could use for economic development.  Gila Bend Act § 2(4).  The committee redrafted the legislation specifically to avoid addressing the issue of the Nation's potential legal claims.

Other committee changes also show congressional intent not to treat the Gila Bend Act as a settlement.  The original bill carried the short title "Papago-Gila Bend Settlement Act."  SOF ¶ 231.  The committee eliminated the word "settlement" from the short title.  Gila Bend Act § 1; Doc. 195-2 at 2.  Moreover, the committee report

1    notes that the Act arises from authority granted by section 308 of the Southern

2    Arizona Water Rights Settlement Act of 1982 ("SWARSA"), P.L. 97-293, 96 Stat.

3    1261.  Gila Bend Act § 2(1).  Section 308 of SWARSA does not contain the word

4    "settlement" and authorizes no settlement of claims; it merely allows for the exchange

5    of reservation land for other public lands.  SWARSA § 308.  Indeed, even the report

6    language cited by the Nation goes no further than to say the Nation's claims "could

7    include" the claims cited in the Motion.  Doc. 195-2 at 8.

8           The Nation's cherry-picked paragraph is overwhelmed by the facts.  The

9    supposed land claims are not mentioned in the Act, or the accompanying Settlement

10   Agreement, and the bulk of the legislative history indicates that Congress intended to

11   avoid further discussion about dubious legal claims and focus instead on providing an

12   economic land base for the people of the San Lucy District.  Having received $30

13   million and the option to purchase replacement land, the allegations of an

14   unauthorized easement and other claims mentioned by the Nation were not settled but

15   *subsumed.  See, e.g., Cohen v. United States*, 650 F.3d 717, 730-31 (D.C. Cir. 2011)

16   (claim subsumed when party pursues other claim based on same facts which provides

17   broader relief); *L-3 Commc'n Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d

18   1066, 1090-91 (D. Colo. 2012) (claim subsumed as "redundant" when it does not fall

19   "squarely … outside the scope" of other pending claim).

20          The only claims actually settled are those specifically mentioned in the Act and

21   the Settlement Agreement: claims for "water rights or injuries to land or water rights."

22   Doc. 195-1 at 4 § 9(a); Doc. 195-3 at 5 § 6.1.  No actual challenge to title or

23   possession would provide broader relief than the full purchase and replacement

24   provided by the Gila Bend Act.  Stated differently, once the Nation was paid the $30

25   million and granted the ability to purchase replacement lands, there was no reason for

26   the Nation or the United States to further consider other potential claims.  The United

27   States had no reason to engage in a "settlement of a land claim" in light of its

28

44                                                    4648905v3

1    agreement with the Nation to address the problem of an economically unproductive

2    land base.

3        At a minimum, a broader reading demonstrates that the legislative history is

4    ambiguous and should not be used to re-insert terms into the Gila Bend Act that

5    Congress intentionally removed.  In the absence of "clearly expressed legislative

6    intention" to the contrary, the Court may not "question the strong presumption that

7    Congress expresses its intent through the language it chooses."  *I.N.S. v. Cardoza-*

8    *Fonseca*, 480 U.S. 421, 433 n.12 (1987).  Congress not only excluded title-related

9    claims from the Gila Bend Act, but also affirmatively removed all references to

10   settlement of such claims.  The plain language of the Gila Bend Act demonstrates that

11   the Act did not settle a land claim.  Accordingly, the parcel is not eligible for gaming

12   under IGRA and would violate Section 3(j)(1) of the 2002 Compact.  Doc. 195-11 at

13   33.

