Mary R. O'Grady (#011434)
John L. Blanchard (#018995)
Shane M. Ham (#027753)
Grace E. Rebling (#028661)
OSBORN MALEDON, P.A.
2929 North Central Avenue
Suite 2100
Phoenix, Arizona  85012
(602) 640-9352
mogrady@omlaw.com
jblanchard@omlaw.com
sham@omlaw.com
grebling@omlaw.com

*Attorneys for Plaintiff Salt River Pima-
Maricopa Indian Community*

Thomas C. Horne (#002951)
Attorney General
Michael Tryon (#003109)
Evan Hiller (#028214)
Assistant Attorneys General
1275 West Washington Street
Phoenix, Arizona  85007-2926
(602) 542-5025
Tom.horne@azag.gov
Michael.tryon@azag.gov
Evan.hiller@azag.gov

*Attorneys for Plaintiff the State of
Arizona*

Linus Everling, General Counsel
 (#019760)
GILA RIVER INDIAN COMMUNITY
525 W. Gu u Ki
P.O. Box 97
Sacaton, Arizona  85247
(520) 562-9763
Linus.Everling@gric.nsn.us

James P. Tuite (Pro Hac Vice)
Merrill C. Godfrey (Pro Hac Vice)
Jason T. Hauter (#022188)
AKIN GUMP STRAUSS HAUER &
 FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, DC  20036-1564
(202) 887-4000
jtuite@akingump.com
mgodfrey@akingump.com
jhauter@akingump.com

Brian J. Schulman (#015286)
GREENBERG TRAURIG LLP
2375 E. Camelback Road, Suite 700
Phoenix, AZ  85016
602-445-8000
schulmanb@gtlaw.com

*Attorneys for Plaintiff Gila River Indian
Community*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **The State of Arizona**; **The Gila River Indian Community**, a federally recognized Indian tribe; and **The Salt River Pima-Maricopa Indian Community**, a federally recognized Indian tribe,<br><br>                Plaintiffs,<br><br>        v.<br><br>**The Tohono O'odham Nation**, a federally recognized Indian tribe,<br><br>                Defendant. | Case No. 2:11-cv-00296-DGC<br><br>**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND CONTROVERTING STATEMENT OF FACTS**<br><br>(Assigned to David G. Campbell) |

Pursuant to Local Rule of Civil Procedure 56.1(a)-(b), Plaintiffs the State of Arizona, the Gila River Indian Community ("Gila River"), and the Salt River Pima-Maricopa Indian Community ("Salt River") hereby file their Statement of Undisputed Material Facts in support of their Motion for Summary Judgment and their Controverting Statement of Facts in support of their Response to Defendant Tohono O'odham Nation's (the "Nation") Statement of Material Undisputed Facts in Support of Its Motion for Summary Judgment (Doc. 194).[1]

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.   1992-1993 Compact Negotiations and the Nation's Decision to Relinquish Any Right to Operate Casinos in the Phoenix Metropolitan Area**

**1.**     In 1989 the Nation formed a Gaming Negotiating Committee for the purpose of seeking a gaming compact with the State of Arizona pursuant to the Indian Gaming Regulatory Act ("IGRA").  Ex. 67.

**2.**     On November 8, 1991, representatives of the San Lucy District, a political subdivision of the Nation, sent a letter to the Bureau of Indian Affairs seeking clarification of the Nation's rights under the Gila Bend Indian Reservation Lands Replacement Act, Pub. L. 99-503 ("Gila Bend Act").  The letter sought to determine whether land purchased pursuant to the Gila Bend Act would be eligible for gaming under IGRA.  The Nation received copies of memoranda briefly discussing the question and concluding that the Gila Bend Act qualified as the settlement of a land claim pursuant to IGRA, 25 U.S.C. § 2719.  Ex. 32-34.

**3.**     On October 23, 1991, the Yavapai-Prescott Indian Tribe filed suit in this Court against the State of Arizona and Governor J. Fife Symington III, seeking to force the State to negotiate a compact in good faith (the "Yavapai-Prescott litigation").  The White Mountain Apache Tribe, the Cocopah Indian Tribe, the San Carlos Apache Tribe of Arizona, the Pascua Yaqui Indian Tribe, and the Nation

---

[1] All page references for documents filed with the Court refer to the blue page numbers appended by the ECF system at the top of each page.

1  intervened in the lawsuit as additional plaintiffs.  No. 3:91-CV-01696-PGR.  A copy

2  of the docket for that lawsuit is attached as Exhibit 128.

3      **4.**      In May 1992 the Federal Bureau of Investigation raided casinos on five

4  Arizona reservations, seizing hundreds of gaming devices.  The raids led to a highly

5  publicized and acrimonious standoff between tribes on one side and federal and state

6  law enforcement on the other, in which leaders feared the possibility of violence.  The

7  standoff ended with Governor Symington agreeing to permit limited gaming while

8  compact negotiations proceeded.  Ex. 129; Ex. 1 (Antone) 64:22-65:23.

9      **5.**      On December 16, 1992, as part of the Yavapai-Prescott litigation, this

10  Court appointed former Justice Frank Gordon to conduct the "baseball" arbitration

11  pursuant to 25 U.S.C. § 2710(d)(7)(B).  Ex. 128 at 16.

12      **6.**      In that process, each tribe in the arbitration and the State submit a "last

13  best offer" compact to the mediator, and the mediator must choose one of the two

14  proposals without amendment. Ex. 8 (Dahlstrom Vol. 1) 62:16-63:18.

15      **7.**      The mediation was conducted under the auspices of this Court and all

16  documents filed for consideration by the mediator were filed with this Court under the

17  miscellaneous case number M-93-0001-PHX.  Ex. 128 at 16; Doc. 195-6 at 2.

18      **8.**      On January 19, 1993, as part of the mediation process, the Nation

19  submitted a brief titled "Comparison of Compact Proposals," which included a

20  section-by-section analysis of the last best offer compact proposals filed by the Nation

21  and the State.  In the brief the Nation argued:

22
        Section 2(s) of the Nation's compact uses the term "Indian Lands", as
23      used in IGRA, to describe the lands where gaming may be conducted.
        The State's compact uses the term "Tohono O'odham Tribal Trust
24      Lands."  See State's Section 2(cc).  The State's provision also adds a
        compact provision to the existing federal law which specifically
25      governs the acquisition of trust land for a gaming use after the
        effective date of the Act.  25 U.S.C. §2719.  The State's section 2(cc)
26      would result in the Nation forfeiting the rights provided to tribes in
        IGRA to request that in certain circumstances after-acquired trust land
27      be available for class III gaming activities.  ***The existing federal law***
28

*requires the Governor's concurrence.  **This is adequate protection to the State and local interests.*  The State simply seeks an ancillary benefit in this provision.

Doc. 195-6 at 3 (emphasis added).

9.      In its final brief to the Court, the Nation further explained why Justice Gordon should choose the Nation's Compact.  "Finally, Arizona public policy today recognizes and endorses Indian casino gaming.  [Footnote citing A.R.S. § 5-601.] Arizona public opinion supports Indian casino gaming, but does not support off-reservation casino gaming . . . .  The Nation's proposal is consistent with Arizona policy in both regards."  Ex. 37 at TON0102478-79.

10.     During the mediation, the members of the Nation's compact negotiating team reviewed and approved all briefs filed with the mediator.  Ex. 1 (Antone) 41:7-42:1.

11.     Section 3(b) of the Nation's last best offer compact submitted to Justice Gordon restricted the Nation to gaming on its then-existing reservation lands, in the San Xavier District, the Sif Oidak District, and the San Lucy District.  This is consistent with a statement given to reporter Mark Thomas Swenson by Andrew Patricio, the Nation's chief gaming negotiator, which appeared in the newspaper the day after Justice Gordon made his selection.  The newspaper reported that "[i]n addition to its current bingo and gaming operation on South Nogales Highway [in San Xavier District], the tribe is looking at gambling operations at Sif Oidak near Casa Grande, and San Lucy at Gila Bend."  Ex. 35 at TON0089194; Ex. 36.

12.     The Nation successfully persuaded Justice Gordon to select the Nation's last best compact offer and reject the State's last best offer.  Justice Gordon filed his decision with this Court on February 16, 1993.  Ex. 128 at 16; Ex. 8 (Dahlstrom Vol. 1) 63:12-63:18.

13.     The State refused to sign the compact selected by Justice Gordon, so the negotiating parties turned to then-Secretary of the Interior Bruce Babbitt, who could

promulgate regulations in lieu of a compact under IGRA.  Secretary Babbitt informed the parties that the Department of the Interior had no desire to impose gaming regulations on the State of Arizona.  Ex. 9 (Dahlstrom Vol. 2) 199:13-201:10.

14.     In the last best offer compact proposal submitted to Justice Gordon, the Nation defined the term "Indian Lands" as "land as defined in 25 U.S.C. § 2703(4)(A) and (B), subject to the provisions of 25 U.S.C. § 2719."  Section 2(s) of the 1993 Compact used an identical definition for "Indian Lands."  The 2002 Compact uses an identical definition for "Indian Lands" with the sole exception that the word "land" is pluralized in the 2002 definition.  Ex. 35 at TON0089190; Doc. 195-4 at 11; Doc. 195-11 at 13.

15.     In the spring of 1993, the Arizona State Legislature undertook efforts to pass legislation which would place restrictions on the governor's power to execute gaming compacts with the tribes, a situation the Nation's attorney described as "a standoff between the tribes and the governor on one side and the legislature on the other."  The Nation joined other tribes in the effort to block the proposed legislation.  Ex. 8 (Dahlstrom Vol. 1) 117:3-118:2; Ex. 1 (Antone) 63:4-64:2.

16.     On May 19, 1993, the Joint Select Committee on Indian Gaming of the Arizona Legislature held a hearing during which several tribal leaders testified.  Representatives of the Nation attended the hearing.  During that hearing, Sen. Matt Salmon asked the testifying tribal leaders whether their tribes "own noncontiguous lands" and whether the tribes "might entertain purchasing noncontiguous land and potentially putting slot machines at those locations."  Ex. 38 at SR0013384; Ex. 8 (Dahlstrom Vol. 1) 101:14-17; Ex. 1 (Antone) 54:19-22.

17.     During the May 19, 1993 hearing, Sen. A.V. "Bill" Hardt stated on the record that any legislation approved by the Legislature should "prohibit gambling on any lands purchased off of the reservation."  Ex. 38 at SR0013330.

18.     On May 26, 1993, the Joint Select Committee on Indian Gaming of the Arizona Legislature held a hearing during which several law enforcement

4652130

1  representatives testified.  During that hearing, Sen. Salmon stated to the witness

2  panel:

> One of the issues that really concerns me is this issue of
> noncontiguous tribal lands and the possibility that a tribal
> government may purchase land outside of the reservation virtually
> anywhere in the state and place casinos on, or place slot machines on
> those parcels of land.  I'm real concerned about that.  I think that's an
> issue we have to clarify in those compacts to make sure that that's not
> in the equation for Arizona, because of the likelihood that they may
> put slot machines in the Mercado, or in my neighborhood in Mesa,
> it's not farfetched.  It could happen.

9  Ex. 39 at SR0013961-62.

10      19.     On May 27, 1993, representatives of the Nation received a

11  memorandum stating that the concerns of Republican legislators "have been distilled

12  to two main issues: (1) After-acquired lands, and (2) off-track betting."  Regarding

13  after-acquired lands, the memorandum indicated to tribal negotiators that some

14  legislators were concerned that "after-acquired land not contiguous to the reservation

15  (e.g., downtown Phoenix) could be used for gaming operations."  The memorandum

16  further stated that the State's lead negotiator, Jack Moortel, suggested that the

17  Nation's attorney, Eric Dahlstrom, contact legislators to "alleviate their concerns."

18  Ex. 40 at TON0105340.

19      20.     In June 1993, during a special session, Arizona State Senators Salmon,

20  Greene, Patterson, and Brewer introduced a bill relating to Indian gaming.  Section 2

21  of the bill would have prohibited the governor from executing a compact that

22  permitted gaming on any Indian lands which were not part of a reservation as of

23  October 17, 1988.  Representatives of the Nation received a memorandum analyzing

24  this bill and pointing out the provision restricting gaming on after-acquired lands.  Ex.

25  41 at AZ000465; Ex. 73 at TON0103500.

26      21.     On June 7, 1993, Eric Dahlstrom, serving as counsel for the Nation,

27  received a "Discussion Points" document that he characterized as "Republican talk

28  points."  Two of the "Points of Concern" listed in that document were that any

compact approved by the Legislature should specify casino sites in the text of the compact, and that it should not permit gaming on after-acquired lands under any circumstances.  Mr. Dahlstrom wrote that "Republicans are not happy" to indicate that some Republican legislators wanted to ban all gaming on after-acquired lands.  Ex. 43; Ex. 8 (Dahlstrom Vol. 1) 131:17-132:13.

22.    During the period of legislative opposition to the 1993 Compact, Senator John McCain met with tribal representatives in Phoenix.  Subsequent to that meeting, on June 4, 1993, during the period in which the Legislature was considering a bill which would block the governor from executing a compact which permitted gaming on after-acquired lands, Senator John McCain wrote a letter to John Greene, President of the Senate, and Mark Killian, Speaker of the House.  In that letter, Sen. McCain states that § 2719 prohibits gaming on lands acquired after October 17, 1988.  Sen. McCain notes that § 2719 contains an exception for lands that have undergone the two-part determination.  Sen. McCain underlined the portion of the letter stating that gaming on after-acquired lands requires "the concurrence of the state governor."  The purpose of the letter was to "assure the State legislators of the reach of IGRA or the coverage of IGRA in regards to after-acquired land."  Ex. 42; Ex. 4 (Brauchli) 39:8-41:8.

