Mary R. O'Grady (#011434)
John L. Blanchard (#018995)
Shane M. Ham (#027753)
Grace E. Rebling (#028661)
OSBORNE MALEDON, P.A.
2929 North Central Avenue
Suite 2100
Phoenix, Arizona 85012
(602) 640-9352
mogrady@omlaw.com
jblanchard@omlaw.com
sham@omlaw.com
grebling@omlaw.com

*Attorneys for Plaintiff Salt River Pima-
    Maricopa Indian Community*

Thomas C. Horne (#002951)
Attorney General
Michael Tryon (#003109)
Evan Hiller (#028214)
Assistant Attorneys General
1275 West Washington Street
Phoenix, Arizona 85007-2926
(602) 542-5025
Tom.horne@azag.gov
Michael.tryon@azag.gov
Evan.hiller@azag.gov

*Attorneys for Plaintiff the State of
    Arizona*

Linus Everling, General Counsel
(#019760)
GILA RIVER INDIAN COMMUNITY
Law Office
525 W. Gu u Ki
P.O. Box 97
Sacaton, Arizona 85247
(520) 562-9763
Linus.Everling@gric.nsn.us

James P. Tuite (Pro Hac Vice)
Merrill C. Godfrey (Pro Hac Vice)
Jason T. Hauter (#022188)
AKIN GUMP STRAUSS HAUER & FELD
LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
(202) 887-4000
jtuite@akingump.com
mgodfrey@akingump.com
jhauter@akingump.com

Brian J. Schulman (#015286)
GREENBERG TRAURIG LLP
2375 East Camelback Road, Suite 700
Phoenix, Arizona 85016
602-445-8000
schulmanb@gtlaw.com

*Attorneys for Plaintiff Gila River Indian
    Community*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **The State of Arizona**; **The Gila River Indian Community**, a federally recognized Indian tribe; and **The Salt River Pima-Maricopa Indian Community**, a federally recognized Indian tribe, <br><br> Plaintiffs, <br><br> v. <br><br> **The Tohono O'odham Nation**, a federally recognized Indian tribe, <br><br> Defendant. | No. CV11-00296-PHX-DGC <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT** <br><br> Oral Argument Set for April 9, 2013, at 2:00 p.m. <br><br> (Assigned to the Hon. David G. Campbell) |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

From February to November 2002, AIGA Tribes (including the Nation) and Governor Hull and her staff worked together to promote the proposed compacts, explaining to the legislature and the public that the compacts would prevent additional casinos in the Phoenix metropolitan area and would allow only one more casino in the Tucson metropolitan area. The Nation does not dispute that the spokesman for it and the other AIGA Tribes, David LaSarte, made many such statements, that it was aware of these statements, and that it provided funds used to distribute them in written form. Nor does it dispute that the Nation's then-Chairman has agreed on the record with one of these statements by Mr. LaSarte, made to the Arizona Senate in March 2002.

These statements were based on the heavily negotiated scope of gaming chart that appears in Section 3(c)(5) of the Compact and the additional restriction on the Nation that appears in Section 3(c)(3). These contractual provisions show the tribes organized according to the markets in which they were conducting gaming (rural, Phoenix, Tucson); the Phoenix market tribes each losing the right to construct any additional facilities; one Tucson-area tribe (Pascua Yaqui) also giving up its right to build an additional casino; and the other Tucson-area tribe, the Nation, retaining the right to open an additional casino (so long as one of its four casinos remained in a rural location). That this interpretation was expressed so extensively and consistently in the months leading up to the Compact's execution establishes not only that the Compact is reasonably susceptible to this reading, but also that this was the meaning attached to it by all the parties. This is conclusive under Restatement (Second) Contracts § 201, and supports summary judgment for the Plaintiffs.

Moreover, this meaning of the Compact is evident on its face. Section 3(c)(3) restricts one of the Nation's 3(c)(5) facility authorizations to a rural location but expressly excludes it only from the "Tucson metropolitan area." No similar language excluding the Phoenix metropolitan area was necessary to ensure the casino's rural nature, suggesting that the Nation's 3(c)(5) authorizations were only for Tucson, not Phoenix. This fits exactly the AIGA Tribes' representations that the Nation's one unbuilt casino could not be

1  located in the Phoenix area but might be located in the Tucson area.

2         Now, over a decade later, the Nation argues not just that the AIGA Tribes' public

3  statements misconstrued the Compact, but that they have *absolutely no textual basis in*,

4  and in fact *contradict*, the Compact.  Neither of these extreme assertions can stand,

5  whether viewed in light of the Compact's language or the extrinsic evidence.

6         In addition, the Nation fails to show not only that the Gila Bend Act qualifies as a

7  settlement of a land claim under IGRA, but even that it should be permitted to advance the

8  argument.  Whether by waiver, judicial estoppel, or simply being wrong as a matter of law,

9  the Nation may not conduct gaming on the Glendale parcel without a two-part

10 determination, and therefore the proposed casino violates the Compact.

**I.     THE NATION'S  SECTION 3(c)(5) GAMING FACILITIES ALLOCATION INCLUDES NO AUTHORIZATION FOR THE PHOENIX MARKET**

**A.     Under Section 24 of the Compact and the Restatement (Second) of Conflict of Laws, Arizona Law Governs Contract Interpretation**

**1.     The Court Must Apply Section 24 Rather than Bypass It**

15        In Section 24, the parties chose to have their contract governed by traditional

16 conflict principles for determining the applicable law, specifying three sources for the

17 analysis:  "This Compact shall be governed by and construed in accordance with the

18 applicable laws of the United States, and the Nation and the State."  Compact § 24.  This

19 provision directs the court to determine the "applicable" law for a particular issue using

20 the traditional Restatement principles for resolving conflicts.  The law of the state with the

21 most significant relationship to the issue governs its disposition.

22        At this point, this straightforward interpretation of Section 24 is the only one being

23 offered to the Court.  In its opening brief, the Nation offered its own interpretation,

24 construing the term "applicable" to refer to the laws that would otherwise apply in the

25 absence of the provision, which, it argued, included a default rule requiring the application

26 of federal law to interpret tribal-state compacts.  Thus, it argued, "the 'applicable' law

27 governing [the Compact's] construction is the law of the United States."  N. Mot. (Doc.

28

193) 31.[1]  But in its reply the Nation abandons any specific interpretation of Section 24 and instead simply dismisses it as being insufficiently clear to *displace* what the Nation says is the default rule.  N. Opp. (Doc. 203) 22.  According to the Nation, a blanket default rule should require that federal law govern the interpretation of all tribal-state compacts, unless the parties "clearly elect" some other law by making "a clear contrary choice."  N. Opp. 22, 21.

The total lack of authority for this argument is striking.  No such "clear statement" rule exists for tribal-state compacts generally, or IGRA compacts specifically.  *Cachil* and *Muhammad* set forth no such rule.[2]  And IGRA forecloses it.  Although IGRA specifically designates a federal forum and expressly provides jurisdiction in actions such as this one, *see* 25 U.S.C. § 2710(d)(7)(A), it says nothing about requiring federal law to govern compact interpretation.  That is no accident.  IGRA leaves to the states and tribes themselves the negotiation of the terms of their compacts and the determination of the law by which they wish their compacts to be interpreted.  *See Confederated Tribes of Siletz Indians v. Oregon,* 143 F.3d 481, 485 (9th Cir. 1996).  The Nation's assertion that the particular "terms of the compacts" (N. Opp. 21) are a matter of federal importance is completely unsupported.  The existence and enforceability generally of tribal-state compacts are matters of federal concern, but the particular terms of those compacts are not.  The Secretary has no power to negotiate these terms, and is allowed to disapprove a compact only if it violates federal law or federal trust duties.  *See* 25 U.S.C. § 2710(d)(8).  If there were an overriding federal interest in interpreting all IGRA compacts in

---

[1] Page numbers are those appended by the ECF system at the top of each page.

