**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, et al., | No. CV-11-00296-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Tohono O'odham Nation, | |
| Defendant. | |

Defendant Tohono O'odham Nation (the "Nation") plans to construct and operate a major casino on unincorporated land within the outer boundaries of the City of Glendale, Arizona, which is in the greater Phoenix metropolitan area. The State of Arizona, the Gila River Indian Community, and the Salt River Pima-Maricopa Indian Community (collectively "Plaintiffs") argue that the proposed casino violates the 2002 Gaming Compact between the State of Arizona and the Nation ("the Compact"), and ask the Court to enjoin the casino's construction. The parties have filed cross-motions for summary judgment, and the Court heard oral arguments on April 9, 2013. For reasons explained below, the Court will grant the Nation's motion for summary judgment on all but one of Plaintiffs' claims, and will require additional briefing on the remaining claim.

**I.    Introduction and Summary.**

Written agreements matter. Parties who reach an accord, particularly on a matter as important and complicated as tribal gaming, carefully document their agreement in writing. They do so to fix the precise terms of their contract, identify their respective

obligations, and avoid later controversy about the nature and scope of their bargain. When disputes do arise, the written document usually constitutes the best evidence of the parties' agreement. Although other evidence can be considered, the written agreement takes center stage, with courts seeking to answer a single question: precisely what did the parties intend when the deal was struck? As a result, parties to complicated contracts hire lawyers to ensure that their written agreements are clear, comprehensive, and binding. Indeed, final contracts often declare that they are complete, that no other agreements have been reached by the parties, and that no unwritten promises will be enforced.

In this case, after long negotiation, the Compact was drafted by experienced lawyers, approved by the voters, and signed by the Governor and the Nation. The 67-page document contains 26 different sections and covers every aspect of the Nation's gaming rights and obligations in Arizona. The Compact also declares that it is complete: "This compact contains the entire agreement of the parties . . . and no other statement, agreement, or promise made by any party, officer, or agent of any party shall be valid or binding." Doc. 195-11 at 76.

A dispute has now arisen. Plaintiffs claim that the Nation and the State agreed there would be no new casinos in the Phoenix metropolitan area. The Nation disagrees. Although Plaintiffs have presented some evidence to support their claim, the written Compact contains no such limitation. It does not prohibit the Nation from building a new casino in the Phoenix area. Even Arizona's liberal parol evidence rule does not permit the Court to find such an agreement in the Compact. As a result, the Court concludes that the parties did not reach such an agreement and that the Nation's construction of a casino on the Glendale-area land will not violate the Compact. The Court therefore must enter summary judgment on virtually all of Plaintiffs' Compact-related claims.

One Compact claim requires further briefing. Plaintiffs claim that even if the parties did not agree to prohibit a new casino in the Phoenix area, the Nation knew that the State and the voters understood there would be no such casino under the Compact. Indeed, Plaintiffs claim that the Nation actively encouraged this understanding of the

Compact while secretly planning to build a casino in the Phoenix metropolitan area. Plaintiffs argue that this is enough, under § 201(2) of the Restatement (Second) of Contracts, for the Court to interpret the Compact in accordance with the State's understanding. Additional briefing is required before the Court can decide whether this claim can be resolved by summary judgment or whether a trial is required.

Plaintiffs also claim that federal law prohibits the Nation from building a casino on the Glendale-area land. The Court concludes, however, that gaming on that land is expressly permitted by the federal statute that authorizes Indian gaming. The Court therefore must enter summary judgment on Plaintiffs' statutory claims as well.

**II.   Background.**

The Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, permits Class III gaming on "Indian lands," but requires that the gaming be "conducted in conformance with a Tribal-State compact." *Id*. § 2710(d)(1). IGRA requires states to negotiate such a compact in good faith upon a tribe's request, and any resulting compact must be approved by the Secretary of the Interior before it becomes effective. *Id*. § 2710(d)(3).

Arizona and the Nation first entered into a gaming compact in 1993. Doc. 195-4. In 1999, some four years before the compact was set to expire, the State commenced negotiations for a new compact with the Arizona Indian Gaming Association ("AIGA"), an organization that included the Nation and most of the gaming tribes in the State. Doc. 195-32 at 15-17, 19.[1] The parties reached agreement on the framework for a new compact in 2002, but the Governor was not authorized by Arizona law to sign the compact and a bill that would have authorized the Governor to sign failed in the Arizona legislature. Doc. 195-13; Doc. 195-27 at 4. In an effort to gain authorization by different means, a coalition of tribes proposed a ballot initiative, called Proposition 202, that set out the precise wording of the gaming compact and required the Governor to enter into

_____

[1] Citations in this order will be to page numbers added to the top of pages by the Court's CMECF system, not page numbers at the bottom of pages.

1    the compact with any requesting tribe.  Doc. 195-14; *see* A.R.S. § 5-601.02.  Voters

2    approved Proposition 202, and the Compact was signed by the Governor and the Nation

3    on December 4, 2002.  Identical copies of the Compact were signed by the State and

4    other gaming tribes.  The Secretary of the Interior approved the Compact on January 24,

5    2003, and it became effective on February 5, 2003.  Doc. 195-15.

6         Three months later, the Nation purchased an unincorporated parcel of land within

7    the outer boundaries of Glendale, Arizona.  The purchase was made under a different

8    federal statute known as the Gila Bend Indian Reservation Lands Replacement Act

9    ("LRA"), Pub. L. No. 99-503 100 Stat. 1798 (1986).  The LRA was passed by Congress

10   in response to flooding of the Nation's reservation land in the 1970s and 1980s by the

11   federal government's Painted Rock Dam, and authorized the Nation to purchase

12   replacement land in Arizona using funds provided by Congress.  The Secretary of the

13   Interior subsequently took a portion of the Glendale-area land into trust, effectively

14   making it part of the Nation's reservation, and this Court upheld the Secretary's action.

15   *GRIC v. U.S.*, 776 F.Supp.2d 977 (D. Ariz. 2011), *aff'd*, 697 F.3d 886 (9th Cir. 2012).

16        Plaintiffs argue that gaming on the Glendale-area land, which was acquired after

17   the passage of IGRA, is not authorized by IGRA and would violate the Compact.

18   Plaintiffs bring this suit pursuant to § 2710 of IGRA, which waives the Nation's

19   sovereign immunity for suits to enjoin gaming activity in violation of a tribal-state

20   compact.  25 U.S.C. § 2710(d)(7)(A)(ii).

21   **III.   Legal Standard.**

22        A party seeking summary judgment "bears the initial responsibility of informing

23   the district court of the basis for its motion, and identifying those portions of [the record]

24   which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*

25   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the

26   evidence, viewed in the light most favorable to the nonmoving party, shows "that there is

27   no genuine dispute as to any material fact and the movant is entitled to judgment as a

28   matter of law."  Fed. R. Civ. P. 56(a).

