Jonathan Jantzen, Attorney General, SBN 016220
Samuel Daughety, Assistant Attorney General, SBN 023170
Office of Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ  85634
(520) 383-3410
jonathan.jantzen@tonation-nsn.gov
samuel.daughety@tonation-nsn.gov

Seth P. Waxman (*Pro hac vice*)
Danielle Spinelli (*Pro hac vice*)
Annie L. Owens (*Pro hac vice*)
Shivaprasad Nagaraj (*Pro hac vice*)
Sonya L. Lebsack (*Pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
seth.waxman@wilmerhale.com
danielle.spinelli@wilmerhale.com
annie.owens@wilmerhale.com
shiva.nagaraj@wilmerhale.com
sonya.lebsack@wilmerhale.com

*Counsel for Defendant Tohono O'odham Nation*

COUNSEL CONTINUED ON FOLLOWING PAGE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| THE STATE OF ARIZONA, THE GILA RIVER INDIAN COMMUNITY, and THE SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY,<br><br>                    Plaintiffs,<br><br>     v.<br><br>THE TOHONO O'ODHAM NATION,<br><br>                    Defendant. | Case No. 2:11-cv-296-DGC<br><br>**THE TOHONO O'ODHAM NATION'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

1  Michael J. Rusing, SBN 006617
2  Todd M. Hardy, SBN 023675
   RUSING LOPEZ & LIZARDI, PLLC
3  6363 N. Swan Road, Suite 151
   Tucson, AZ  85718
4  (520) 792-4800
5  mrusing@rllaz.com
   thardy@rllaz.com
6
   *Counsel for Defendant Tohono O'odham Nation*
7

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ......................................................................................................................... 2

I.    *RESTATEMENT* SECTION 201(2) DOES NOT APPLY HERE BECAUSE THE COMPACT IS UNAMBIGUOUS ................................................................................ 2

II.    IF THIS COURT APPLIES SECTION 201(2) IN THIS CASE, IT SHOULD CONSIDER ONLY THE UNDERSTANDING OF THE STATE'S NEGOTIATORS AT THE TIME THE DISPUTED TERM WAS AGREED UPON ....................................... 8

CONCLUSION .................................................................................................................... 10

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Bock v. Computer Associates International*, 257 F.3d 700 (7th Cir. 2001) .............................. 5

*Brewer v. Muscle Shoals Board of Education*, 790 F.2d 1515 (11th Cir. 1986) ...................... 6

*Caminetti v. United States*, 242 U.S. 470 (1917) ...................................................................... 5

*Flying J v. Comdata Network*, 405 F.3d 821 (10th Cir. 2005) .................................................. 5

*Frigaliment Importing v. B.N.S. International Sales*, 190 F. Supp. 116
    (S.D.N.Y. 1960) ................................................................................................................ 4

*Harris Corp. v. Giesting & Associates*, 297 F.3d 1270 (11th Cir. 2002) ................................. 5

*HPI/GSA—3C, LLC v. Perry*, 364 F.3d 1327 (Fed. Cir. 2004) ............................................ 4, 6

*Long v. City of Glendale*, 93 P.3d 519 (Ariz. Ct. App. 2004) .......................................... 5, 6, 7

*Raffles v. Wichelhaus*, 159 Eng. Rep. 375 (Ex. 1864) .............................................................. 3

*Taylor v. State Farm Mutual Automobile Insurance*, 854 P.2d 1134 (Ariz. 1993) .............. 5, 9

*United States for Use & Benefit of Union Building Materials v. Haas & Haynie
    Corp.*, 577 F.2d 568 (9th Cir. 1978) ................................................................................. 5

*United States Rubber Co. v. Silverstein*, 128 N.E. 123 (N.Y. 1920) ........................................ 4

*Woods Masonry v. Monumental General Casualty Insurance*, 198 F. Supp. 2d
    1016 (N.D. Iowa 2002) ..................................................................................................... 5

