1

2

Mary R. O'Grady (#011434)
John L. Blanchard (#018995)
Shane M. Ham (#027753)
Grace E. Rebling (#028661)
OSBORN MALEDON, P.A.
2929 North Central Avenue
Suite 2100
Phoenix, Arizona 85012
(602) 640-9352
mogrady@omlaw.com
jblanchard@omlaw.com
sham@omlaw.com
grebling@omlaw.com

*Attorneys for Plaintiff Salt River Pima-
  Maricopa Indian Community*

Thomas C. Horne (#002951)
Attorney General
Michael Tryon (#003109)
Evan Hiller (#028214)
Assistant Attorneys General
1275 West Washington Street
Phoenix, Arizona 85007-2926
(602) 542-5025
Tom.horne@azag.gov
Michael.tryon@azag.gov
Evan.hiller@azag.gov

*Attorneys for Plaintiff the State of
  Arizona*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

Linus Everling, General Counsel
  (#019760)
GILA RIVER INDIAN COMMUNITY
525 W. Gu u Ki
P.O. Box 97
Sacaton, Arizona 85247
(520) 562-9763
Linus.Everling@gric.nsn.us

James P. Tuite (Pro Hac Vice)
Merrill C. Godfrey (Pro Hac Vice)
Jason T. Hauter (#022188)
AKIN GUMP STRAUSS HAUER &
  FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
(202) 887-4000
jtuite@akingump.com
mgodfrey@akingump.com
jhauter@akingump.com

Brian J. Schulman (#015286)
GREENBERG TRAURIG LLP
2375 E. Camelback Road, Suite 700
Phoenix, AZ 85016
602-445-8000
schulmanb@gtlaw.com

*Attorneys for Plaintiff Gila River Indian
  Community*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| **The State of Arizona**; **The Gila River Indian Community**, a federally recognized Indian tribe; and **The Salt River Pima-Maricopa Indian Community**, a federally recognized Indian tribe,<br><br>Plaintiffs,<br><br>v.<br><br>**The Tohono O'odham Nation**, a federally recognized Indian tribe,<br><br>Defendant. | Case No. 2:11-cv-00296-DGC<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF**<br><br>(Assigned to Hon. David G. Campbell) |

1        Pursuant to the Court's Order of May 7, 2013 [Doc. 216], Plaintiffs hereby

2   submit the following supplemental brief addressing the Court's questions regarding

3   the Restatement (Second) of Contracts ("Restatement" or "Rest.") § 201(2).

4   **I.**    **SECTION 201(2) APPLIES ACCORDING TO ITS TERMS, WITHOUT**

5          **ANY ADDED STANDARD OF REASONABLENESS.**

6        There is no authority for imposing a standard of reasonableness as a limiting

7   overlay on § 201(2).  As far as Plaintiffs are aware, no court has applied a

8   reasonableness requirement to § 201(2).[1]  In particular, there is no such authority

9   under Arizona law.  To the contrary, the Restatement and case law applying it make

10  clear that no such limitation exists.  Arizona law applies to interpretation of the

11  Compact [Doc. 216 at 14], and the language of the Restatement as written must

12  control here because Arizona courts follow the Restatement "[a]bsent *Arizona law* to

13  the contrary."  *Ft. Lowell-NSS Ltd. P'ship v. Kelly*, 166 Ariz. 96, 102, 800 P.2d 962,

14  968 (1990) (emphasis added).

15       The application of § 201(2) when one party has an "unreasonable"

16  interpretation of a contract term is illustrated by *Bock v. Computer Associates Int'l,*

17  *Inc.*, 257 F.3d 700 (7th Cir. 2001).  *Bock* involved a suit against the company that had

18  acquired Platinum, the plaintiff's former employer, over whether a severance

19  agreement included commissions in severance pay calculations.  The district court

20  held that the agreement was ambiguous because both plaintiff's and defendants'

21  interpretations were reasonable.  *Id.* at 705-06.  The court of appeals reversed on this

22  point, rejecting as unreasonable Platinum's interpretation that commissions were

23  excluded.  *Id.* at 706 ("There is nothing in the language of the agreement itself to

24  make this a reasonable interpretation.")  It nevertheless cited § 201(2) and remanded

25  to the district court for "findings on the question whether Bock knew, or had reason to

26  know, Platinum's intent with respect to commissions."  *Id.* at 708, 709.  The court

27  ───────────────

28      [1] The Nation has never raised this "reasonableness" argument against
application of § 201.

