Jonathan Jantzen, Attorney General, SBN 016220
Samuel Daughety, Assistant Attorney General, SBN 023170
Office of Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ  85634
(520) 383-3410
jonathan.jantzen@tonation-nsn.gov
samuel.daughety@tonation-nsn.gov

Seth P. Waxman (*Pro hac vice*)
Danielle Spinelli (*Pro hac vice*)
Annie L. Owens (*Pro hac vice*)
Shivaprasad Nagaraj (*Pro hac vice*)
Sonya L. Lebsack (*Pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
seth.waxman@wilmerhale.com
danielle.spinelli@wilmerhale.com
annie.owens@wilmerhale.com
shiva.nagaraj@wilmerhale.com
sonya.lebsack@wilmerhale.com

*Counsel for Defendant Tohono O'odham Nation*

COUNSEL CONTINUED ON FOLLOWING PAGE

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| THE STATE OF ARIZONA, THE GILA RIVER INDIAN COMMUNITY, and THE SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY, <br><br> Plaintiffs, <br><br> v. <br><br> THE TOHONO O'ODHAM NATION, <br><br> Defendant. | Case No. 2:11-cv-296-DGC <br><br> **THE TOHONO O'ODHAM NATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL RECONSIDERATION** |

Michael J. Rusing, SBN 006617
Todd M. Hardy, SBN 023675
RUSING LOPEZ & LIZARDI, PLLC
6363 N. Swan Road, Suite 151
Tucson, AZ  85718
(520) 792-4800
mrusing@rllaz.com
thardy@rllaz.com

*Counsel for Defendant Tohono O'odham Nation*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Baladevon, Inc. v. Abbott Laboratories*, 871 F. Supp. 89 (D. Mass. 1994) ............................ 4

*Bender v. Highway Truck Drivers & Helpers Local 107*, 598 F. Supp. 178
        (E.D. Pa. 1984)............................................................................................................ 4

*Dorchester Exploration v. Sunflower Electric Cooperative*, 504 F. Supp. 926
        (D. Kan. 1980) ............................................................................................................ 5

*Frigaliment Importing v. B.N.S. International Sales*, 190 F. Supp. 116
        (S.D.N.Y. 1960)........................................................................................................... 2

*James v. Zurich-American Insurance Co. of Illinois*, 203 F.3d 250 (3d Cir. 2000) .................. 4

*Johnson v. Cavan*, 733 P.2d 649 (Ariz. Ct. App. 1986) ....................................................... 3, 4

*Long v. City of Glendale*, 93 P.3d 519 (Ariz. Ct. App. 2004) ................................................. 4

*Madeirense do Brasil S/A v. Stulman-Emrick Lumber Co.*, 147 F.2d 399
        (2d Cir. 1945)............................................................................................................. 3

*Skycam, Inc. v. Bennett*, 2011 WL 3293015 (N.D. Okla. Aug. 1, 2011)................................. 4

*Taylor v. State Farm Mutual Automobile Insurance*, 854 P.2d 1134 (Ariz. 1993) ............... 4, 7

## STATUTES

25 U.S.C. §2719 .......................................................................................................... 7

## OTHER AUTHORITIES

2 *Farnsworth on Contracts* §7.9 (3d ed. 2004) .................................................................... 2

*Restatement (Second) of Contracts* (1981)
        §201........................................................................................................ 1, 2, 3
        §201(1)................................................................................................... 1, 2, 4, 5
        §201(2)........................................................................................................ 1

i

1    Plaintiffs have moved for partial reconsideration of this Court's May 7, 2013, Order,

2   arguing that this Court overlooked evidence showing a genuine dispute of material fact

3   regarding the applicability of Section 201(1) of the *Restatement (Second) of Contracts*.