14   **B.     The Nation Intentionally Abandoned Any Right It Might Have Had
            to Assert That the Gila Bend Act Is a Settlement of a Land Claim**

15

16       The Nation conceded long ago that the Gila Bend Act does not qualify as a

17   settlement of a land claim under § 2719 of IGRA.  The Nation intentionally

18   abandoned the argument in order to secure its first gaming compact.  In 1993, both the

19   governor and the state legislature were profoundly concerned about gaming on

20   noncontiguous, after-acquired land.  SOF ¶¶ 3-26.  To overcome legal challenges and

21   political opposition, the Nation made statements to this Court, State officials, and the

22   public assuring everyone that no gaming would occur outside the existing reservation

23   lands without the concurrence of the governor.  Having made such assurances, the

24   Nation is now barred by the doctrines of judicial estoppel and waiver from changing

25   its position and asserting sovereign immunity to succeed in its deception.

26

27

28

4648905v3

1

### 1. Judicial Estoppel Bars the Nation from Asserting That the Gila Bend Act Qualifies as the Settlement of a Land Claim

2

During litigation relating to the 1993 Compact, the Nation successfully argued to this Court that the State would be protected from gaming on noncontiguous, after-acquired lands by the § 2719 two-part determination.  The doctrine of judicial estoppel bars the Nation from reversing course in this litigation.  "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position."  *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).  This Court should invoke the doctrine of judicial estoppel to prevent the Nation from gaining an unfair advantage and to protect "the dignity of judicial proceedings" against the Nation's attempt to "play[] fast and loose with the courts."  *Id.* (quotations and citations omitted).  Some of the factors that can inform the decision to apply the doctrine include whether the party's later position is "clearly inconsistent" with its previous position, whether the party successfully persuaded a court to adopt its previous position, and whether the party would derive an unfair advantage from the inconsistency.  *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).[12]  All three of these factors argue in favor of applying judicial estoppel here.

During the litigation between certain tribes and the State over gaming compacts during the Symington administration, the Court selected former Justice Frank Gordon to conduct the "baseball" arbitration called for in IGRA to resolve compact negotiation disputes between states and tribes.  SOF ¶¶ 3-7.  Both the Nation and the State submitted complete proposed compacts, which represented their last best offers, and Justice Gordon was to choose between them without making any changes.

---

[12] Arizona law also requires that the same parties participate in both cases giving rise to judicial estoppel.  *Flood Control Dist. of Maricopa Cnty. v. Paloma Inv. Ltd. P'ship*, 279 P.3d 1191, 1203 (App. 2012).  Because the State and the Nation participated in the prior litigation, this requirement is met and the choice of law is not relevant.

4648905v3

1    *Id.*  During that process the Nation submitted a "Comparison of Compact Proposals,"

2    which was intended to allow Justice Gordon to "readily see the differences as well as

3    the similarities between the two proposed compacts."  SOF ¶ 8.  The Nation's

4    negotiating team reviewed and approved the brief.  SOF ¶ 10.

5         The State's proposal included language that would flatly prevent the Nation

6    from gaming on non-contiguous after-acquired lands.  Doc. 195-6 at 3.  The Nation

7    complained in its brief that the State's proposed definition of Indian lands would

8    eliminate the right to conduct gaming on after-acquired lands meeting one of the

9    exceptions in § 2719 of IGRA.  Doc. 195-6 at 3.  The Nation argued that entirely

10   eliminating its ability to game on after-acquired lands was unnecessary because only

11   one of the § 2719 exceptions could possibly apply to the Nation:  "**The existing**

12   **federal law requires the Governor's concurrence.  This is adequate protection to**

13   **the State and local interests.**  The State simply seeks an ancillary benefit in this

14   provision."  Doc. 195-6 at 3 (emphasis added).  The Nation's argument to this Court

15   could not have been clearer:  Justice Gordon should not select a compact which

16   entirely prohibits gaming on after-acquired lands because any such gaming would

17   require the governor's concurrence, meaning the two-part determination set forth in

18   § 2719(b)(1)(A).  The Nation's position in that litigation is "clearly inconsistent" with

19   its position in this case.  This factor favors the application of judicial estoppel.  *New*

20   *Hampshire*, 532 U.S. at 750.