23.    On June 8, 1993, tribal representatives including a representative of the Nation met with staff for legislative representatives, and provided a number of handouts to the staff members.  One of the handouts was entitled "After Acquired Lands," and it stated that "[a]nother exception to the prohibition of gaming on after acquired lands is when the lands are taken into trust as part of a settlement of a land claim.  This will not effect [*sic*] Arizona because aboriginal land claims in Arizona have already been settled pursuant to the Indian Claims Commission Act of 1946."  This handout constituted the position of all of the tribes in attendance at the meeting, including the Nation, and no tribal representatives expressed disagreement with the

4652130

content of the handout.  Ex. 44, Ex. 8 (Dahlstrom Vol. 1) 140:25-142:10; Ex. 4 (Brauchli) 69:17-70-11.

24. The legislative special session adjourned without passing a bill, but if the Nation had made clear to Sen. Salmon that it believed it could operate a casino in the Phoenix metropolitan area, the 1993 Third Special Session "would have turned out very, very differently" because Sen. Salmon would have "kept that special session in place until hell froze over" to ensure that the Nation kept its commitment not to do so.  Ex. 28 (Salmon) 58:2-59:11.

25. After the adjournment of the special session, with no legislation to bar the governor from signing a compact, Governor Symington and the Nation executed the Nation's first gaming compact on June 24, 1993 (the "1993 Compact").  At the time of signing, the Nation had only disclaimed, and had never asserted, any right to conduct gaming on non-contiguous after-acquired lands without a two-part determination.  The Nation never asserted such a right with respect to Gila Bend Act lands or any other lands, despite having had numerous negotiation sessions, the arbitration, and other meetings with state officials over several years, including at least one where the Gila Bend Act was mentioned.  If the Nation had ever asserted such a right to the State's representatives rather than openly disclaiming it, Governor Symington "would have fought that tooth and nail."  Doc. 195-4 at 72; Doc. 195-6 at 2; Ex. 8 (Dahlstrom Vol. 1) 58:9-62:2; 70:7-71:9; 88:11-89:7; Ex. 9 (Dahlstrom Vol. 2) 256:16-20; Ex. 7 (Clark) 34:25-35:17.

26. On July 9, 1993, after the execution of the 1993 Compact, Governor Symington gave an interview on KAET, the Phoenix public broadcasting station.  In that interview, Gov. Symington stated that Congress was contemplating amendments to IGRA which would "address the issue of tribal lands and the ability of the tribes to take in new land and put casinos on new land, which is something that really worries a lot of people."  Gov. Symington went on to say that he was not concerned about that issue because "I, for one, feel that IGRA's actually fairly clear on that issue, they

4652130

1  can't do it without the permission of the governor."  A copy of the transcript of the

2  interview was distributed to representatives of the Nation.  Ex. 45 at TON0101778,

3  TON0101784.

4      27.    The "Governing Law" clause in Section 24 of the 1993 Compact is

5  identical to the "Governing Law" clause in Section 25 of the 2002 Compact.  Doc.

6  195-4 at 71; Doc. 195-11 at 76.

7  **II.    Structure of 1999-2002 Compact Negotiations and Proposition 202
8  Campaign**

9      28.    The negotiation and signing of the Nation's 2002 Compact occurred in

10  Arizona and the real property that is the subject of this action is located in Arizona.

11  Doc. 45 (Answer) at 4 ¶ 18.

12      29.    During the period from 1999 to 2002, various Arizona Indian tribes,

13  including the Nation, GRIC, and Salt River, negotiated with the staff of then-

14  Governor Jane Hull and representatives of the Arizona Department of Gaming

15  regarding potential terms for new gaming compacts.  The Nation and the tribes also

16  engaged in negotiations with Governor Hull and the Arizona Department of Gaming

17  ("ADOG") to obtain their support for Proposition 202, the ballot initiative endorsed

18  by the Nation, and their opposition to competing gaming-related ballot initiatives.

19  Doc. 45 (Answer) at 5 ¶ 23.

20      30.    Approximately 17 tribes negotiated collectively through the Arizona

21  Indian Gaming Association ("AIGA").  AIGA as an organization was composed of

22  the tribal leaders from member tribes.  Ex. 13 (LaSarte) 12:22-13:18.; Ex. 11 (Hart)

23  24:14-25:21; Ex. 3 (Bielecki) 25:21-26:11.

24      31.    The then-current gaming compacts for the Nation and Gila River were

25  set to expire in 2003.  Salt River had not executed a gaming compact until 1998, and

26  therefore Salt River's compact was not set to expire until 2008.  Ex. 17 (Makil Vol. 2)

27  133:10-17.

28

**32.**     Tribes in AIGA agreed to meet and negotiate among themselves in good faith so that they could present a united front to the State during negotiations, which was important.  Ex. 12 (Landry) 12:4-8; Ex. 26 (Ramon) 26:18-27:2, 62:23-63:20; Ex. 14 (Lewis) 34:9-36:1, 52:17-21; Ex. 19 (Manuel, Edward) 140:3-141:8; Ex. 62.

**33.**     It was helpful to all AIGA tribes, including the Nation, that in negotiating with the State the tribes had worked among themselves to develop and maintain common positions.  Ex. 24 (Nation) 182:24-184:22; Ex. 19 (Manuel, Edward) 140:3-141:8.

**34.**     As part of its participation in AIGA, the Nation paid membership dues and provided funding for AIGA media activities.  Ex. 24 (Nation) 162:10-13.

**35.**     As negotiations got underway, tribal leaders signed an Agreement in Principle ("Agreement"), which was "entered into with respect, good faith, cooperation, and unity."  The Agreement was executed by 16 tribal leaders, including the Nation's then-Chairman, Edward Manuel, Jr.  Doc. 195-10 at 3.

**36.**     The purpose of the Agreement was to create "strength in numbers" and to ensure that if a tribe "felt that a unilateral action was required, then they would at least give notice to the group so that everybody would be informed and could act accordingly."  Ex. 19 (Manuel, Edward) 140:19-141:3; Ex. 9 (Dahlstrom Vol. 2) 268:9-269:8.

**37.**     The tribes moved forward with negotiations under the Agreement confident that it bound the tribes to put their "cards on the table."  Ex. 9 (Dahlstrom Vol. 2) 269:9-270:14; Ex. 14 (Lewis) 100:2-7.

**38.**     The Agreement was an agreement of good faith cooperation among the tribes to negotiate as a group and to be honest, open, and candid with each other about their positions.  Ex. 13 (LaSarte) 95:13-97:5; 121:11-123:25; Ex. 15 (Lunn) 72:4-7.

**39.**     The Agreement required the tribes to be honest with each other if they disagreed about a proposal from the State.  Chairman Manuel understood the term "good faith" meant "to be honest."  Ex. 19 (Manuel, Edward) 142:16-22; 143:19-22.

4652130

40. The "whole intent" of the Agreement was that a tribe would not try to directly undermine the stated objectives of other tribes in the group without discussing the matter first. Ex. 19 (Manuel, Edward) 144:3-14.

41. If the Nation had been considering building a casino in west Phoenix during the time the compacts were being negotiated, good faith required the Nation to disclose that fact to the other tribes in the negotiating process. Ex. 19 (Manuel, Edward) 180:20-181:4.

42. The tribal leaders in AIGA were not wordsmiths or technocrats, but they as peers shook hands and looked each other in the eye and said they would be candid and open about their intentions. Ex. 13 (LaSarte) 122:2-25.

43. The Agreement was a "meaningful commitment," and it was reasonable to expect that the signatory tribes would abide by it. Ex. 24 (Nation) 142:23-144:5.

44. The Nation's representatives believed the Agreement was in effect from the date of execution in January 2000 through the November 2002 election. Ex. 20 (Miguel) 25:9-24.

45. There was a relationship of trust among the Arizona tribes during negotiations, particularly among the four O'odham tribes:  Gila River, Salt River, Tohono O'odham, and Ak-Chin.  These four tribes are commonly known as "sister tribes." Ex. 14 (Lewis) 101:9-103:3; Ex. 19 (Manuel, Edward) 88:17-90:4; Ex. 21 (Norris) 89:5-13.

46. The result of this collective negotiation was a standard form compact for all tribes.  There would have been no agreement with the State if there had not been an agreement among the tribes about the nature of the standard form compact and the obligations of each tribe which executed one. Ex. 3 (Bielecki) 36:5-38:9.

47. During the 1999-2002 negotiations, elected officials dealt with decision making on high-level issues in the negotiations.  Staff members were responsible for implementing the elected leaders' decisions by drafting compact language.  Staff members provided support to the elected officials and were sometimes present at or

4652130

1   involved in discussions among the elected officials of various tribes.  Ex. 24 (Nation)

2   33:10-35:8.

3      **48.**   David LaSarte was Executive Director of AIGA.  LaSarte had no legal

4   or fiduciary duty to any specific tribe.  LaSarte's directions could take the form of

5   formal action, or could come from a consensus discussion of tribal leaders where the

6   direction was discussed and nobody objected.  His directions were always vetted

7   through the whole group of tribal leaders.  LaSarte followed the instructions given to

8   him by tribal leaders, and he did his job well.  Ex. 13 (LaSarte) 10:13-20, 15:23-17:4,

9   25:3-26:13; Ex. 19 (Manuel, Edward) 104:25-105:6.

10     **49.**   LaSarte acted as a spokesperson for the group of AIGA tribes, and it

11  was important to Chairman Manuel and other tribal leaders that he spoke accurately

12  about the tribes' collective positions.  Tribal leaders always had the ability to correct

13  him and ask him to correct what he said.  Ex. 19 (Manuel, Edward) 106:3-107:5.

14     **50.**   Chairman Manuel was the head of the Nation's gaming compact

15  negotiating committee and the Nation's spokesperson and decision-maker at AIGA

16  meetings of elected officials.  He had the final word about what the Nation's

17  negotiating position would be.  Ex. 24 (Nation) 118:21-119:15;  Ex. 19 (Manuel,

18  Edward) 103:18-104:4, 107:20-22.

19     **51.**   During the 1999-2002 compact negotiations, all members of the

20  Commerce Committee of the Nation's legislative council were principal

21  representatives of the Nation in the negotiations.  This included Francis Miguel for the

22  entire period, Mary Ann Antone until June 2001, and Dennis Ramon from 2001 to

23  2002.  Ex. 20 (Miguel) 19:17-20:16; Ex. 26 (Ramon) 15:22-16:10; 25:11-24; Ex. 1

24  (Antone) 10:22-24, 12:15-17.

25     **52.**   During the 1999-2003 period, Mark Curry served as the Nation's

26  Attorney General.  Dan Quigley served as outside counsel.  Together the two

27  provided legal advice to the Nation, served as lead negotiators for the Nation, and

28  drafted a significant portion of the language of the compact.  Quigley and Curry

would relay positions that had been vetted with the Chairman and the tribal council and other governmental entities of the Nation to the rest of the negotiating parties. Neither Curry nor Quigley ever said anything in meetings they were not authorized to say.  Ex. 24 (Nation) 32:4-11; 33:4-9; Ex. 19 (Manuel, Edward) 30:15-31:4; Ex. 27 (Ritchie) 20:22-22:1.

53.    The Nation's compact negotiators would discuss what the Nation's negotiating position would be before going into negotiating sessions and would all get on the same page.  Ex. 19 (Manuel, Edward) 107:13-108:7.

54.    Alex Ritchie served as an assistant to Chairman Manuel and as a negotiating team member during the 1999-2002 compact negotiations.  Ex. 27 (Ritchie) 7:9-8:24.

55.    During the 1999-2002 compact negotiations and initiative campaign, Ivan Makil was the President of the Salt River Pima-Maricopa Indian Community and the Chairman of AIGA.  Ex. 16 (Makil Vol. 1) 8:8-18; 25:2-14.

56.    During the 1999-2002 compact negotiations and initiative campaign, Larry Landry was a lobbyist who served as Salt River's lead negotiator at the staff level.  Ex. 12 (Landry) 8:25-9:15.

57.    During the 1999-2002 compact negotiations and initiative campaign, Eric Dahlstrom served as outside counsel for the Gila River Indian Community and participated in negotiations on its behalf.  Ex. 13 (LaSarte) 27:17-28:1.

58.    During the 1999-2002 compact negotiations and initiative campaign, Rodney Lewis was the general counsel of the Gila River Indian Community and participated in negotiations on its behalf, as well as the creation of the ballot initiative.  Ex. 14 (Lewis) 26:10-27:19.

59.    During the 1999-2002 compact negotiations and initiative campaign, Gregory Lunn served as a negotiator on behalf of, and as a political consultant to, the Fort McDowell Yavapai Nation ("Fort McDowell").  Ex. 15 (Lunn) 10:17-11:4.

4652130

**60.**     During the 1999-2002 compact negotiations and initiative campaign, Britt Clapham represented the Navajo Nation.  Ex. 6 (Clapham) 17:20-22.

**61.**     During the 1999-2002 compact negotiations and initiative campaign, Luis Ochoa represented the Yavapai Prescott Indian Tribe.  Ex. 22 (Ochoa) 15:11-19:14.

**62.**     Mike Bielecki and Steve Hart were lead negotiators for the State who were at all or virtually all of the negotiating sessions involving the State.  Ex. 11 (Hart) 21:10-22:9; Ex. 3 (Bielecki) 20:17-21:15, 92:23-93:7.

**63.**     Mike Bielecki would report to the governor on a regular basis regarding the negotiations, and Steve Hart was frequently involved in those discussions.  Ex. 11 (Hart) 22:5-9.