[2] Moreover, the Nation admits that it is citing mere dicta from *Cachil*: it speculates in the conditional tense that *if* California law had differed from federal law, "it seems clear that the court *would have* applied federal law."  N. Opp. 21-22 n.10 (emphasis added).  Nobody knows what the court might have decided had the issue been presented and briefed in the context of a consequential controversy over the issue.  Also, the Nation's attempt to distinguish the dicta in *Wilson v. Marchington* because it "might not have been referring to IGRA compacts at all" (N. Opp. 21-22 n.10) is ineffective because the Nation does not limit its own argument or rationales to IGRA compacts (tribes and states are just as sovereign when entering tribal-state compacts pursuant to other federal statutes).  *See* N. Opp. 21.

1  accordance with federal law, Congress would have said so when it provided a federal

2  forum.

3        Nor do tribes or states have any inherent interest in applying federal law to the

4  interpretation of all tribal-state compacts, especially where, as here, the Nation has

5  identified no conflict between the Nation's law and Arizona law.  In such circumstances, a

6  default federal rule hardly gives expression to state or tribal sovereignty.  And, as in its

7  opening brief, the Nation can cite no authority for its inapt analogy to interstate compacts.

8  N. Opp. 21.

9        In sum, there is no "clear choice" test for enforcing choice-of-law clauses in tribal-

10  state compacts, and there is no authority for this Court to set aside Section 24.  The

11  question is "how [Section 24] should be applied by the Court," Order Dated June 15, 2011

12  (Doc. 43) at 13, not whether to apply it at all.

13        The Nation argues that Plaintiffs' definition of Section 24 is a nullity, relying on the

14  premise that "a traditional conflict-of-laws analysis . . . would apply in the absence of any

15  choice-of-law clause." N. Opp. 22.  If the Nation concedes that premise, then its argument

16  is unnecessary because the parties agree that there is no default federal rule and the

17  Restatement governs.  Even so, Plaintiffs' reading of Section 24 still is not a nullity.  The

18  parties locked in place a traditional conflicts analysis and specified three sources,

19  intending to eliminate the risk that any different rule might be applied.  By contrast, in its

20  opening brief the Nation interpreted "applicable" as referring generically to any and all

21  default rules that might otherwise be applied at some future point, rather than as fixing on

22  any specific rule ex ante to avoid uncertainty.  N. Mot. 30-31.  Such a clause, by its nature,

23  would always be superfluous.

24        In any event, applying a federal default rule would contradict controlling authority.

25  The Nation cites no authority to distinguish *Empire Healthchoice Assurance v. McVeigh,*

26  547 U.S. 677 (2006), and its predecessors.  N. Opp. 22-23 n.11.  The Nation argues that

27  these cases apply state law only to "conduct . . . ordinarily regulated by state law," rather

28  than to "activity" that "is inherently federal," which it defines here as "Class III gaming on

1    Indian lands." *Id*.  This contravenes the reasoning of *Empire* itself, which requires an

2    actual, significant conflict between federal policy and state law rather than mere

3    characterization of an activity as "inherently federal."  *Empire* explained that the dissent's

4    focus on the "pervasively federal" nature of "FEHBA contracts at large" was incorrect and

5    that the proper analysis turned on the narrow issue of "reimbursement" —in particular,

6    whether state law of reimbursement conflicted significantly with a specific federal policy.

7    547 U.S. at 692-93.  Likewise, here, the Nation improperly frames the issue as "Class III

8    gaming on Indian lands" at large, rather than the contract interpretation rules applicable to

9    an IGRA compact.  The Nation does not and cannot identify any specific federal policy

10   that the use of state law to govern contract interpretation would impair.  *See Siletz*, 143

11   F.3d at 485.

12          **2.      Under the Restatement, Arizona Law Is the Applicable Law for
                      Contract Interpretation**

13          "Applicable" law is determined on an issue-by-issue basis, applying the contacts

14   listed in Restatement § 188.  The state with the most significant relationship to the issue of

15   admitting extrinsic evidence during contract interpretation is Arizona—it is where the

16   negotiations took place and it is a party to the compact.  The Nation does not dispute the

17   obvious importance of the law of the state where negotiations occurred in determining

18   whether those negotiations are admissible.  And it does not contest that at least two of the

19   five contacts in § 188—the place of negotiation and the domicil/ residence/ nationality of

20   the parties—favor application of Arizona law.  The federal government had no role in the

21   negotiations and is not a party to the Compact.

22          The Nation attempts to transform two other contacts—the place of performance and

23   the location of the subject matter—into abstract jurisdictional contacts, arguing that under

24   the Restatement "these factors are concerned with identifying the forum[3] with

25

26   _____

27        [3] To be clear, the term "forum" in the field of conflict of laws usually refers to the
     court in which suit is filed, the court with the task of adjudicating the choice of law.  *See*
     "Forum state," *Black's Law Dictionary* 726 (9th ed. 2009).  The more appropriate term
28   here would be "state."  *See* Rest. 2d. Confl. § 3.  But in any event, the argument is wrong.

1    *jurisdiction* over the performance" rather than the physical location.  N. Opp. 24.  Such an

2    approach would merely beg the question because Arizona, the Nation, and the United

3    States all have some degree of jurisdiction over Indian gaming on the Nation's lands.

4    Moreover, rather than speak in abstract jurisdictional terms, the Restatement refers

5    specifically to "place" and "location," and discusses interests arising from the physical

6    location of land.  With respect to subject matter, it explains, "When the contract deals with

7    a specific physical thing, such as land or a chattel, . . . the location of the thing . . . is

8    significant.  The state where the thing is located will have a natural interest in transactions

9    affecting it."  Rest. 2d Confl. § 188 cmt. e.  The Restatement also  describes the "place of

10   performance" as "the state where performance is to occur," with no reference to

11   jurisdiction.  *Id.*  The Nation does not dispute that under an analysis of physical "location"

12   or "place," both factors favor Arizona law.

13          The Nation quibbles with being treated with Arizona as a single state in this

14   analysis, arguing that its courts would have no obligation to follow Arizona law.  N. Opp.

15   23.  But the reference to Arizona law in the Nation's Code § 1-102 is the clearest (and

16   only) indication of what rule the Nation's courts would apply.  The Nation offers nothing

17   to the contrary.  When there is no conflict between the laws of two states in a multi-state

18   conflicts analysis, those two states are treated as a single state under § 188.  *See* Rest. 2d

19   Confl. § 186 cmt. c.  The ultimate question, when grouping states in this manner, is

20   whether, "[t]aking the laws of each state as a whole, there is [any] conflict between them

21   with reference to these facts."  Robert A. Leflar, *True "False Conflicts*," 48 B.U.L. Rev.

22   164, 173 (1968) (cited by the Restatement as support for § 186 cmt. c).  The Nation

23   identifies no such conflict here between Arizona and the Nation.  In any event, even if

24   § 1-102's reference to Arizona law is disregarded, and the Nation is treated as having no

25   law at all on the issue, then the result is the same because the Nation drops out of the

26   analysis entirely.  Section 24 would still require a binary choice between Arizona law and

27   federal law.  The place of performance and the location of the subject matter would favor

28   Arizona rather than both Arizona and the Nation, and Arizona law would still govern,

1    under either the two dispositive factors in § 188(3) or the five in § 188(2).