IV.    **Plaintiffs' Statutory Claim.**

IGRA authorizes tribes to engage in gaming on Indian land that existed at the time of its passage on October 17, 1988.  25 U.S.C. § 2719.  Section 2719(a) of IGRA generally prohibits gaming on land taken into trust by the Secretary after that date, but contains several exceptions.  The Nation claims that the Glendale-area land falls within one of these exceptions for after-acquired land "taken into trust as part of a settlement of a land claim," 25 U.S.C. § 2719(b)(1)(B)(1), and that gaming on the land is therefore permitted.  Plaintiffs disagree, arguing that land acquired under the LRA does not qualify for the "settlement of a land claim" exception.  The Court declined to resolve this disagreement at the motion to dismiss stage because the Department of the Interior was about to decide the issue (Doc. 43 at 12), but two years have passed with no decision by the Department, and the Court must resolve this case.

Plaintiffs also argue that the Nation is judicially estopped from asserting that it acquired the Glendale-area land in settlement of a land claim, and that it waived this argument through previous actions.  The Court will address these arguments after addressing the "land claim" issue.

A.    **The Meaning of "Land Claim."**

As noted above, Congress passed the LRA in response to flooding of the Nation's reservation by the Painted Rock Dam.  The LRA provided the Nation with $30 million and stated that the Nation was "authorized to acquire by purchase private lands in an amount not to exceed, in the aggregate, nine thousand eight hundred and eighty acres." LRA § 6(c).  The LRA further stated that "the Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to [this act]."  *Id*. at § 6(d).  The LRA required the Nation to execute "a waiver and release . . . of any and all claims of water rights or injuries to land or water rights . . . from time immemorial to the date of the execution by the Tribe of such a waiver."  *Id*. at § 9(a).

Plaintiffs argue that the Glendale-area land was not acquired in "settlement of a land claim" within the meaning of the IGRA exception, 25 U.S.C. § 2719(b)(1)(B)(1),

because the phrase "land claim" is actually a term of art that Congress uses to mean "a claim to title or possession," and the LRA did not settle a claim to title or possession. Doc. 198 at 39-40.  Plaintiffs cite several statutes that use the phrase "land claim" to describe a claim for title, including a settlement with the Catawba Tribe of South Carolina in which Congress described a land claim as "litigation to regain possession of its treaty lands" and as a claim that the tribe "was dispossessed of its land in violation of Federal law."   25  U.S.C. § 941(a)(4)(B),  (D),  (E).   From this and other examples, Plaintiffs contend that a "settlement of a land claim" refers specifically to an action by Congress to quiet title to land formerly subject to title or possession by an Indian tribe.

Plaintiffs do not dispute that the LRA was passed in response to flooding by a federal dam that rendered the Nation's property virtually useless, nor that the LRA required the Nation to release "all claims of water rights or injuries to land."  LRA § 9(a). Plaintiffs contend, however, that the flooding gave rise to a tort claim, that the Nation released claims for "damages to land" under the LRA, and that a tort claim for damages to land does not constitute a claim to title or possession.

The Court finds Plaintiffs' interpretation of "land claim" too narrow.  When interpreting a phrase in a statute, such as "land claim" in IGRA, the Court must defer to the reasonable construction of an executive agency assigned to administer the statute. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).  The Department of the Interior has issued regulations under IGRA that define a "land claim" as "any claim by a tribe concerning the impairment of title or other real property interest or loss of possession."  25 C.F.R. § 292.2.  This definition includes claims for title and possession as Plaintiffs contend, but it also includes claims for impairment of "other real property interest[s]."  25 C.F.R. § 292.2.  The claims settled by the Nation under the LRA fall within this broad definition.

The extensive flooding caused by the federal government's dam gave rise to claims by the Nation for a trespass severe enough to constitute an unlawful taking.  *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427 (1982) ("As early as

1872 . . . this Court held that the defendant's construction, pursuant to State authority, of a dam which permanently flooded plaintiff's property constituted a taking."). Such a taking by definition interfered with the Nation's title to and possession of its land. The flooding also interfered with "other real property interest[s]" such as use of the land. The claim arising from the flooding thus satisfied every aspect of the regulation's definition.

Plaintiffs contend that the legislative history of the LRA shows that Congress was primarily focused on assisting the Nation with its economic problems rather than settling a land claim. Doc. 198 at 43 (citing Doc. 195-2 at 10). They also note that the word "settlement" was removed from the short title of the LRA, and argue that its removal evinced a Congressional intent not to settle a land claim. Doc. 195-2 at 2. But a desire to improve the economic condition of the Nation is not inconsistent with settlement of a land claim. The LRA specifically required the Nation to assign to the federal government "all right, title, and interest" in the more than 9,000 flooded acres and to execute a "waiver and release" of "any and all claims of water rights or injuries to land . . . from time immemorial to the date of the execution by the Tribe of such waiver." LRA §§ 4(a), 9(a). This is a classic settlement. Indeed, the title to § 6 of the LRA even refers to the $30 million paid to the Nation as "Settlement Funds." LRA § 6.

The Court finds that the LRA settled a "land claim" within the meaning of IGRA. As a result, the Glendale-area land acquired by the Nation with LRA funds qualifies for gaming under IGRA § 2719(b)(1)(B)(1). The land also qualifies for gaming under § 3(j)(1) of the Compact, which specifically authorizes gaming on after-acquired lands that qualify for gaming under § 2719. Doc. 195-11 at 33.

**B.     Judicial Estoppel.**

Plaintiffs argue that the Nation should be judicially estopped from asserting that the Glendale-area land was acquired through settlement of a land claim because of the position it took in an arbitration related to the 1993 compact. In determining whether to apply judicial estoppel, courts typically consider (1) whether a party's later position is clearly inconsistent with its earlier position, (2) whether the party has successfully

1    persuaded the court to accept its earlier position such that judicial acceptance of an

2    inconsistent position in a later proceeding would create the perception that either the first

3    or the second court was misled, and (3) whether allowing the inconsistent position would

4    give the party an unfair advantage or impose an unfair detriment on the opposing party.

5    *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

6          During an arbitration related to the 1993 compact, the Nation submitted a brief

7    explaining differences between the compact proposed by the State and the compact

8    proposed by the Nation.  Doc. 199 ¶ 8.  The brief states:

9                 The State's Section 2(cc) would result in the Nation forfeiting
                  the rights provided to tribes in IGRA to request that in certain
10                circumstances after-acquired trust land be available for class
                  III gaming activities.  The existing federal law requires the
11                Governor's concurrence.  This is adequate protection to the
                  State and local interests.  The State simply seeks an ancillary
12                benefit in this provision.