## OTHER AUTHORITIES

*Corbin on Contracts* §24.5 (1998) ............................................................................................ 4

*Restatement (Second) of Contracts* (1981)
    §161(b) .............................................................................................................................. 7
    §201 ...................................................................................................................... 1, 3, 7, 8
    §201(2) ...................................................................................................................... *passim*

2 *Farnsworth on Contracts* (3d ed. 2004)
    §7.9 ............................................................................................................................ 3, 4, 8
    §7.12 .................................................................................................................................. 5

**PRELIMINARY STATEMENT**

After holding that "the written Compact … does not prohibit the Nation from building a new casino in the Phoenix area" and that "Arizona's liberal parol evidence rule" does not alter that result, this Court ordered the parties to submit supplemental briefs addressing (1) whether *Restatement of Contracts (Second)* §201(2) "appl[ies] when a party's understanding of the contract is not reasonable"; and (2) "to which representatives of the State … the trier of fact [should] look" when applying Section 201(2). 5/7/13 Order 2, 25.

The answer to the first question is no. This Court's unequivocal holding that "no reasonable reading of the Compact could lead a person to conclude that it prohibited new casinos in the Phoenix area," 5/7/13 Order 25, forecloses Plaintiffs from resurrecting their failed contract-interpretation claim by invoking Section 201(2). As courts and treatises have consistently made clear, Section 201 comes into play only where a contractual term is ambiguous—not, as here, where a contract has only one objectively reasonable meaning. Section 201(2) is an interpretive principle designed to address the situation in which the parties attached different reasonable meanings to an ambiguous contractual term at the time they agreed on that term. In those circumstances, Section 201(2) allows consideration of extrinsic evidence of each party's interpretation—and what each party knew about the other's interpretation—to determine which of the two reasonable interpretations of the ambiguous term should govern. Where party *A* knew of party *B*'s interpretation at the time the agreement was made, but *B* was unaware of *A*'s interpretation, courts will enforce *B*'s interpretation. That makes good sense: Like the related doctrine of *contra proferentem* (which resolves ambiguity against the drafter), Section 201(2) resolves ambiguity against the party that had the best opportunity to avoid it—the party that knew of the ambiguity and did not raise it when the term was agreed on. But, also like *contra proferentem*, Section 201(2) has no application where there is no ambiguity to be resolved; it is not a freestanding mechanism through which to introduce extrinsic evidence. It thus has no application here.

This Court accordingly need not reach the second question. Were it to do so, however, because the purpose of Section 201(2) is to interpret disputed contract provisions

1  against the party who had the best opportunity to avoid the dispute, the only relevant
2  extrinsic evidence would be evidence of what the State's representatives to the Compact
3  negotiations believed—and, more specifically, what the Nation's representatives knew or
4  had reason to know the State's representatives believed, and vice versa—*before* the disputed
5  Compact term was agreed upon by the parties.  That occurred at least by February 2002,
6  when the Compact Framework was finalized, and no later than mid-May 2002, when
7  Proposition 202—which embodied the parties' prior agreement regarding the location of
8  gaming facilities and contained the same language as the Compact that was ultimately
9  signed—was filed.  After that point, neither party had the opportunity to change the disputed
10 Compact language, and the parties' post-hoc understandings—and *a fortiori* the
11 understanding of the voters and the legislature, who were not parties to the Compact or
12 involved in negotiating its terms—are not relevant to interpreting the disputed terms.