1    explained:  "The alleged breach turns entirely on the question for which we are

2    remanding to the district court: did Bock know, or have reason to know, that Platinum

3    intended to exclude commissions?  If he did, Platinum may be rescued from the plain

4    and ordinary meaning of the severance agreement itself.  If he did not, Bock may

5    prevail as a matter of pure contract interpretation."  *Id.* at 711; *cf. Local Union 1395,*

6    *Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B.*, 797 F.2d 1027, 1035-1036 (D.C.

7    Cir. 1986) (citing § 201, reversing, and remanding for consideration of whether the

8    parties manifested differing interpretations of their agreement, even though, "[w]ere

9    we faced only with the language of the agreement itself, we would have little trouble

10   upholding the Board's order").

11        Here, as in *Bock*, findings regarding what each party knew or had reason to

12   know are required, notwithstanding the Court's determination that the State's

13   interpretation of the Compact is not reasonable.  Application of § 201(2) is mandatory

14   and unconditional.  "In cases of misunderstanding, *there must be an inquiry* into the

15   meaning attached to the words by each party and into what each knew or had reason

16   to know.  See § 201."  Rest. § 214 cmt. b (emphasis added).  Moreover, comment b to

17   § 201 explains that "the question of meaning in cases of misunderstanding *depends on*

18   an inquiry into what each party knew or had reason to know . . . . See § 20 and

19   Illustrations."  Rest. § 201 cmt. b (emphasis added).

20        Section 20 amplifies this point.  It concerns contract formation and provides a

21   rule, in § 20(2), parallel to § 201(2): where there is a misunderstanding at formation, a

22   contract is formed according to the meaning attached by the one party, where the

23   other knows the meaning the one has attached.  Section 20 places fault squarely on the

24   other party who knows of the first party's meaning and enters the contract without

25   addressing it—regardless of objective reasonableness.  "Subsection (2) deals with

26   cases where both parties are not equally at fault.  If one party knows the other's

27   meaning and manifests assent intending to insist on a different meaning, he may be

28   guilty of misrepresentation.  *Whether or not there is such misrepresentation* as would

3

give the other party a power of avoidance, *there is a contract under Subsection (2)(a)* . . . ." Rest. § 20 cmt. d (emphasis added).  Thus, the party unaware of the difference in meaning may elect either to avoid the contract by proving misrepresentation (an election foreclosed here by the Court's ruling on sovereign immunity [Doc. 43 at 20]), or to enforce the contract according to the meaning that it has attached to the contract.

An illustration in the Restatement makes clear that objective reasonableness is not a requirement to enforce the meaning of the party who was unaware:

> A says to B, "I offer to sell you my horse for $100." B, knowing that A intends to offer to sell his cow for that price, not his horse, and that the word "horse" is a slip of the tongue, replies, "I accept." The price is a fair one for either the horse or the cow.  There is a contract for the sale of the cow and not of the horse.

Rest. § 20 cmt. d illus. 5.  And even "[i]f the price is excessive for the cow," A *still* can enforce the contract for the cow unless B meets the standards "applicable in a suit for reformation."  Rest. § 20 Reporter's Note to cmt. d.

Obviously it is not objectively reasonable to believe that the word "horse" means "cow."  Without reference to extrinsic evidence, the contract in Illustration 5 could mean only one thing.  Yet under the Restatement, B's contract to purchase a horse obligates B to purchase the cow, because "a party who makes a contract knowing of a misunderstanding is sufficiently at fault to justify his being subjected to the other party's understanding." *Centron DPL Co. v. Tilden Fin. Corp.*, 965 F.2d 673, 675 (8th Cir. 1992) (quoting E. Allan Farnsworth, *Contracts* 488 (2d ed. 1982)); *accord* E. Allan Farnsworth, *Contracts* § 7.9 at 462 (3d ed. 1999) ("Farnsworth").

This case presents an analogous situation.  The State negotiated and executed the Nation's 2002 compact (the "Compact") believing the written agreement expressed its unmistakable intent to bar additional casinos in the Phoenix area—the State meant "cow" but the Court has ruled that the written Compact says "horse." The Compact is enforceable to prevent additional casinos in Phoenix if the Court's resolution of the disputed facts shows that the Nation knew or had reason to know the

4

1    State meant "no additional casinos in Phoenix" when it executed the Compact, and the

2    Nation knowingly remained silent—particularly where it did so with the intent of

3    enforcing a different interpretation later.  This result is required by the Restatement

4    and thus required by Arizona law.  *Ft. Lowell-NSS*, 166 Ariz. at 102, 800 P.2d at 968.