4   Plaintiffs contend that this Court should admit extrinsic evidence purportedly showing that

5   the Nation agreed with the State that, notwithstanding the Compact's unambiguous contrary

6   language, the Compact would bar the Nation from gaming on its Indian lands in the Phoenix

7   area.  Under Section 201(1), they contend, the State's unreasonable interpretation of the

8   Compact should be enforced notwithstanding the actual words of the parties' agreement.

9    This Court should deny that motion for two reasons.  *First*, as explained more fully in

10   the Nation's May 22, 2013, supplemental brief, Section 201 is an interpretive principle that

11   is relevant only where a contractual term is ambiguous and extrinsic evidence may illuminate

12   the meaning the parties attached to the ambiguous term.  In that respect, Section 201 is in

13   accord with the basic principle of Arizona contract law that extrinsic evidence may not be

14   introduced to vary the meaning of an unambiguous agreement.  Section 201 is not a vehicle

15   through which Plaintiffs may enforce what this Court has already concluded is an

16   *unreasonable* interpretation of an *unambiguous* contract.  *Second*, even if Section 201(1)

17   somehow applied, on this record, no reasonable factfinder could conclude that the Nation

18   intended, by entering into the Compact, to relinquish its right to game on its Indian lands in

19   the Phoenix area.  Indeed, this Court has already effectively so held, finding, after reviewing

20   all of Plaintiffs' extrinsic evidence, that "the parties did not reach such an agreement."

21   5/7/13 Order 2.  Nothing in Plaintiffs' motion suggests that the Court should revisit that

22   conclusion.

23    1.    Section 201(1) is inapplicable here for the same reason Section 201(2) is

24   inapplicable:  This Court has already determined that the Compact is unambiguous and that,

25   "[e]ven considering Plaintiff[s'] parol evidence, the Court cannot conclude that [it is]

26   reasonably susceptible to Plaintiff[s'] interpretation."  5/7/13 Order 19.  This Court also held

27   that the parties intended the written contract to be the complete and exclusive expression of

28   their agreement.  *Id.* at 21-22 ("The Court cannot infer an additional consistent term as

Plaintiffs request.").  Plaintiffs do not challenge those determinations in moving for reconsideration.  As the Nation's supplemental brief explains (at 2-7), Section 201 is a rule of interpretation to determine "[w]hose [m]eaning [p]revails" once a contractual ambiguity has been established.  *Restatement (Second) of Contracts* §201 (1981); *see also* 2 *Farnsworth on Contracts* §7.9 (3d ed. 2004) (explaining that the principles embodied in *Restatement* §201 aid the court in determining which party's meaning governs "in a dispute over contract interpretation").

Specifically, Section 201(1) provides that "[w]here the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning."  It implements the principle that, in interpreting a contract, a court should strive to ascertain the parties' intentions at the time the contract was made and enforce the parties' shared understanding of their agreement.  *See Restatement* §201 cmt. c. ("Subsection (1) makes it clear that the primary search is for a common meaning of the parties, not a meaning imposed on them by the law.").  That is so even if, in the absence of extrinsic evidence of the parties' understanding, the court would have interpreted the contract differently.  For instance, in the famous "chicken case," *Frigaliment Importing v. B.N.S. International Sales*, 190 F. Supp. 116 (S.D.N.Y. 1960), discussed in the Nation's supplemental brief (at 4), if both buyer and seller had intended that their contract for the sale of chickens be a contract for the sale of "broilers and fryers" only, under Section 201(1), the court would enforce the shared understanding of the parties even if, in common parlance, the word "chicken" has a broader meaning.

But it does not remotely follow that Section 201 contemplates enforcing *entirely unreasonable* interpretations of contracts.  Rather, Section 201 merely realizes that evidence of custom, usage, and the parties' negotiations can in some cases show that a term that has a generally used meaning that seems apparent on the face of the contract can also have a different meaning—and if the parties share that different meaning, their shared understanding should be enforced.  As the comments explain, "[u]nless a different intention is shown, language is interpreted in accordance with its generally prevailing meaning."

2

*Restatement* §201 cmt. a.  But "most words are commonly used in more than one sense," and "[d]ifferences of usage also exist in various localities and in different social, economic, religious and ethnic groups.  All these usages change over time, and persons engaged in transactions with each other often develop temporary usages peculiar to themselves." *Id.*  Section 201 provides a means to resolve such "[u]ncertainties in the meaning of words" by putting them into "the context in which they [were] used." *Id.* cmt. b.