21        The Nation also meets the second factor because it successfully persuaded

22   Justice Gordon to accept its position.  SOF ¶ 12.  Finally, the Nation unquestionably

23   derives an unfair advantage from its inconsistent positions.  The Nation represented to

24   this Court that language essentially identical to the 2002 Compact regarding gaming

25   on after-acquired lands would protect State and local interests with IGRA's two-part

26   determination.  Now it wants to reverse course over the objections of the State and the

27   locality where it seeks to build its casino.  This Court has already held that Plaintiffs

28   have no judicial remedy for the Nation's fraudulent inducement and material

4648905v3

1   misrepresentations, which led to the current Compact retaining the language

2   advocated by the Nation in 1993.  Doc. 43 at 19.  Invoking judicial estoppel will

3   ensure that the Nation does not gain an advantage in the current Compact that neither

4   the Plaintiffs nor the general public anticipated.

5          **2.     The Nation Waived the Right to Invoke the Settlement of a
              Land Claim Exception**

6

7          During the 1992-1993 compact negotiations, the Nation made the strategic

8   political decision to walk away from any right to conduct gaming on noncontiguous

9   lands purchased with Gila Bend Act funds, and therefore the Glendale parcel is not

10  eligible for gaming.  A waiver is "the voluntary relinquishment—express or

11  implied—of a legal right or advantage" that is "knowing or intelligent" because the

12  waiving party has "sufficient awareness of the relevant circumstances and likely

13  consequences."  *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162,

14  1170-71 (9th Cir. 2006) (quotations and citations omitted).[13]  Courts presume that a

15  party may waive the benefit of a statutory provision "absent some affirmative

16  indication of Congress' intent to preclude waiver."  *United States v. Mezzanatto*, 513

17  U.S. 196, 201 (1995).  Because the Gila Bend Act contains no indication that its

18  benefits may not be waived by the Nation, its behavior in the 1992-1993 negotiations

19  constitutes a waiver of any purported right to game on the Glendale parcel.

20         While negotiating in 1992-1993, the Nation was well aware of both the

21  relevant circumstances and likely consequences of waiving its right to game on

22  noncontiguous, after-acquired lands.  The Nation faced tremendous political

23  opposition to its efforts to secure a gaming compact.  SOF ¶¶ 3-26.  The Nation was

24  repeatedly informed that the governor and members of the legislature were highly

25  concerned about the possibility that a tribe might build a casino off existing

26

27         [13] Under Arizona law the elements of waiver are substantially the same.  *See,
28  e.g.*, *Am. Cont'l Life Ins. Co. v. Ranier Constr. Co., Inc.*, 607 P.2d 372, 374 (1980).
    The choice of law is therefore irrelevant to the waiver issue.

reservations and in the middle of a metropolitan area.  SOF ¶¶ 6, 13, 15-23.  The legislature formed the Joint Select Committee on Indian Gaming and held hearings at which off-reservation gaming repeatedly came up and assurances were sought from tribal leaders that no such gaming would occur.  *Id.*

In a special session called by Gov. Symington to address Indian gaming, the legislature considered a bill that would have banned all gaming on after-acquired lands in Arizona.  SOF ¶ 20.  All of the tribes involved in the negotiations, including the Nation, were informed that gaming on after-acquired lands was one of the top concerns of the legislature.  SOF ¶¶ 19-23.  In that environment, if the Nation had informed the State's leaders that it believed it had the right to build a casino in the Phoenix metropolitan area, the Republican leadership would have kept the gaming special session in place "until hell froze over" to pass the bill blocking gaming on after-acquired lands.  SOF ¶ 24.

Faced with these circumstances and the potential consequence that the Nation would fail to secure a gaming compact at all, the Nation knowingly and voluntarily made or joined numerous statements assuring decision makers that gaming on noncontiguous, after-acquired land would not occur without the concurrence of the governor.  One of those statements was made to this Court.  *See* discussion *supra* at IV(B)(1).  The Nation also represented to the public that it intended to game only on its existing reservation lands near Tucson, Casa Grande, and Gila Bend. SOF ¶ 11.