**64.**     Paul Walker was the public information officer for the Arizona Department of Gaming during compact negotiations until 2001 and attended all the negotiations during that period.  He left to work at the Corporation Commission and was replaced by Christa Severns, but returned to work for Governor Hull as a lobbyist in the effort to pass a bill which would authorize the governor to sign the compacts.  Ex. 31 (Walker) 8:9-18, 17:21-18:4, 19:23-20:10; Ex. 29 (Severns) 7:22-8:4; Ex. 11 (Hart) 19:3-21:3.

**65.**     There were 20 or 30 negotiating sessions between the tribes and the state over the course of three years.  Ex. 11 (Hart) 57:12-58:24.

**66.**     State negotiators relied on their lawyers for drafting.  Ex. 11 (Hart) 22:10-24.

**67.**     The negotiations with the State and the AIGA tribes on opposite sides ended in February 2002, when the two sides reached an agreement memorialized in a document known as the Compact Framework.  From that point forward, the AIGA tribes and the State worked together to secure statutory changes necessary to implement the proposed standard form compact reflected in the Compact Framework.  Ex. 11 (Hart) 71:3-72:3; Doc. 195-13.

### III.    Negotiations Over Gaming Facility Locations in Metropolitan Areas

**68.**    As negotiations began, Governor Hull was very clear that unless certain policy goals of hers were met, there would be no deal, and every tribe's goal was to actually get a deal.  Ex. 13 (LaSarte) 29:7-30:10.

**69.**    Governor Hull had a strong position from the beginning of negotiations that the State wanted to limit the number of casinos overall and to be able to say that there would be no additional casinos in the metropolitan areas.  The governor's desire to be able to say no additional facilities in the Phoenix market was expressed consistently and continually throughout the negotiations.  Ex. 11 (Hart) 44:13-47:13; Ex. 31 (Walker) 36:13-37:6; Ex. 9 (Dahlstrom Vol. 2) 288:2-12; Ex. 13 (LaSarte) 81:13-84:3.

**70.**    Proximity of facilities to metropolitan areas was a main focus of the negotiations.  Ex. 17 (Makil Vol. 2) 173:2-6.

**71.**    The number of facilities, the location of facilities, and the number of gaming devices were all items negotiated during the compact negotiations.  Ex. 11 (Hart) 31:9-25.

**72.**    The limits on the numbers of gaming devices and gaming facilities were a key element of the compacts.  Doc. 45 (Answer) at 6 ¶ 28.

**73.**    The State negotiators, including Bielecki and Hart, made having no additional casinos in the Phoenix metropolitan area an essential, key deal point.  Ex. 15 (Lunn) 47:1-20; Ex. 14 (Lewis) 49:2-11.

**74.**    The State was trying to limit the total number of devices per facility to roughly 1,000 machines per facility, and then by limiting the number of facilities within each metropolitan area, to place overall limits on the numbers of machines within each metropolitan area.  Ex. 11 (Hart) 77:9-80:14.

**75.**    Because the principal markets in Arizona are the Phoenix market and the Tucson market, the State was interested in restricting the number of metro casinos to help protect the customer base for rural tribes.  The State hired an economist to

4652130

model the metro and rural markets and the compact proposals to ensure that the rural tribes were protected.  Ex. 11 (Hart) 84:16-85:18; 169:10-170:6; Ex. 3 (Bielecki) 76:7-77:22.

76.    It was important to the State to know how many casinos would be in each of the Tucson and Phoenix markets so they could ensure that the metro-area casinos did not eliminate the customer base for the non-metro casinos.  It was very important to the State that there not be a perception of expansion of facilities in the Phoenix market.  Ex. 11 (Hart) 197:20-199:16; Ex. 12 (Landry) 54:10-15; Ex. 89.

77.    By August 2000, the state's position was that it was willing to increase the number of gaming devices if the tribes were willing to agree not to increase the number of facilities.  The State wanted to reduce the number of facilities statewide from the numbers authorized in the previous compacts, and it wanted to have no additional facilities in Phoenix and in Tucson.  Ex. 11 (Hart) 44:11-48:8.

78.    The transfer system permitting non-gaming tribes to transfer device rights to gaming tribes was designed to accommodate the increase in devices per facility while decreasing the number of facilities, as well as to provide revenue to non-gaming tribes.  Ex. 31 (Walker) 35:23-37:19; Ex. 58.

79.    The State and the tribes discussed at many meetings the concept that there would be no added facilities in the Phoenix area and there would be no added facilities or perhaps one in the Tucson area.  Ex. 11 (Hart) 93:25-94:15.

80.    Because the State was allowing more machines per facility into the metro markets in exchange for fewer facilities, the State demanded that the Phoenix-market tribes in AIGA tribes come to an agreement among themselves as to exactly how many casinos would be in the Phoenix market.  Ex. 12 (Landry) 45:21-46:11; 65:6-66:14.

81.    Because the State expressed concerns about the two metropolitan markets in particular, the tribes formed self-selected subgroups of the tribes in each of those markets to negotiate among themselves and develop AIGA's positions with

respect to the numbers of facilities and machines in those markets.  This was an internal effort to define and develop the tribes' unified position regarding those markets vis-a-vis the governor.  This effort began after a weeklong negotiation session in September 2000.  Ex. 15 (Lunn) 84:2-86:12; Ex. 13 (LaSarte) 42:19-45:4, 59:12-65:24; Ex. 31 (Walker) 87:22-88:14; Ex. 9 (Dahlstrom Vol. 2) 273:3-275:20.

82.    The discussions among the tribes in particular market areas were to address a concern by tribes that capacity should not go up in places or in volumes that would harm another tribe or put them out of business.  Ex. 3 (Bielecki) 74:10-76:1.

83.    The AIGA tribes that negotiated in a subgroup with respect to limits on the number of gaming facilities and the number of machines per facility in the Tucson metropolitan market, referred to as the Tucson metro tribes and other similar terms, were the Nation and the Pascua Yaqui Tribe.  Ex. 15 (Lunn) 84:2-85:4; Ex. 13 (LaSarte) 42:19-45:4, 60:18-62:16; Ex. 19 (Manuel, Edward) 111:3-24, 130:18-132:6; Ex. 11 (Hart) 84:16-85:18; Ex. 74 at TON0083066; Ex. 76.

84.    The tribes that negotiated in a subgroup with respect to limits on the number of gaming facilities and the number of machines per facility in the Phoenix metropolitan market, also called the Phoenix metro tribes or Maricopa County tribes, were Salt River, Gila River, Ak-Chin, and Fort McDowell.  Ex. 15 (Lunn) 84:2-85:4; 85:15-13; Ex. 13 (LaSarte) 42:19-45:4, 59:12-65:24; Ex. 11 (Hart) 84:16-85:18; Ex. 6 (Clapham) 40:4-12; Ex. 9 (Dahlstrom Vol. 2) 275:21-276:11; Ex. 74 at TON0083066; Ex. 76.

85.    The Ak-Chin Indian Community was at times treated as a rural casino during the negotiations, but based on a market study conducted by its casino operations company, Ak-Chin determined that it should be considered part of the Phoenix market area, and the AIGA tribes agreed.  Ex. 12 (Landry) 25:15-20; Ex. 58 at GRIC000694.

86.    Tribal leaders in AIGA agreed among themselves and with the State that there would not be any additional casinos in the Phoenix metropolitan area beyond the

1   seven that were then in operation by Salt River, Gila River, Ak-Chin, and Fort

2   McDowell.  Ex. 16 (Makil Vol. 1) 47:21-49:3; Ex. 17 (Makil Vol. 2) 219:13-220:12;

3   Ex. 14 (Lewis) 45:17-47:21; 57:15-61:8; Ex. 15 (Lunn) 48:13-49:7, 51:25-52:18;

4   81:20-82:22, 93:4-94:10; Ex. 13 (LaSarte) 129:7-20; Ex. 11 (Hart) 92:22-93:13; Ex. 3

5   (Bielecki) 143:10-16; Ex. 31 (Walker) 29:2-30:5.

6       **87.**   Because the AIGA tribal leaders agreed the compacts should authorize

7   no additional casinos in the Phoenix metropolitan area, the Phoenix metro tribes each

8   agreed that the new compacts would reduce the maximum number of facilities each

9   tribe could operate by one facility, as compared to their then-effective compacts.  This

10  reduction is reflected in columns 3 and 4 of Section 3(c)(5) of the 2002 Compact.

11  The four Phoenix-market tribes made it clear in discussions with other tribes and the

12  State that they agreed to this reduction specifically for the purpose of ensuring that

13  only the existing casinos in the Phoenix market would be allowed under the compacts.

14  Ex. 12 (Landry) 52:15-53:7; Ex. 14 (Lewis) 55:4-56:2, 57:15-58:17; 98:5-11; Ex. 17

15  (Makil Vol. 2) 164:21-166:1.

16      **88.**   The State told Pascua Yaqui and the Nation that it wanted a limit of a

17  thousand machines per facility and no added facilities in Tucson, and asked them to

18  try to find a way to work that out.  In response, the Nation was adamant about having

19  another facility that it could potentially put into Tucson.  The State eventually acceded

20  to that demand as long as the Nation could work out an agreement with the other

21  Tucson-market tribe, Pascua Yaqui, although the State was not happy about the added

22  facility.  Pascua Yaqui objected to the Nation's placing facilities near its facilities, and

23  eventually the Nation and Pascua Yaqui reached an agreement on this issue.  Ex. 11

24  (Hart) 81:22-83:8; 93:25-97:6; Ex. 27 (Ritchie) 29:6-21.

25      **89.**   The Nation never asserted any right or interest in negotiating for

26  machine or facility rights as part of the Phoenix market group.  Ex. 19 (Manuel,

27  Edward) 125:14-126:10; 139:23-140:2; Ex. 20 (Miguel) 46:14-47:11; Ex. 15 (Lunn)

28  85:11-14; Ex. 9 (Dahlstrom Vol. 2) 225:12-226:6; Ex. 13 (LaSarte) 62:21-63:20.

4652130

90.     The Nation never negotiated for the right to locate facilities in the Phoenix market, and the State did not agree to give it the right to locate facilities in that market.  Ex. 11 (Hart) 207:17-208:16; Ex. 9 (Dahlstrom Vol. 2) 225:12-226:6; Ex. 13 (LaSarte) 59:12-65:24.

91.     It would have been easy for the Nation to participate in the separate negotiations regarding among the Phoenix metro tribes, but the Nation did not do so and did not ask to do so.  Ex. 24 (Nation) 199:19-200:3; 201:5-201:23.

92.     If the Nation were intending to operate gaming in the Phoenix market, that is something that other tribes reasonably would have expected the Nation would bring up in the negotiations.  The Nation never asserted during compact negotiations the right to conduct gaming on Gila Bend Act lands under the settlement of a land claim exception, and there was no way for other parties to the negotiations to know that the Nation intended to assert such a right in the future.  The Nation never made such an assertion before January 2009.  Ex. 24 (Nation) 94:1-97:13; Ex. 27 (Ritchie) 39:1-18; Ex. 19 (Manuel, Edward) 144:3-14; Ex. 13 (LaSarte) 62:21-64:22.

IV.     **Section 3(c)(5) and Its Precursors, the Scope of Gaming Charts, Allocate Gaming Facility Locations in Metropolitan Markets**

93.     Section 3(c)(5) of the 2002 Compact is organized by market area and limits the Phoenix metropolitan area to seven casinos; it was intended to capture the deal point agreed to among the tribes and the State that there would be no additional casinos in the Phoenix metropolitan area.  The parties all intended for there to be certainty on this key point.  Ex. 15 (Lunn) 41:2-42:25; 93:4-94:10; Ex. 11 (Hart) 172:2-173:15; Ex. 3 (Bielecki) 75:15-79:9, 103:7-104:6; 125:10-126:21; Ex. 31 (Walker) 86:8-88:11, 114:2-25; Ex. 9 (Dahlstrom Vol. 2) 226:7-227:3, 229:7-21; Ex. 13 (LaSarte) 117:10-118:3.

94.     The chart in Section 3(c)(5) of the 2002 Compact began as a chart known as the "Scope of Gaming" chart.  It was created by the AIGA tribal leaders and their representatives with the express purpose of separating the tribes into geographic

markets.  The chart in Section 3(c)(5) was the result of a lot of negotiation over the course of the several years, during which many iterations of the chart were circulated among the AIGA tribes.  Tribal leaders spent a huge amount of time talking about the chart and spent a huge amount of time with the State working on the chart.  Ex. 19 (Manuel, Edward) 110:11-111:2; Ex. 9 (Dahlstrom Vol. 2) 231:16-232:4; Ex. 16 (Makil Vol. 1) 91:8-24; Ex. 11 (Hart) 60:16-61:12; 76:1-77:8; Ex. 13 (LaSarte) 52:18-56:9; Doc. 195-13 at 13.

95.     A great many versions of the Scope of Gaming chart circulated during the 1999-2002 negotiations.  Chairman Manuel of the Nation regularly reviewed these Scope of Gaming charts during the negotiating period.  Ex. 19 (Manuel, Edward) 110:11-111:2; 114:15-18; 137:9-18; Ex. 9 (Dahlstrom Vol. 2)  270:19-25; 272:20-274:16; 276:16-277:19; 280:3-280:12; 283:5-284:11; 284:22-285:21; 286:2-286:6, 288:23-289:20, 289:25-290:7, 290:11-291:1, 291:6-291:21, 292:5-293:14, 293:18-295:3; 295:16-296:1; Ex. 13 (LaSarte) 216:4-217:14; Ex. 31 (Walker) 81:1-81:10; Ex. 11 (Hart) 60:16-61:12; Ex. 46; Ex. 47, Ex. 48;  Ex. 49; Ex. 50; Ex. 74; Ex. 75; Ex. 51, Ex. 52 at GRIC004453; Ex. 53, Ex. 54; Ex. 55; Ex. 56; Ex. 57; Ex. 58; Ex. 76; Ex. 77; Ex. 78; Ex. 79; Ex. 88; Doc. 195-13 at 13.