2          The contact that the Nation emphasizes above all others, the place of contracting, is

3    unimportant and inconsequential here.  "Standing alone, the place of contracting is a

4    relatively insignificant contact," except with respect to "issues involving the validity of a

5    contract."  Rest. 2d. Confl. § 188 cmt. e.  The choice of law issue here, contract

6    interpretation, has nothing to do with the validity of the Compact.  The Nation's emphasis

7    on the Secretary of the Interior's role might matter if the question were what law to apply

8    to determine validity.  Here, other contacts such as the place of negotiation merit the most

9    emphasis.  In any event, as it relates to contract interpretation, the place of contracting is

10   at best neutral for the Nation, given that offer, acceptance, and execution occurred in

11   Arizona and that the Compact gives state law a role in making the Compact effective, *see*

12   § 2(vv)(1).[4]   Regardless, under §188(2) or § 188(3), Arizona law applies.

13        **B.    Under Arizona Law, Sections 3(c)(3) and 3(c)(5), Read Together with the
                  Extrinsic Evidence in Hand, Support Summary Judgment for Plaintiffs**
14
                  **1.    The Nation Fails to Address the Interaction Between Sections
15                        3(c)(3) and 3(c)(5)**

16        When the Nation argues that the Plaintiffs' interpretation is "untethered" to any

17   language in the Compact, N. Opp. 9, it fails to address the language on which Plaintiffs

18   rely—namely, Sections 3(c)(3) and 3(c)(5), read together.  Section 3(c)(3) expressly refers

19   to the "Tucson metropolitan area" as a market within which the Nation is operating

20   casinos and from which one of the four casinos authorized in Section 3(c)(5), its rural

21   casino, is excluded.   When Sections 3(c)(3) and 3(c)(5) are read together, they raise a

22   question that the Nation fails to address:  Why, when 3(c)(3) is intended to restrict one of

23   the Nation's casinos in 3(c)(5) to a rural location, does it expressly exclude the casino

24   from only the *Tucson* metropolitan area?  Why is exclusion from the Phoenix metropolitan

25   area not mentioned?  The answer is that in drafting 3(c)(3) an express exclusion from the

26

---

27        [4] The Nation quotes the Secretary's objections to Section 2(vv)(1), but the
     Secretary does not have the power to excise that provision and did not purport to do so.
28   The Secretary has the power only to approve or disapprove the Compact as a whole, and
     that provision is in the Compact.

1   Phoenix market was not necessary because the "allocation" in Section 3(c)(5) authorizes

2   the Nation to locate casinos within only one urban market—Tucson.

3          This question looms large for the Nation because Sections 3(c)(3) and 3(c)(5) play

4   a critical role in the Compact's authorizing structure.  Without them, there is no

5   authorization of Class III gaming.  Section 3(a) authorizes certain "Class III Gaming

6   Activities" as a general matter, "[s]ubject to the terms and conditions of this Compact."

7   One of those terms and conditions is that such activities must be in an authorized Gaming

8   Facility.  *See* § 2(n) ("'Gaming Facility' means the buildings or structures in which Class

9   III Gaming, as authorized by this Compact, is conducted.").  Only Sections 3(c)(3) and

10   3(c)(5) authorize such facilities.  Under Section 3(c)(3), every casino and every slot

11   machine in Arizona must, in order to be authorized, appear within the numbers in the chart

12   in Section 3(c)(5). "The Tribe *may operate* Gaming Devices *in the number of Gaming*

13   *Facilities in column (3) or (4)* of the Tribe's row in the Table [in 3(c)(5)], whichever is

14   lower, but shall not operate more than its Maximum Devices per Facility in any one

15   Gaming Facility" (emphasis added).  Section 3(c)(3) goes on to limit further the location

16   and scope of one of the Nation's four authorizations in Section 3(c)(5), requiring that it

17   "be at least fifty (50) miles from the existing Gaming Facilities of the tribe in the Tucson

18   metropolitan area," and have only 645 machines and 75 tables.

19          From the text of Section 3(c)(3), it is apparent that this restriction is intended to

20   require a rural, reduced-capacity facility; the Nation admits as much.  N. Mot. 16-17; N.

21   Opp. 28-29 & n.14; Ex. 24 (Nation) 85:8-14.  Because the language of 3(c)(3) excludes

22   the casino from only the Tucson metropolitan area, a person reading that restriction would

23   expect to see in Section 3(c)(5) a listing of market groupings that gives the Nation rights

24   to operate Gaming Facilities only in the Tucson market.  And that is what one finds,

25   although the headings for each of the market areas and the spacing between them no

26   longer appear.  It is the missing headings and spacing, as well as the draft footnotes about

27   parity in each of the urban market groupings (which appeared through most of the

28   negotiations and were removed only in the final draft), *see, e.g.*, SOF (Doc. 199) ¶ 107;

1   Ex. 47-58, that create ambiguity in what would otherwise unambiguously show that the

2   Nation's authorizations are in the Tucson market.  But in any event the surviving language

3   in the Compact makes those market groupings inferable—the rural restriction in Section

4   3(c)(3) that fails to mention Phoenix; the ordering of the tribes in Section 3(c)(5) in rural,

5   Phoenix, and Tucson groupings; and the labeling of Section 3(c)(5) as an "allocation" of a

6   limited supply.  Thus, Section 3(c)(5) does speak to the geographic market location of the

7   facilities authorized.  Otherwise, the language in 3(c)(3) further limiting the location of

8   one of the Nation's four casinos to 50 miles outside Tucson would be out of place (under

9   the Nation's logic, it should appear in Section 3(j)(1)).

10          The proper interpretation of Section 3(c)(5) as a market-based allocation of devices

11   and machines is inferable on the face of the Compact even under a federal standard for

12   ambiguity (see section I.C., *infra*), but it is inescapable with the extrinsic evidence in

13   hand.  The prior drafts show that the Phoenix-market tribes negotiated for "parity" in

14   machine and device numbers within that market to arrive at the numbers in the chart, and

15   that the Tucson-market tribes did the same for their market.  *See* SOF ¶¶ 96-101.  In light

16   of this evidence, to which the Nation has no answer, the "reasonably susceptible"

17   threshold is easily met.

18          Instead of addressing the interaction of Sections 3(c)(3) and 3(c)(5), the Nation

19   atomizes the Compact.  It initially focuses on Section 3(c)(5), arguing that it says nothing

20   about location (ignoring the interaction between the reference to location in 3(c)(3) and

21   3(c)(5)).  N. Opp. 24.  It then turns to the location restriction in 3(c)(3), noting that its

22   existing rural facility at Why complies with 3(c)(3)'s terms.  N. Opp. 28.  But that is not

23   responsive to Plaintiffs' point about the significance of Section 3(c)(3)'s wording.  The

24   question in this case has never been *compliance* with the restriction in Section 3(c)(3); the

25   point rather is what the wording of that restriction reveals about Section 3(c)(5).  It shows

26   that the Gaming Facility authorizations allocated to the Nation in Section 3(c)(5), without

27   which the Nation cannot conduct gaming, are for facilities in the Tucson market.

28          The Nation simply refuses to address Sections 3(c)(3) and 3(c)(5) *together* in the

1  context of the whole agreement.  It appears to argue that when determining whether a

2  contract is "reasonably susceptible" to an interpretation, it is impermissible to look at the

3  contract as a whole and to draw inferences based on how various provisions relate to each

4  other.  N. Opp. 30-31.  The Nation's apparent position is that there must be one "specific

5  term or phrase" upon which all interpretation arguments depend.  N. Opp. 31.  There is no

6  authority for such a rule.

7      The two cases on which the Nation relies do not support its atomizing approach.  In

8  both cases courts held that the excluded extrinsic evidence would actually vary or

9  contradict an agreement.[5]  Here, by contrast, actual language in the Compact—the

10  restriction in 3(c)(3)—shows that the drafters treated Section 3(c)(5) as a market-based

11  allocation.  The extrinsic evidence only illuminates and confirms this reading.