13   *Id*; *see also* Doc 195-6 at 3.  Because one of the after-acquired land exceptions in IGRA

14   requires a governor's approval (§ 2719(b)(1)(A)), but the "settlement of a land claim"

15   exception does not (§ 2719(b)(1)(B)(i)), Plaintiffs contend that this statement in the

16   arbitration brief effectively asserted that the Nation could use only the exception that

17   required the governor's approval, not the "settlement of a land claim" exception.

18         The Court concludes that the second and third elements of judicial estoppel are not

19   satisfied here.  *See New Hampshire,* 532 U.S. at 750-51.  The second element does not

20   apply because the Nation never succeeded in persuading the arbitrator to accept its

21   argument.  The 1993 arbitration decision was limited to accepting in full either the State's

22   or the Nation's compact proposal.  The arbitrator's choice expressed no view on whether

23   and how the IGRA after-acquired land exceptions would apply, and therefore presents no

24   risk that a determination in this case would create a perception that either the arbitrator or

25   this Court was misled.

26         The third element does not apply because, even if the cryptic statement in the

27   Nation's arbitration brief is construed as inconsistent with the Nation's position in this

28   case, the Nation will gain no advantage from the inconsistency.  Although the arbitrator

1   ultimately accepted the Nation's proposal, the State did not consent to the arbitrator's

2   selection and the 1993 arbitration failed to produce a binding compact.  The Court cannot

3   conclude that the Nation's position in this case, in the absence of any meaningful benefit

4   gained from the arbitration, would give the Nation an unfair advantage or impose an

5   unfair detriment on Plaintiffs.

6          **C.     Waiver.**

7          "Waiver is the intentional relinquishment of a known right with knowledge of its

8   existence and the intent to relinquish it."  *United States v. King Features Entm't, Inc.,* 843

9   F.2d 394, 399 (9th Cir. 1988).  "Although mere silence can be a basis for a claim of

10  estoppel when a legal duty to speak exists, waiver must be manifested in an unequivocal

11  manner."  *Duncan v. Office Depot,* 973 F.Supp. 1171, 1177 (D. Or. 1997); *see also*

12  *United States v. Amwest Surety Ins. Co.,* 54 F.3d 601, 602–03 (9th Cir.1995) (quoting

13  *Groves v. Prickett,* 420 F.2d 1119, 1125 (9th Cir. 1970) ("An implied waiver of rights

14  will be found where there is 'clear, decisive and unequivocal' conduct which indicates a

15  purpose to waive the legal rights involved.")).

16         During negotiations for the 1993 compact, Plaintiffs claim that the Nation knew

17  that some politicians feared that gaming compacts would lead to the placement of casinos

18  in metropolitan areas.  In the face of this opposition, Plaintiffs allege that the Nation

19  "knowingly and voluntarily made or joined numerous statements assuring decision

20  makers that gaming on noncontiguous, after-acquired land would not occur without the

21  concurrence of the governor."  Doc. 198 at 49.  Plaintiffs provide testimony that the

22  Nation joined other tribes in efforts to block proposed legislation that would limit the

23  Governor's power to execute gaming compacts.  Doc. 199 ¶ 15.  They note that "tribal

24  representatives" met with staffers for legislative leaders on June 8, 1993, and distributed

25  a handout which said:

26              Another exception to the prohibition of gaming on after
              acquired lands is when the lands are taken into trust as part of
27            a settlement of a land claim.  This will not effect [sic] Arizona
              because aboriginal land claims in Arizona have already been
28            settled pursuant to the Indian Claims Commission Act of
              1946.

*Id*. ¶ 23.  Plaintiffs allege that representatives of the Nation attended the meeting where this statement was distributed and never expressed disagreement with it.  Plaintiffs also proffer the deposition testimony of Eric Dahlstrom, the Nation's attorney in the negotiations, that "the tribes gave the staff a handout."  Doc. 199 ¶ 19;  Doc. 199-1 at 74-75.  When asked if he remembered the tribes' position on the issue of gaming on after-acquired lands, Dahlstrom said "As best I can recall, [the position of] the tribes, meaning the joint tribes at the meeting on June 8th, was represented in the handout[.]"  *Id*.  Robert Charles Braucheli, another of the Nation's lawyers, testified that "it would make sense" that there was briefing on the issue of gaming on after-acquired lands (Doc. 199-1 at 49), but he could not confirm that he attended the June 8th meeting and he did not prepare the memo (Doc. 205-9 at 4).[2]

The Nation makes two arguments regarding waiver.  First, it asserts that terms and conditions negotiated by the committee representing the tribes in the 1993 negotiations were subject to the approval of the Nation's Legislative Council.  Doc. 199-5 at 40-44.  As a result, negotiators did not have power to waive the Nation's right to assert that some of their land fell under the settlement exception.  Second, the evidence of a failure to object to statements made by affiliated parties is not "clear, decisive, and unequivocal" conduct demonstrating the Nation's intent to waive its rights.

The Court agrees.  Plaintiffs do not argue that representatives of the Nation either drafted the handout distributed at the June 8th meeting or were primary speakers at the meeting.  Instead, they assert that the position in the handout represented the position of all the tribes and that the Nation did not voice disagreement.  As noted above, however, waiver normally cannot occur through silence.  *Duncan,* 973 F. Supp. at 1177.  A clear, decisive, and unequivocal act must occur.  *Amwest Surety*, 54 F.3d at 602-03; *King Features*, 843 F.2d at 399; *Groves*, 420 F.2d at 1125.  The Court cannot conclude that the

_____

[2] Plaintiffs also claim that counsel for the Nation were aware of a Department of the Interior field solicitor memorandum indicating that the LRA qualified as a land claim settlement, but Plaintiffs' citation does not support that claim.  Doc. 99 ¶ 23 (cited as SOF ¶ 23).

1    Nation's silence during the 1993 meeting constituted a knowing waiver, in perpetuity, of
2    its right to claim the exception in § 2719(b)(1)(B)(i).

3            Moreover, only a few weeks after the June 1993 meeting, the Nation and the State
4    signed a compact that expressly incorporated IGRA § 2719.  Doc. 204 at 14-15.  The
5    express incorporation of that section and its exceptions contradicts any suggestion that
6    the Nation unequivocally and intentionally waived its right to invoke those exceptions.

7    **V.    Plaintiffs' Compact-Related Claims.**

8            **A.    Choice of Law.**

9            The parties present differing interpretations of the Compact.  Plaintiffs claim that
10   it bars any new casinos in the Phoenix metropolitan area, while the Nation claims it does
11   not.  In order to resolve this dispute, the Court must first determine which body of law
12   governs the interpretation.  The Compact contains a "Governing Law" clause, but that
13   clause lists federal law, Arizona law, and the Nation's law as potentially applicable,
14   thereby failing to resolve a conflict between these bodies of law.  Doc. 195-11 at 76.