## ARGUMENT

**I.    *RESTATEMENT* SECTION 201(2) DOES NOT APPLY HERE BECAUSE THE COMPACT IS UNAMBIGUOUS**

Section 201(2) of the *Restatement* is a principle of contract interpretation that comes into play only after a court has determined that the contract is ambiguous—either because a contractual term is vague on its face or because extrinsic evidence reveals that it is reasonably susceptible to more than one interpretation.  In those circumstances, extrinsic evidence that one party knew of the ambiguity at the time the agreement was made is relevant to determining which party's reasonable interpretation should govern.  Here, however, this Court has already considered all of Plaintiffs' extrinsic evidence and held (at 19) that even taking that evidence into account, the Compact is not reasonably susceptible to Plaintiffs' interpretation.  Plaintiffs cannot now invoke Section 201(2) as a vehicle for resurrecting the contract interpretation claims this Court has already rejected.

1.    On its face, Section 201 of the *Restatement* makes clear that it is a rule to determine "[w]hose [m]eaning [p]revails" only once a contractual ambiguity has been established:

2

> § 201.  Whose Meaning Prevails
>
> (1)  Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is *interpreted* in accordance with that meaning.
>
> (2)  Where the parties have attached different meanings to a promise or agreement or a term thereof, it is *interpreted* in accordance with the meaning attached by one of them if at the time the agreement was made
>
>> (a)  that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or
>>
>> (b)  that party had no reason to know of any different meaning attached by the other, and the other had reason to know of the meaning attached by the first party.
>
> (3)  Except as stated in this Section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.

*Restatement (Second) of Contracts* §201 (1981) (emphases added).  Section 201 is thus unmistakably a rule of contract *interpretation*—it is concerned with the "meaning" of the words chosen by the parties and "interpret[ing]" ambiguous contractual language in light of extrinsic evidence of that meaning.  *See id.*; *see also* 2 *Farnsworth on Contracts* §7.9 (3d ed. 2004) (explaining that the principles embodied in *Restatement* §201 aid the court in determining which party's meaning governs "[i]n a dispute over contract interpretation").

The comments to the *Restatement* underscore that Section 201(2) is a tool for clarifying the meaning of an ambiguous term by placing it in the context of the parties' negotiations and not a stand-alone vehicle for introducing extrinsic evidence absent ambiguity: "*Uncertainties in the meaning of words* are ordinarily greatly reduced by the context in which they are used….  In general, the context relevant to interpretation of a bargain is the context common to both parties.  More precisely, *the question of meaning* in cases of misunderstanding depends on an inquiry into what each party knew or had reason to know, as stated in Subsections (2) and (3)." *Restatement* §201 cmt. b (emphases added).

Two classic cases are repeatedly cited to illustrate the kind of "misunderstanding" Section 201(2) addresses.  Both involve ambiguous contract terms.  In *Raffles v. Wichelhaus*, 159 Eng. Rep. 375, 375-376 (Ex. 1864), the parties contracted for the sale of cotton to be

3

transported from Bombay on the ship *Peerless*. Unknown to the parties, there were two ships *Peerless* sailing from Bombay, one in October and the other in December. The term "*Peerless*" thus had two reasonable interpretations. The court concluded that the parties each had a different *Peerless* in mind and thus no contract was formed. If it could be proved, however, that when the agreement was made, party *A* knew that party *B* had in mind the December *Peerless*, and party *B* had no reason to know that party *A* had in mind the October *Peerless*, under Section 201(2) a court would enforce party *B*'s interpretation. *See, e.g.*, 2 *Farnsworth* §7.9. Similarly, *Frigaliment Importing v. B.N.S. International Sales*, 190 F. Supp. 116 (S.D.N.Y. 1960), turned on the ambiguity of the word "chicken": The buyer thought it meant "broilers and fryers," while the seller thought it included "stewers." Because the seller had no reason to know of the narrower meaning attached by the buyer (and presumably the buyer did have reason to know of the broader meaning of the term "chicken"), the seller's meaning prevailed. *See* 2 *Farnsworth* §7.9.