5            As the "horse-cow" illustration shows, enforcing a known yet unreasonable

6    interpretation makes sense because § 201 is an inquiry into meanings actually

7    attached by one or both parties, rather than the meanings of objectively reasonable

8    third parties.  "In a dispute over contract interpretation, each party claims that the

9    language should be given the meaning that that party attaches to it at the time of the

10   dispute.  However, the resolution of the dispute begins, not with these meanings, but

11   with the meanings attached by each party at the time the contract was made."

12   Farnsworth § 7.9 at 458-59.  For this reason, objectively unreasonable meanings

13   actually attached by at least one party are enforceable under 201(1) as well as 201(2).

14   In *Johnson v. Cavan,* application of § 201(1) trumped the argument that "the lease

15   does not mention parking spaces and is facially unambiguous."  152 Ariz. 452, 454,

16   733 P.2d 649, 651 (App. 1986). "Surely if one party shows that the other party

17   attached the same meaning that the first party did, the other party should not be able

18   to avoid that meaning by showing that a reasonable person would have attached a

19   different one."  Farnsworth § 7.9 at 459.[2]

20           The same logic holds under § 201(2).  Just as § 201(1) holds the parties to a

21   meaning attached by both, § 201(2)(a) enforces one party's attached meaning when

22   the other party knowingly remains silent and signs the contract, because it has

23   "acquiesced in and is bound by the meaning" attached by the other party.  *Perry &*

---

[2] Indeed, if the parties each attached the same meaning to their agreement, that meaning must be enforced, even if the written agreement is based on a convoluted secret code known only to the parties. *See Bibb v. Allen*, 149 U.S. 481, 494-96 (1896).  The same reasoning applies under § 201(2), so long as the one party who attached a particular meaning to the contract can "convince the court that the other party knew or had reason to know the meaning of the symbols used in accordance with the translation asserted."  5 Corbin on Contracts § 24.8 at 58 (rev. ed. 1998) ("Corbin").  The views of a hypothetical reasonable person are not relevant.

1   *Wallis, Inc. v. United States*, 427 F.2d 722, 725 (Ct. Cl. 1970) (cited in the Reporter's

2   Note to Rest. § 201 cmt. b).  When § 201(2)(a) applies, only one meaning attached by

3   a party is known to both parties at the time of contracting.  For this reason, "[a] party

4   who willingly and without protest enters into a contract with knowledge of the other

5   party's interpretation of it is bound by such interpretation and cannot later claim that it

6   thought something else was meant."  *Perry & Wallis*, 427 F.2d at 725; *accord Emor*

7   *Inc. v. Cyprus Mines Corp.*, 467 F.2d 770, 775 (3d Cir. 1972) (also cited in the

8   Reporter's Note to Restatement § 201 cmt. b).  This rationale of willing, knowing

9   acquiescence leaves no room for what a third party might think is reasonable.  The

10  more unreasonable the one party's meaning, the more unreasonable the second party's

11  manifestation of assent without protest.  Both parties may have been unreasonable,

12  but it is the second who knowingly proceeded in the face of a misunderstanding.

13          The Restatement explicitly establishes the primacy of the "subjective" intent of

14  the parties, manifested objectively.  "Interpretation of contracts deals with the

15  meaning given to language and other conduct by the parties rather than with meaning

16  established by law."  Rest. § 212 cmt. a.  Even an objectively unreasonable meaning

17  attached by one of the parties controls under § 201, because an objective

18  reasonableness standard is an inferior "meaning established by law."  While meaning

19  itself is subjective, proof of meaning must be objective: "the relevant intention of a

20  party is that manifested by him rather than any different undisclosed intention."  *Id.*;

21  *accord* Rest. § 2 cmt. b.  After making this distinction between subjective meaning

22  and objective proof, the comment refers back to § 201 as a search for a meaning

23  known to both parties:  "*There may be a contract* [*i.e.*, mutual assent] in accordance

24  with the meaning of one party if the other knows or has reason to know of the

25  misunderstanding and the first party does not.  See §§ 200, 201."  If the Restatement

26  included an unwritten reasonableness requirement in § 201, these explanations of the