The illustrations of "[m]utual understanding" given in the *Restatement* demonstrate exactly that kind of interpretation of an ambiguous term:

> A agrees to sell beer to B at a specified price per barrel.  At the time of the agreement both parties and others in their trade use as standard barrels wooden barrels which originally hold 31 gallons and hold less as they continue in use.  A statute defines a barrel as 31½ gallons.  The statute does not prevent interpretation of the agreement as referring to the barrels in use.

*Restatement* §201 cmt. c. ill. 3.  Even if a court might otherwise apply the statutory definition of "barrel," evidence of trade usage can show that a different reasonable definition exists and, if the parties agreed on it, can be enforced.  *See also id.* ill. 1 (even if term "f.o.b." is defined one way in the U.C.C., commercial usage may give the term a different meaning that can be enforced if extrinsic evidence shows the parties agreed on it); *Madeirense do Brasil S/A v. Stulman-Emrick Lumber Co.*, 147 F.2d 399, 402 (2d Cir. 1945) (basis for illustration 1).

The lone Section 201 case that Plaintiffs cited in their summary judgment briefing confirms the point.  *Johnson v. Cavan* presented the question whether the term "premises" in a lease should be construed to include parking spaces.  733 P.2d 649, 652 (Ariz. Ct. App. 1986).  Notably, in *Johnson*, *both* parties to the lease testified unequivocally that they intended to include the parking spaces in the leased "premises," and undisputed evidence showed that the parking spaces had been treated as part of the premises during the lease.  *See id.* at 650, 652.  The trial court had refused to consider that evidence at all on the ground that the language of the lease was unambiguous; the court of appeals reversed, noting that under Arizona law a court should examine extrinsic evidence to determine whether a contract is

reasonably susceptible to the claimed meaning. *Id.* at 651-652. Finding that, in light of the extrinsic evidence, the contract was reasonably susceptible to the parties' interpretation, the court held that under *Restatement* §201(1), the term "premises" should be interpreted to give effect to the parties' mutual understanding. *Id.* at 652.[1] In sharp contrast, in this case, this Court has already examined Plaintiffs' extrinsic evidence and determined that the Compact's language is not "reasonably susceptible" to Plaintiffs' interpretation in light of that evidence. Under Arizona law, that is the end of the inquiry. *See Taylor v. State Farm Mut. Auto. Ins.*, 854 P.2d 1134, 1140 (Ariz. 1993); *id.* at 1140 n.2 ("Some words are clear beyond dispute."); *Long v. City of Glendale*, 93 P.3d 519, 528 (Ariz. Ct. App. 2004) ("before admitting external evidence of the intent of the parties," a court will "first consider the allegations made by the proponent of the extrinsic evidence" to determine whether the language of the contract is "'reasonably susceptible'" to the interpretation alleged).

Other courts have similarly recognized that Section 201(1) is a tool for interpreting ambiguous language, not a means of "completely escap[ing] the confines of the actual writing," *Long*, 93 P.3d at 529. *See, e.g.*, *James v. Zurich-American Ins. Co. of Ill.*, 203 F.3d 250, 255 (3d Cir. 2000) (applying Section 201(1) only after holding that the contractual provision at issue "is ambiguous"); *Skycam, Inc. v. Bennett*, 2011 WL 3293015, at *7 (N.D. Okla. Aug. 1, 2011) (ending the interpretation inquiry upon finding that contract was unambiguous, but noting that Section 201(1) would apply only "[i]n the unlikely event a portion of the [contract] is deemed to be ambiguous"); *Baladevon, Inc. v. Abbott Labs.*, 871 F. Supp. 89, 98 (D. Mass. 1994) (concluding that "evidence as to both the contracting parties' subjective intent controls the *interpretation of ambiguous contract terms*" and applying Section 201(1) (emphasis added)); *Bender v. Highway Truck Drivers & Helpers*

---

[1] Contrary to Plaintiffs' description of *Johnson* in their supplemental brief (at 5), *Johnson* nowhere suggests that the meaning both parties attached to their agreement was "objectively unreasonable." To the contrary, it merely applied the basic Arizona rule regarding extrinsic evidence—that it is admissible if, in light of the evidence, the contract is reasonably susceptible to the interpretation the evidence is offered to support. 733 P.2d at 651.