In addition, the Nation joined the other tribes who were involved in the negotiation to prevent the legislature from blocking all gaming on after-acquired land.  SOF ¶ 15.  As part of that effort, the tribes made a presentation to staffers for legislative leaders on June 8, 1993, at which tribal representatives provided a handout reiterating the consistent message that gaming on noncontiguous, after-acquired lands would require a two-part determination because other exceptions in § 2719 did not apply:

4648905v3

1

2

3

4

> Another exception to the prohibition of gaming on after acquired
> lands is when the lands are taken into trust as part of a settlement
> of a land claim. **This will not effect [*sic*] Arizona because
> aboriginal land claims in Arizona have already been settled**
> pursuant to the Indian Claims Commission Act of 1946.

5   SOF ¶ 23.  Representatives of the Nation attended the meeting when this document

6   was distributed.  *Id.*  No representative from the Nation expressed disagreement about

7   "the settlement of a land claim" statement contained in the handout, even though

8   counsel for the Nation was aware of a field solicitor memorandum indicating that the

9   Gila Bend Act qualified as a land claim settlement.  *Id.*

10          Sen. John McCain, a principal author of both IGRA and the Gila Bend Act as

11   well as a steady supporter of the Nation's early gaming efforts, also passed along

12   assurances to the legislature that Arizona would be protected by the two-part

13   determination.  SOF ¶ 22.  Sen. McCain's letter was designed to "assure the State

14   legislators of the reach of IGRA or the coverage of IGRA in regards to after-acquired

15   land."  SOF ¶ 22.  These assurances, and those of other tribes, convinced the

16   legislative opponents not to block Indian gaming until hell froze over, but to stand

17   aside as Governor Symington signed the Nation's compact at the Heard Museum on

18   June 24, 1993. SOF ¶ 25.

19          By publicly representing or joining representations to this Court and the

20   legislature that the settlement of a land claim exception could not apply to them, the

21   Nation convinced the State and other tribes that the issue was off the table.  Shortly

22   after signing the 1993 compact, Governor Symington gave an interview in which he

23   said the two-part determination would be required for gaming on new reservation

24   lands in Arizona. SOF ¶ 26.

25          Faced with the opportunity to secure a gaming compact in 1993, the Nation

26   made the knowing, voluntary, intelligent, and understandable decision to waive any

27   argument invoking the § 2719 settlement of a land claim exception.  The Nation

28   cannot undo that waiver when doing so would cause significant harm to the Plaintiffs.

4648905v3

1    **V.     PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF**

2          "There is nothing novel about a permanent injunction issued on summary

3    judgment rather than after trial." *Cont'l Airlines, Inc. v. Intra Brokers, Inc*., 24 F.3d

4    1099, 1102 (9th Cir. 1994).  Here, (1) the Plaintiffs have suffered irreparable injury;

5    (2) remedies at law are inadequate; (3) the balance of hardships favors Plaintiffs; and

6    (4) a permanent injunction is in the public interest.  *See Apple Inc. v. Psystar Corp*.,

7    658 F.3d 1150, 1152-53 (9th Cir. 2011), citing *eBay Inc v. MercExchange, L.L.C.*, 547

8    U.S. 388, 391 (2006).

9          First, the Nation cannot dispute that in the absence of an injunction, Plaintiffs

10   will suffer irreparable harm.  The State negotiated and gave valuable consideration for

11   compacts that would not allow additional casinos in the Phoenix area, an interest that

12   would be permanently destroyed absent an injunction here.  *See* SOF ¶¶ 73-80, 237.

13   The State sought to provide market security and ongoing gaming revenues to rural

14   tribes, including non-gaming tribes, a goal that was achieved through supply

15   restrictions in urban markets and through the machine transfer system.  *Id*.  Without

16   an injunction, that balance will be disrupted.