96.     From a very early stage, at least as early as April 7, 2000, the Scope of Gaming chart contained indications that the tribes were grouped into the Phoenix metro tribes, the Tucson metro tribes, and the rural tribes, even in those charts which reflected an early attempt to allocate facilities and devices by tribal population.  In almost every version of the Scope of Gaming Chart, including the version attached to the final Compact Framework agreement between the State and the tribes, the Phoenix metro tribes and Tucson metro tribes were separated by blank space into separate groups.   Quigley 70:15-71:4; Ex. 46; Ex. 47, Ex. 48;  Ex. 49; Ex. 50; Ex. 74; Ex. 75; Ex. 51, Ex. 52 at GRIC004453; Ex. 53, Ex. 54; Ex. 55; Ex. 56; Ex. 57; Ex. 58; Ex. 76; Ex. 77; Ex. 78; Ex. 79; Ex. 88; Doc. 195-13 at 13; Ex. 108.

4652130

**97.**     Many early drafts of the Scope of Gaming charts contained footnotes showing (1) that the numbers of facilities and machines in the Phoenix market were still being negotiated by the four Maricopa County or Phoenix-area tribes, referring to discussions among the Fort McDowell Tribe, the Salt River Pima-Maricopa Indian Community, the Gila River Indian Community, and the Ak-Chin Indian Community; and (2) that the numbers of facilities and machines in the Tucson market were still being negotiated by the two Tucson metro tribes, the Nation and the Pascua Yaqui Tribe.  Ex. 24 (Nation) 198:7-15; Ex. 11 (Hart) 72:7-77:8; 193:19-194:15; Ex. 3 (Bielecki) 199:21-200:18, 204:15-207:16;  Ex. 9 (Dahlstrom Vol. 2) 286:2-288:1, 291:6-21; Ex. 51, Ex. 52; Ex. 53, Ex. 54; Ex. 55; Ex. 56; Ex. 76; Ex. 77; Ex. 78; Ex. 79.

**98.**     The footnotes reflected the fact that there needed to be agreement about parity among the tribes within each of the Phoenix and Tucson markets, respectively. Ex. 11 (Hart) 74:7-75:19; Ex. 3 (Bielecki) 197:24-198:16; Ex. 19 (Manuel, Edward) 130:18-140:2; Ex. 77; Ex. 78; Ex. 79; Ex. 80.

**99.**     The parity requirement had to do with both device allocation and facility allocation because the numbers of devices and facilities could not be separated as negotiating points.  Ex. 11 (Hart) 74:7-75:25, 77:9-82:15.

**100.**     The fundamental grouping of tribes and the issue of market parity with each of the markets was something that was present at the beginning of negotiations over the chart and continued through the entirety of the process.  Ex. 11 (Hart) 66:3-12.

**101.**     The market parity footnotes were removed from the Scope of Gaming chart as the Phoenix metro tribes and Tucson metro tribes resolved their issues separately and reported to the larger group that the footnotes could be removed.  Ex. 59; Ex. 11 (Hart) 64:11-68:19.

**102.**     The tribes resolved the market parity issues by agreeing that there would be a potential for up to seven facilities in Phoenix and up to five facilities in Tucson,

4652130

and that agreement allowed the parties to remove the footnotes from the scope of gaming chart.  Ex. 11 (Hart) 64:11-68:19, 72:4-77:8; 193:19-194:15; Ex. 55.

103.    The urban tribes reached agreement on the scope of gaming chart based on their understanding of what the Maricopa County or Phoenix market was and what the Tucson market was, and their agreement was to certain numbers of facilities in each of those markets.  Ex. 11 (Hart) 120:14-122:15; Ex. 9 (Dahlstrom Vol. 2) 242:1-13.

104.    The scope of gaming charts reflected the tribes' efforts to respond to demands from the State when it entered into negotiations: the State wanted a commitment that gaming would be limited and that the number of facilities would be reduced, so that they could say to voters that the State wants limited gaming that would remain on reservations, and that it would not be a Las Vegas-style effort.  Ex. 27 (Ritchie) 39:24-40:24.

105.    The final version of the Scope of Gaming chart contained in the Compact Framework retained the blank spaces separating the tribes into Phoenix metro tribes, Tucson metro tribes, and rural tribes.  Doc. 195-13 at 13.

106.    The order of the list of gaming tribes in Section 3(c)(5) of the 2002 Compact is the same as the order of the tribes, as separated into market groups, in the Scope of Gaming chart included in the Compact Framework.  This order remained consistent throughout the bulk of the negotiations.  Ex. 51, Ex. 52; Ex. 53, Ex. 54; Ex. 55; Ex. 58; Ex. 76; Ex. 77; Ex. 78; Ex. 88; Doc. 195-13 at 13.

107.    The State removed the titles and spaces between market groupings simply to make the chart cleaner and smaller, not to make a substantive change about the parties' agreement that only certain numbers of machines and facilities would be allowed within each market.  The market groupings that remain in Section 3(c)(5) still reflect that agreement.  Ex. 11 (Hart) 67:20-68:19; 73:3-12.

4652130

**V.     The Nation's Negotiations with Other Tribes and the State Regarding Gaming Facility Numbers and Locations**

**108.**    The Nation has three gaming facilities on its reservation in Southern Arizona, two in the Tucson area and a third near the town of Why.  Doc. 45 (Answer) at 4 ¶ 16.

**109.**    The Nation argued that it was a hybrid between a rural tribe and a metro tribe and should be treated differently from other metro tribes by not being required to give up one of its four gaming facilities.  Ex. 24 (Nation) 83:5-85:20; Ex. 11 (Hart) 111:6-112:17.

**110.**    In September 2000, the Nation was operating a casino near the airport in Tucson, operating a casino near Why, and constructing a casino in the Tucson area near Sahuarita.  At that time, the State had asked the Nation to agree to be limited to three facilities, and the Nation did not know whether it would be permitted to operate more than three facilities.  Ex. 23 (Quigley) 60:11-61:20; Ex. 80.

**111.**    Steve Hart negotiated to try to get the tribes to agree to no additional facilities in the Tucson market.  In discussions with the Nation's attorneys, Dan Quigley and Mark Curry, Steve Hart conveyed the message, "The governor wants to see an overall reduction in the number of facilities.  You guys [the Nation] are still stuck at four.  Everyone else has dropped a facility.  We want no added facilities in Phoenix, and you've got this one added facility in Tucson.  We'd like to get rid of that."  Hart was asking the Nation to agree to having no added facilities in either metropolitan area, and the Nation responded by insisting on the right to put another facility in Tucson.  Ex. 11 (Hart) 93:25-97:6; 119:10-120:13.

**112.**    The other AIGA tribes and the State asked the Nation why they refused to give up one of their four gaming facility rights when all other tribes in metropolitan markets were giving up a facility, and where the Nation would put another casino, and the Nation identified only Tucson, Gila Bend, rural areas of its main reservation such as Casa Grande, and Florence as potential locations; it did not identify west Phoenix

4652130

1    or the Phoenix metropolitan area as a location.  Ex. 15 (Lunn) 36:17-41:14, 82:23-

2    83:13; Ex. 12 (Landry) 49:1-50:1; Ex. 24 (Nation) 61:18-64:6, 70:19-72:21; Ex. 13

3    (LaSarte) 101:10-105:22, 127:10-128:13, 148:18-149:1.

4       **113.**    At an AIGA attorney work group meeting on May 22, 2001, the group

5    discussed a request from the State that the tribes reduce the number of gaming

6    facilities statewide from 29 to 26.  There was a discussion about how to address this

7    issue and about the tribes that did not want to give up a facility.  The Nation was

8    among those tribes because the Nation did not want to go from four facilities to three.

9    Dan Quigley discussed the Nation's reasons for wanting four facilities, stating that the

10   Nation wanted to keep a rural casino in Why open and needed three other facility

11   authorizations to have enough locations to be able to use the Nation's full gaming

12   device allocation.  Ex. 23 (Quigley) 71:9-82:6; Ex. 109; Ex. 110.

13      **114.**    After a lunch break at the attorney work group meeting on May 22,

14   2001, Dan Quigley stated that the Nation might be willing to agree that only three of

15   its four casinos could be in the metro Tucson area.  The Nation certainly discussed

16   this same point with the State at some point during the compact negotiations.  Ex. 23

17   (Quigley) 80:5-82:6; Ex. 109; Ex. 110.

18      **115.**    At a meeting between AIGA and the State on May 22, 2001, that

19   occurred after the AIGA attorney work group meeting, Steve Hart said that the State

20   wanted to see a reduction from the total number of 29 facilities in column 4 of the

21   September 15, 2000 scope of gaming chart, and asked AIGA whether there had been

22   any movement on that issue.  Steve Hart also inquired whether the Nation was willing

23   to reduce to three facilities.  Dan Quigley gave the same explanation to Steve Hart

24   that he had given to the AIGA Tribes earlier in the day.  Ex. 23 (Quigley) 71:12-

25   77:17; Ex. 55; Ex. 109.

26      **116.**    In May 2001 Hart talked with Dan Quigley and Mark Curry separately.

27   This was a very serious conversation.  At the time, the Nation had one facility

28   operating in the Tucson market (Desert Diamond 1), a second facility about to open in

the Tucson market in three or four months (Desert Diamond 2), and a rural facility at Why.  Hart asked why the Nation needed another facility in addition to the three already in operation or under construction.  Dan Quigley responded to Hart by explaining that if they could get Pascua Yaqui to agree, the Nation would like to be able to put a third facility in the Tucson area.  Ex. 11 (Hart) 93:25-97:6, 204:5-20.

117.   Hart then asked whether, if Pascua Yaqui did not agree to that, the Nation would agree to be limited to the three existing facilities.  Quigley responded no, because even if Pascua Yaqui would not agree to allow the Nation to locate three facilities in Tucson, the Nation was both a rural tribe and an urban tribe and had land in Gila Bend and Florence and needed the option to build another rural facility in either Gila Bend or Florence in addition to the one at Why.  Quigley stated that if in four or five years growth occurred along the I-10 corridor, a Gila Bend facility could have a market.  Ex. 11 (Hart) 93:25-97:6, 125:18-126:11, 127:12-128:9.

118.   Dan Quigley explained to Steve Hart that Gila Bend and Florence were not part of Phoenix.  Ex. 11 (Hart) 115:12-19.

119.   Steve Hart discussed these same issues with the Nation's representatives multiple times over the course of the negotiations and got a similar response from the Nation each time.  One such conversation occurred on the second floor of AIGA's offices in the summer or early fall of 2001.  Ex. 11 (Hart) 93:25-97:6, 111:6-112:17, 113:19-24, 119:10-120:11.

120.   The Nation assured the other tribes and the governor's office that there would be two or perhaps three facilities in the Tucson area, a facility in Why, and potentially one facility in Gila Bend or Florence instead of Tucson.  Ex. 11 (Hart) 129:11-130:7.

121.   The Nation's representatives were asked similar questions in AIGA meetings regarding where the Nation would place a fourth casino if its allocation were not reduced from the 1993 Compact, and the Nation's representatives would answer by identifying Tucson, Gila Bend, and Florence as possible locations.  Every time

4652130

1   they answered this question, they mentioned a location near Tucson as the first

2   possibility.  Ex. 12 (Landry) 49:1-50:1.

3       **122.**   In an AIGA tribal leaders meeting, Chairman Edward Manuel stated

4   that the Nation intended to retain its three existing facilities because a lot of resources

5   had been invested in those, and that retaining the right to four facilities would allow it

6   to put another casino in the Tucson market or in a rural location on its primary

7   reservation in order to create jobs and provide economic development.  These

8   statements were also made by the Nation's representatives in staff-level meetings.

9   Ex. 13 (LaSarte) 130:22-134:2.

10       **123.**   The Nation never told anyone during compact negotiations that the

11   Nation believed it had no duty to disclose possible locations for casino sites.  Ex. 23

12   (Quigley) 90:24-91:13; Doc. 45 (Answer) at 6-7 ¶ 32.

13       **124.**   The Nation informed the negotiating parties that if it operated a fourth

14   casino, that casino "would not be located in a metropolitan area; it would be in a rural

15   area."  Ex. 24 (Nation) 85:8-14.

16       **125.**   The Nation did not consider closing the casino near Why because it

17   generated economic development on the west side of the Nation.  Ex. 2 (Arnold Vol.

18   1) 57:5-18.

19       **126.**   Ultimately, because of the Nation's representations about the need for

20   and the possible locations for another facility in addition to three existing facilities,

21   the other AIGA tribes agreed to support the Nation's request for four facilities. Ex. 13

22   (LaSarte) 58:6-59:10, 101:10-102:25; Ex. 9 (Dahlstrom Vol. 2) 293:18-295:3; Ex. 58.

23       **127.**   The State agreed to authorize the Nation to build four facilities based on

24   assurances that the unbuilt facility would either go into Tucson if the Nation worked

25   out something with Pascua Yaqui, or if not, the right to build the facility would be

26   held so that one day they could perhaps open a facility in Gila Bend or Florence.  Ex.

27   11 (Hart) 101:11-22; Ex. 3 (Bielecki) 74:10-76:1.

28

1

## VI.    Relationship Between Section 3(c)(5) and Section 3(c)(3)

2     **128.**    The Scope of Gaming chart was converted into Section 3(c)(5) of the

3 2002 Compact because it was a document that the State believed everyone had agreed

4 to and had a common understanding about, particularly with regard to markets and

5 market groupings, and there wasn't time to turn the chart into ten pages of writing.