12      The interaction of Sections 3(c)(3) and 3(c)(5) makes this a relatively easy case for

13  admitting extrinsic evidence.  By contrast, a harder case was *Johnson v. Cavan,* 733 P.2d

14  649, 651-52 (Ariz. App. 1986), where the court held that in light of extrinsic evidence,

15  lease language letting "Suites 117 through 120," but saying nothing about parking spaces,

16  should be interpreted to include certain parking spaces as well.  The court relied on what

17  the parties knew when the relevant contracts were signed.  Because both parties to the

18  lease "assumed and intended that the parking spaces be a part of the lease," and the

19  assignee lessors (appellees) "were on notice of appellant's claim of an exclusive right to

20  use the parking spaces for his business," they "were obligated to inquire of appellant by

21  what right or title he claimed possession.  They could not rely solely upon the silent lease

22  to resolve the uncertainty about parking spaces."  *Id.*

23      Another reason for admitting extrinsic evidence here is the Nation's failure to

24

25  _____

[5] In *Velarde v. Pace Membership Warehouse*, 105 F.3d 1313, 1317 (9th Cir. 1997), an employer attempted to prove an additional condition precedent to a bonus

26  payment, which would have directly contradicted the sole and exclusive condition "as long as you work through the date specifi[ed] above."  In *Long v. City of Glendale*, 93

27  P.3d 519, 528 (Ariz. Ct. App. 2004), the court held that a requirement in a deed that land be used as a city's "primary municipal airport" would be "unavoidably change[d]"

28  by an additional requirement that a second runway be built.

1    explain why its interpretation even makes sense—why tribes with casinos in the Phoenix

2    market would agree to reduce their facility authorizations while simultaneously allowing a

3    Tucson tribe to enter the market to take advantage of the reduction.  The Nation does not

4    dispute that the Court must avoid an interpretation that "no reasonable party would have

5    assented to," but offers no answer to the parallels between *Burkons* and this case, *see* N.

6    Opp. 31 n.16; Pl. Mot. (Doc. 198) 27-28 (discussing *Burkons v. Ticor Title Ins. Co.*, 813

7    P.2d 710, 715-16 (Ariz. 1991)).  The Nation is forced to claim that its reading of the

8    Compact is "inexorabl[e]," N. Opp. 30, because the extrinsic evidence shows that its

9    reading makes no sense and was never intended.

10         In the end, the question of interpretation can be reduced to a straightforward

11   application of Restatement (Second) of Contracts § 201.  The Nation fails entirely to

12   respond to § 201(1):  "Where the parties have attached the same meaning to a promise or

13   agreement or a term thereof, it is interpreted in accordance with that meaning."  It does not

14   dispute that AIGA was composed of its member tribes (including the Nation), that David

15   LaSarte acted as spokesperson for the AIGA tribes, and that it was important to the

16   Nation's Chairman Manuel that LaSarte speak accurately.  N. Con. (Doc. 204) ¶¶ 30, 49.

17   The Nation also does not dispute that LaSarte publicly stated many times that the

18   Compacts would not permit additional casinos in Phoenix.  *See, e.g.,* N. Con. ¶¶ 148-150;

19   154; 191.  Although the Nation dismisses those public statements as "bullet-point

20   summar[ies]" that "fail[ed] to take into account the possibility of" the Nation's concurrent

21   secret plan to locate a casino in West Phoenix, N. Opp. 34, the Nation was one of those

22   AIGA Tribes.  It is undisputed that Chairman Manuel has agreed on the record with at

23   least one of these statements made to the Arizona Senate.  N. Con. ¶ 154.  And neither

24   Chairman Manuel nor any other representative of the Nation ever expressed disagreement

25   with any similar statements by LaSarte or others.  N. Con. ¶ 196.[6]  In fact, it is undisputed

26

27   _____
          [6] It is also undisputed that the Nation's current Chairman derided other
28   propositions competing with Proposition 202 because they would "open gaming into
     cities," rather than "keep gaming on the reservation."  N. Con. ¶ 182.

1   that no one, not even opponents of Proposition 202, ever expressed disagreement with this

2   interpretation.  N. Con. ¶ 194.  What the Nation may have believed privately is irrelevant

3   to this analysis.  *See* Rest. 2d Contr. § 212 cmt. a.[7]

4          The Nation argues that such statements are not probative because they "were made

5   after the Compact negotiations concluded and thus shed little light on the intention of the

6   parties at the time the contract was made."  N. Opp. at 34.  To the contrary, these

7   consistent and pervasive statements were made in the period immediately preceding the

8   Compact's execution in December 2002.  They are highly probative of the meaning

9   attached by all parties to the Compact.

10         Restatement § 201(2) compels a similar conclusion because the Nation knew of

11  many other statements to the same effect by the State and other tribes.  *See, e.g.,* N. Con.

12  ¶¶ 142-147; 151-153; 156-158; 168-169; 189-193.  In an attempt to avoid § 201(2), the

13  Nation postulates a distinction between the "proper interpretation of the Compact" and

14  "the consequences of the Compact's provisions."  N. Opp. 34-35 n.20.  This artificial

15  distinction has no support in the law, and the Nation cites none.  It is contradicted by the

16  language of § 201 itself, which applies to "meanings" that are "attached . . . to a promise

17  *or agreement* or a term thereof."  There is no distinguishing the "meaning" of an

18  "agreement" as a whole from its operation in practice.

19                    **2.      Plaintiffs' Interpretation Does Not Conflict with any Other
                            Provision, Particularly in Light of the Extrinsic Evidence**

20         The Nation attempts to exclude extrinsic evidence under Arizona law by arguing

21  that the evidence of market-based allocations in Section 3(c)(5), clarifying the ambiguity

22  in Sections 3(c)(3) and 3(c)(5), would "vary or contradict" the rest of the Compact.  N.

23  Opp. 30.  But the Court must make this determination in view of the extrinsic evidence—

24  evidence that the Nation again ignores in its analysis.  *See* Pl. Mot. 28; N. Opp. 30.  That

25  evidence shows, for example, that an authorized spokesman for the Nation and the other

26

27  _____

28         [7] This undisputed proof of statements by the AIGA tribes' spokesman makes it
    unnecessary to resolve disputes over statements by the Nation's own officers.

1    AIGA tribes made public statements supporting Plaintiffs' interpretation of this same

2    language.  *See, e.g.,* SOF ¶¶ 148, 150, 154, 168-169.  It also shows that the headings and

3    spacing in Section 3(c)(5) were removed for clerical, not substantive, reasons and that the

4    "parity" footnotes were removed only at the end of negotiations.  SOF ¶¶ 101-102, 105,

5    107.  This evidence shows that the Plaintiffs' interpretation is consistent with and does not

6    vary the rest of the agreement.

7            Nor is there any contradiction on the face of the agreement.  The Nation confuses

8    the issue of whether Section 3 of the Compact as a whole is an authorization of gaming (it

9    is) with whether Section 3(j)(1) is an authorization of gaming anywhere it is legal under

10   IGRA (it is not).  Section 3(a) authorizes certain gaming *activities,* but only "[s]ubject to

11   the terms and conditions of this Compact."  Those activities must occur within a "Gaming

12   Facility," § 2(n), and Gaming Facilities are authorized only by Sections 3(c)(3) and

13   3(c)(5).  *If* a Gaming Facility is authorized under those sections, it must also satisfy

14   additional terms and conditions.  One such further requirement is the necessary (but by no

15   means sufficient) condition in Section 3(j)(1) that "[a]ll Gaming Facilities shall be located

16   on the Indian Lands of the Tribe."  It is entirely consistent with this restriction to read the

17   prior authorizations in Sections 3(c)(3) and 3(c)(5) as limited to particular markets,

18   particularly where 3(c)(3) already places a further geographical limitation on one of the

19   Nation's casino authorizations in 3(c)(5).  Under Section 3(j)(1), no Gaming Facility

20   authorized under Sections 3(c)(3) and 3(c)(5) can be located outside a tribe's Indian

21   Lands.  But it is not true, as a matter of logic or exegesis, that all Gaming Facilities

22   "located on the Indian Lands of the Tribe" are necessarily authorized under Sections

23   3(c)(3) and 3(c)(5).  Indeed, the Nation admits, as it must, that compliance with IGRA is

24   not sufficient, and that there are other location requirements, even under its own reading

25   of the Compact.  *See* N. Opp. 20 ("the Compact's plain terms, . . . *with irrelevant*

26   *exceptions*, expressly permit gaming wherever IGRA allows it.") (emphasis added).  Thus,

27   the Nation cannot identify a single provision of the Compact that would be negated by

28   Plaintiffs' reading of Sections 3(c)(3) and 3(c)(5).

1
2

### 3. Extrinsic Evidence Not Only Supports but Compels Plaintiffs' Interpretation

3

The Nation argues that the extrinsic evidence would not even "permit" the Court to

4

read the Compact how Governor Hull and all 17 AIGA tribes read it during 2002.  N. Opp.