15           On the key question of contract interpretation in this case – the role of the parol
16   evidence rule – federal and Arizona law differ significantly.  Federal law applies the
17   traditional parol evidence rule:  a court first considers the plain language of the contract,
18   and if the language is not ambiguous on its face, parol evidence is never considered.
19   *Nehmer v. DVA*, 494 F.3d 846, 861 (9th Cir. 2007); *Klamath Water Users Protective
20   Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999).  Parol evidence may be used
21   under this rule only to clarify an ambiguity that appears on the face and the agreement.
22   *Id.*  Arizona applies a more liberal version of the parol evidence rule:  "the judge first
23   considers the offered evidence and, if he or she finds that the contract language is
24   'reasonably susceptible' to the interpretation asserted by the proponent, the evidence is
25   admissible to determine the meaning intended by the parties."  *Taylor v. State Farm Mut.
26   Auto. Ins. Co.*, 854 P.2d 1134, 1140 (Ariz. 1993).

27           Although the governing law provision of the Compact also mentions the Nation's
28   law, the Nation has no developed law on the parol evidence rule.  As a result, the Court

1    must decide whether to apply the federal or Arizona version of that rule.

2                    **1.      The Ninth Circuit's Statement in *Cachil*.**

3            The Nation relies heavily on a Ninth Circuit opinion that appears to select federal

4    law for interpretation of IGRA gaming compacts.  In *Cachil Dehe Band v. California*,

5    618 F.3d 1066 (9th Cir. 2010), the Ninth Circuit stated that "[g]eneral principles of

6    federal contract law govern the Compacts, which were entered pursuant to IGRA."  *Id.* at

7    1073.  *Cachil* engaged in no analysis of the choice of law question.  Instead, because the

8    Ninth Circuit perceived no difference between federal and state law in the dispute before

9    it, *Cachil* applied California law.  *Id*.

10           Plaintiffs argue that the statement regarding federal law in *Cachil* is dictum.  The

11   Court agrees.  Federal and state law in *Cachil* were the same.  *Id*.  As a result, no conflict

12   existed and no choice of law was required.  *Cachil*'s statement that federal law governs

13   IGRA compacts was unnecessary to the decision.

14           The Court also finds the *Cachil* dictum unpersuasive.  *Cachill* cited the *Kennewick*

15   case in support of the dictum, but *Kennewick* held only that "[f]ederal law controls the

16   interpretation of a contract entered pursuant to federal law when the United States is a

17   party."  880 F.2d at 1032.  The United States is not a party to IGRA compacts.  The other

18   case cited by the Ninth Circuit, *Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095 (9th

19   Cir. 2006), interpreted a compact that expressly said it was to be "construed in

20   accordance with the laws of the United States."  *Id.* at 1098.  Federal law was chosen by

21   the parties, not the court.  *Idaho* also found no difference between federal and Idaho law

22   on the question before it, and thus was not required to make a choice of law.  *Id.*

23           Because *Cachil*'s statement is dictum, includes no choice of law analysis, and cites

24   cases that do not support the assertion that federal law governs all IGRA compacts, the

25   Court concludes that it is not bound by *Cachil*.  The Court will undertake a traditional

26   choice of law analysis to determine the applicable law in this case.

27

28

1          **2.      Choice of Law Analysis.**

2          Section 6 of the Restatement (Second) of Conflicts of Law governs choice of law

3   generally, and § 188 contains factors particularly applicable to contract disputes.   For

4   purposes of the analysis, Plaintiffs assert that Arizona law and the Nation's law should be

5   considered identical because the Nation has no parol evidence rule and its Rules of Court

6   provide that "[w]here applicable, the Arizona rules will be followed to the extent they do

7   not directly conflict with a written Tohono O'odham law or rule and are applicable to the

8   facts and circumstances of a case."   Tohono O'odham Rules of Court 1 at p.1.   When

9   counsel for the Nation was asked during oral argument if he was aware of any different

10  parol evidence rule that the Nation might apply, he said no.  Doc. 215 at 13.  The Court

11  accordingly will assume that the Nation would apply Arizona's parol evidence rule.   The

12  choice, then, is between the law of Arizona and the Nation on one hand, and federal law

13  on the other hand.

14         The Court must identify the forum with the most significant relationship to the

15  transaction and the parties.   Section 6 of the Restatement identifies several underlying

16  principles to aid in that inquiry.   Restatement (Second) of Conflict of Laws § 6 (1971).

17  Given the facts of this case, one factor – the needs of the interstate and international

18  system – is particularly notable.  *Id*.  Additional contract-specific factors are suggested in

19  § 188, including "(a) the place of contracting, (b) the place of negotiation of the contract,

20  (c) the place of performance, (d) the location of the subject matter of the contract, and

21  (e) the domicile residence, nationality, place of incorporation and place of business of the

22  parties."  *Id*. § 188.

23         Considering these factors, the Court concludes that the law of Arizona and the

24  Nation clearly applies.   Beginning with the most relevant factor from § 6 – the needs of

25  the interstate system – the Court notes that IGRA calls for compacts to be negotiated

26  between individual states and tribes.   No uniform national compact has been prescribed

27  by Congress.   IGRA's recognition that states should be free to negotiate their own

28  compacts demonstrates that the interstate gaming system embraces local interests and

- 13 -

1    needs; national uniformity is not required.  This factor weighs in favor of choosing the

2    law of Arizona and the Nation.

3         Factors (b), (c), (d), and (e) of § 188 also favor that choice.  The Compact was

4    negotiated in Arizona, the Compact will be performed on the Nation's land within

5    Arizona, gaming that is the subject of the Compact will occur in Arizona, and both

6    parties to the Compact are domiciled in Arizona.  The Nation argues under factor (a) that

7    the place of contracting is Washington D.C. because that is where the Compact was

8    finally approved by the Secretary of the Interior, but the Court gives little weight to this

9    factor when the parties signed the Compact in Arizona.  Moreover, comment e to § 188

10   notes that "standing alone, the place of contracting is a relatively insignificant contact."

11   *Id*.

12        It comes as no surprise that the law to be chosen for interpretation of a contract

13   between Arizona and the Nation is the law of Arizona and the Nation.  Those entities

14   clearly have the most significant relationship with the Compact.  The Federal government

15   is not a party to the Compact, and the Restatement analysis shows that there is little

16   reason to choose federal law.  The Court will apply the Arizona parol evidence rule.

17        **B.     Meaning of the Compact.**

18        Arizona law requires a court to "first consider the allegations made by the

19   proponent of the extrinsic evidence as to the appropriate interpretation of the writing in

20   light of the extrinsic evidence alleged."  *Long v. City of Glendale*, 93 P.3d 519, 528 (Ariz.