As Farnsworth explains, this result is justified because "a party that makes a contract knowing of a misunderstanding is sufficiently at fault to justify that party's being subjected to the other party's understanding." *Id.* Stated another way, if party *A* knows that a contractual term is ambiguous and that the two parties interpret it differently, but party *B* does not know this, and party *A* does not take the opportunity to clear up the ambiguity, party *A* cannot later complain if it is bound by party *B*'s reasonable understanding. Like the related doctrine of *contra proferentem*, which construes ambiguity against the drafter in certain circumstances, Section 201(2) interprets ambiguous contractual provisions against the party in the best position to have avoided the ambiguity in the first place. *See id.*; *cf. U.S. Rubber Co. v. Silverstein*, 128 N.E. 123, 124 (N.Y. 1920) (Cardozo, J.) ("The promise, *if uncertain*, [is] to be taken 'in the sense in which the promisor had reason to suppose it was understood by the promisee.'" (emphasis added)); *see also HPI/GSA—3C, LLC v. Perry*, 364 F.3d 1327, 1335 (Fed. Cir. 2004) (explaining doctrine of *contra proferentem*). It thus "preserve[s] the security of the expectations *reasonably* induced by [the] former party's assent to the words used by both." *Corbin on Contracts* §24.5 (1998) (emphasis added).

4

As these authorities demonstrate, Section 201(2)'s purpose is to resolve competing *reasonable* interpretations of an *ambiguous* contractual term. Where a contract is unambiguous—*i.e.*, not reasonably susceptible to more than one meaning—there is no need to interpret it, and no justification for admitting extrinsic evidence of the parties' understanding of the agreement's meaning. *See Taylor v. State Farm Mut. Auto. Ins.*, 854 P.2d 1134, 1140 (Ariz. 1993); *Long v. City of Glendale*, 93 P.3d 519, 528 (Ariz. Ct. App. 2004); *Farnsworth* §7.12 ("[I]nterpretation ends with the resolution of problems that derive from the failure of language, that is to say, with the resolution of ambiguity and vagueness."); *cf. Caminetti v. U.S.*, 242 U.S. 470, 485 (1917) ("Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion."). In that circumstance, Section 201(2) simply does not come into play. *See, e.g.*, *Woods Masonry v. Monumental Gen. Cas. Ins.*, 198 F. Supp. 2d 1016, 1031 n.9 (N.D. Iowa 2002) (refusing to apply Section 201(2) in dispute over insurance contract and explaining that "because the court finds that the insurance policy is unambiguous, it will not consider extrinsic evidence to interpret the provision at issue"); *see also Harris Corp. v. Giesting & Assocs.*, 297 F.3d 1270, 1273-1274 (11th Cir. 2002) ("termination for convenience" clause unambiguous and therefore "parol evidence may not be admitted, and the district court erred by permitting [plaintiff] to enter parol evidence and by instructing the jury to consider it" (citing Section 201(2)).

Accordingly, when courts apply the principles embodied in Section 201(2), they uniformly do so only *after* determining that the contractual language at issue is ambiguous and thus that admission of extrinsic evidence is appropriate. *See, e.g.*, *U.S. for Use & Benefit of Union Bldg. Materials v. Haas & Haynie Corp.*, 577 F.2d 568, 572-574 (9th Cir. 1978) (where "parties attached different meanings to an ambiguous clause," the issue was "whether either party knew or had reason to know of the meaning given to the contract by the other"); *Flying J v. Comdata Network*, 405 F.3d 821, 832, 837-839 (10th Cir. 2005) (making threshold determination that "Article 4.2 is ambiguous" and proceeding to interpret "the meaning of Article 4.2" under Section 201(2)); *Bock v. Computer Assocs. Int'l*, 257 F.3d

5

700, 709 (7th Cir. 2001) (holding that term "incentive compensation" in severance-pay agreement was ambiguous in light of extrinsic evidence and remanding for trier of fact to determine "whether both parties shared the same meaning for the term …, or whether [Party *B*] knew, or had reason to know, [Party *A*]'s intended meaning"); *Brewer v. Muscle Shoals Bd. of Educ.*, 790 F.2d 1515, 1519-1520 (11th Cir. 1986) (holding that contractual requirement that employer "favorably consider" plaintiff for future position was ambiguous, and finding, based on extrinsic evidence, that because "[defendant] did not object to [plaintiff's] stated understanding of the term …, [defendant] is bound by [that] meaning."); *see also HPI/GSA—3C*, 364 F.3d at 1335 ("[A] party that enters without objection into a contract with knowledge of the other party's *reasonable* interpretation is bound by that *reasonable* interpretation." (emphases added)).