27  distinctions between the subjective and objective components in interpretation would

28

be incorrect and incomplete.[3]

The Restatement also notes the distinction between the inquiry of § 201(2)(a), regarding actual subjective knowledge by the second party of the first party's attached meaning, and § 201(2)(b), where the "reason to know" standard relies on a partly objective determination:  "When a party is thus held to a meaning of which he had reason to know, it is sometimes said that the 'objective' meaning of his language or other conduct prevails over his 'subjective' meaning."  Rest. § 212 cmt. a.  But the comment emphasizes that even under § 201(2)(b), "the operative meaning is found in the transaction and its context rather than in the law or in the usages of people other than the parties."[4]  *Id.*

In sum, under Arizona law a court may not add a "reasonableness" element to the Restatement in conflict with a meaning proven under § 201.

## II.    THE STATE'S UNDERSTANDING OF THE COMPACT IS THE MEANING ATTACHED BY THE GOVERNOR AND HER AGENTS.

The trier of fact should look to the understanding of the Governor and her agents in the negotiations to determine the meaning the State attached to the Compact.

---

[3] Other bodies of law make the same distinction between (1) meaning actually subjectively attached by at least one party and known to the other, and (2) objectively reasonable meanings, and prioritize the former over the latter.  The Vienna Convention "provides that if the other party 'knew or could not have been unaware' of a party's intent, the latter's intent prevails, and that *otherwise* recourse is to be had to 'the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances.'"  Farnsworth 463 n.19.  The United Nations Convention on Contracts for the International Sale of Goods, Article 8, Paragraph 1 provides that "statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what that intent was."  Paragraph 2 then provides, "*If the preceding paragraph is not applicable*, statements made by and other conduct of a party are to be interpreted according to the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances."  5 Corbin § 24.5 at 19 & n.43 (noting that this "mirrors" the Restatement's approach) (emphasis added).

[4] Thus, the one caveat to the § 201(2)(b) subjective inquiry is that the "reason to know" standard has an objective aspect; an interpretation may be so unreasonable that, absent other circumstances, the other party cannot have had "reason to know" of it.  Still, "reason to know" is not the same as objective reasonableness, because it depends on inferences that would normally be drawn by a person in that party's position from information actually possessed by that party.  § 19 cmt. b.  Thus "reason to know" is "to be distinguished from knowledge and from 'should know.'"  *Id.*

As the signer of the Compact and the only person authorized by the voters to negotiate and execute the Compact on behalf of the State, the Governor is the person whose understanding of the Compact is relevant for analyzing Restatement § 201(2), and the understanding of her agents is imputed to her.

A.    **The State's Attached Meaning Is Determined by the Understanding of the Governor and Her Agents**

Since both the Arizona Legislature and the Proposition 202 voters expressly authorized the Governor to negotiate and execute tribal-state gaming compacts under IGRA, a trier of fact should look to Governor Hull and her representatives to determine the meaning the State attached to the Compact.  In 1992, the Arizona legislature gave the Governor the power to negotiate and execute gaming compacts on behalf of the State.  A.R.S. § 5-601(A).  And in November 2002, through Proposition 202, Arizona voters exercised the power reserved to them by the State's constitution to authorize the Governor to finalize and execute tribal-state gaming compacts that met certain conditions.  A.R.S. § 5-601.02(A).  Proposition 202 also authorized the State, through the Governor, to negotiate and enter into amendments to the Compact.  A.R.S. § 5-601.02(E).  Having been thus authorized to act for the State in negotiating and executing tribal-state compacts, the Governor had a duty to take care that these laws be faithfully executed.  *See Salt River Pima-Maricopa Indian Community v. Hull*, 945 P.2d 818, 824-25 (Ariz. 1997).

Governor Hull negotiated the compacts for years, told voters what it would mean, and with authority from the voters she executed the compacts for the State.  It is undisputed that Governor Hull understood that the Compact would permit no additional casinos in Phoenix.  *E.g.*, Doc. 199 ¶¶ 142, 146, 157-58, 193.  As Governor Hull explained in the publicity pamphlet that accompanied Proposition 202, "[v]oting 'yes' on Proposition 202 ensures that no new casinos will be built in the Phoenix metropolitan area and only one in the Tucson area for at least 23 years."  Doc. 199 ¶ 193.  Governor Hull also supported the Proposition 202 campaign, a major talking

8

1    point of which was that the Compact would not authorize any additional casinos in the

2    Phoenix market.  Doc. 199 ¶ 142-154, 156-170, 184-193.

3        There is no record evidence that Governor Hull's understanding of the

4    Compact changed prior to execution.  Indeed, the Nation does not dispute that it never

5    corrected the statements by Governor Hull, AIGA, the Proposition 202 campaign,

6    numerous print and broadcast reporters, and others that the standard form compact

7    would allow no additional gaming facilities in the Phoenix market.  Doc 204 ¶ 196.