*Local 107*, 598 F. Supp. 178, 187 (E.D. Pa. 1984) ("*[S]eeming uncertainties in the words of a contract* may frequently be made clear by looking to the intent of the bargaining parties." (emphasis added) (citing Section 201(1))); *Dorchester Exploration v. Sunflower Elec. Coop.*, 504 F. Supp. 926, 933, 934 (D. Kan. 1980) (according contractual language the meaning mutually assigned to it by the parties only after determining the language was "ambiguous" because "the language and punctuation employed in [the disputed clause] do not compel any definite [meaning]"). Plaintiffs' motion therefore fails at the threshold.

2.       Even if Section 201(1) applied here, however, Plaintiffs' motion would still fail. On this record, no reasonable factfinder could conclude that the Nation shared the State's unreasonable interpretation of the Compact and intended and agreed that the Compact would bar the Nation from gaming on its Indian lands in the Phoenix area. Indeed, this Court has effectively already so held: After examining all of Plaintiffs' extrinsic evidence offered in support of their claim that "the Nation and the State agreed there would be no new casinos in the Phoenix metropolitan area," the Court concluded that "the parties did not reach such an agreement." 5/7/13 Order 2. Plaintiffs have not asked this Court to revisit that holding. And they cannot achieve the same result through Section 201(1).

The evidence is overwhelming that the Nation never agreed that the Compact would bar it from gaming on its Indian lands in the Phoenix area. Indeed, the Compact by itself refutes the claim: The Compact means what it says, and that alone is compelling evidence that the Nation *intended* it to mean what it says. That is particularly true in light of the integration clause on which the parties agreed. *See* Compact §25 (the Compact "contains the entire agreement of the parties with respect to the matters covered by this Compact and no other statement, agreement, or promise made by any party, officer, or agent of any party shall be valid or binding").

Substantial undisputed evidence further supports that conclusion. For example, both the State's lead negotiator and Gila River's lead counsel separately proposed that the compact should prohibit gaming on all after-acquired lands. Indeed, Gila River's proposal was specifically motivated by the desire to prevent tribes from acquiring new trust lands near

Phoenix and seeking to game on them.  Quigley Decl. ¶54 ("Mr. Dahlstrom said he wanted to eliminate the possibility that a tribe could get after-acquired lands in trust near Phoenix and conduct gaming on the lands.").  There would have been no need for such a proposal if, as Plaintiffs claim, the parties had already agreed that the Compact would confine each tribe to its specific "market."  The parties rejected both proposals, instead agreeing that IGRA would continue to govern gaming on after-acquired lands—meaning that any tribe that acquired gaming-eligible trust lands in the Phoenix metropolitan area could game on those lands.  *See* Quigley Decl. ¶¶53-54; Nagaraj Ex. 30 (Hart Dep.) 146:21–147:24; Nagaraj Ex. 31 (Landry Dep.) 38:18–40:8; Nagaraj Ex. 37 (Ochoa Dep.) 88:1–89:25; Nagaraj Ex. 28 (Clapham Dep.) 57:19–58:6; Nagaraj Supp. Ex. 26 (Smith, W.M. Dep.) 16:4–17:2; Nagaraj Supp. Ex. 14 (Makil Dep.) 100:12-19; *see also* Compact §3(c)(3), (j)(1).  In addition, deposition testimony from Plaintiffs' own witnesses confirms that the Nation never agreed to limit its ability to game on its Indian lands beyond the limitations expressly set out in the Compact.[2]  In light of this record, the extrinsic evidence on which Plaintiffs rely is simply insufficient to create a genuine dispute of material fact regarding the Nation's intentions.  Plaintiffs claim (at 2) that "the Nation made a number of public statements that the Compact would not permit additional casinos in the Phoenix metropolitan area."  Even if that were true—and the Nation disputes that any such statements were ever made—in light of the