17         The casino's opening will also violate representations made to the public by

18   Plaintiffs and the Nation that the Compact would bar any new casinos in the Phoenix

19   metropolitan area, irreparably undermining public confidence in Plaintiffs and the

20   initiative process.  Moreover, the proposed casino will draw business away from the

21   existing Phoenix-area casinos of Salt River and Gila River (SOF ¶ 238), an irreparable

22   harm.  *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir.

23   2009), *vacated and remanded on other grounds, Douglas v. Indep. Living Center of S.*

24   *Cal., Inc.*, 132 S. Ct. 1204 (2012); *accord Gila River Indian Cmty*. v. *United States*,

25   No. CV-10-1993-PHX, 2011 WL 1656486, at *3 (D. Ariz. May 3, 2011) ("the

26   Nation's sovereign immunity would prevent the Community from recovering

27   damages," and "[t]he Community therefore is likely to suffer irreparable harm").

28

4648905v3

1    Second, by their nature, none of these irreparable harms can adequately be

2    remedied by damages.

3    Third, the balance of hardships favors Plaintiffs.  The Nation's proposed illegal

4    gaming operation would disrupt the intensively negotiated, voter-approved, and

5    highly regulated balance of gaming facilities in Arizona.  The Nation can suffer no

6    cognizable hardship from an injunction because it has no legitimate interest in

7    conducting gaming activities on the Glendale Parcel.  Both the Compact and IGRA

8    made clear to the Nation long before it purchased Parcel 2 that illegal gaming activity

9    can be enjoined by this Court.  *See* Compact § 15(d); 25 U.S.C. § 2710(d)(7)(A)(ii).

10   Finally, an injunction barring the Nation from gaming on the Glendale Parcel

11   serves the public interest because the people of Arizona approved Proposition 202

12   based in large part on representations that the Compact would not allow any new

13   casinos in the Phoenix metropolitan area.  An injunction is necessary to protect the

14   public interest.

### CONCLUSION

16   The Court should deny the Nation's motion for summary judgment, and grant

17   Plaintiff's cross-motion for summary judgment.

18   . . .

19   . . .

20   . . .

4648905v3

RESPECTFULLY SUBMITTED this 14th day of January, 2013.

OSBORN MALEDON, P.A.

OFFICE OF THE ATTORNEY
GENERAL, STATE OF ARIZONA

By____s/ Mary R. O'Grady____
    Mary R. O'Grady
    John L. Blanchard
    Shane M. Ham
    Grace E. Rebling
    2929 North Central Avenue
    Suite 2100
    Phoenix, Arizona  85012

*Attorneys for Plaintiff Salt River Pima-Maricopa Indian Community*

By____s/ Michael Tryon____
    Thomas C. Horne, Attorney General
    Michael Tryon
    Evan Hiller
    Assistant Attorneys General
    1275 West Washington Street
    Phoenix, Arizona  85007-2926

*Attorneys for Plaintiff the State of Arizona*

GILA RIVER INDIAN COMMUNITY

By____s/ James P. Tuite____
    Linus Everling, General Counsel
    525 W. Gu u Ki
    P.O. Box 97
    Sacaton, Arizona  85247

    James P. Tuite (*Pro Hac Vice*)
    Merrill C. Godfrey (*Pro Hac Vice*)
    Jason T. Hauter (#022188)
    AKIN GUMP STRAUSS HAUER &
     FELD LLP
    1333 New Hampshire Avenue, N.W.
    Washington, DC  20036-1564

    Brian J. Schulman
    GREENBERG TRAURIG LLP
    2375 E. Camelback Road, Suite 700
    Phoenix, AZ  85016

*Attorneys for Plaintiff Gila River Indian Community*

4648905v3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 14th day of January, 2013, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, which will send a notice of filing to all counsel of record.

           */s/* Julie Greenwood       

4648905v3