6 Inclusion of the chart was meant to reflect the compromises and negotiations and

7 representations that had led to the chart, including the negotiated market-based

8 allocations and the Nation's representations.  There would not have been a compact if

9 there hadn't been a common, secure understanding of the market allocations in the

10 chart.  Ex. 11 (Hart) 99:13-101:10; 103:2-105:5; 172:13-173:15; Ex. 3 (Bielecki)

11 76:2-79:9, 100:24-101:16, 133:6-13.

12     **129.**    The location of the Nation's unbuilt fourth casino was of concern to the

13 State, and the State believed that the scope of gaming chart addressed that point by

14 authorizing the Nation to operate three casinos in the Tucson market and one subject

15 to the restrictions in Section 3(c)(3).  The State and the Nation agreed that they were

16 authorizing Tucson market facilities, not Phoenix market facilities, in the scope of

17 gaming chart; Chairman Manuel, Mark Curry, and Dan Quigley all knew this to be

18 true.  Ex. 11 (Hart) 97:9-98:2, 207:5-208:16; 209:14-210:18.

19     **130.**    The grouping of the Pascua Yaqui Tribe and the Nation together in

20 Section 3(c)(5) was meant to be an authorization to operate facilities in the Tucson

21 market area, and section 3(c)(3) is intended to convey, "But though you're operating

22 in the Tucson market area, at least one of these facilities is going to be [50 miles]

23 from your other facilities."  Section 3(c)(3) presumes that the other facilities are

24 Tucson market facilities.  Ex. 11 (Hart) 90:4-23.

25     **131.**    The language in section 3(c)(3) came out of negotiations in January

26 2002 involving Hart and Bielecki for the State and Mark Curry for the Nation, after

27 the State had accepted that the Nation would have four facility authorizations.  The

28 State was attempting to ensure that the Why facility did not move closer into Tucson

and become a fourth Tucson urban facility, and to shrink the size of the facility. Because the Nation would not agree to a reduction from four authorized facilities to three facilities, the State tried to get the Nation "to go from four facilities to three and a half."  Ex. 11 (Hart) 154:13-155:11.

132.   The language in section 3(c)(3) was intended to be a footnote or qualification of an authorization in the Scope of Gaming chart to operate up to four facilities in the Tucson area, the footnote being that one of them has to be at least 50 miles away from the others.  Ex. 11 (Hart) 101:11-102:24; 108:18-109:7.

133.   Section 3(c)(3) embodies an agreement by the Nation that one of its four facility rights would be limited to a rural area, and not be located in a metropolitan area.  Ex. 24 (Nation) 83:5-85:20; Ex. 6 (Clapham) 36:11-37:16.

134.   The Nation's lawyers in the compact negotiations, Mark Curry and Dan Quigley, participated in drafting the limitation on the Nation in Section 3(c)(3).  Ex. 23 (Quigley) 96:8-97:10.

135.   The compact limitation limiting facilities to Indian lands was not intended by the State to be the only restriction on the location of facilities; the Scope of Gaming chart in Section 3(c)(5) was intended by the State to place limitations on where facilities are going to go and reflects the agreements, representations, and assurances that were given in that regard.  Ex. 11 (Hart) 47:14-49:3.

**VII.   Negotiated Framework and SB 1001**

136.   The drafting of the compact occurred in 2002 by first drafting the Compact Framework agreement between the Governor and the AIGA Tribes, then by drafting a bill which eventually became SB 1001, and then by the tribes drafting an ballot initiative which eventually became Proposition 202.  Ex. 11 (Hart) 27:7-28:9; 177:11-179:21; Ex. 3 (Bielecki) 34:5-22.

137.   The Compact Framework was drafted in January and February 2002.  It represented the agreement between the tribes and the governor for purposes of seeking legislative authority for the governor to enter into compacts with the tribes.  It

1   was an important document, but it emerged at the end of the negotiating process and

2   did not lay out the full course of the several years of negotiations going back and forth

3   over what the deal was and why it was and what was important to the various tribes.

4   Ex. 11 (Hart) 58:25-60:8; Doc. 195-13 at 13.

5       **138.**   The Scope of Gaming chart that appears as section 3(c)(5) of the 2002

6   Compact lists the tribes in identical format in the Compact Framework, in SB 1001,

7   and in Proposition 202, save for the removal of the white space separating the market

8   groups.  Doc. 195-11 at 23-24; Doc. 195-14 at 8; Doc. 195-13 at 13; Ex. 131 at

9   TON0094360-61.

10       **139.**   The Compact Framework was intended to ensure, and was understood

11   by the State and the AIGA tribes to mean, that there would be no additional casinos

12   built in the Phoenix area beyond the seven then already in existence.  Ex. 15 (Lunn)

13   48:13-24; Ex. 12 (Landry) 56:18-24.

14       **140.**   The Nation actively participated in promoting adoption of the Compact

15   to Arizona legislators, and both Alexander Ritchie, the Nation's liaison to AIGA, and

16   Joe Abate, a lobbyist representing the Nation in AIGA's day-to-day operations,

17   represented to legislators throughout the lobbying effort in favor of SB 1001 that

18   under the Compact, there would be no additional casinos in the Maricopa County

19   market.  Everybody in AIGA knew that having no increase in facilities in the Phoenix

20   market was a critical argument in this effort.  Ex. 13 (LaSarte) 79:21-80:22; 136:2–

21   137:20.

22       **141.**   In preparation for the Arizona legislature's special session addressing

23   SB 1001, the Nation's lobbyists participated in numerous meetings of AIGA lobbyists

24   with the Governor's staff to coordinate the messages to give to legislators, and one of

25   the primary elements they were explaining to legislators was that under SB 1001 there

26   would be no additional casinos in the Phoenix metropolitan area and only one in the

27   Tucson area, and that was because the Nation believed it had a particular need for that

28   casino.  Ex. 31 (Walker) 25:6–26:15, 91:18-92:9.

1     **142.**   On February 20, 2002, Governor Jane Dee Hull issued a press release

2    titled "Governor, Tribes Outline New Gaming Compacts" which described the

3    agreement between the AIGA tribes and the State.  The press release stated that one of

4    the "major points" of the agreement was "[n]o additional casinos allowed in the

5    Phoenix metropolitan area and one additional casino in the Tucson area."  This press

6    release was in the possession of representatives of the Nation no later than February

7    21, 2002, including Dan Quigley, Tom Arnold, Mark Curry, Gary Dufault, and Matt

8    Smith.  Ex. 61 at TON0072338.

9     **143.**   On February 20, 2002, the Arizona Republic published an article

10   headlined "Tribes agree to share gambling profits with state in exchange for fewer

11   casino restrictions" by reporters Mary Jo Pitzl and Tom Zoellner.  The article stated

12   that under the agreement between the AIGA tribes and the State, "[m]etro Phoenix

13   will see no new casinos; the number is frozen at seven."  This article was in the

14   possession of Dan Quigley, a representative of the Nation, on February 20, 2002, as

15   well as other representatives of the Nation who were on the "listserv" email for the

16   negotiation work group.  Ex. 114.

17    **144.**   On February 21, 2002, the Arizona Daily Star published an article

18   headlined "Accord reached on tribal gaming" by reporter Howard Fischer of Capitol

19   Media Services.  The article stated that under the agreement between the AIGA tribes

20   and the State, the Nation was permitted to build "an additional urban casino" which

21   Fischer characterized as "a third Tucson-area casino."  This article was in the

22   possession of representatives of the Nation on February 21, 2002, including Matt

23   Smith and Ned Norris.  Ex. 92 at TON1027707-09.

24    **145.**   On February 21, 2002, the Arizona Republic published an article

25   headlined "Hull, tribes OK gaming deals" by reporters Mary Jo Pitzl and Tom

26   Zoellner.  The article stated that under the agreement between the AIGA tribes and

27   the State, "[m]etro Phoenix will see no new casinos; the number is frozen at seven."

28   This article was in the possession of representatives of the Nation on February 21,

2002, including Matt Smith and Ned Norris.  Ex. 92 at TON1027707, TON1027712-13.

146.   On February 21, 2002, State spokesperson Christa Severns appeared on the radio program "Real Life with David Liebowitz" on KTAR, a Phoenix radio station.  During an interview with the host, Severns stated that under the agreement between the AIGA tribes and the State "we're not going to see any more facilities in the Phoenix area.  We're gonna see a potential of one more casino in the Tucson area."  A transcript of this radio program was in the possession of Matt Smith, a representative of the Nation.  Ex. 94 at TON1027794.

147.   On February 22, 2002, the Arizona Republic published an unsigned editorial headlined "Hull and tribes deal fair hand."  The editorial states that under the agreement between the AIGA tribes and the State, the "Phoenix metro area would be limited to seven casinos, the number currently in operation."  This article was in the possession of representatives of the Nation on February 22, 2002, including Matt Smith Alex Ritchie, Alexandra Terry, Dan Quigley, Joe Abate, Mark Curry, Tom Arnold, and Ned Norris.  Ex. 93.

148.   On February 27, 2002, Steve Hart and David LaSarte appeared together on Horizons, a public affairs program broadcast on the Phoenix-area public television station.  During the joint interview, Hart stated that the number of casinos in the Phoenix area "is seven today and for the length of this Compact, 20 years, that's the number of casinos that will be in the -- kind of greater Phoenix metro area."  Representatives of the Nation were aware no later than February 28, 2002, that this interview took place.  No tribal leader was anything other than supportive and congratulatory regarding this and other similar appearances by LaSarte.  Ex. 13 (LaSarte) 193:17-195:13, 199:13-201:9; Ex. 90 at 3; Ex. 95 at TON1027824.

149.   On March 7, 2002, reporter Tom Zoellner wrote an article which appeared in the Arizona Republic headlined "State relying on casino boom."  In that article Zoellner interviewed David LaSarte about the agreement between the AIGA

4652130

tribes and the State, and reported that LaSarte "conceded that individual casinos in the cities will grow in size, but pointed out that the agreement freezes the number of casinos in the metro Phoenix area at seven." This article was in the possession of representatives of the Nation on March 7, 2002, including Matt Smith, Alex Ritchie, Alexandra Terry, Dan Quigley, Joe Abate, Mark Curry, Tom Arnold, and Ned Norris. Matt Smith forwarded the article to Ned Norris again on March 11, 2002.  Ex. 96 at TON0128017, TON0127993.

150.    On March 18, 2002, the Tucson Citizen ran an editorial authored by David LaSarte, the executive director of AIGA, headlined "17-tribe pact best bet for Indians and state."  The article was accompanied by a text box listing "Highlights of the proposed 17-tribe gaming compact."  One of the bullet points in the text box stated that "[t]he transfer system would allow the Tohono O'odham Nation to build one more casino in the Tucson area. No additional casinos could be built in the Phoenix area."  Electronic versions of this article were in the possession of representatives of the Nation.  Ex. 112 at TON0038658; Ex. 113.

151.    On March 28, 2002, reporter Jim Nintzel wrote an article which appeared in the Tucson Weekly headlined "Place your bets on the future of gambling in Arizona."  In that article Nintzel states that under the agreement between the AIGA tribes and the State, "[t]he Tohono O'odham would get one more casino near Tucson, but there would be no more casinos allowed in the Phoenix metro area."  This article was in the possession of Matt Smith.  Either Mr. Smith or his staff would forward such an article to other representatives of the Nation.  Ex. 97 at TON0128277; Ex. 30 (Smith, Matthew) 78:21-79:18.

152.    On April 2, 2002, reporter Mary Jo Pitzl wrote an article which appeared in the Arizona Republic headlined "Tracks push gaming battle in Legislature."  The article states that "the accord Hull negotiated also would keep the number of Phoenix-area casinos at the current seven, while permitting one more to be built in Tucson."  This article was in the possession of representatives of the Nation

1  on April 2, 2002, including Matt Smith Alex Ritchie, Alexandra Terry, Dan Quigley,

2  Mark Curry, Tom Arnold, and Ned Norris. Ex. 98 at TON0128383, TON0128385.

3      **153.**    On April 3, 2002, AIGA staff produced a Legislative Tracking Report

4  which described Senate Bill 1001, the bill which encapsulated the agreement between

5  the AIGA tribes and the State.  The summary of the bill stated that the bill allowed

6  "no additional facilities in the Phoenix metro area and only one new facility in the

7  Tucson area."  This document was in the possession of Dan Quigley, a representative

8  of the Nation. Ex. 111 at GRIC000268; Ex. 23 (Quigley) 101:5-13.

9      **154.**    On April 8, 2002, David LaSarte, representing AIGA in support of SB

10  1001, testified before the Arizona Senate Committee on Government that the

11  Compact would "limit[] the number of facilities in the Phoenix metro area to the

12  current number, and also allow[] only for the possibility of one additional facility in

13  Tucson."  Chairman Edward Manuel of the Nation was present at this hearing and

14  thought that this statement was correct.  After the hearing, the tribal leaders of AIGA

15  tribes were unanimously supportive of the statements that LaSarte had made.  Ex. 13

16  (LaSarte) 141:8-142:15, 201:10-202:17; Ex. 19 (Manuel, Edward) 154:10-156:5;

17  158:10-159:2; Ex. 31 (Walker) 22:24-25:5; Ex. 81 at 9; Ex. 82 at GRIC000438.

18      **155.**    LaSarte's statement on April 8, 2002 matched precisely with what the

19  tribal lobbyists and the State's lobbyists, including Rick Pyper, Paul Walker, Steve

20  Hart, and Mike Bielecki, were explaining to legislators as a primary benefit of the

21  proposed compacts and SB 1001.  Ex. 31 (Walker) 26:16-27:3.