5

32.  But, as noted above, the Nation does not dispute the facts that support judgment for

6

Plaintiffs under Restatement § 201(1) or § 201(2).  Many other facts lead to the same

7

conclusion.  The Nation's attempts to contest a few of them warrant brief mention.

8

The Nation admits that it never attempted to take part in the negotiations over the

9

number of facilities and machines in the Phoenix market.  It argues, however, that it had

10

no reason to do so "because the Compact's terms expressly authorized" the Nation to

11

operate in the Phoenix area "and did not confine any tribe to a specific 'market.'"  N. Opp.

12

32.  But "the Compact's terms" had not yet been drafted at the time—that was the whole

13

point of the market-group negotiations.  Based on the declaration of one witness, the

14

Nation claims that Phoenix and Tucson market-group negotiations never occurred, but this

15

assertion does not raise a genuine issue of material fact because it is refuted by

16

overwhelming evidence, including the same witness's contemporaneous memorandum to

17

the file.[8]  The Nation also argues that during negotiations there were not fixed numbers of

18

devices to be allocated to each market, N. Opp. 33, but that is not what Plaintiffs aver.

19

The tribes who negotiated for devices and machines in the Phoenix market arrived at the

20

final allocations in the chart for that market over time.  *See* SOF ¶¶ 68-92.  During that

21

period, the Nation participated in Tucson-area negotiations and undisputedly was entirely

22

23

24

25

26

27

28

---

[8] With Dan Quigley's declaration, the Nation claims that the Tucson-area "negotiations did not involve dividing up facility or device rights among the two tribes . . . ."  N. Opp. 33 n.18.  But his Memorandum to File dated September 11, 2000, shows negotiations between the two Tucson tribes over facility size, location, and number of devices.  SOF Ex. 80.  Also, for example, early versions of the scope of gaming charts state that the facility cap for Pima County was "TBN by TON and PYT," meaning "to be negotiated" by the Nation and Pascua Yaqui.  SOF Ex. 49; SOF Ex. 9 (Dahlstrom Vol. 2) 283:24-284:11.  Later versions contain a footnote to "Facilities" and "Max. Devices per Facility," stating "[f]inal numbers still subject to negotiation between Tucson Area Tribes."  SOF Ex. 51 and 53.  And other witnesses, including the Nation's former chairman, have testified that the Nation and Pascua Yaqui negotiated separately over facility and device rights for the "Tucson market."  *See, e.g.,* SOF Ex. 13 (LaSarte) 42:19-45:4; SOF Ex. 19 (Manuel, Edward) 131:25-132:6.

1    absent from the Phoenix negotiations.  SOF ¶ 83; SOF Ex. 80; SOF Ex. 13 (LaSarte)

2    42:19-45:4; SOF Ex. 19 (Manuel, Edward) 131:25-132:6; N. Con. ¶¶ 90-91.

3         The Nation argues that a prohibition on gaming on after-acquired lands was

4    proposed and not included, N. Opp. 32, but ignores why the issue quickly died—AIGA

5    tribes assured the State that such a provision was overbroad and unnecessary to achieving

6    its goals, including specifically keeping additional casinos out of Phoenix.  *See, e.g.,* N.

7    Ex. 30 (Hart) 147:4-147:16.

8         Further, the Nation claims that in negotiations to keep the rights to four casinos, it

9    made representations only about where it might relocate its rural casino, and not about

10   where it might place its unbuilt casino.  N. Opp. 33-34 & n.19.  That is refuted by

11   overwhelming record evidence.  During the negotiations in which the Nation sought to

12   retain the right to build an additional casino while all other urban-market tribes gave up

13   such rights, it made representations, in response to repeated inquiries, about the range of

14   possible locations for such a casino.  Contrary to the Nation's argument, N. Opp. 34 n.19,

15   the Nation *did* represent it would not build a facility anywhere outside these locations.

16   *See* SOF ¶¶ 111, 112, 116-122, 124, 127; *see also* Pl. Mot. 27.  The Nation's

17   representatives gave false answers that omitted West Phoenix as a potential location even

18   though the Nation had already initiated an active search to acquire a casino site there.[9]

19       **C.    Sections 3(c)(3) and 3(c)(5) Are Ambiguous Under Federal Law**

20        As discussed above, the Nation fails to address the ambiguity apparent on the face

21   of the Compact when Sections 3(c)(3) and 3(c)(5) are read together.  As a result, the

22   Nation's assertion that the "language of the Compact could not be clearer," N. Opp. at 24,

23   serves only to highlight the need for extrinsic evidence.

24        Although the Nation tries to bury *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039

25   _____

26        [9] Although it argues that these representations were not authorized, it relies on a
     declaration that puts at issue the substance of attorney-client communications for which
     the Nation claimed privilege during discovery.  Quigley Decl. (Doc. 206) ¶ 27.  The
27   Nation's authority argument concerns disputed facts, but if those facts are to be tried,
     either these new assertions should be excluded, or additional discovery should be allowed
28   in light of the Nation's waiver of privilege.

1   (9th Cir. 1996), in a footnote, that decision is dispositive on this point.  In *Crow*, the Ninth

2   Circuit agreed that "[t]he Crow present a good argument that lotteries generally include

3   slot machines."  *Id.* at 1045-46.  But the court found ambiguity based on an inference it

4   drew from a gap in one of the compact appendices: "[t]he lack of security provisions for

5   slot machines implies that the compact was not intended to allow their use."  *Id.* at 1045.

6   *Crow* controls here because a similar inference can be drawn on the face of this

7   Compact—"the lack of [any mention in Section 3(c)(3) of the Phoenix metropolitan area]

8   implies that the compact was not intended to allow [the Nation to locate facilities there]."

9        In any event, the Nation does not dispute that "objective evidence of the

10  surrounding circumstances" is admissible even under federal law.  N. Opp. 29 n.15.  This

11  rule allows proof of latent ambiguity through evidence other than the subjective testimony

12  of the parties about their own contract.  *See AM Int'l v. Graphic Mgmt.*, 44 F.3d 572, 575-

13  77 (7th Cir. 1995).  Objective evidence is not limited to interpretation of "terms of art that

14  may be informed by common usage in a trade or industry," N. Opp. 29 n.15, but rather

15  includes any "evidence of ambiguity that can be supplied by disinterested third parties,"

16  *AM Int'l*, 44 F.3d at 575.  The enormous quantity of press articles reporting that the Nation

17  could locate its unbuilt casino in Tucson but not Phoenix, SOF ¶¶ 143-145, 147, 149-152,

18  156, 158, 185, 187-190, 192, and the undisputed absence of any public statement to the

19  contrary, SOF ¶ 194, constitute such evidence of ambiguity, showing objectively the

20  circumstances in which the parties signed the Compact.  This supports admitting further

21  extrinsic evidence under federal law.