21   Ct. App. 2004) (citing *Taylor*, 854 P.2d at 1140).  The court must then consider the

22   language of the writing to determine if it is reasonably susceptible to the suggested

23   interpretation.  *Id*.  If it is reasonably susceptible, the court must consider the extrinsic

24   evidence; otherwise, the court should disregard the evidence.  *Id*.  Thus, "even under

25   Arizona's more permissive approach to the parol evidence rule, a proponent of parol

26   evidence cannot completely escape the confines of the actual writing."  *Id*.

27        In keeping with this approach, the Court will consider evidence presented by the

28   parties regarding negotiation of the Compact, the parties' intent and understanding, and

- 14 -

1    the Proposition 202 campaign.  The Court will then turn to the language of the Compact

2    to see if it is reasonably susceptible to the Plaintiffs' suggested meaning.

3                     **1.      Parol Evidence.**

4             Plaintiffs suggest that one of the State's goals in negotiating the Compact with

5    AIGA was to "eliminate all rights to build additional facilities in the two metropolitan

6    markets" – Phoenix and Tucson.  Doc. 198 at 9 (citing Doc. 199 ¶¶ 68-74).  For this

7    reason, Plaintiffs claim, negotiations with a Phoenix-area group of tribes occurred

8    separately from a Tucson-area group of tribes.  Doc. 199 ¶¶ 81-85.  Plaintiffs claim that

9    the result was the Gaming Device Allocation Table contained in the Compact at

10   § 3(c)(5).  Doc. 195-11 at 23.  Plaintiffs call this table a "Scope of Gaming" table and

11   note that earlier drafts of the table contained specific references to lists of tribes with

12   gaming devices located in Phoenix and those located in Tucson.  Doc.199-4 at 13-16;

13   Doc. 199-5 at 85-88.  These references to the Phoenix and Tucson markets were removed

14   from the final version of the table, but Plaintiffs maintain that the order in which the

15   tribes are listed in the final table was intended to maintain the geographic groupings.

16   Doc. 199 ¶¶ 105-106.  Because the Nation is listed with the only other Tucson-area tribe,

17   Plaintiffs contend that any casinos to be built by the Nation were limited to the Tucson

18   metropolitan area.

19           Plaintiffs also assert that as part of its plan to limit gaming facilities in

20   metropolitan areas, the State asked the metropolitan tribes during negotiations to agree to

21   one fewer gaming facility than they each had been allotted under the 1993 compact.  In

22   exchange for that concession, the State offered to increase the number of gaming

23   machines in the remaining gaming facilities.  All of the metropolitan-area tribes agreed to

24   this exchange except the Nation.  Plaintiffs assert that the Nation refused the request

25   because it operated two large casinos in the Tucson area and one small casino near Why,

26   Arizona, the Nation wanted to maintain the small casino to provide needed jobs for tribal

27   members in Why, and the Nation could not use its increased allotment of gaming

28   machines if it was limited to the two large Tucson casinos and the small Why casino.

The State claims that it proposed a compromise that would permit the Nation to retain its allotment of four casinos, but would require one of the four facilities to be located at least 50 miles from Tucson.  This provision would ensure that at least one of the Nation's four casinos would be in a rural area.  Implicit in this compromise, the State argues, was the understanding that the Nation, as a Tucson-area tribe, would have no right to open a casino in the Phoenix area.  Plaintiffs claim that the Nation found this compromise acceptable, and it was memorialized in the Compact at § 3(c)(3).  Plaintiffs cite parol evidence in support of this version of events.

After the terms of the Compact had been settled between the State and AIGA, the Arizona Legislature failed to pass a bill authorizing the Governor to sign the Compact.  In response, the tribes, including all members of AIGA, formed a group called Arizonans for Fair Gaming and Indian Self-Reliance.  Doc. 204 at 84.  That organization promoted Proposition 202, a ballot initiative which asked the public to authorize the Governor to sign the negotiated compact with the various gaming tribes.  *Id*.  The Nation provided approximately $1,800,000 in support of Proposition 202 and in opposition to competing Propositions 200 and 201.  *Id*. at 84-85.

Plaintiffs assert that the tribes that funded and promoted Proposition 202, including the Nation, affirmatively represented to the public that the Compact would result in no additional casinos in the Phoenix metropolitan area.  David Lasarte-Meeks, the executive director of AIGA at the time, testified that:

> . . . everybody also understood that the concept of no increase in the number of facilities in the Phoenix area market was also very critical to getting the initiative past the electorate.  It was a major talking point, because it was a major point of concern for the public.  So the very concept of no increase in the number of facilities in the Phoenix market was a critical piece getting it passed, especially considering we barely passed.

*Id*. at 164.

Plaintiffs have produced a copy of an "Answers to Common Questions" brochure distributed in the campaign for Proposition 202.  Doc. 199-5 at 5-10.  The brochure posits

this question:  "Does Prop 202 limit the number of tribal casinos in Arizona?"  And it provides this answer:  "Under Prop 202, there will be no additional facilities authorized in Phoenix, and only one additional facility permitted in Tucson."  Doc. 199-5 at 9.  Mr. Lasarte-Meeks testified that this brochure was widely distributed during the campaign and that the Nation "absolutely" knew about and used the brochure.  Doc. 199-1 at 181. "I can say with 100 percent certainty that this was disseminated to Tohono O'odham and their leaders, their staff, their tribal members . . . and that it was used by them," he testified.  *Id*.  Albert Manual, Jr., a member of the Nation who served for a time as chairman of Vi-ikam Doag Industries ("VDI"), an economic development corporation chartered by the Nation allegedly for the purpose of the Phoenix-area casino project, also testified that Proposition 202 included the understanding that no additional casinos would be built in the Phoenix area.  Doc. 199-1 at 240.

The Nation does not dispute that "certain campaign material, including the Answers to Common Question document, suggested that the compact would preclude additional facilities in the Phoenix area."  Doc. 204 at 88.  Nor does it dispute that the brochure was produced in part with funds it provided.  The Nation instead claims that the brochure was inaccurate because it was drafted by "public relation consultants" who "did not necessarily seek to depict the compact with legal precision."  *Id*.  The Nation also contends that neither AIGA nor the campaign was authorized to speak for individual tribes, including the Nation.