    2.    Here, this Court has already held that the Compact is unambiguous because, "[e]ven considering Plaintiff[s'] parol evidence, the Court cannot conclude that these provisions are reasonably susceptible to Plaintiff[s'] interpretation" that the Compact bars gaming in the Phoenix area. 5/7/13 Order 19. Indeed, Plaintiffs still cannot point to any *specific* "promise or agreement or a term thereof" in the Compact to which such an interpretation might attach. *Restatement* §201(2)(b). Accordingly, there is no need to determine "[w]hose [m]eaning [p]revails," and Section 201(2) has no application. *Id.* §201(2); *see Long*, 93 P.3d at 529 ("[O]ne cannot claim that one is 'interpreting' a written clause with extrinsic evidence if the resulting 'interpretation' unavoidably changes the meaning of the writing."). Put another way, this Court has already properly determined that "no reasonable reading of the Compact could lead a person to conclude that it prohibited new casinos in the Phoenix area," 5/7/13 Order at 25, and thus that, under Arizona law, Plaintiffs' extrinsic evidence is inadmissible, *see Long*, 93 P.3d at 528 (court may admit extrinsic evidence only if it finds that contractual language is "'reasonably susceptible'" to the proponent's interpretation). Section 201(2), which is a tool for interpreting ambiguous contractual terms, does not provide Plaintiffs a back door through which to introduce the very evidence this Court has already excluded.

6

Any other result would be contrary to the purpose of Section 201(2) and would have absurd consequences. Allowing Plaintiffs to use Section 201(2) as a means to introduce extrinsic evidence supporting an interpretation of the Compact this Court has already held to be *unreasonable* would unmoor Section 201(2) from its express objective: to determine the "meaning" of an "[u]ncertain[]" contractual term. *Restatement* §201 cmt. b. It would transform a principle of contract *interpretation* into a freestanding claim for relief completely divorced from the parties' actual, unambiguous agreement. *Any* claimed "meaning"—no matter how absurd or contrary to the words of the contract the parties signed—could be the basis for relief under Section 201(2) if it could be shown that the other party had a "reason to know" of the claimed "meaning." That result would eviscerate the parol evidence rule. As Arizona courts have made clear, "even under Arizona's more permissive approach to the parol evidence rule, a proponent of parol evidence cannot completely escape the confines of the actual writing." *Long*, 93 P.3d at 529. But allowing parties to introduce extrinsic evidence of their *unreasonable* understanding of an *unambiguous* contract would permit them to do precisely that, thus turning every contract case into a dispute about the parties' subjective intentions, wholly unrelated to their actual agreement. That is simply not the law.

In the last analysis, Plaintiffs' attempt to invoke Section 201(2) here is yet another effort to recycle their failed material misrepresentation and fraudulent inducement claims, in which they alleged that the Nation failed to correct their mistaken assumption that they would retain their monopoly over gaming facilities in the Phoenix area. *See* Pls.' Opp. to MTD 23 (alleging in support of those claims that the Nation "fail[ed] to 'correct a mistake of the other party as to a basic assumption on which that party is making the contract and [such] … non-disclosure … amount[ed] to a failure to act in good faith.'" (quoting *Restatement* §161(b)). This Court has already dismissed those claims, MTD Order 18-19, and Plaintiffs cannot now revive them under the guise of Section 201(2).