8    In fact, the Nation admits that the record does not reveal a *single* person who *ever*

9    disputed the numerous claims that the Compact would permit no additional casinos in

10   the Phoenix market.  *Id.* at ¶ 194.

11       The Arizona voters who passed Proposition 202 gave the Governor authority to

12   enter into compacts which included terms previously negotiated by the Governor, to

13   conduct further negotiations (including authority to make both substantive and

14   technical amendments), and to execute the compacts on the State's behalf.  A.R.S.

15   §§ 5-601.02(A); (E); (F); (I)(6).  Unlike voters, who only authorized further actions

16   by the Governor, Governor Hull negotiated, reviewed, and executed a complete

17   compact; no complete compact was ever provided to the voters or Legislature.[5]

18       Governor Hull's understanding of the Compact was informed by the

19   knowledge and understanding of the individuals who represented her in negotiations.

20   The State negotiators, including Mike Bielecki and Steve Hart, acted as the

21   Governor's agents in negotiating the Compact.  *See, e.g.*, Restatement (Third) of

22   Agency §§ 1.01 (agency defined), 1.08 (duty of agent to provide information to

23   principal); *Salt River Valley Water Users' Association v. Giglio*, 549 P.2d 162, 167

24   (Ariz. 1976) ("Agency is a question of intent and generally the agent must be acting

25   under the control of the principal and for the principal's benefit."); *cf. Cachil Dehe*

26

27   _____
     [5] After the election but before executing the Compact, the Governor and the
     Nation made changes to the text of Proposition 202.  *Compare, e.g.*, Compact [Doc.
28   195-11] § 3(v)(2)(D) *with* A.R.S. § 5-601.02(I)(6)(b)(iii) (authorized disclosure of
     confidential information expanded beyond authority granted by Proposition 202).

1    *Band of Wintun Indians v. California*, 618 F.3d 1066, 1076 n.5 (9th Cir. 2010)

2    (California submitted declaration of state negotiators as evidence of state's intent);

3    *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039 (9th Cir. 1996) (Montana submitted

4    declaration of state negotiators as evidence of state's understanding). The State

5    negotiators understood from meetings with the tribes that there would be no additional

6    casinos in the Phoenix area under the Compact. *E.g.*, Doc. 199 ¶¶ 79, 86, 120. There

7    is no evidence that the State negotiators ever had a different understanding.[6]

8           Governor Hull and the State negotiators understood, and represented to voters,

9    legislators, and tribes, that the Compact would not allow additional casinos in Phoenix

10   and allow only one additional casino in the Tucson market.  This meaning constitutes

11   the State's meaning when the parties executed the Compact.  Moreover, because the

12   Nation dealt principally and extensively with the Governor's representatives in the

13   negotiations, those communications are most probative in determining "what the

14   Nation knew about the State's understanding."  Doc. 216 at 25.

15          **B.     The Meaning Attached by the State Is Not Dependent on the
16                   Legislature's or Voters' Understandings of the Executed Compact**

17          Neither the Legislature nor the voters had the opportunity to review the

18   complete, integrated Compact and thus only the Governor could possibly know the

19   full effect of the Compact at the time of execution.  The voters intended, through

20   Proposition 202, to remedy a "legal roadblock" precluding the Governor from

21   executing the new compacts that the parties had been negotiating since 2000.  Doc.

22   195-14 at 2.  The declaration of purpose explains that Proposition 202 was "critical to

23   promptly resolve any technical deficiencies in current state law and provide a means

24   for the state to enter into new or amended tribal-state gaming compacts."  *Id.*  The

25   _____

26          [6] The Nation cites only to negotiating meetings in which the State proposed a
     complete ban on all gaming on after-acquired lands.  *See* Doc. 193 at 17.  But a
27   complete ban—including prohibiting gaming on contiguous after-acquired lands—is
     an entirely different proposal from one that prohibits new casinos in the Phoenix
28   metropolitan area.  These conversations shed no light on the State negotiators'
     understanding of whether the Compact barred additional casinos in the Phoenix area.