---

[2] *See, e.g.*, Nagaraj Ex. 43 (Walker Dep.) 43:19–24 ("Q. … [Y]ou can't point to any member of the Nation or any of their lobbyists or lawyers who have ever specifically stated that there would be no new casinos in the Phoenix area.  Correct?  A. Correct."); Nagaraj Ex. 41 (Severns Dep.) 54:7-9 ("I have no recollection of a conversation in which [the Nation] mentioned they would or would not build [a casino in Phoenix].");  Nagaraj Ex. 33 (Lewis Dep.) 44:1-17 (does not recall the Nation ever stating it would not game in Phoenix area); Nagaraj Ex. 35 (Makil Dep.) 95:7-11 ("Q. [Y]ou don't recall any specific representative of the Nation affirmatively stating that the Tohono O'odham would not build casinos in the Phoenix area.  Correct?  A. No one ever said anything to me."); Nagaraj Ex. 31 (Landry Dep.) 43:10-13 ("Q. During the negotiations, no one from the Tohono O'odham ever specifically stated that the tribe would never game in the Phoenix area, did they?  A. That's correct."); Nagaraj Ex. 32 (LaSarte Dep.) 62:21–63:15 ("Q. And at no time did the State ever ask the Tohono O'odham to agree never to game in the Phoenix metropolitan area.  Correct? … [A.] I do not recall any discussions for or against the possibility of Tohono O'odham gaming in the Phoenix metropolitan market[.]").

6

1    Compact's language and the record as a whole, those statements would not permit a

2    reasonable factfinder to conclude that the Nation intended the Compact to bar it from gaming

3    on its lands in the Phoenix area.

4          None of the statements on which Plaintiffs rely purports to be a precise articulation of

5    all the legal consequences of the lengthy and complex Compact.  All the statements were

6    supposedly made after the parties' negotiations over the terms of the Compact had

7    concluded, as part of the efforts, first, to get the legislature to pass a bill authorizing the

8    Governor to enter into the Compact, and later, to promote Proposition 202.  They were thus

9    necessarily simplified summaries of the Compact for the benefit of non-parties—non-parties

10   whose understanding Plaintiffs have now conceded is irrelevant to this suit.  *See* Pl. Supp.

11   Br. 10-11.  They were not statements made by the parties to each other about the legal

12   consequences of the Compact's language.  They thus shed little, if any, light on "'the

13   intention of the parties at the time the contract was made,'" which is the relevant inquiry.

14   *Taylor*, 854 P.2d at 1139.

15         In light of the Compact's actual language, the only possible conclusion is that those

16   simplified statements were never intended to capture fully all of the parties' legal rights and

17   obligations, including those contingent on changed circumstances.  At most, the statements

18   were predictions of the effect that the Compact would have on gaming in Arizona, assuming

19   the status quo remained in place.  That was true in several respects.  For example—and most

20   relevant here—the Compact unambiguously authorized gaming on after-acquired land to the

21   extent permitted by the Indian Gaming Regulatory Act.  *See* Compact §3(j)(1) ("Gaming

22   Activity on lands acquired after the enactment of the Act on October 17, 1988 shall be

23   authorized only in accordance with 25 U.S.C. §2719," which allows gaming on lands

24   acquired after IGRA's effective date if they are acquired as part of the settlement of a land

25   claim), §2(s) (providing for gaming on "Indian Lands" "subject to the provisions of 25

26   U.S.C. §2719").  In light of that clear language, any statements suggesting that the Compact

27   precluded new casinos in Phoenix were obviously based on the status quo, given that, at the

28   time, the tribes that already had trust land in the Phoenix area were operating their maximum

                                          7

1    number of allotted casinos, and no other tribe had after-acquired land in the Phoenix area

2    eligible for gaming.  The statements did not take into account possible changed future

3    circumstances, including that tribes would acquire new, gaming-eligible trust land in the

4    Phoenix area.  *See, e.g.*, Pl. Ex. 13 (LaSarte Dep.) 80:3-5, 80:19-22 ("nobody ever raised the

5    possibility that any tribe other than [the four Phoenix-area tribes] would operate a facility in

6    the Phoenix market," and "given those assumptions, nobody ever contemplated the

7    possibility that there would be a new tribe entering that market and increasing the number of

8    facilities in that market").