22      **156.**    On April 18, 2002, reporter Mary Jo Pitzl wrote an article which

23  appeared in the Arizona Republic headlined "Hull's gaming bill blocked."  The article

24  discussed the failure of Senate Bill 1001, which reflected the agreement between the

25  AIGA tribes and the State, and included a text box with seven bullet points

26  summarizing the content of the bill.  One of the bullet points states that the bill

27  "[w]ould freeze the number of casinos in the Phoenix urban area at seven."  Another

28  bullet point states that the bill "[w]ould allow Tucson to add one casino, for a total of

five." This article was in the possession of representatives of the Nation on April 18, 2002, including Alex Ritchie, Joe Abate, Edward Manuel, Dennis Ramon, and Ned Norris.  Ex. 99 at TON0128610, TON0128612.

157.   On April 19, 2002, Governor Jane Dee Hull sent a letter to Arizona State Senate President Randall Gnant, in which Gov. Hull responded to a number of questions that Sen. Gnant had asked about Senate Bill 1001, the bill which encapsulated the agreement between the AIGA tribes and the State.  In response to Question No. 9 from Sen. Gnant, Gov. Hull responded that under the bill "there will be no additional facilities in the Phoenix metropolitan area and only one additional facility in the Tucson metropolitan area."  This article was in the possession of representatives of the Nation on April 25, 2002, including Matt Smith, Joe Abate, Gary Dufault, Dennis Ramon, and Ned Norris.  Ex. 101 at TON0128797, TON0128801.

158.   On April 22, 2002, Governor Jane Dee Hull wrote an editorial which appeared in the Arizona Republic headlined "Gaming deal sound policy for both sides."  In that editorial, Gov. Hull stated that under the agreement between the AIGA tribes and the State embodied in SB 1001, "Phoenix will keep the same number of casinos, Tucson may add one."  This article was in the possession of representatives of the Nation on April 25, 2002, including Alex Ritchie, Joe Abate, Edward Manuel, Dennis Ramon, and Ned Norris.  Ex. 100 at TON0128789, TON0128792.

159.   When it became clear that there would not be enough support in the legislature to pass SB 1001 with a wide enough margin to avoid the initiative process, the bill was withdrawn to give the Tribes the ability to craft how the issue would appear on the ballot.  Ex. 3 (Bielecki) 164:8-165:9.

## VIII.  Proposition 202 Campaign

160.   Proposition 202 was based on the Compact Framework to which Governor Hull and the AIGA tribes had agreed.  The Nation participated in the negotiations that led to Proposition 202, supported Proposition 202, and entered into

the 2002 Compact after the voters approved Proposition 202.  Ex. 3 (Bielecki) 89:16-24; Doc. 45 (Answer) at 8 ¶ 48.

161.    In 2002, seventeen Arizona Indian tribes, including the Nation, united to support Proposition 202 and oppose Propositions 200 and 201 under the banner Arizonans for Fair Gaming and Indian Self-Reliance (the "Prop 202 Campaign" or "Campaign").  All tribal leaders in AIGA participated in the Prop 202 Campaign.  The Nation provided approximately $1,800,000 of financial support for that effort.  Doc. 45 (Answer) at 7 ¶ 36; Ex. 26 (Ramon) 39:13-40:7.

162.    The Arizona Department of Gaming supported Proposition 202, and Steve Hart met regularly with the Campaign to monitor and talk to them about what was going on in the campaign to promote Proposition 202.  Steve Hart wrote a letter for the public information pamphlet comparing competing propositions, and he spoke publicly about the Proposition.  Ex. 11 (Hart) 22:25-23:25.

163.    A major talking point of the Prop 202 Campaign was that there would be no additional casinos allowed in the Phoenix metropolitan area and one additional casino in the Tucson area.  Ex. 18 (Manuel, Albert) 77:7-78:7; Ex. 13 (LaSarte) 79:21-80:22.

IX.    **The "Answers to Common Questions" Document and Other Public Statements that Proposition 202 Authorized No Additional Casinos in the Phoenix Metropolitan Area**

164.    AIGA and the Campaign trained tribal officials to promote consistency in the messages that were told the public, and the tribes agreed on what those consistent statements and messages would be.  Ex. 27 (Ritchie) 48:4-24.

165.    The Nation made a significant effort to have the standard form compact adopted as legislation and then made a significant effort to promote the passage of Proposition 202.  Ex. 24 (Nation) 36:11-37:4.

166.    The Nation funded a significant portion of the Campaign effort, and the Nation's elected officials participated in various media events with other elected

4652130

officials from other tribes, and the Nation put a tremendous amount of work into its own grassroots community efforts to support the proposition in Southern Arizona. Ex. 24 (Nation) 184:24-186:6; Ex. 30 (Smith, Matthew) 33:7-23.

167.    The Nation's elected officials and representatives who spoke with voters in support of Proposition 202 intended for voters to rely on their public statements. The Nation believed it was reasonable that people would rely on those statements' accuracy.  Ex. 24 (Nation) 186:13-187:18, 193:24-194:9.

168.    Because the AIGA tribes knew that having no additional facilities in the Phoenix metropolitan area was a key talking point with the public, the agreement among the tribes, including the Nation, that there would be no additional gaming facilities in the Phoenix area was included in information distributed statewide in connection with the campaign in support of Proposition 202.  A document called Answers to Common Questions, in particular, was handed out at various events held in support of Proposition 202 and distributed to Arizona voters.  Ex. 60 at TON0095666; Ex. 19 (Manuel, Edward) 170:4-13; Ex. 13 (LaSarte) 162:15-163:22; Ex. 12 (Landry) 69:18-71:10; Ex. 15 (Lunn) 65:12-66:2; Ex. 31 (Walker) 29:2-6, 109:12-19; Ex. 29 (Severns) 35:13-25; Ex. 10 (Enos) 92:22-93:9; Ex. 9 (Dahlstrom Vol. 2) 303:13-304:1.

169.    The Answers to Common Questions document stated that under compacts authorized by Proposition 202, "there will be no additional facilities authorized in Phoenix, and only one additional facility permitted in Tucson."  Ex. 60 at TON0095666.

170.    The "one additional facility permitted in Tucson" in this statement and others like it was a reference to the Nation's unbuilt casino.  Ex. 29 (Severns) 66:6-69:2; Ex. 13 (LaSarte) 188:18-189:4.

171.    The Answers to Common Questions document states that it was paid for with substantial funding provided by the Tohono O'odham Nation.  Ex. 60 at TON0095667; Ex. 24 (Nation) 162:24-163:2.

4652130

172.   The Nation intended for voters to rely on the campaign materials for which the Nation provided funding.  Ex. 24 (Nation) 194:7-9.

173.   It was important to the Nation that information in the Answers to Common Questions document be accurate.  Ex. 24 (Nation) 187:19-190:8.

174.   The Nation played a very significant leadership role in the development of the Answers to Common Questions document and other Proposition 202 campaign documents.  Ex. 13 (LaSarte) 158:21-159:13.

175.   The Nation provided information used in the Answers to Common Questions document, and the Nation's representatives Matt Smith and Alex Ritchie helped draft the document.  The Answers to Common Questions document contains an entire answer devoted to the benefits the Nation has received from gaming.  Ex. 24 (Nation) 187:19-188:6; Ex. 13 (LaSarte) 159:14-160:8; Ex. 60 at TON0095664.

176.   The Answers to Common Questions document was approved at a meeting of AIGA tribal leaders, in keeping with an established process by which AIGA tribal leaders authorized campaign materials before they were distributed to the public under the auspices of the Campaign.  Ex. 13 (LaSarte) 157:21-161:2; Ex. 17 (Makil Vol. 2) 195:1-196:8; 198:2-24; Ex. 9 (Dahlstrom Vol. 2) 235:25-236:14.

177.   The Answers to Common Questions document was a common document in the Prop 202 Campaign used as a handout when AIGA representatives spoke to voters.  It was widely distributed, via e-mail, in fliers, in materials used by AIGA representatives in public appearances, in direct mail to community groups, and by tribal leaders in their communities.  Ex. 13 (LaSarte) 161:3-164:18; Ex. 12 (Landry) 69:24-71:8; Ex. 15 (Lunn) 65:25-66:2.

178.   The Nation distributed the Answers to Common Questions document during the campaign in support of Proposition 202.  Ex. 13 (LaSarte) 161:3-164:18.

179.   The Nation's Chairman Edward Manuel saw a copy of the Answers to Common Questions document during a "speaker training" session conducted during

4652130

the campaign, and felt it was important that this document be accurate.  Ex. 19 (Manuel, Edward) 170:4-13.

180.    The Nation and its elected officials either agreed with or never disputed the accuracy of the statement in the Answers to Common Questions document that "there will be no additional facilities authorized in Phoenix, and only one additional facility permitted in Tucson."  Doc. 45 (Answer) at 7-8 ¶ 40; Ex. 24 (Nation) 165:1-7; Ex. 19 (Manuel, Edward) 170:4-13; Ex. 18 (Manuel, Albert) 75:22-76:7; Ex. 27 (Ritchie) 59:1-60:19; Ex. 13 (LaSarte) 157:21-161:2; Ex. 17 (Makil Vol. 2) 202:14-203:13, 205:20-206:18.

181.    Nation officials, including Chairman Manuel, were among speakers trained to make public appearances for AIGA and the Campaign in favor of Proposition 202.  Ex. 19 (Manuel, Edward) 161:9-165:5; Ex. 83; Ex. 84; Ex. 85 at 8.

182.    Chairman Ned Norris, Jr., the Nation's current chairman, who at the time was the casino manager for the Nation, acted as a public relations spokesman for the Nation in relation to the campaign in support of Proposition 202.  Norris publicly supported Proposition 202 in appearances on behalf of AIGA and the Campaign.  In urging Arizona voters not to choose competing Propositions 200 or 201, Norris made statements to the effect that Proposition 202 would not "open gaming into cities" and that opening gaming into cities would be unacceptable, because "the citizens of Arizona have, repeatedly over the years, expressed their desire to keep gaming on the reservation."  Doc. 45 (Answer) at 8 ¶ 41; Ex. 87; Ex. 21 (Norris) 28:25-29:6, 40:16-21.

183.    Matt Smith, the Nation's public relations representative for the Proposition 202 campaign, also spoke publicly in favor of Proposition 202 on numerous occasions.  Smith also assisted generally with the AIGA and the Campaign collective public relations campaign in support of the compact renegotiation process.  Ex. 24 (Nation) 35:9-36:10; Ex. 86.

4652130

1    **184.**   AIGA also commissioned speakers to cover main talking points with the

2    editorial boards of Arizona newspapers. In meetings with the editorial boards of

3    Tucson-area newspapers, both Chairman Manuel and Alexander Ritchie represented

4    that under the Compact there would be no additional casinos in the Phoenix market

5    and up to one more in the Tucson market.  Ex. 13 (LaSarte) 153:25–156:15; Ex. 23

6    (Quigley) 105:14-22; Ex. 87.

7    **185.**   On September 14, 2002, the Arizona Republic ran an article headlined

8    "Summaries of 3 gaming propositions" which offered "highlights" of the arguments

9    in the Arizona Ballot Proposition Guide for and against Proposition 202.  The article

10   reprinted the statement made by Governor Jane Dee Hull in the Guide, which said that

11   "[v]oting 'yes' on Proposition 202 ensures that no new casinos will be built in the

12   Phoenix metropolitan area and only one in the Tucson area for at least 23 years."

13   This article was in the possession of Matt Smith, a representative of the Nation.  Ex.

14   102 at TON0130418; Ex. 30 (Smith, Matthew) 102:12-15.

15   **186.**   On September 24, 2002, Dan Quigley forwarded to Mark Curry a copy

16   of a chart entitled "Comparison of Initiatives" which compared provisions of the "17

17   Tribe Initiative," the "CRIT Initiative," and the "Racetracks Initiative."  The cover

18   memo written by Dan Quigley called the document "ADOG Initiative Comparison."

19   The second item on the comparison chart states that the 17 Tribe Initiative

20   (Proposition 202) authorizes 12 casinos in the "Greater Phoenix and Tucson areas"

21   and states "there will be no additional facilities in the Phoenix metro area and only

22   one in the Tucson metro area."  Ex. 133.

23   **187.**   On September 29, 2002, reporter Mary Jo Pitzl wrote an article which

24   appeared in the Arizona Republic headlined "Gaming initiatives: What they're

25   about."  The article states that Proposition 202 "stipulates that no more casinos could

26   be built in Maricopa County, and only one more in Pima County."  This article was in

27   the possession of representatives of the Nation on September 29, 2002, including

28

4652130

Alexandra Terry, Joe Abate, Matt Smith, Dennis Ramon, and Ned Norris.  Ex. 103 at TON0130628; TON0130633.

188.    On October 10, 2002, reporter Jim Nintzel wrote an article which appeared in the Tucson Weekly headlined "High Stake$."  The article states that under Proposition 202 "[o]ne more casino could be built in Pima County; no more would be allowed in the [sic] Maricopa County."  This article was in the possession of Matt Smith, a representative of the Nation.  Ex. 104 at TON0130847.

189.    On October 22, 2002, the Arizona Republic ran an unsigned editorial headlined "Eliminating gaming is phony scenario."  The editorial states that Proposition 202 "would not allow any new casinos to be built in the metropolitan Phoenix area, and it authorizes just one more tribal casino in the Tucson area."  This article was in the possession of Matt Smith, a representative of the Nation.  Ex. 105 at TON0131006.

190.    On October 23, 2002, reporter Mary Jo Pitzl wrote an article which appeared in the Arizona Republic headlined "All or nothing on Prop. 202, poll says."  The article states that Proposition 202 "would not permit any new casinos in Maricopa County and only one more in the Tucson area."  This article was in the possession of Matt Smith, a representative of the Nation.  Ex. 106.

191.    On October 28, 2002, David LaSarte appeared in a televised debate supporting Proposition 202.  During that debate LaSarte stated: "They [the 17 tribes] voluntarily made it so that there will be no new casinos in Phoenix, only one additional casino in Tucson."  A transcript of the debate was in the possession of representatives of the Nation.  No tribal leaders expressed disagreement with LaSarte's statement in the debate.  Ex. 13 (LaSarte) 195:16-199:11; Ex. 91 at TON0131275.