22        **D.    The Market-Based Aspects of Section 3(c)(5) Can Alternatively Be
          Proven as Additional Consistent Terms**

23

24        As the Court noted at the motion to dismiss stage, the admissibility of parol

25  evidence is normally determined with the evidence in hand.  Order dated June 15, 2011

26  (Doc. 43) at 14.  Moreover, the parties agree that the integration clause is not

27  automatically conclusive.  N. Opp. 35-36.  Rather, as with all contract law, the point of the

28  parol evidence rule, and of enforcing integration clauses, is to vindicate the parties' intent,

1   specifically, their intent regarding what is and what is not part of the agreement.  Thus, the

2   parties agree that additional terms that are (1) consistent with the other terms of the

3   agreement and (2) might naturally have been omitted can be proven by extrinsic evidence.

4   *Id.* at 35.

5       The extrinsic evidence shows that the parties negotiated and intended to enforce

6   market-based allocations of machines and devices.  The whole structure of the

7   negotiations over Section 3(c)(5) was market-based, as the prior drafts of the scope of

8   gaming charts show.  *See* SOF ¶¶ 81-84, 93-107; Ex. 47-58.  The headings and spacing

9   were eliminated solely as a clerical matter, an understandable, non-substantive omission.

10  *See* SOF ¶¶ 101-102; 105; 107.  The market-area names are consistent additional terms

11  that should not be barred by the integration clause.  Restoring them by implication is not

12  inconsistent with the rest of the Compact.  Moreover, the Nation's false statements and

13  omissions concealing its ongoing efforts to locate a casino in West Phoenix further explain

14  why the omission of such terms was natural.  If the Nation had been honest in the

15  negotiations, this matter could and undoubtedly would have been addressed more directly.

16      The Nation argues now for the first time that its sovereign immunity protects it

17  from proof of consistent additional terms.  N. Opp. 36.  It cites no support for this

18  proposition.  The admission of extrinsic evidence under the applicable law of contracts is

19  allowed by IGRA and the Compact itself.  *See* Compact § 24; *Siletz*, 143 F.3d at 485.

20  **II.    THIS COURT SHOULD REJECT THE NATION'S EFFORTS TO AVOID
        THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

21      Plaintiffs invoke the implied covenant not to "rewrite" the parties' bargain, N. Opp.

22  37, but to enforce it.  As discussed above, the parties' expectations of a market-based

23  allocation of facilities and devices are reflected in the Compact's language.  The Nation

24  seeks to exploit imprecision in that language—imprecision that would not exist but for the

25  Nation's own fraudulent conduct—to breach obligations embodied in the Compact and

26  publicly agreed to by the Nation.  The Nation protests that it is immune to claims of fraud.

27  N. Mot. 41-42; N. Opp. 3, 39 n.23.  While it may be immune to certain legal theories, the

28

1   same facts can support more than one theory, and the Nation is not immune to facts.  Nor

2   is parol evidence inadmissible on or irrelevant to this claim.  The Nation misreads

3   *Traumann v. Southland Corp.*, 842 F. Supp. 386 (N.D. Cal. 1993).  *See* N. Opp. at 44 n.

4   22.  In rejecting Southland's argument that the parol evidence rule barred the Traumanns'

5   implied covenant claim, the court relied on the entire history of the parties' dealings,

6   including allegedly false representations before execution.  842 F. Supp. at 391-92.

7       Breach of the implied covenant includes denying the reasonably expected benefits

8   of the bargain.  *See Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons*

9   *local No. 395 Pension Trust Fund*, 38 P.3d 12, 29-30 (Ariz. 2002).  The evidence here

10  shows that the State and the AIGA tribes reasonably expected as a benefit of the Compact,

11  particularly sections 3(c)(3) and 3(c)(5), that there would be no additional Phoenix

12  casinos.  The Nation does not dispute that such expectations were reasonable, except by

13  contending that they are legally unprotected by the express language of the Compact.  Yet

14  the Nation concedes, as it must, that "the implied covenant may in certain circumstances

15  be breached by conduct 'not expressly excluded' by the contract's terms."  N. Opp. 38.  Its

16  only answer to that principle is to argue that "the Compact expressly *authorizes*" a

17  Glendale casino.  *Id.*  But as discussed above, Section 3(j)(1) does not specify that the

18  Nation may build a casino in the Phoenix area, *see* N. Opp. at 39.  Only the casinos

19  authorized in Sections 3(c)(3) and 3(c)(5) are allowed, and compliance with IGRA is only

20  a necessary, not a sufficient condition.[10]  Nothing in the Compact expressly authorizes a

21  Tucson-area tribe to enter the Phoenix market, particularly where each Phoenix tribe gave

22  up a facility authorization in Section 3(c)(5).

23      The Nation seeks "to recapture opportunities forgone" at the time of contracting,

24  which is "bad faith performance."  Burton, "Breach of Contract and the Common Law

25

26      [10] Like the preceding sentences of 3(j)(1), the last sentence is worded as a restriction on location, stating that gaming on after-acquired lands "shall be authorized

27  *only* in accordance with 25 U.S.C. § 2719."  (Emphasis added.)  The Nation splices the parts it likes, deleting the word "only" and adding the word "any."  *See* N. Opp. at 37-38.

28  The Nation cannot make its argument without revising the contractual language.

1    Duty to Perform in Good Faith," 94 *Harv. L. Rev*. 369, 387 (1980).  The Nation did not

2    bargain for the right to enter the Phoenix market.  And when it bargained for the right to

3    retain a fourth casino authorization, its expressed rationale was to preserve its ability to

4    operate a rural facility, not to gain the right to move into a new urban market.  Entering

5    that market now would deprive Plaintiffs of benefits that they justifiably expected to

6    receive, and that the Nation knew they expected to receive, under the Compact.

7    **III.   PROMISES MADE DURING THE  COMPACT NEGOTIATIONS ARE
         ENFORCEABLE UNDER PROMISSORY ESTOPPEL**

8
         The Nation argues that promissory estoppel is outside the scope of 25 U.S.C.

9
10   § 2710.  Plaintiffs' promissory estoppel claim seeks to hold the Nation to the promises it

     made during Tribal-State gaming negotiations and as such comes within 25 U.S.C.
11
     § 2710(d)(7)(A)(ii), which abrogates sovereign immunity for "any" cause of action
12
13   initiated by a State or Indian tribe to enjoin class III gaming in violation of a compact.

14       The Nation also argues (N. Opp. 40) that it cannot be liable under promissory

15   estoppel because "an actual contract" exists here.  But this is true only if the contract

     conflicts with the promise.  *See Chanay v. Chittenden*, 563 P.2d 287, 290 (Ariz. 1977).[11]
16
     No such conflict exists here.  *See supra* Section I(B)(2); *see also* Pl. Mot. 29.
17
18   **IV.   THE GILA BEND ACT IS NOT A SETTLEMENT OF A LAND CLAIM AND
         THE NATION IS BLOCKED FROM ASSERTING OTHERWISE**

19       **A.   Congress Did Not Intend to Settle any Claim that Qualifies as a "Land
              Claim" Under IGRA**
20
21       No separate claims relating to clouds on title and possession were included in the

22   Gila Bend Act settlement.  Pursuant to the Gila Bend Act, the federal government

23   purchased the flooded land from the Nation for $30 million, which could be used to buy

     economically viable lands.  In exchange, the Nation's flood-related tort claims were
24

25   _____

26       [11] The cases cited by the Nation are not to the contrary.  In *Walker v. KFC Corp.*,
     728 F.2d 1215, 1219-20 (9th Cir. 1984), a conflict existed between plaintiff's promissory
     estoppel claim and the express contract insofar as the plaintiff's detrimental reliance was
27   the very consideration that formed the foundation of the express contract.  And in *All-
     Tech Telecom v. Amway Corp*., 174 F.3d 862, 869 (7th Cir. 1999), there was conflict with
28   "an express contract governing the relationship out of which the promise emerged."