Plaintiffs also provide evidence that during the campaign for Proposition 202 the Nation was making plans to build a Phoenix-area casino.  Mary Ann Antone, a former member of the Nation's Legislative Council, testified that the Nation was looking for land to purchase in the Phoenix area as early as 1988 or 1989, and that while that land was not specifically for casino purposes, casinos were an option.  Doc. 199-1 at 14. Plaintiffs also proffer handwritten notes from a meeting that allegedly occurred in May 2001, attended by Albert Manuel and Gloria Ramirez, members of the Nation's Legislative Council.  Doc. 199-5 at 45-54.  The notes contemplate the building of a

casino west of Phoenix while noting that the participants were "unsure what will happen" with the gaming compact. *Id* at 49. The notes say: "Buy Land West Phx, put in trust and build a casino," and "Put it in a shell company – need to keep it quiet expecially [sic] when negociations [sic] of compact [with] State." *Id* at 48-49. The Nation argues that these notes are inadmissible hearsay and have not been properly authenticated. Plaintiffs respond that the notes were produced by the Nation during discovery in this case. When asked about the notes in his deposition, Mr. Manuel stated that he had no reason to dispute the notes and that the notes refreshed his memory to some extent, particularly with regard to what appears to be a proposed location for a casino represented by a hand-drawn map on the fourth page, but Manuel did not know who took the meeting notes. Doc. 205-16 at 4.

Plaintiffs also provide the transcript of a June 26, 2001, meeting of the San Lucy District Council in which Richard Ramirez refers to plans to build a casino "on the west end of Phoenix" and the need to keep the plans confidential "to minimize the impact of public hearings" due to "resentment from the public about . . . Indian tribes building casinos." Doc. 199-9 at 37. Transcripts from meetings of VDI also reflect a VDI employee stating that the new casino would be "way out there, but . . . still [in] the Phoenix area." Doc. 199-10 at 33. Another employee states that "if that's going to be the position of the State, they don't want any more casinos around the Phoenix area, then they're going to fight it, whoever the new governor is." *Id.* at 41-42. The first employee responds: "Which is why we really want to wait until the initiative passes before it gets out." *Id.*

Plaintiffs present additional evidence that the Nation planned to acquire property for a casino in the Phoenix area while the Compact negotiations were underway and while the Proposition 202 campaign was circulating the brochure stating that no new Phoenix-area casinos would be built. The Nation disputes the admissibility and interpretation of much of this evidence.

**2.     Language of the Compact.**

- 18 -

With this extrinsic evidence in mind, the Court must examine the language of the Compact and decide whether it is reasonably susceptible to Plaintiffs' interpretation that the Compact barred new casinos in the Phoenix metropolitan area. Section 3(j) of the Compact is titled "Location of Gaming Facility." Doc. 195-11 at 33. If the Compact contained a limitation on the location of a casino in the Phoenix area, one would expect to find it here. But the section contains no such limitation. It states that all casinos must be "located on Indian Lands," that they "shall be located not less than one and one-half (1½) miles apart," and, specifically, that "Gaming Activity on lands acquired after the enactment of [IGRA] on October 17, 1988 shall be authorized only in accordance with 25 U.S.C. § 2719," which includes the exception for land acquired in settlement of a land claim. Doc. 195-11 at 11; 25 U.S.C. § 2719(b)(1)(B)(i). No further limitations on the location of a casino are included in § 3(j).

Plaintiffs rely on two other provisions in the Compact – the Gaming Device Allocation Table in § 3(c)(5), and the provision in § 3(c)(3) stating that at least one of the Nation's four casinos must be 50 miles from Tucson. Even considering Plaintiff's parol evidence, the Court cannot conclude that these provisions are reasonably susceptible to Plaintiff's interpretation.

The Gaming Device Allocation Table lists the number of devices and number of casinos allocated to each tribe. For the Nation, it shows 1400 gaming devices and four facilities. The table says nothing about geographic locations or limitations, and does not mention the cities of Phoenix or Tucson. Nor does it separate the tribes into groups. Doc. 195-11 at 24. Even earlier versions of the table do nothing more than mention that some tribes have facilities in the Tucson area while others have facilities in the Phoenix area. Plaintiffs make much of the fact that the tribes are listed in an order that "groups" them into Tucson, Phoenix, and rural tribes, but nothing about the table in the Compact indicates that the order in which the tribes are listed has some significance, much less some limiting effect. There were spaces between the alleged geographical groups of tribes in earlier drafts of the table (Doc. 199-4 at 31), but nothing in the language of those

1    drafts suggests that the spaces somehow denote geographical limits on casinos.  And if

2    the spaces were intended to have such significance, it is noteworthy that they were

3    deleted from the final version of the Compact.

4          Plaintiffs argue that geographic limitations mentioned in § 3(c)(3) are evidence

5    that § 3(c) generally was meant to limit the locations of casinos.  The Court has difficulty

6    accepting this proposition when the Compact includes § 3(j), which is titled "Location of

7    Gaming Facility" and includes no such limitation.    Moreover, the key sentence in

8    § 3(c)(3) does little to help Plaintiffs' case.  It states:

9                      If the Tribe is the Tohono O'odham Nation, and if the Tribe
                     operates four (4) Gaming Facilities, then at least one of the
10                    four (4) Gaming Facilities shall: a) be at least fifty (50) miles
                     from the existing Gaming Facilities of the Tribe in the Tucson
11                    metropolitan area as of the Effective Date; b) have no more
                     than six hundred forty-five (645) Gaming Devices; and c)
12                    have no more than seventy-five (75) Card Game Tables.

13   Doc. 195-11 at 23.  Plaintiff's read the specific reference to "existing Gaming Facilities

14   of the Tribe in the Tucson metropolitan area" as somehow limiting the Nation's allotment

15   of present and future casinos to the Tucson area, but the language does not say that.  It

16   requires only that one of the Nation's four casinos be operated at least 50 miles from

17   Tucson, and that the casino have limited devices and tables.  The sentence does make

18   reference to the Nation's two existing casinos in the Tucson area, but says nothing about

19   the location of a fourth casino if the small casino remains in Why.  Plaintiffs do not

20   dispute that the Nation continues today to operate the casino in Why.

21         The Court cannot find that the § 3(c)(3) language quoted above, alone or in

22   concert with the table, is reasonably susceptible to Plaintiffs' interpretation.  Section

23   3(c)(3) was a compromise that was added to the Compact when the Nation refused to

24   reduce its gaming facility allocation from four to three.  The provision was designed to

25   alleviate concern that the Nation would close its rural facility and operate four gaming

26   facilities in metropolitan areas.  The sentence simply does not say anything about the

27   location of a fourth casino, provided the casino in Why remains, and therefore, like the

28   table, is not reasonably susceptible to Plaintiffs interpretation.

1    Section 25 of the Compact reinforces this conclusion.  It states: "This Compact

2    contains the entire agreement of the parties with respect to the matters covered by this

3    Compact and no other statement, agreement, or promise made by any party, officer, or

4    agent of any party shall be valid or binding."  Doc. 195-11 at 76.  In this integration

5    clause, the parties specifically agree that understandings not written in the Compact have

6    no force.