3.   In any event, even if Section 201(2) could somehow apply here notwithstanding this Court's holding that the Compact is unambiguous, and even assuming that the State truly held the unreasonable belief that the Compact would bar the Nation from

7

gaming in the Phoenix area and that the Nation knew of this belief, Plaintiffs' argument would still fail.[1] On this record, no reasonable factfinder could conclude that the State "had no reason to know of any different meaning attached" to the Compact by the Nation. *Restatement* §201(2)(b). As the *Restatement* itself observes, "[o]rdinarily a party has reason to know of meanings in general usage." *Id.* §201 cmt. b. This Court has held not only that the Nation's reading of the Compact comports with "meanings in general usage," but that it is *the only reasonable interpretation* of the Compact. 5/7/13 Order 25. Plaintiffs cannot show that the State had no reason to know that the Nation would read the Compact to mean precisely what it says.

## II. IF THIS COURT APPLIES SECTION 201(2) IN THIS CASE, IT SHOULD CONSIDER ONLY THE UNDERSTANDING OF THE STATE'S NEGOTIATORS AT THE TIME THE DISPUTED TERM WAS AGREED UPON

Because *Restatement* §201(2) does not apply where, as here, the contract at issue is unambiguous, this Court need not determine to which representatives of the State it should look "[t]o decide what the State understood when the Compact was entered, and what the Nation knew about the State's understanding." 5/7/13 Order 25. If, however, the Court believes that Section 201(2) is relevant, then it should consider only the understanding of the State's representatives charged with negotiating the Compact, at the time that the disputed term was agreed upon—that is, when the Compact Framework was finalized (or, at the latest, when Proposition 202 was filed).

As discussed above, Section 201(2) provides that a court faced with competing interpretations of ambiguous contract language should construe the contract against the party who was in the best position to avoid the ambiguity in the first place. *See* 2 *Farnsworth*

---

[1] In fact, it is wholly implausible that the State believed that the Compact categorically barred new casinos in Phoenix. Plaintiffs cite statements made during the Proposition 202 campaign suggesting that the Compact would result in "no new casinos in Phoenix," but the plain language of the Compact makes clear that such statements were not literally true. For instance, the Compact included a so-called "poison pill" provision providing that if a non-Indian entity were ever allowed to conduct gaming operations, tribes could engage in unlimited gaming without amending their compacts. *See* Compact §3(h)(1). The language of the Compact thus put both sides on notice that, under certain circumstances, additional gaming facilities in Phoenix would be permitted.

8

§7.9.  For obvious reasons, this inquiry focuses on the parties' understandings "*at the time the agreement was made*."  Restatement §201(2) (emphasis added); *see also Taylor*, 854 P.2d at 1139 (courts interpreting ambiguous contract provisions seek to determine "'the intention of the parties at the time the contract was made'").  The parties' later understanding is irrelevant, as is the understanding of persons who were not parties to the contract and thus could not have altered its language.

Here, the actual participants in the Compact negotiations on behalf of the State and the Nation would have been in the best position to point out and avoid ambiguity (had there been any).  The negotiators for both sides spent more than two years in intensive negotiations crafting the precise language that was ultimately included in the Compact.  Quigley Decl. ¶20.  Indeed, "the State and tribal representatives worked on both high-level and lower-level deal points, as well as negotiating and drafting the text of the written compact provisions."  *Id.* ¶5.  Accordingly, those representatives would have had the best opportunity to identify and remedy any ambiguity that might have arisen by proposing new language to address any concerns over the meaning of the Compact's provisions.  *See id.* ¶¶2-22, 24.  The Governor was not involved in the fine points of the negotiations.  *See id.* ¶5 ("The vast majority of the meetings between the tribes and the State did not include the Governor or her top advisers, but instead included executive staffers[.]").  And neither the legislature nor the voters played any part at all in the Compact negotiations or the crafting of the disputed Compact terms.