1   voters' intent was to authorize the Governor to complete and execute the tribal-state

2   compacts; it was not their intent to execute on behalf of the State a fully integrated

3   compact through Proposition 202, much less to preempt the terms previously

4   negotiated by the Governor as understood by her and presented to voters.

5          The Legislature's intent here is not relevant.  Any power the Legislature may

6   have had to negotiate and execute tribal-state compacts was previously delegated to

7   the governor.  A.R.S. § 5-601.  Because a judicial ruling held that authority to be

8   insufficient, *American Greyhound Racing, Inc. v. Hull*, 146 F. Supp. 2d 1012 (D. Ariz.

9   2001), the Compact entered into by the Governor on behalf of the State was executed

10  by the authority granted from the people in A.R.S. § 5-601.02, not by any authority

11  granted by the Legislature.  Similarly, the Legislature's non-action in 1993 effectively

12  permitted Governor Symington to negotiate and execute the 1993 compact without

13  statutory conditions.  Although statements made to the Legislature shed light on

14  Governor Hull's view of the Compact, the Legislature's intent is irrelevant.

15         In any event, the record reveals no evidence that the voters who supported

16  Proposition 202 or individual legislators held a different view on Phoenix casinos than

17  Governor Hull.[7]  The Nation concedes that no statement was ever made to voters by

18  anyone which contradicted the State and AIGA talking point that the Compact would

19  permit no additional casinos in the Phoenix area.  Doc. 204 ¶ 194.  Objective evidence

20  of voter or legislative intent leads to the same conclusion.

## CONCLUSION

22         For the foregoing reasons, the Court should deny the Nation's motion for

23  summary judgment and set the § 201(2) issue for trial.

---

25         [7] The Nation cites only to a single obtuse statement that Proposition 202
26  "greatly widens the scope of gaming" in the publicity pamphlet by a *former* state
    negotiator who did not participate in the 1999-2002 negotiations.  Doc. 195-14 at 33.
27  This sheds no light whatsoever on the State's understanding of the Compact.  In any
    event, the statement about the scope of gaming appears to refer to the addition of
28  blackjack and poker to the compacts for the first time.  *Compare* Doc. 195-4 at 16-17
    *with* Doc. 195-11 at 19 (Section 3(a) of 1993 and 2002 compacts).

1        RESPECTFULLY SUBMITTED this 22nd day of May 2013.

2    OSBORN MALEDON, P.A.            GILA RIVER INDIAN COMMUNITY

3    By s/ Shane M. Ham             By s/ James P. Tuite (with permission)

4      Mary R. O'Grady                Linus Everling, General Counsel
     John L. Blanchard              525 W. Gu u Ki

5      Shane M. Ham                 P.O. Box 97
     Grace E. Rebling               Sacaton, Arizona  85247

6      2929 N Central Avenue, Suite 2100
     Phoenix, Arizona  85012          James P. Tuite (*Pro Hac Vice*)

7                              Merrill C. Godfrey (*Pro Hac Vice*)
   *Attorneys for Plaintiff Salt River Pima-*    Jason T. Hauter (#022188)

8    *Maricopa Indian Community*        AKIN GUMP STRAUSS HAUER &
                              FELD LLP

9    OFFICE OF THE ATTORNEY       1333 New Hampshire Avenue, N.W.
   GENERAL, STATE OF ARIZONA     Washington, DC  20036-1564

10

11    By s/ Michael Tryon (with permission)    Brian J. Schulman
     Thomas C. Horne, Attorney General    GREENBERG TRAURIG LLP

12      Michael Tryon                 2375 E Camelback Road, Suite 700
     Evan Hiller                  Phoenix, Arizona  85016

13      Assistant Attorneys General
     1275 W Washington Street       *Attorneys for Plaintiff Gila River Indian*

14      Phoenix, Arizona  85007-2926     *Community*

15    *Attorneys for Plaintiff the State of*
   *Arizona*

16

17                   **CERTIFICATE OF SERVICE**

18

19       I hereby certify that on May 22, 2013, I electronically transmitted the attached
document to the Clerk's Office using the CM/ECF System for filing and transmittal of

20 a Notice of Electronic Filing to all CM/ECF registrants:

21

22 s/ Julie Greenwood

23

24

25

26

27

28