9         Such predictions regarding future casinos in Phoenix were necessarily premised on

10   other assumptions as well.  For instance, the Compact (and the Compact Framework)

11   included a so-called "poison pill" provision providing that if a non-Indian entity were ever

12   allowed to conduct gaming operations, the Compact's otherwise-applicable restrictions on

13   tribal gaming would be lifted, and the tribes could engage in unlimited gaming—including in

14   the Phoenix area—without amending their compacts.  *See* Compact §3(h)(1)(A) (if a non-

15   tribal entity is allowed to engage in gaming, then "[t]he Tribe shall be authorized under this

16   Compact to operate Class III Gaming Devices without limitations on the number of Gaming

17   Devices, the number of Gaming Facilities, or the Maximum Gaming Devices Per Gaming

18   Facility, and without the need to amend this compact"); Nagaraj Ex. 13 at 5 (Compact

19   Framework).  In fact, it is undisputed that the parties discussed and understood the legal

20   ramifications of the poison pill in contemplating Proposition 201, which was on the ballot

21   with Proposition 202 and sought to allow commercial gaming for horse and dog racetracks.

22   Once the gaming initiatives had been filed, the AIGA attorney work group "discussed

23   whether the passage of Proposition 201 would trigger the … 'poison pill,'" and "[t]he

24   consensus was that it would, such that tribes would be authorized to operate an unlimited

25   number of gaming devices and unlimited Las Vegas-style casino games in an unlimited

26   number of gaming facilities if both Proposition 201 and Proposition 202 were passed."

27   Quigley Decl. ¶105; *see also* Nagaraj Ex. 14 at 104 (Proposition 202) (statement of Ian A.

28   MacPherson, a former State gaming-compact negotiator, noting that the proposed compact

8

1    "greatly widens the scope of gambling, dramatically increases the size of existing casino

2    operations and has 'triggers' for more expansions").  Any statement suggesting that the

3    Compact barred new casinos in Phoenix did not take into account the possibility that the

4    poison pill could lead to multiple new casinos in Phoenix.  The parties thus indisputably

5    knew that statements that, under the Compact, there would be no new casinos in Phoenix

6    were not literally true, and the parties could not reasonably have understood them to be

7    literally true.[3]

8         For the same reasons, the testimony at page 156 of David LaSarte's deposition (Pl.

9    Ex. 13) does not create an issue of fact that precludes summary judgment.  LaSarte testified

10   that, at unidentified "editorial board meetings" of local newspapers, "Alex [Ritchie] and

11   Edward [Manuel] would say, there will be no increase in the number of facilities in the

12   Phoenix market, and there will be up to one increase potentially in the Tucson market."  *Id.*

13   156:1-7.  Not only have Ritchie and Manuel disputed this uncorroborated testimony, *see*

14   Ritchie Decl. ¶21; Manuel Decl. ¶9, but there is no evidence that the alleged statements ever

15   appeared in any editorial resulting from those meetings, *see* Pl. Ex. 13 (LaSarte Dep.)

16   156:16–157:14.  In any event, even if LaSarte's testimony were undisputed, the statements

17   he claims Ritchie and Manuel made to the newspaper editorial boards were made in support

18   of the Proposition 202 campaign.  *See id.* Pl. Ex. 13 (LaSarte Dep.) 155:15-18 ("Q.  Do you

19   have a specific recollection of either Edward or Alex specifically telling anybody that under

20

21        [3] Other talking points in the Proposition 202 campaign literature demonstrate that
     such statements were intended to be predictions of the future effects of the Compact, not
22   binding legal interpretations.  For example, the "Answers to Common Questions"
     document—which Plaintiffs hold out as evidence that the Nation interpreted the Compact to
23   bar new casinos in Phoenix—also states that "Prop 202 will provide an estimated $1.1 billion
     from Indian gaming to the state over the next 10 years, with over $80 million going to the
24   state in the first full year of implementation."  Pl. Ex. 60 at 4.  But that statement, which is
     necessarily based on a certain set of assumptions, cannot reasonably be read to mean that *the*
25   *Compact* provides that $1.1 billion was required to go to the State over the ten years
     following its implementation, or that either party would have been in breach of the Compact
26   had that not occurred.  In addition, as even the former president of the Salt River Pima-
     Maricopa Indian Community acknowledged, other talking points in this document were
27   simply inaccurate.  Pl. Ex. 17 (Makil Dep. Vol. 2) 207:18-21.