192.    On November 3, 2002, reporter Mary Jo Pitzl wrote an article which appeared in the Arizona Republic headlined "Making sense of gaming propositions."  The article states that Proposition 202, the ballot initiative based on the agreement

between the AIGA tribes and the State, "would freeze the number of casinos in Maricopa County at seven."  The article also responds to the question "Could there be more casinos in the Valley?" by stating "Yes, under the terms of [competing gaming initiatives] Propositions 200 and 201.  No, according to Proposition 202."  This article was in the possession of representatives of the Nation on November 4, 2002, including Alexandra Terry, Joe Abate, Matt Smith, Dennis Ramon, and Ned Norris.  Ex. 107 at TON0131210-11; TON0131191-92.

193.    During the 2002 election, the Arizona Secretary of State published the Arizona Ballot Proposition Guide, a pamphlet containing arguments for and against Proposition 202, the ballot initiative based on the agreement between the AIGA tribes and the State.  That pamphlet contained a statement of support for Proposition 202 by Governor Jane Dee Hull, in which she stated that "[v]oting 'yes' on Proposition 202 ensures that no new casinos will be built in the Phoenix metropolitan area and only one in the Tucson area for at least 23 years."  The pamphlet also contained an argument in favor of Proposition 202 signed by tribal leaders, including Tohono O'odham Chairman Edward Manuel.  This pamphlet is required by A.R.S. § 19-123(B) to be distributed to every Arizona household with a registered voter, which includes representatives of the Nation.  Doc. 195-14 at 25-26.

194.    The statements that Proposition 202 would allow no additional casinos in the Phoenix market and up to one in the Tucson market went entirely undisputed.  There was never any public statement by anyone saying that Proposition 202 or SB 1001 would allow the possibility of additional casinos to be opened in the Phoenix metropolitan area.  Ex. 24 (Nation) 168:25-169:6.

195.    On November 5, 2002, Arizona voters approved Proposition 202 and rejected competing Propositions 200 and 201.  In a November 6, 2002 article in the Tucson Citizen newspaper, Chairman Manuel was quoted as responding to the election outcome by saying, "To us, this is a major victory . . . .  We stayed together.

1    We stayed united.  We will try to keep working on that to keep the unity together."

2    Ex. 62 at TON0039361.

3        **196.**   On December 4, 2002, Chairman Edward Manuel on behalf of the

4    Nation and Governor Hull on behalf of the State executed the 2002 Compact.  At no

5    time before, at, or after the signing of the compact did the Nation ever dispute any of

6    the many statements the Nation's representatives (including Chairman Manuel),

7    Governor Hull, AIGA, the Prop 202 Campaign, and others made that the 2002

8    Compact would allow no additional gaming facilities in the Phoenix market and only

9    one additional gaming facility in the Tucson market.  Pursuant to section 2(vv) the

10   Nation's Compact did not become effective until the compacts of the tribes in

11   Maricopa, Pima, and Pinal Counties became effective.  Doc. 195-11 at 17, 77; Doc.

12   45 (Answer) at 7-8 ¶ 40.

13   **X.     The Nation's Secret Plan – The West Phoenix Project**

14       **197.**   The Nation was looking for property in west Phoenix for gaming

15   purposes as early as 1989 to 1990, and the possibility of buying west Phoenix

16   property on which a casino might be built was always on the table from 1989 to 2001.

17   Ex. 1 (Antone) 13:20-23, 15:24-19:20.

18       **198.**   In 2002, prior to the execution of the 2002 compact, the Nation looked

19   for and was considering the possibility of acquiring property in the Phoenix

20   metropolitan area for gaming purposes.  It did not disclose that it was considering

21   such an acquisition.  Doc. 45 (Answer) at 6 ¶ 32; 8 ¶ 48; 9 ¶ 50.

22       **199.**   There is no legitimate reason that this search for land should have been

23   kept secret from the other AIGA tribal leaders during compact negotiations.  Ex. 21

24   (Norris) 63:3-7; Ex. 19 (Manuel, Edward) 103:11-16.

25       **200.**   On January 25, 2000, the Nation requested a waiver from the Secretary

26   of the Interior of requirements in Section 6(d) of the Gila Bend Act—that one area of

27   land be contiguous to San Lucy Village near Gila Bend, Arizona—and that the Nation

28   be permitted to take more than three areas of contiguous tracts of land in trust. In sum,

the Nation requested that it be allowed to place up to five separate areas of land in trust.  Ex. 132; Doc. 45 (Answer) at 9 ¶ 51.

201.   On May 31, 2000, Interior granted the waiver of the requirement that no more than three separate areas of land may be acquired under the Gila Bend Act. The Nation did not disclose these facts to the State or to the AIGA tribes during the negotiation of the compacts.  Doc. 45 (Answer) at 9 ¶ 52.

202.   In March 2001 representatives of the San Lucy District, a political subdivision of the Nation, and Vi-ikam Doag Industries, an enterprise chartered by the Nation, engaged in an effort to acquire land that would be used by the Nation to operate a casino.  Ex. 18 (Manuel, Albert) 11:18-12:7; Ex. 5 (Chaston Vol. 1) 41:14-42:8; Ex. 64.

203.   In May 2001 at least two members of the Nation's Legislative Council, Albert Manuel and Gloria Ramirez, attended a meeting during which the attendees discussed a plan to acquire land in the Phoenix metropolitan area which would be used for the Nation to operate a casino.  Ex. 18 (Manuel, Albert) 105:24-106:7; Ex. 68 at TON0116092-94.

204.   Handwritten minutes of the May 2001 meeting attended by Albert Manuel and Gloria Ramirez contained a map of the west Phoenix area with the label "Land in West Phx to put a casino on."  The attendees raised the possibility that a stadium would be built in the vicinity of 107th Avenue.  The minutes indicate that the attendees were "unsure what will happen" with the gaming compact.  The minutes also contained notations which read, "Buying Land West Phx, put in trust and build a casino," and "Put it in a shell company – need to keep it quite expecially when negociations of compact [with] State."  Ex. 68 at TON0116093-94 (errors in original).

205.   At a meeting of the San Lucy District Council on June 26, 2001, Richard Ramirez told the elected officials that the project to put "a casino on the west end of Phoenix" constituted "a good opportunity . . . depending on what happens with the big compact," but that the plan needed to be kept secret to "minimize the impact

4652130

1   of public hearings" due to "resentment from the public about . . . Indian tribes

2   building casinos."  Ex. 115 at 25:5-20.

3        **206.**   At a meeting of the San Lucy District Council on June 26, 2001,

4   Richard Ramirez told the elected officials that the search for casino land in the

5   Phoenix metropolitan area was be held "as confidential, because we don't want, you

6   know, people to know we are seriously considering this.  Because if you do, I'm sure

7   that there's going to be a lot of resistance from . . . the general public."  Ex. 115 at

8   29:4-16.

9        **207.**   At a meeting of the San Lucy District Council on June 26, 2001, VDI

10  employee Jim Chaston told the elected officials that the reason the Nation pursued a

11  waiver of the three-parcel maximum in the Gila Bend Act was "so that San Lucy

12  could use one of these exemption[s] to – to do this [build a casino] on the west side of

13  Phoenix."  Mr. Chaston reiterated the point at another meeting of the San Lucy

14  District Council on August 26, 2001.  Ex. 115 at 42:4-8; Ex. 116 at 19:9-16.

15       **208.**   At a VDI board meeting on April 13, 2002, Richard Ramirez informed

16  the board that the Nation had already approached the San Lucy District regarding the

17  purchase of land in the Phoenix metropolitan area for the purpose of gaming, with the

18  specific impetus being the Framework Agreement giving the Nation "a thousand more

19  machines" to put into play compared to the current compact.  Ex. 122 at 4:9-21; Ex.

20  25 (Ramirez, Richard Vol. 2) 131:14-19.

21       **209.**   On June 9, 2002, VDI employee Jim Chaston made a "West Phoenix

22  Land Presentation" to members of the San Lucy District Council.  A document

23  distributed at that presentation noted that "[o]ne of the main uses for this Land would

24  be a Casino" and that "the Nation would have to get over some political hurdles

25  related to gaming" if the land purchase went forward.  Ex. 65 at TON0116245; Ex. 69

26  at TON0116078;  Ex. 5 (Chaston Vol. 1) 108:2-110:16.

27       **210.**   On June 10, 2002, Richard Ramirez wrote an email to Jim Chaston

28  indicating that the result of the June 9th meeting was that VDI could proceed to place

1    the two recommended properties into escrow, as the escrow of land in the west

2    Phoenix area was "already pre-approved."  The email also indicated that Jim Chaston

3    should give another presentation, and that in the subsequent presentation "[o]ne other

4    map that may be useful is one that shows all the Casinos."  Ex. 69 at TON0116078.

5        211.    On August 1, 2002, the VDI board held a joint meeting with the

6    Nation's Commerce Committee.  Five members of the Commerce Committee

7    attended: Albert Manuel, Jr., Frances Miguel, Dennis Ramon, Kenneth Williams, and

8    Barbara Salvicio.  The minutes indicate that the purpose of the meeting is "the land

9    purchase for the West Buckeye Property . . . for a casino to be built on that property."

10   Commerce Committee member Frances Miguel stated that she felt the project was

11   long overdue.  Commerce Committee member Kenneth Williams encouraged the VDI

12   board to move forward with the property.  The minutes state that "[t]he Commerce

13   Committee is in full support of the land purchase for gaming purposes."  Ex. 66.

14       212.    During the 1999-2002 compact negotiations and campaign for

15   Proposition 202, the members of the Nation's Commerce Committee, including

16   committee chairman Dennis Ramon, were actively involved in negotiations while

17   simultaneously participating in the search for land in the Phoenix metropolitan area

18   for a casino.  Ex. 26 (Ramon) 15:22-16:10; 25:17-28:2; Ex. 20 (Miguel) 19:17-20:16.

19       213.    Commerce Committee chairman Dennis Ramon placed no importance

20   whatsoever on being honest with the other tribes during the compact negotiations.

21   Ex. 26 (Ramon) 76:12-77:1.

22       214.    At a VDI board meeting on August 12, 2002, Richard Ramirez informed

23   the board that attorney Judy Dworkin, whose representation encompassed the search

24   for land to build a casino in the Phoenix metropolitan area, was "going to keep it

25   confidential" and that she would not tell representatives of Ak-Chin "what we're

26   doing" with regard to the search for casino land in the Phoenix metropolitan area.  Ex.

27   123 at 6:11-16.

28

215.    On August 15, 2002, members of the Nation's Commerce Committee took a tour of the proposed gaming sites in the Phoenix metropolitan area.  Ex. 66 at TON0116186; Ex. 26 (Ramon) 101:17-102:20.

216.    On August 21, 2002, the Nation's Gaming Board, Commerce Committee, Investment Committee chairperson, Treasurer, and Chairman Edward Manuel attended a formal presentation regarding the secret land search.  An updated copy of the West Phoenix Land Presentation document was distributed to the attendees.  Ex. 70 at TON0116198; Ex. 117.

217.    At a VDI board meeting on August 22, 2002, VDI employee Jim Chaston and VDI board members discussed the fact that their proposed casino location is "way out there, but it's still in the Phoenix area"; their knowledge that Governor Hull did not want additional casinos in the Phoenix metropolitan area; and their belief that under the terms of the negotiated 2002 Compact "everybody in the Phoenix area loses one casino, which drops them to what they currently have" because Governor Hull wanted no additional casinos in the Phoenix area.  Ex. 118 at 5:7-21.

218.    At a VDI board meeting on August 22, 2002, VDI employee Jim Chaston and VDI board members discussed the fact that Governor Hull would leave office after the election, to be replaced either by Matt Salmon or Janet Napolitano, although both candidates would be likely to share Hull's view that there will be no additional casinos in the Phoenix metropolitan area.  An attendee named Max noted "if that's going to be the position of the State, they don't want any more casinos around the Phoenix area, then they're going to fight it [the west Phoenix casino], whoever the new governor is."  Jim Chaston responded that this consistency in the State's position "is why we really want to wait until the initiative passes before it [the plan] gets out."  Ex. 118 at 13:16-14:13.

219.    On September 4, 2002, VDI employee Jim Chaston received a copy of a report written by gaming consultant William J. Palermo of Gaming & Resort

Development, Inc. ("Palermo Report").  The report was an "analysis and evaluation of the underlying market & economic feasibility for a Class III casino gaming and related amenity development, proposed for an area in the western section of metropolitan Phoenix, Arizona."  The Palermo Report was commissioned by Jim Chaston at the suggestion of Tom Arnold, the head of the Tohono O'odham Gaming Authority.  Ex. 71 at TON0116242;  Ex. 5 (Chaston Vol. 1) 125:17-126:4.

220.    The Palermo Report evaluated the gaming market in the Phoenix metro area, examined the three competing gaming initiatives that were on the ballot at the time, and studied the feasibility of placing a casino on two different proposed sites, one at Interstate 10 and 339th Avenue and the other at Interstate 10 and Palo Verde. Ex. 71.

221.    The Palermo Report recommended that the Nation's proposed casino would generate "two to three times" the customer volume if the Nation located the casino "no further west than the Glendale area."  Ex. 71 at TON0116182.

222.    Jim Chaston showed a copy of the Palermo Report to Tom Arnold, who was not surprised by the conclusion that "we needed to be closer in with more population."  Ex. 5 (Chaston Vol. 1) 146:6-11.