1    settled as a prerequisite to the land purchase by the United States.  Pub. L. 99-503 §§ 4, 6,

2    9.  After the Nation received the maximum possible remedy for any alleged cloud on the

3    title—the purchase of the damaged land—claims relating to the title became moot.

4         The Nation does not dispute that neither the Gila Bend Act nor the Settlement

5    Agreement mentions *any* of the land claims the Nation asserts were settled by the Act and

6    the Agreement.  Pl. Mot. 42.  And the Nation continues to ignore the dramatic changes that

7    Congress made in committee to the Gila Bend Act to avoid the Nation's potential land

8    claims, changes made specifically to overcome the Executive Branch's strong opposition

9    to any such settlement.  Pl. Mot. 43.  Congress re-crafted the legislation to focus instead

10   on the trust responsibilities of the United States, even striking the word "settlement" from

11   the title of the Act.  Pl. Mot. 43-44.  Rather than acknowledge those changes, the Nation

12   relies solely on a selective reading of the legislative history, omitting the portions showing

13   that Congress did not intend to settle anything but the tort claims explicitly mentioned in

14   the Settlement Agreement.  *See* Pl. Mot. 42-44.

15        The Nation falsely claims that, when the Gila Bend Act was amended in committee,

16   "Congress left the relevant language regarding the scope of the [claims] waiver

17   untouched."  N. Opp. 13.  In fact, Congress *did* modify the waiver language, and did so in

18   a manner that shows it intended to exclude land claims.  The bill as introduced required a

19   "waiver and release of any and all claims for injuries to land or water rights."  H.R. 4216

20   § 8(a) (Doc. 200-1 at 65).  The amended version, however, required a "waiver and release

21   of any and all claims *of water rights or* injuries to land or water rights."  Gila Bend Act

22   § 9(a) (Doc. 195-1 at 4) (emphasis added).  A parallel of this "claims of water rights or

23   injuries to . . . water rights" construction applying to land claims would be "claims to land

24   or injuries to land."  Congress chose not to use a parallel construction, but included *only*

25   "injuries to land."  In clarifying the language of the settlement section, Congress expressly

26   avoided any hint that "land claims," as opposed to property torts, were to be settled as a

27   condition to the federal government's purchase of the Nation's damaged land.

28        This carefully worded restriction cannot possibly be, as the Nation claims, "a

1    complete settlement of 'any and all' claims relating to the Gila Bend Reservation."  N.

2    Opp. 12.  If that were correct, there would be no need for restrictive language relating to

3    injuries to land and water rights—every conceivable claim would be included.  Yet the

4    restrictive language was put in both the statute and the Settlement Agreement.  This Court

5    is not free to ignore restrictive language in a statute.  *See Ctr. for Biological Diversity v.*

6    *Salazar*, 695 F.3d 893, 903 (9th Cir. 2012) (statutes must be interpreted so "no clause,

7    sentence, or word shall be superfluous, void, or insignificant") (citing *TRW Inc. v.*

8    *Andrews,* 534 U.S. 19, 31 (2001)).

9         The Nation attempts to conflate the flooding torts with land claims by referring to

10   the Painted Rock Dam flooding as "flooding pursuant to an unauthorized easement."  N.

11   Opp. 12.  But, of course, there is no such thing as flooding "pursuant to" an invalid

12   easement, and the Nation cites no authority showing such a legal concept exists.  Either

13   the flood damage is permissible because it remains within a valid easement, or the flood

14   damage is a tort.  The validity of the easement is an analytically separate question from the

15   alleged tort damages.

16        Similarly, the Nation uses selective quoting to interpret the Code of Federal

17   Regulations, claiming that "the relevant question is whether the legislation enacted by

18   Congress 'resolves or extinguishes with finality the tribe's land claim in whole or in part,

19   thereby resulting in the alienation or loss of possession of some or all of the lands claimed

20   by the tribe.'"  N. Opp. 14 (quoting 25 C.F.R. § 292.5(a)).  But the Nation omits language

21   requiring that it first must show that the legislation actually settles a land claim.  Where

22   the Nation says "*the legislation enacted by Congress,*" the regulation says "*a settlement of*

23   *a land claim*."  25 C.F.R. § 292.5(a).  The portion the Nation quotes merely adds a

24   restriction that a land claim settlement must result in alienation to qualify for the

25   § 2719(b)(2)(B) exception.  Under the Nation's reading, a land swap between the federal

26   government and a tribal government would qualify without any dispute over title or

27   possession.  The correct reading requires a determination that the enabling legislation was,

28   in fact, a "settlement of a land claim" before reaching the question of alienation.  Loss of

1    lands is necessary, not sufficient.

2          Nor has the Nation cited any examples of torts to land treated as a settlement of a

3    land claim under § 2719.  None of the examples cited by the Nation (N. Opp. 13 n.2) even

4    come close to showing that a tort counts as a land claim under § 2719.[12]  The Nation asks

5    this Court to be the first body of any kind to declare that a tort is a land claim under

6    IGRA, and therefore expand the scope of § 2719.  The Court should decline to do so.

7          **B.    Under Well-Established Principles of Judicial Estoppel, the Nation**
8                  **Should Be Held to Its Prior Representation to this Court that Gaming**
                   **on Its After-Acquired Lands Requires a Two-Part Determination**
9          The Nation struggles to explain away its prior statements to this Court.  The

10   language of its mediation brief, particularly in light of the factual circumstances

11   surrounding its 1993 effort to obtain a compact, shows that the Nation promised to satisfy

12   the two-part determination process before gaming on after-acquired lands.

13         Running through the *New Hampshire v. Maine* guidelines, 532 U.S. 742, 749-50

14   (2001), the Nation claims that its current position is not clearly inconsistent with its prior

15   position because the language in its mediation brief applies only to those circumstances in

16   which the Nation would "request" a two-part determination.  N. Opp. 15-16.  This post

17   hoc justification ignores the context in which the Nation's 1993 statements were made—it

18   was arguing against a definition of Indian lands that would have barred all gaming on any

19   after-acquired lands.  The Nation sought to assure the State that any such gaming could be

20   easily controlled by state and local authorities.  The Nation therefore unequivocally stated

21   in its mediation brief that "[t]he existing federal law requires the Governor's concurrence"

22   and that "[t]his is adequate protection to the State and local interests."  SOF ¶ 8.  Now, the

24         [12] The Seneca Nation settlement explicitly settled claims relating to leases, a clear
title-related settlement.  25 U.S.C. § 1774(a).  In the Torres-Martinez Desert Cahuilla
25   settlement, Congress included explicit instructions on where gaming could occur on
settlement property, mooting the need to determine whether the flooding claims qualified
26   as "land claims" under § 2719.  25 U.S.C. § 1778(d)(b).  The Cherokee, Choctaw, and
Chickasaw Nations settlement was not merely to resolve claims of "mismanagement of
27   tribal trust resources" but also to settle claims of illegal possession of the tribal drybed
lands by private landowners, a clear land claim that resulted in a quiet title action.  25
28   U.S.C. § 1779(9), (13), (14).

1  Nation asks this Court to interpret this as a circular argument—namely, that the two-part

2  determination protects the State only when the Nation chooses to seek a two-part

3  determination.  This is an absurd reading of the Nation's brief.  The Nation plainly

4  promised that the two-part determination would give adequate protection to the State,

5  which wanted no gaming at all on after-acquired lands.  That makes sense only if the

6  "settlement of a land claim" exception does not apply in Arizona—and the Nation and

7  other tribes represented exactly that.  SOF ¶ 23.