7    In summary, the language of the Compact is not reasonably susceptible to

8    Plaintiffs' interpretation, even in light of the parol evidence Plaintiffs provide.  As the

9    Arizona Court of Appeals noted in *Long*, "one cannot claim that one is 'interpreting' a

10   written clause with extrinsic evidence if the resulting 'interpretation' unavoidably

11   changes the meaning of the writing."  95 P.3d at 529.

12                          **3.      Additional Consistent Term.**

13   Alternatively, Plaintiffs argue that the evidence proves that an "additional

14   consistent term" should be read into the Compact.  Despite the integration clause in § 25,

15   Plaintiffs cite the Restatement and argue that courts are required to conclude that a

16   contract "is not completely integrated if the writing omits a consistent additional agreed

17   term which is such a term as in the circumstances might naturally be omitted from the

18   writing."  Restatement (Second) of Contracts § 216(2)(b) (1981).  Plaintiffs argue that

19   their proposed limitation is not inconsistent with the terms of the Compact and naturally

20   could have been omitted because both sides thought it superfluous.

21   The Court cannot agree that a term limiting the geographic location of gaming

22   facilities would naturally be omitted from the Compact.  Both parties had substantial

23   interests at stake and were well-represented during negotiations.  At oral argument,

24   counsel for Plaintiffs suggested that the location of casinos was so important that the

25   Governor considered it "nuclear."  Doc. 215 at 58.  One would expect any agreement on

26   an issue of such importance to be carefully included in the Compact.  In fact, as already

27   noted, a provision concerning the location of gaming facilities was included in the

28   Compact, and it says nothing about future facilities in the Phoenix area.  Compact §§

3(c)(3), 3(j); Doc. 195-11 at 23, 33.  The Court cannot infer an additional consistent term as Plaintiffs request.

### 4.   Restatement (Second) of Contracts § 201

Section 201 of the Restatement presents a somewhat different question for the Court to resolve than the parol evidence rule or the "consistent additional term" argument.  Section 201 provides rules for interpreting a contract when the parties attach a meaning that is not clear from the contract's language, or when the parties each attach different meanings to the contract.  For reasons stated in the choice of law discussion above, the Court concludes that Arizona law governs this Compact interpretation question.

Arizona courts generally follow the Restatement (Second) of Contracts.  *See*, *e.g.*, *Abrams v. Horizon Corp.*, 669 P.2d 51, 57 (Ariz. 1983); *In re Naarden Trust*, 990 P.2d 1085, 1088 (Ariz. Ct. App. 1999).  Arizona cases have specifically applied § 201.  *See Johnson v. Cavan*, 733 P.2d 649, 652 (Ariz. Ct. App. 1986).

### a.   Section 201(1).

Restatement § 202(1) applies when the parties agree on the meaning of a contract and their agreement differs from what the written words of the contract might suggest.  The section provides:  "Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning."  Restatement (Second) of Contracts § 201 (1981).  To prevail under this section, Plaintiffs must prove that the Nation attached the same meaning to the Compact as the State – that it prohibited any new casinos in the Phoenix area.

At oral argument, the Court specifically asked Plaintiffs' counsel if there is "any undisputed evidence which [the Court] can rely on for purpose of summary judgment that the Nation itself shared the view that this compact prohibited any additional casinos in the Phoenix area[.]"  Doc. 215 at 38.  Counsel's only response was to direct the Court's attention to the statements made by AIGA and to argue that the Nation had "hired a spokesperson" and thereby admitted that he spoke for the tribe.  *Id*. at 39.

1    At the outset of negotiations for the Compact, the various tribes were so concerned
2    about being bound by AIGA that they executed an agreement in principle stipulating that
3    the tribes would cooperate in good faith, but would not be bound by the actions of AIGA.
4    Doc. 195-10 at 2.  The agreement stated:  "Nothing in this agreement shall be construed
5    to impair the Tribal Leaders' ability to protect the sovereign interests of their individual
6    Indian Nations or their ability to take any action inconsistent with the actions or positions
7    of other Tribal Leaders."  *Id.*  In light of this agreement not to be bound, the Court cannot
8    conclude that AIGA's statements about the meaning of the Compact reflected the
9    Nation's view.  And without any additional evidence that the Nation attached Plaintiffs'
10   meaning to the Compact, the Court finds not only that Plaintiffs are not entitled to
11   summary judgment, but also that Plaintiffs have failed to create a genuine issue of fact
12   sufficient to defeat the Nation's motion on the § 201(1) claim.

13                              **b.      Section 201(2).**

14   Section 201(2) applies when the parties attach different meanings to the contract:

15           Where the parties have attached different meanings to a
16           promise or agreement or a term thereof, it is interpreted in
             accordance with the meaning attached by one of them if at the
17           time the agreement was made

18           (a) that party did not know of any different meaning attached
             by the other, and the other knew the meaning attached by the
19           first party; or

20           (b) that party had no reason to know of any different meaning
             attached by the other, and the other had reason to know the
21           meaning attached by the first party.

22   Restatement (Second) of Contracts § 202(2) (1981).  Under this section, Plaintiffs need
23   not prove that the Nation understood the Compact to prohibit new casinos in the Phoenix
24   area.  Plaintiffs must show only that the Nation knew or had a reason to know that the
25   State attached that meaning to the Compact.

26           Plaintiffs cite numerous statements made by the media, AIGA, and government
27   officials, including from Governor Hull, that the Compact would not allow any new
28   gaming facilities in the Phoenix area.  Doc. 211 at 13 (citing Doc. 199 ¶¶ 142-47, 151-53,

156-58, 168-69, 189-93).   Governor Hull made her view clear on February 21, 2002, when she issued a press release stating that "[n]o additional casinos [would be] allowed in the Phoenix metropolitan area" under the Compact.   Doc. 199 ¶ 142.   Voters who approved Proposition 202 were presented with campaign materials stating that the Compact would result in no new Phoenix-area casinos.   The evidence suggests that the Nation knew or had reason to know of these views because it participated directly in the campaign that made these representations.   As noted above, the executive director of AIGA testified that the brochure which said "there will be no additional facilities authorized in Phoenix" (Doc. 199-5 at 9) was known to and used by the Nation.   He testified:  "I absolutely do feel comfortable saying with 100 percent certainty that Tohono O'odham leaders, staff, tribal members, and supporters had input on this document and used it during the ballot initiative."  Doc. 199-1 at 181.   The Nation's knowledge of the State's understanding is also supported by evidence from the VDI meeting where an employee states that the Nation should keep its Phoenix-area casino plans confidential until after the initiative passes.  Doc. 199-10 at 41-42.   One can infer that the plans were to be kept confidential because the Nation knew the State and others believed no such casinos would be built under the Compact.