Moreover, the understanding that is relevant for purposes of Section 201(2) is the parties' understanding at the time they agreed upon the disputed contractual term.  Plaintiffs point to several alleged statements that the Compact would prohibit new casinos in Phoenix that were made during the legislative effort and Proposition 202 campaign, but those campaigns occurred only *after* the parties had agreed on the major deal points, including the provisions of the Compact governing the number and location of gaming facilities.  Specifically, the negotiations between the tribes and the State ended in early 2002.  Quigley Decl. ¶9.  In mid-February 2002, the parties turned their attention to securing legislative support to grant the Governor authority to enter into standard form compacts with the tribes

9

1  consistent with the "Compact Framework," a detailed summary of the key decision points
2  that had been reached during negotiations. *See id.* ¶¶9, 88-92, 97; *see* Nagaraj Ex. 13. The
3  proposed legislation dealt with the grant of authority to the Governor only; it would not have
4  allowed the legislature to change the Compact language or the points of agreement embodied
5  in the Compact Framework. Quigley Decl. ¶¶9, 88-92, 97.

6      The legislative effort failed, and in mid-May 2002, the tribes filed a ballot initiative,
7  Proposition 202, requiring the Governor to enter into a standard form compact with the tribes
8  based on the Compact Framework. *Id.* ¶¶10, 98-102; *see* Nagaraj Ex. 14. After that point,
9  the parties had no ability to alter the major points of the Compact, including the provisions
10 governing the location of gaming facilities. And the voters were asked simply to vote up or
11 down on whether the Governor should be required to enter into the Compact with the
12 provisions set out in Proposition 202. Like the legislature, the voters were not choosing
13 among competing versions of compact language or given any vehicle for expressing their
14 understanding of what the language meant. *Id.* ¶10. Proposition 202 ultimately passed, and
15 the Governor was thus legally required to sign the Compact pursuant to Proposition 202.
16 The State accordingly entered into materially identical compacts with the Nation and many
17 other tribes in December 2002. *Id.*

18     In short, given the purpose of Section 201(2), the relevant understanding is that of the
19 persons who negotiated the Compact language on behalf of the State and the Nation at the
20 time the disputed terms of the Compact were agreed upon—when the Compact Framework
21 was finalized, or, at the latest, when Proposition 202 was filed, after which the parties had no
22 effective ability to alter the disputed terms.

## CONCLUSION

24     The Nation's motion for summary judgment should be granted in its entirety.

| | | |
|---|---|---|
| 1 | Dated:  May 22, 2013 | Respectfully submitted, |

/s/ Danielle Spinelli
Jonathan Jantzen,
   Attorney General, SBN 016220
Samuel Daughety,
   Assistant Attorney General, SBN 023170
Office of Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ  85634
Telephone: (520) 383-3410
jonathan.jantzen@tonation-nsn.gov
samuel.daughety@tonation-nsn.gov

Seth P. Waxman (*Pro hac vice*)
Danielle Spinelli (*Pro hac vice*)
Annie L. Owens (*Pro hac vice*)
Shivaprasad Nagaraj (*Pro hac vice*)
Sonya L. Lebsack (*Pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 663-6000
seth.waxman@wilmerhale.com
danielle.spinelli@wilmerhale.com
annie.owens@wilmerhale.com
shiva.nagaraj@wilmerhale.com
sonya.lebsack@wilmerhale.com

Michael J. Rusing, SBN 006617
Todd M. Hardy, SBN 023675
RUSING LOPEZ & LIZARDI, PLLC
6363 N. Swan Road, Suite 151
Tucson, AZ  85718
(520) 792-4800
mrusing@rllaz.com
thardy@rllaz.com
*Counsel for Defendant Tohono O'odham Nation*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22d day of May, 2013, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, which will send a notice of filing to all counsel of record.

/s/ Danielle Spinelli
DANIELLE SPINELLI