28

Proposition 202, there would be no new casinos in the Phoenix metropolitan area or Maricopa County?").  And those statements, like the other similar statements Plaintiffs point to, can reasonably be interpreted only as predictions as to what would occur assuming that no tribe acquired gaming-eligible land in the Phoenix area and that the market was not opened to non-tribal gaming.  Even LaSarte did not contend—nor could he—that Ritchie and Manuel were describing every potential scenario under the Compact if the factual circumstances changed, or that they were providing a legal interpretation of the Compact's language.

In sum, the record evidence does not permit the conclusion that the Nation—or, for that matter, the State—believed, contrary to the Compact's express provisions, that the Compact barred the Nation from gaming in the Phoenix area.  Rather, the evidence tells an altogether different story—one that *is* consistent with the actual language of the parties' agreement.  During the Compact negotiations, the State proposed eliminating the tribes' right to game on after-acquired trust lands, but the tribes refused.  The State ultimately agreed that the permissible location of gaming facilities would be governed by IGRA.  Representatives of the State then told legislators and the public that under the Compact, there would be no new casinos in Phoenix.  Both the State and the Nation understood, however, that such statements did not reflect all of the Compact's provisions and were not literally true.  At best, such statements were true *assuming* that the poison-pill provision would not be triggered and that no tribe would acquire new gaming-eligible trust lands in the Phoenix area.  Perhaps the State actually did assume that there would be no such new trust acquisitions (although it had actual notice of the Lands Replacement Act).  If so, the State failed to foresee how the Compact's unambiguous terms would be applied if factual circumstances changed.  But such lack of foresight does not entitle a party to rewrite the terms of an agreement it signed— regardless of whether the other party acquiesced in or failed to correct the faulty assumption.  As the Court has already correctly concluded, the parties did not agree that the Compact would bar the Nation from gaming on its after-acquired trust lands in the Phoenix area.

1

2

**CONCLUSION**

This Court should deny Plaintiffs' motion for partial reconsideration.

Dated:  May 24, 2013                    Respectfully submitted,


                                        /s/ Danielle Spinelli
                                        Jonathan Jantzen,
                                           Attorney General, SBN 016220
                                        Samuel Daughety,
                                           Assistant Attorney General, SBN 023170
                                        Office of Attorney General
                                        TOHONO O'ODHAM NATION
                                        P.O. Box 830
                                        Sells, AZ  85634
                                        Telephone: (520) 383-3410
                                        jonathan.jantzen@tonation-nsn.gov
                                        samuel.daughety@tonation-nsn.gov

                                        Seth P. Waxman (*Pro hac vice*)
                                        Danielle Spinelli (*Pro hac vice*)
                                        Annie L. Owens (*Pro hac vice*)
                                        Shivaprasad Nagaraj (*Pro hac vice*)
                                        Sonya L. Lebsack (*Pro hac vice*)
                                        WILMER CUTLER PICKERING
                                           HALE AND DORR LLP
                                        1875 Pennsylvania Avenue, N.W.
                                        Washington, D.C.  20006
                                        Telephone:  (202) 663-6000
                                        seth.waxman@wilmerhale.com
                                        danielle.spinelli@wilmerhale.com
                                        annie.owens@wilmerhale.com
                                        shiva.nagaraj@wilmerhale.com
                                        sonya.lebsack@wilmerhale.com

                                        Michael J. Rusing, SBN 006617
                                        Todd M. Hardy, SBN 023675
                                        RUSING LOPEZ & LIZARDI, PLLC
                                        6363 N. Swan Road, Suite 151
                                        Tucson, AZ  85718
                                        (520) 792-4800
                                        mrusing@rllaz.com
                                        thardy@rllaz.com
                                        *Counsel for Defendant Tohono O'odham Nation*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 24th day of May, 2013, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, which will send a notice of filing to all counsel of record.


        <u>/s/ Danielle Spinelli</u>
        DANIELLE SPINELLI