223.    At a VDI board meeting on September 19, 2002, VDI employee Jim Chaston informed attendees that Jonathan Jantzen (then an assistant Attorney General for the Nation) reported being asked by a "middle management person" at ADOG about the possibility of the Nation building a casino "in Phoenix," which Mr. Chaston characterized as "some type of information going out or a leak."  Mr. Chaston further reported that Mr. Jantzen and Mark Curry "didn't seem too concerned" because the mention of the Nation building a casino in the Phoenix area "wasn't up at the governor's level or at the negotiating level, it was just at a mid-level in the regulatory office," and further noted that a potential leak of the plan was "still a concern out there, especially prior to the propositions coming up for election."  Ex. 119 at 14:18-15:6.

4652130

**224.**   At a VDI board meeting held on October 17, 2002, Jim Chaston notified the attendees that he had discussed the search for casino land with Tom Arnold, the head of the Nation's gaming authority, and that Mr. Arnold reported that a site "closer in towards Tolleson or Glendale" would generate "two to three times the revenue" of the sites near Buckeye which were under consideration at the time.  Ex. 121 at 3:7-13.

**225.**   On October 25, 2002, the VDI board held a meeting during which one attendee noted that "we are . . . now, a week and a half, two weeks away from the vote" and that if Proposition 202 passes "we'll proceed in how we need to make that project develop."  Richard Ramirez noted that it was "critical" for Proposition 202 to pass, because Proposition 202 "maintains what the negotiation has been for the Nation" and would permit the Nation to operate four casinos, whereas Proposition 200 would only authorize three casinos for the Nation.  Richard Ramirez also announced that Mark Curry would attend an October 29th meeting in case attendees at that meeting had "questions regarding, you know, the validity of this."  Ex. 127 at 2:7-3:24.

**226.**   On October 29, 2002, VDI and the San Lucy District Council held a meeting during which they discussed the West Phoenix project and indicated that the land should be "put in escrow until about February 2003."  The meeting was attended by Mark Curry, who gave legal advice to the attendees regarding the West Phoenix project.  At that meeting, VDI employee Jim Chaston referred to the Palermo Report and stated to the attendees, "let's hold off until the election and we can get some more -- or make a decision on whether we want to pursue the current locations or possibly (inaudible), depending on what our goals are and what we want to achieve."  Jim Chaston also informed attendees of his discussions with Tom Arnold of the Nation's gaming authority, and discussed the increased cost of land "moving closer in, towards the Glendale area."  Ex. 120 at 5:15-7:8; Ex. 72 at TON0116212-14.

**227.**   At a VDI board meeting on February 10, 2003, Richard Ramirez informed the attendees about requirements set forth by the Nation's Commerce

Committee and the Tohono O'odham Gaming Authority, and Ramirez noted that "the compact has been signed, and so there are no more real concerns that might jeopardize our chances on this discussion.  So I think that they're ready to move forward."  Ex. 125 at 3:2-4:5.

228.    At a VDI board meeting on February 23, 2003, attendees discussed the 2002 Compact and noted that "it limited the number of metro casinos to what it sits now," along with further noting that the term "metro" was not defined as "a certain radius."  Albert Manuel, a member of the Nation's Legislative Council, disagreed that the 2002 Compact limited the number of casinos in the Phoenix metropolitan area at the current number, but noted that this view is "what has been stated over there."  Ex. 124 17:22-18:14.

229.    At a VDI board meeting on February 23, 2003, attendees discussed the 2002 Compact and whether "Gila River or Salt River" would view the Nation's Phoenix-area casino as a violation of the 2002 Compact as embodied by Proposition 202.  One attendee noted that he would be "surprised if we don't hear anything from them" about the Nation's Phoenix-area casino.  Ex. 124 at 48:21-50:23.

230.    At a VDI board meeting on June 26, 2003, Richard Ramirez reported to the attendees that the Nation's Chairwoman, Vivian Juan-Saunders, believed any attempt to place a casino in the Phoenix area "would be a political battle" because the Nation had agreed that when it built a fourth casino it would be "nowhere near Phoenix."  Ex. 126 at 4:2-14.

**XI.    The Glendale Parcel and the Proposed Glendale Casino**

231.    On February 24, 1986, Representatives Udall and McCain introduced the "Papago-Gila Bend Settlement Act" as H.R. 4216 in the 99th Congress.  A true and correct copy of the bill as introduced is attached as Exhibit 130.

232.    In August 2003, Rainier Resources, Inc., a Delaware corporation owned by the Nation, purchased the parcel of land at issue in this case (the "Glendale parcel").  Doc. 45 (Answer) at 9 ¶ 54.

233.   The Nation acquired the Glendale parcel through Rainier Resources in part to conceal its ownership of the land.  Doc. 45 (Answer) at 9 ¶ 55.

234.   The Nation's ownership of the Glendale parcel was not generally known during the period from August 2003 until January 2009.  The Peoria Unified School District opened a high school across the street from the Glendale parcel during that time period, and various restaurants, hotels, and retail establishments were developed within a few miles of the Glendale parcel during that time period.  Doc. 45 (Answer) at 10 ¶ 56.

235.   Operating a casino on the Glendale parcel is an act of bad faith on the part of the Nation because it goes counter to expectations created by and assurances given by the Nation.  Ex. 3 (Bielecki) 183:20-184:6; Ex. 11 (Hart) 105:7-107:16; Ex. 20 (Miguel) 105:11-107:6; Ex. 19 (Manuel, Edward) 179:15-181:4; Ex. 31 (Walker) 117:14-118:21.

236.   When the negotiations leading to the 2002 Compact occurred, Salt River had five additional years before its existing compact expired.  If the negotiators for Salt River had known that the Nation intended to build a casino in the Phoenix market, Salt River would have either insisted on additional clarifying language in the Compact, or would have refused to execute its own Proposition 202 compact in order to block the Nation's Compact from taking effect.  Ex. 12 (Landry) 65:6-66:14; 85:1-18; Doc. 195-11 at 16-17 (Compact § 2(vv)(4)).

237.   If the Nation operates its proposed casino on the Glendale parcel, the State will be harmed because it will not receive the promised benefit of freezing the number of casinos in the Phoenix market.  The State will also be harmed by a disruption in the market balance sought by the State during compact negotiations.  Ex. 11 (Hart) 74:7-79:10; 84:16-85:18; 199:5-16; Ex. 3 (Bielecki) 74:10-77:22.

238.   If the Nation operates its proposed casino on the Glendale parcel, it will cause a loss of revenue to the seven existing gaming facilities in the Phoenix market,

4652130

which includes facilities operated by Gila River Indian Community and Salt River Pima-Maricopa Indian Community.  Ex. 63.

**XII.   Integration**

239.    The standard-form compact negotiated by the AIGA tribes with the State did not specifically contain every single detail about the agreement.  Rather, tribal leaders arrived at agreements about principles and then staff members worked to reflect those principles in the written compact.  Ex. 16 (Makil Vol. 1) 37:1-21; 83:5-15.

240.    During the 1999-2002 compact negotiations, there were understandings that were implicit that may not have been in writing on the deal points of the agreement.  Ex. 12 (Landry) 20:21-21:11.

241.    Although the Compact was intended to reflect the agreements of tribal leaders arrived at during the course of compact negotiations, there was not necessarily specific language for each such agreement written into the Compact.  Ex. 15 (Lunn) 13:15-23; 50:24-51:16.

242.    The Yavapai-Prescott Indian Tribe signed a separate, collateral agreement regarding gaming facility location and video lottery terminals on the same day it entered into its form compact in 2003.  Ex. 22 (Ochoa) 15:1-18:19; 47:23-50:17.

**PLAINTIFFS' CONTROVERTING STATEMENT OF FACTS**

1.      Undisputed.

2.      Undisputed.

3.      Undisputed.

4.      Disputed in part.  Plaintiffs admit that flooding in the 1970s and 1980s rendered a portion of the Gila Bend Indian Reservation uninhabitable.  Plaintiffs dispute that the entirety of the Nation's 10,000-acre Gila Bend Indian Reservation was uninhabitable and unable to be farmed.  The 1983 BIA study found "all of the

arable land of the reservation—5,962 acres—to be unsuitable for agriculture."  The

study also concluded that the remaining 4,000 acres of the reservation were of little or

no economic value.  H.R. Rep. No. 99-851 at 6.  In addition, Plaintiffs dispute that the

flooding left the Nation without any land that could support economic development.

The Nation's Sil Murk (Daik Village) had been relocated in the 1960s—prior to the

flooding—to San Lucy Village, which was never flooded.  Pub. L. No. 88-462, 78

Stat. 559 (1964).

5.      Disputed in part.  Plaintiffs admit Congress enacted the Gila Bend

Indian Reservation Lands Replacement Act (Gila Bend Act).  Publ. L. No. 99-503,

100 Stat. 1798 (1986).  Plaintiffs dispute that the Gila Bend Act was passed "to

provide for the settlement of [the Nation's] claims arising from the operation" of the

dam.  This quoted language appears in H.R. Rep. No. 99-851 (at 1) only in reference

to the bill as originally introduced by Congressmen Udall and McCain.  The substitute

amendment, which was passed, removed this language from the Gila Bend Act.  H.R.

Rep. No. 99-851 at 9 (amended congressional findings "replace[d] those in the

original bill which stressed the need to settle prospective O'odham legal claims

against the United States as well as to provide alternative lands for the tribe," which

did not reflect "the principal purpose of the legislation—to provide suitable

alternative lands and economic opportunity for the tribe").  Doc. 195-2 at 10.

6.      Disputed in part.  Plaintiffs admit that pursuant to the Gila Bend Act,

the Nation received the sum of $30 million in exchange for assigning to the United

States all rights, title, and interest in 9,888 acres within the Gila Bend Indian

Reservation.  Plaintiffs dispute that the Gila Bend Act required the sum be used to

acquire replacement lands.  The Gila Bend Act merely authorizes the purchase of

replacement land but does not require it.   Gila Bend Act § 6(a) (the Nation "may

spend the principal and the interest . . . on behalf of the San Lucy District for land and

water rights acquisition, economic and community development, and relocation

costs").

4652130

7.   Disputed in part.  Plaintiffs admit that the Gila Bend Act provides that the Secretary of the Interior shall hold in trust for the Nation land acquired pursuant to § 6(c) and that met certain requirements.  Gila Bend Act § 6(d).  Plaintiffs dispute that land located in unincorporated portions of Maricopa, Pima, or Pinal Counties necessarily meets the requirements of § 6(d).  The subsection prohibits replacement land "within the corporate limits of any city or town."  Unincorporated land within or surrounded by the corporate limits of any city or town—for instance a county island—does not meet the subsection's requirements.

8.   Disputed in part.  Plaintiffs dispute that the Gila Bend Act required the $30 million sum be used to acquire replacement lands. Gila Bend Act § 6(a).

9.   Undisputed.

10.   Undisputed.

11.   Disputed.  Plaintiffs dispute the assertion that the 2002 Compact authorizes Class III gaming on "Indian Lands" of the Nation.  Other than attempting to read together two separate parts of the Compact and thereby form a legal conclusion, the Nation has provided no evidence to support this assertion.

12.   Undisputed.

13.   Undisputed.

14.   Disputed.  Defendant's assertion that the 2002 Compact "does not expressly prohibit the Nation or any other tribe from gaming in Phoenix" is a legal conclusion and, indeed, the ultimate issue to be decided here. Defendants provide no evidence to support its conclusory interpretation of the Compact.  Plaintiffs dispute the Nation's legal interpretation of the Compact and further dispute the Nation's assertion insofar as the Nation is estopped from making this argument, having represented in 1993 that after-acquired gaming would be subject to a two-part determination set forth in IGRA, 25 U.S.C. § 2719(b)(1)(B)(iii), requiring the concurrence of the Governor, a requirement that Arizona statute prohibits, A.R.S.  5-601(C) ("The governor shall not concur in any determination by the United States

4652130

secretary of the interior that would permit gaming on lands acquired after October 17, 1988 pursuant to 25 United States Code § 2719.").

15.     Disputed insofar as the Defendant's assertion is a legal conclusion.

16.     Undisputed.

17.     Admit with clarification.  Salt River Pima-Maricopa Indian Community was not a party to the case referenced, did not appear or participate in proceedings before this Court, and filed only an amicus brief before the Court of Appeals for the Ninth Circuit.

4652130

RESPECTFULLY SUBMITTED this 14th day of January, 2013.

OSBORN MALEDON, P.A.

By____s/ Mary R. O'Grady_____
   Mary R. O'Grady
   John L. Blanchard
   Shane M. Ham
   Grace E. Rebling
   2929 North Central Avenue
   Suite 2100
   Phoenix, Arizona  85012

*Attorneys for Plaintiff Salt River Pima-*
*Maricopa Indian Community*

OFFICE OF THE ATTORNEY
GENERAL, STATE OF ARIZONA

By____s/ Michael Tryon_____
   Thomas C. Horne, Attorney General
   Michael Tryon
   Evan Hiller
   Assistant Attorneys General
   1275 West Washington Street
   Phoenix, Arizona  85007-2926

*Attorneys for Plaintiff the State of Arizona*

GILA RIVER INDIAN COMMUNITY

By____s/ James P. Tuite_____
   Linus Everling, General Counsel
   525 W. Gu u Ki
   P.O. Box 97
   Sacaton, Arizona  85247

   James P. Tuite (*Pro Hac Vice*)
   Merrill C. Godfrey (*Pro Hac Vice*)
   Jason T. Hauter (#022188)
   AKIN GUMP STRAUSS HAUER &
    FELD LLP
   1333 New Hampshire Avenue, N.W.
   Washington, DC  20036-1564

   Brian J. Schulman
   GREENBERG TRAURIG LLP
   2375 E. Camelback Road, Suite 700
   Phoenix, AZ  85016

*Attorneys for Plaintiff Gila River Indian*
*Community*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of January, 2013, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, which will send a notice of filing to all counsel of record.

*s/*____Julie Greenwood_____

4652130