8          The Nation also argues that the Court did not accept the Nation's earlier position

9  because the mediator lacked the authority to alter the Nation's proposal.  N. Opp. 17.  The

10  Nation cites no authority requiring that a court specifically highlight and explicitly

11  endorse a particular argument before a successful outcome justifies application of judicial

12  estoppel.  The only authority offered, *Reed Elsevier Co. v. Muchnick*, 130 S. Ct. 1237,

13  1249 (2010), imposes no such requirement.  There the Court reasoned that not only had

14  the district court declined to adopt the argument in question, but the party to be estopped

15  had already abandoned the argument in the Court of Appeals in the very same case,

16  thereby eliminating any risk of inconsistent positions.  *Id.*  The Nation's selective quoting

17  ignores that abandonment was key to the *Reed Elsevier* decision, because the Nation never

18  abandoned the representations it made during the 1993 mediation or compact negotiations,

19  and the mediator accepted its position.  Nothing in *Reed Elsevier* allows it to take a

20  contrary position here.  *See also Stevens Tech. Servs., Inc. v. S.S. Brooklyn*, 885 F.2d 584,

21  588 (9th Cir. 1989) (judicial estoppel requires only that prior court adopted position to be

22  estopped "in some manner").

23          Similarly, the Nation cites no authority establishing that a court cannot have been

24  successfully persuaded unless its decision ultimately became effective.  In *Williams v.*

25  *Boeing*, 517 F.3d 1120, 1135 (9th Cir. 2008) (cited at N. Opp. 17), the court found no risk

26  of inconsistent positions because the Consent Decree had been affirmatively rejected by

27  the court of appeals.  The Nation faced no such rejection by any court.  The miscellaneous

28  case for the mediation (M-93-0001-PHX) came to a conclusion.  The subsequent

negotiation of a different compact is more akin to a case that settles while pending on appeal, where the decision of the lower court remains valid.  *See Ringsby Truck Lines, Inc. v. W. Conf. of Teamsters*, 686 F.2d 720, 721 (9th Cir. 1982) (settling after judgment does not automatically vacate the judgment so dissatisfied litigants may not have trial court decisions "wiped from the books").  Moreover, the Nation admits that the provision at issue—the definition of Indian lands—actually became effective.  The definition advanced by the Nation in the mediation became the definition in the 1993 Compact and remains the definition in the 2002 Compact.  *See* N. Con. ¶ 14.

Next, the Nation claims that the Plaintiffs suffer no unfair detriment because the mediation compact never became effective and the State "was thereafter free to continue to pursue a compact that would bar gaming on after-acquired land."  N. Opp. 17.  But this argument fails to recognize that *the State did act to bar gaming on after-acquired land*.  In the next regular legislative session after execution of the 1993 Compact, the legislature passed a statute making the necessary repeal of SB 1001 and simultaneously prohibiting the governor from concurring in a two-part determination under § 2719.  1994 Ariz. Sess. Laws ch. 285 § 2.  That prohibition remains in effect today.  A.R.S. § 5-601(C).  The Nation promised that the two-part determination would protect against gaming on after-acquired lands, and the State acted to make that protection permanent and mandatory.  To let the Nation take an inconsistent position now would be unjust.

### C.   The Nation Clearly and Unequivocally Waived Its Right to Assert a "Settlement of a Land Claim" Exception

The Nation incorrectly argues that it did not waive its alleged statutory right to assert a "settlement of a land claim" exception because the Plaintiffs rely upon mere silence rather than affirmative conduct.  N. Opp. 18-19.  But the Nation did not merely remain silent; it actively participated with a group of tribes that affirmatively represented to the State—in writing—that the "settlement of a land claim" exception would never apply in Arizona.  *See* SOF ¶ 23.  That the Nation's attorney was not the lead speaker at the group meeting where the tribes delivered this assurance is irrelevant.

1  The Nation stood shoulder to shoulder with its fellow tribes when they advanced this

2  affirmative representation.  *See* SOF ¶¶ 22-23.  The Nation's tribal council endorsed this

3  action by approving the 1993 Compact, which the State joined because it believed it

4  was protected by the two-part determination.  *See* SOF ¶¶ 25-26.

5  　　　The Nation argues that Plaintiffs do not identify a single action that constitutes a

6  waiver.  N. Opp. 19.  But, in light of all the circumstances associated with the 1993

7  litigation and compact negotiations, the Nation's decision to stand with the other tribes

8  must be viewed as an affirmative act of waiver.  *See* SOF ¶¶ 22-23.  The case cited by

9  the Nation is not to the contrary.  In *adidas-America v. Payless Shoesource*, 546 F. Supp.

10  2d 1029, 1074-75 (D. Or. 2008), the court merely held that failure to prosecute other

11  alleged infringements does not constitute a waiver of intellectual property rights as

12  against the current defendant.  *Id.*  But the Nation did not fail to act in this case.  It took

13  affirmative steps to secure a compact by making and joining public statements that a

14  two-part determination would apply.[13]  *See* SOF ¶¶ 8, 23.

15  　　　To overcome stiff opposition to Indian gaming compacts, the Nation knowingly,

16  voluntarily, intelligently, and understandably communicated that it would not seek to game

17  on after-acquired land without a two-part determination, thereby waiving its right to assert

18  that the Gila Bend Act is a settlement of a land claim.

19  　　　　　　　　　　　　　　**CONCLUSION**

20  　　　The Court should grant summary judgment to the Plaintiffs and deny summary

21  judgment to the Nation on Counts One, Two, Three, Four, and Seven of the Complaint.

22  　　　Dated this 29th day of March 2013.

23

24

25  _____

26  [13] Plaintiffs emphatically dispute the significance of the Nation's alleged disclosure in a July 15, 1992 meeting with the State, and the corrected transcript speaks for itself. (Doc. 195-5 at 11-22.)  In any event, all of the Nation's actions constituting a waiver

27  occurred *after* that particular meeting.  SOF ¶¶ 8, 23.  If they had any significance at all, statements made before the waiver would merely illuminate and amplify what the Nation

28  waived.

| | | |
|---|---|---|
| 1 | OSBORN MALEDON, P.A. | OFFICE OF THE ATTORNEY GENERAL, STATE OF ARIZONA |

OSBORN MALEDON, P.A.

By     /s/ Mary R. O'Grady
    Mary R. O'Grady
    John L. Blanchard
    Shane M. Ham
    Grace E. Rebling
    2929 North Central Avenue
    Suite 1200
    Phoenix, Arizona 85012

*Attorneys for Plaintiff Salt River Pima-*
   *Maricopa Indian Community*

OFFICE OF THE ATTORNEY GENERAL, STATE OF ARIZONA

By     /s/ Michael Tryon
    Thomas C. Horne, Attorney General
    Michael Tryon
    Evan Hiller
    Assistant Attorneys General
    1275 West Washington Street
    Phoenix, Arizona 85007-2926

*Attorneys for Plaintiff State of Arizona*

GILA RIVER INDIAN COMMUNITY

By /s/ Brian J. Schulman
    Linus Everling, General Counsel
    525 W. Gu u Ki
    P.O. Box 97
    Sacaton, Arizona 85247

    James P. Tuite (*Pro Hac Vice*)
    Merrill C. Godfrey (*Pro Hac Vice*)
    Jason T. Hauter (#022188)
    AKIN GUMP STRAUSS HAUER &
      FELD, LLP
    1333 New Hampshire Avenue, N.W.
    Washington, DC 20036-1565

    Brian J. Schulman
    GREENBERG TRAURIG, LLP
    2375 East Camelback Road, Suite 700
    Phoenix, Arizona 85016

*Attorneys for Plaintiff Gila River Indian*
   *Community*

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on March 29, 2013, I electronically transmitted the attached
document to the Clerk's Office using the CM/ECF System for filing and service to counsel
3  of record.

4

5                                    /s/  Amy Hershberger

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28