The Nation disputes this evidence, arguing that much of it is inadmissible.   The Nation also cites evidence that legislators and negotiators for the State clearly understood that new casinos could be built in the Phoenix area if the Compact was signed.   For example, the Nation presents evidence that the State and some tribes proposed during negotiations that gaming on after-acquired lands be prohibited, a proposal that was rejected and not included in the Compact.  Doc. 193 at 17-28.   The Nation also presents evidence that some State legislators attempted to modify the terms of the 1993 compact – terms which are the same as the Compact's – to exclude all gaming on after-acquired lands precisely to avoid gaming on noncontiguous reservation land such as the Glendale-area land.   Doc. 199 ¶¶ 15-22.   The proposed legislation did not pass.   The Nation also notes that one of the negotiators of the 1993 compact published a comment during the

1    Proposition 202 campaign in which he warned that the Compact "greatly widens the

2    scope of gambling, dramatically increases the size of existing casino operations and has

3    'triggers' for even more expansions."  Doc. 195-14 at 33.  From this and other evidence,

4    the Nation asserts that anyone even passingly familiar with the Compact and its

5    negotiations, including the State, knew that the Compact did not bar additional casinos on

6    after-acquired land in the Phoenix area.

7        As this brief recitation demonstrates, the parties have presented sharply conflicting

8    evidence on what the State understood the Compact to mean and what the Nation knew

9    about the State's understanding.  Although such a genuine dispute of fact normally would

10    result in a denial of summary judgment, and the parties would proceed to trial, the Court

11    is troubled by two issues the parties have not addressed fully.

12        The first issue:  The Court concludes above that the language of the Compact is

13    not reasonably susceptible to Plaintiffs' interpretation.   Another way to state this

14    conclusion is that no reasonable reading of the Compact could lead a person to conclude

15    that it prohibited new casinos in the Phoenix area.  This necessarily means that any

16    understanding on the part of the State that the Compact contained such a limitation was

17    not reasonable.  Does § 201(2) apply when a party's understanding of the contract is not

18    reasonable?  Section 201(2) on its face does not contain a reasonableness requirement,

19    but the absence of such a requirement would mean that one party is bound by the other

20    party's entirely unreasonable interpretation if the first party knows about it.

21        The second issue:  To decide what the State understood when the Compact was

22    entered, and what the Nation knew about the State's understanding, to which

23    representatives of the State should the trier of fact look?  The Governor?  The voters who

24    approved Proposition 202?  The Arizona Legislature?  Individuals who represented the

25    State in negotiations?  The parties present evidence with respect to each of these different

26    potential representatives, but provide no law or argument on which representative's

27    knowledge controls.

28        The Court will set a short briefing schedule to address these and any other issues

1    the parties deem relevant to the § 201(2) claim.

2            **C.     Covenant of Good Faith and Fair Dealing.**

3            Plaintiffs argue that the Nation's plan to locate a casino in the Phoenix market

4    violates the covenant of good faith and fair dealing implied in the Compact.    The

5    covenant acts to prevent a party from doing something that, while not specifically

6    prohibited by a contract, prevents the other party from enjoying benefits they reasonably

7    expected to flow from the contract.  *See Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz.

8    1986).   The Court concluded above that the terms of the Compact are not reasonably

9    susceptible to Plaintiffs' proffered interpretation – that Plaintiffs could not reasonably

10   have expected that the Compact would ban new casinos in the Phoenix area.  This is true

11   not only from the complete absence of any such ban in the Compact language, but also

12   from the integration clause and its declaration that no other agreements or promises are

13   valid or binding.  Doc. 195-11 at 76.  The Court finds that the State could not reasonably

14   expect a ban on Phoenix-area casinos to flow from the Compact, and accordingly will

15   enter summary judgment in favor of the Nation on the breach of covenant claim.

16           **D.     Promissory Estoppel.**

17           Where one party makes a promise and a second party acts in reasonable and

18   detrimental reliance on that promise, the first party's promise may be enforced even in

19   the absence of a completed contract.  *Hass v. Darigold Dairy Prods., Inc.*, 751 F.3d 1096,

20   1100 (9th Cir. 1985); Restatement (Second) of Contracts § 90 (1981).  Plaintiffs argue

21   that the Nation made representations that the Compact would prevent the construction of

22   new casinos in the Phoenix area.  The State claims that it reasonably and detrimentally

23   relied on those representations by not insisting on more specific geographic restrictions in

24   the Compact.

25           Although Plaintiffs' evidence would appear to support a claim for promissory

26   estoppel, such a claim is barred by the Nation's sovereign immunity.  IGRA provides that

27   "[t]he United States district courts shall have jurisdiction over any cause of action

28   initiated by a State or Indian tribe to enjoin a class III gaming activity . . . *conducted in*

*violation of any Tribal-State compact*[.]"   25 U.S.C. § 2710(d)(7)(A)(ii) (emphasis added).  This clause abrogates the Nation's sovereign immunity with respect to violations of the Compact, *see Cabazon Band v. Wilson*, 124 F.3d 1050, 1059-60 (9th Cir. 1997), but a promissory estoppel claim does not allege a violation of the Compact.  Rather, it seeks to enforce a promise that is not in the Compact.  As courts have recognized, a claim for promissory estoppel "cannot be characterized . . . as an 'express or implied-in-fact' contract.'"  *Jablon v. United States*, 657 F.2d 1064, 1070 (9th Cir. 1981).  "A promissory estoppel claim is not the same as a contract claim. Promissory estoppel provides an equitable remedy and is not a theory of contract liability."  *Double AA Builders v. Grand State Constr.*, 114 P.3d 835, 843 (Ariz. Ct. App. 2005).  Because promissory estoppel is based on a promise not contained in the Compact, IGRA's waiver of sovereign immunity does not apply.

The Court's ruling on Defendant's motion to dismiss reserved this issue for summary judgment, noting that the issue was better decided in the context of evidence presented by the parties.  Doc. 43 at 17-18.  Having considered that evidence, the Court concludes that the promissory estoppel claim does in fact seek enforcement of a promise outside of the Compact.  Because the claim is not based on the Compact, it does not fall within § 2710(d)(7)(A)(ii)'s waiver of sovereign immunity.

**IT IS ORDERED:**

1.     Defendant's motion for summary judgment (Doc. 193) is **granted** with respect to all claims other than Plaintiffs' claim for breach of the Compact under Restatement (Second) of Contracts § 201(2).

2.     Plaintiff's cross motion for summary judgment (Doc. 198) is **denied**.

3.     By the close of business on **May 22, 2013**, the parties shall file memoranda, not to exceed 10 pages per side, addressing the two issues identified above and any other issues the parties deem relevant to the § 201(2) claim.   The Court is particularly interested in any case law that has addressed these issues.  Further evidence should not be submitted.  The parties shall file reply memoranda, not to exceed five pages per side, by

1    **May 29, 2012**.  The Court will rule on the § 201(2) issue without further argument.

2        Dated this 7th day of May, 2013.

_____
David G. Campbell
United States District Judge